1   MARSHA JONES MOUTRIE (SBN 69711)
    City Attorney
2   Marsha.Moutrie@smgov.net
    JOSEPH LAWRENCE (SBN 99039)
3   Assistant City Attorney
    LANCE S. GAMS (SBN 125487)
4   Deputy City Attorney
    IVAN O. CAMPBELL (SBN 216049)
5   Deputy City Attorney
    1685 Main Street, Third Floor
6   Santa Monica, California 90401-3295
    Telephone:  310.458.8336
7   Facsimile:   310.393.6727

8   DON G. RUSHING (SBN 87565)
    DRushing@mofo.com
9   JAMES W. HUSTON (SBN 115596)
    WILLIAM V. O'CONNOR, JR. (SBN 216650)
10  MORRISON & FOERSTER LLP
    707 Wilshire Boulevard, Suite 6000
11  Los Angeles, California 90017-3543
    Telephone:  213.892.5200
12  Facsimile:   213.892.5454

13  Attorneys for Plaintiff
    CITY OF SANTA MONICA

14

15           UNITED STATES DISTRICT COURT

16         CENTRAL DISTRICT OF CALIFORNIA

17  CITY OF SANTA MONICA,      Case No. **CV13-08046** -JFW (VBKx)

18         Plaintiff,

19       v.             **COMPLAINT FOR**
                              **DECLARATORY AND**
20  UNITED STATES OF AMERICA,   **INJUNCTIVE RELIEF UNDER**
    FEDERAL AVIATION          **THE QUIET TITLE ACT AND**
21  ADMINISTRATION and MICHAEL P.  **UNITED STATES**
    HUERTA, in his Official Capacity as   **CONSTITUTION**
22  Administrator of the Federal Aviation
    Administration,
23
          Defendants.
24

25

26

27

28

                                              COMPLAINT

COPY

FILED
CLERK, U.S. DISTRICT COURT
OCT 31 2013
CENTRAL DISTRICT OF CALIFORNIA
BY           DEPUTY

1   Plaintiff City of Santa Monica ("City" or "Santa Monica") brings this action

2 against Defendants United States of America ("United States"), the Federal

3 Aviation Administration ("FAA"), and Michael P. Huerta, in his official capacity as

4 the Administrator of the FAA.

5         **NATURE OF THE ACTION**

6   1. This lawsuit stems from the FAA's unsubstantiated claim that Santa

7 Monica must operate the Santa Monica Municipal Airport in perpetuity.  The City

8 purchased most of the property, upon which a part of the Airport is situated, in the

9 1920s by grant deed and has retained its fee interest in the land ever since.  In 1941,

10 to assist in providing military protection for the Douglas Aircraft Company during

11 World War II, the City leased the Airport Property to the United States.  At no point

12 has the City's fee interest to the Airport Property been alienated from the City.  Yet

13 the FAA contends that a 1948 Instrument of Transfer terminating the United States'

14 short-lived lease of the Airport Property obligates Santa Monica to run an airport on

15 the property forever.  The Instrument of Transfer, however, is not a deed.  It is

16 merely a surrender of the United States' temporary leasehold interest back to the

17 City.  While the Instrument of Transfer contains "restrictions" and a "reversion

18 clause," the only interests that could revert back are the then-existing property

19 rights of the United States in 1948—that is, a mere right to possession under a

20 temporary leasehold interest without title to the property.  When the leases expired

21 on their own terms in 1953, the United States' interest in the Airport Property

22 ceased entirely.

23   2. Santa Monica has clearly and repeatedly asserted its unencumbered

24 title to the Airport Property and its ability, after certain contractual and legal

25 obligations expire in July 2015, to use the Airport Property as it chooses in its

26 sovereign discretion, including for non-aviation purposes.  Santa Monica has also

27 attempted to negotiate with the FAA regarding options for the Airport Property

28 after July 2015, but the FAA refuses to move from its arbitrary and unsupported

position that the City must operate the Airport in perpetuity under the Instrument of Transfer, or the Airport Property will revert to the United States.

3.     Santa Monica brings this lawsuit to establish the City's rights to determine for itself and its citizens the future of the Santa Monica Airport.  By this action, the City seeks to clear the City's title to the Airport Property and establish its right to operate its property in the exercise of its police power for the benefit of its citizens.

4.     Santa Monica brings a quiet title action against the FAA's claim of a continuing interest in the Airport Property.  The FAA's asserted right of reverter should Santa Monica cease to operate the Airport Property as an airport clouds Santa Monica's title to the Airport Property.  Through this action, Santa Monica seeks to quiet title against restrictions on the property and the claimed right of reverter.  The City further seeks a declaration and, if necessary, injunctive relief, preventing the FAA from interfering with the City's fee interest, right to title, and unfettered use of the Airport Property as it sees fit in its sovereign discretion after present contractual obligations expire.

5.     Furthermore, Santa Monica brings constitutional claims seeking a declaration that the FAA's actions in taking the Airport Property from the City and commandeering the City to run the airport in perpetuity are unconstitutional under the Fifth and Tenth Amendments to the United States Constitution.

      a.     First, the FAA's demand that Santa Monica operate an airport in perpetuity at its direction and on its terms amounts to a taking by the United States without just compensation in violation of the Fifth Amendment of the United States Constitution.

      b.     Second, the FAA's command that Santa Monica run an airport on the Airport Property in perpetuity deprives Santa Monica of its right to use the property for other purposes.  This deprivation amounts to a regulatory taking by the United States without just

2

1  compensation in violation of the Fifth Amendment of the United
2  States Constitution.

3  c.  Third, by forcing the City to run an airport at its direction, the
4  FAA is commandeering the City and its officials to act for the
5  purposes of the United States in violation of the Tenth
6  Amendment of the United States Constitution.  Additionally, the
7  FAA has violated the Fifth and Tenth Amendments of the
8  United States Constitution through conditioning the return of the
9  Airport Property on the City's relinquishing its inherent
10  sovereign rights and its rights as a property owner to exercise
11  control over its own land.

12  d.  Finally, by asserting that the City of Santa Monica must operate
13  the Airport in perpetuity, the FAA is depriving Santa Monica of
14  its sovereign right to control the Airport Property, in which
15  Santa Monica has an established property right.  The FAA's
16  assertion lacks factual and legal support, and impairs Santa
17  Monica's rights as a municipality and property owner.

18  **JURISDICTION AND VENUE**

19  6.  This Court has jurisdiction over the subject matter of this action
20  pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. §1346(f)
21  (district court has exclusive jurisdiction of civil actions under section 2409a to quiet
22  title as against a property interest claimed by the United States).  Additionally, the
23  action arises out of the Constitution of the United States, and the City seeks to
24  redress violations of the Fifth and Tenth Amendments to the United States
25  Constitution.  The relief sought is authorized by 28 U.S.C. §§ 2201-2202, 2409a.

26  7.  Venue is proper in the Central District of California under 28 U.S.C. §
27  1391(e), as the City is located in this district and the property that is the subject of
28  this action is located within this judicial district.

3

1    8.    There can be no doubt that there is a present and actual controversy

2    between the parties.

3    **PARTIES**

4    **Plaintiff**

5    9.    The City is a State of California Charter City and Municipal

6    Corporation, organized and existing under and by virtue of the Constitution and

7    laws of the State of California, located in the County of Los Angeles, California.

8    The City owns and operates the Santa Monica Municipal Airport ("the Airport" or

9    "SMO") and the Airport Property is located within the political boundaries of the

10   City.[1]

11   **Defendants**

12   10.   Defendant United States of America acts by and through its agencies

13   and officers, including the FAA.

14   11.   Defendant FAA is the agency responsible for federal oversight of

15   airports.

16   12.   Defendant Michael P. Huerta is the Administrator of the FAA.  He is

17   sued in his official capacity.  Administrator Huerta has statutory responsibility for

18   all matters relating to the FAA.

19   13.   Relief is sought against each defendant as well as his agents, assistants,

20   successors, employees, attorneys, and all persons acting in concert or cooperation

21   with them or at their direction or under their control.

22

23

24

25

26   [1] A small portion of SMO is situated in the City of Los Angeles.  All parcels
     referenced in and related to this Complaint (i.e., all of the Airport Property) lie
27   within the borders of Santa Monica.

28

COMPLAINT

# FACTUAL BACKGROUND

## The City's Acquisition of the Airport Property

14. The site that is now the Airport (the "Airport Property") was used as an informal landing strip beginning in 1917. In 1922, Douglas Aircraft Company ("Douglas") began testing and producing military and civilian aircraft on and around the Airport Property.

15. In 1926, the City acquired title to certain parcels of unimproved land that now constitute most of the Airport Property through a Grant Deed. This Grant Deed conveyed the entire Airport Property to the City "free of incumbrances" [sic] except taxes related to the year 1926–1927, and the terms of a five year lease that the former owner (Herbert Stanton) had made to the City of Santa Monica. The total purchase price for these parcels was more than $755,000, or approximately $10 million in today's dollars. On August 30, 1926, the City passed a resolution accepting the 1926 Grant Deed. Between 1926 and before December 1941, the City acquired, through various other grant deeds that vested fee simple title in the City, additional smaller parcels that make up the Airport Property.

16. In 1929, Douglas expanded its operations and use of the Airport Property, ramping up production and testing of its early airliners, the DC-3 and DC-4.

17. When the United States entered World War II in 1941, Douglas became a major defense contractor, employing nearly 44,000 workers and supplying hundreds of aircraft in support of the war effort. The Douglas jobs transformed the City as new homes were built for the Douglas workers near the Airport Property.

## United States' Lease of the Airport Property

18. On May 27, 1941, President Franklin D. Roosevelt issued Presidential Proclamation 2487, which declared that the United States was faced with an "unlimited national emergency" which required "military, naval, air and civilian

defenses be put on the basis of readiness to repel any and all acts or threats of aggression directed toward any part of the Western Hemisphere."

19.   In December 1941, the City leased the Airport Property to the United States to aid in the war effort and so that the United States could provide military protection for Douglas—a major military contractor—during the war.  The United States' leasehold interest was accomplished through two separate leases covering two adjoining parcels of land, which together comprised the Airport Property.

20.   Lease No. W-04-193-ENG.4894 (the "Runway Lease") leased approximately 86 acres on the northern portion of the Airport Property that consisted mostly of two runways laid out in an "X" configuration (see Figure 1, below (photograph of X-configured runway at SMO)).  The Runway Lease term began on December 8, 1941 and was to end twelve months from the date of the termination of Presidential Proclamation 2487.  The City charged the United States only $1 for the entire term of the lease.[2]

**Figure 1**



---

[2] The Runway Lease and its supplements are attached as Exhibit A to this Complaint.

COMPLAINT

21.   Lease No. W3460-ENG.549 (the "Golf Course Lease") went into effect December 1, 1941, and leased to the United States for "[m]ilitary purposes" approximately 83 acres on the southern portion of the Airport Property that consisted of a golf course.  The Golf Course Lease terminated on June 30, 1943 with an option of renewal annually thereafter until June 30, 1947.  Under the Golf Course Lease, the City required the United States to pay only $150 per month to the City.[3]

22.   In 1944, the Santa Monica City Council passed Resolution No. 3536, in which the City agreed to allow the United States the right to build a Project on the Airport Property.  As a condition to this agreement, the Civil Aeronautics Administration "required that the City have certain property interests in the landing area of the Airport and the lands to be improved."  Specifically, under Section 2 of Resolution No. 3536, the City, "[i]n order to satisfy the Government" that the City was "qualified to sponsor the Project," warranted that it had "fee simple title to all the lands comprising the present airport."  The City noted that such lands were held in fee simple free from encumbrances, except for the City's lease to Douglas, the City's lease to a gas utility company, and the City's December 1941 leases to the United States.  Through Resolution No. 3536, the City reaffirmed its fee interest in the land.

23.   In 1944 and 1945, respectively, Supplement Number 1 to the Runway Lease and the Golf Course Lease modified the leases to allow for the construction of a new runway to accommodate larger aircraft.  (See Figure 2 below (showing a view of the new runway circa 1952).)  Supplement Number 1 to the leases also released the United States from its obligation to restore the leased parcels to their original condition under the leases in exchange for the United States' conveyance

---

[3] The Golf Course Lease and its supplements are attached as Exhibit B to this Complaint.

7

of any improvements to the property and cash payments to the City.  The payments to the City were then reinvested in the Airport Property in order to obtain additional land and fund the improvements.  Supplement Number 1 to the Golf Course Lease also extended the lease term until twelve months after the termination of Proclamation 2487 (i.e., to align the lease term with that of the Runway Lease) and reduced the rent to $1 for the entire duration of the lease.

**Figure 2**



24.    In April 1945, the United States condemned a number of residential properties on approximately 20 acres of the west side of the airport.  The properties were purchased by the United States *using City funds* in order to expand the Airport.

25.    In November 1945, the Airport Property was further expanded when Douglas conveyed an approximately 15 acre parcel on the Airport's south side to the City by grant deed.

COMPLAINT

26.     Figure 3 below is an aerial view of the modern airport, including all acquired parcels, with overlays of the Runway Lease (yellow) and Golf Course Lease (red).

**Figure 3**



27.     The City made significant investments in the Airport Property from 1941 to 1946 to support the war effort and protect Douglas employees that lived and worked in the community.  Furthermore, the City invested a significant amount of its own funds into the Airport and collected only nominal rent from the United States.

28.     At the end of World War II, the United States determined that it was no longer necessary to maintain a presence at the Airport Property to protect Douglas.  Accordingly, the United States and the City modified both the Runway and Golf Course Leases through a Supplement Number 2 to each lease.  In accordance with the language of these second supplemental agreements entered into on July 15, 1946, the United States stopped maintaining and operating the airport and paying rent.  Thus, since 1946, the City has continuously maintained and operated the airport.

9

COMPLAINT

29.     Because the United States had not yet surrendered its leasehold interest and Proclamation 2487 had not been terminated, from July 1946 until 1948, the City operated the Airport under a right of entry from the United States.  The City, as always, retained its fee interest in the land.

### The United States Surrenders Its Leasehold

30.     On July 29, 1946, the War Assets Administration ("WAA") issued Form SPB-5 *Declaration of Surplus Real Property* concerning the Airport Property, declaring as surplus the United States' leasehold interest in the Runway Lease and Golf Course Lease.  On January 9, 1947, the United States made the determination that its 168 acre leasehold interest at the Airport Property, along with any improvements, should be disposed of under the Surplus Property Act of 1944 ("SPA").  By April 1948, the WAA had agreed to surrender its leasehold interest in the Airport to the City pursuant to the SPA and its implementing regulations.

31.     On August 10, 1948, the United States officially surrendered its leasehold interest in the Airport Property to the City pursuant to a 1948 Instrument of Transfer.  The Instrument of Transfer provided certain restrictions on the property, including non-discrimination restrictions and public use requirements.

32.     In order to enforce these restrictions, the Instrument of Transfer included a "reversion clause," which provides that, in the event any of the restrictions or conditions set forth in the Instrument of Transfer is not met, "the title, right of possession, and all other rights transferred by the instrument" to Santa Monica shall, at the option of the government, "revert" to the government "sixty (60) days following the date upon which demand to this effect is made in writing[.]"  The reversion clause, which by its terms only applies to rights transferred pursuant to the Instrument, is set forth in its entirety in Figure 4 below.[4]

---

[4] The Instrument of Transfer is attached as Exhibit C.

**Figure 4**

(1)  That in the event that any of the aforesaid terms, conditions, reservations or restrictions is not met, observed, or complied with by the PARTY OF THE SECOND PART or any subsequent transferee, whether caused by the legal inability of said PARTY OF THE SECOND PART or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument to the PARTY OF THE SECOND PART, or any portion thereof, shall at the option of the PARTY OF THE FIRST PART revert to the PARTY OF THE FIRST PART sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administrator or his successor in function, unless within said sixty (60) days such default or violation shall have been cured and all such terms, conditions, reservations and restrictions shall have been met, observed or complied with, in which event said reversion shall not occur and title, right of possession, and all other rights transferred hereby, except such, if any, as shall have previously reverted, shall remain vested in the PARTY OF THE SECOND PART, its transferees, successors and assigns.

33.   A resolution of the Santa Monica City Council confirmed that the intent of the Instrument of Transfer was only to surrender the United States' leasehold interest in the Airport Property.  Through Resolution No. 183, the City confirmed that the United States of America "does surrender to the City of Santa Monica [its] lease-hold interest in and to the premises[.]"  The Instrument of Transfer did not convey title in the land as the City always maintained its fee interest in the Airport Property.  The Instrument of Transfer, therefore, is not a deed transferring title to real property; it is merely a surrender of the United States' leasehold interest back to the City.

34.   The City Council never agreed to, or even considered, forfeiting its police powers over the Airport Property for all time.  Nor could the City Council do so, because all governments must maintain their flexibility to protect the public welfare through unpredictably changing times and circumstances.  The City Council could not have contracted away the right of future Councils to address emerging community needs.  No such express or implied contract was created.

11

35.     In 1949, the United States transferred to the City through quitclaim deed the 20 acres acquired through condemnation by exercise of federal war powers and paid for with City funds.  This property is not covered by the Instrument of Transfer.

36.     On April 28, 1952, President Truman proclaimed that the national emergency declared in 1941 no longer existed and terminated Proclamation 2487.  Accordingly, the already-surrendered Runway and Golf Course Leases expired, by their own terms, on April 28, 1953.

### The Pure Jets Nuisance

37.     In the 1960s, the first civilian jets began using the Airport.  These "pure jets" were ten times louder and more polluting than the present-day fan jets.  The noise impact on adjacent neighborhoods was severe.

38.     In 1967, a large group of City residents living near the Airport sued the City, claiming jet operations had damaged their property value and created a nuisance.  The California Supreme Court held that, although the plaintiffs' evidence failed to establish their case, the City could be sued by residents for Airport impacts on nuisance and other theories.  (*Nestle v. City*, 6 Cal. 3d 920 (1972)).  Thereafter, the City considered a wide range of regulations to shield itself from liability, including a jet ban, jet curfew, and even Airport closure.  A jet curfew was enacted.

### The City's Plan for Airport Closure and the 1984 Settlement Agreement

39.     In the late 1960s, there was a growth in general aviation nationwide, and Santa Monica Airport operations (takeoffs and landings) reached an all-time high of over 356,000 per year.  Santa Monica residents began expressing their concern about the impact of the increased air travel on the City.

40.     In response to the rising tide of resident apprehensions, various aviation associations also began expressing their concerns if the Airport operations were to end.  The FAA recognized and responded to these aviation-related concerns in an April 1971 letter to the then Senior Vice President of the Aircraft Owners and

12

Pilots Association, Max Karant.  The FAA stated its position that once the City's grant assurance obligations ended, "Santa Monica Airport is vulnerable to being discontinued and used for non-aviation purposes."  The FAA characterized "the challenge" it faced with regards to the Airport as needing to convince Santa Monica residents of "the good things aviation offers[.]"  The FAA did not take the position that the City was obligated to operate the Airport in perpetuity.

41.    In 1975, to alleviate the impact on Santa Monica residents, the City Council adopted ordinances to reduce aircraft noise, including a total jet ban, a ban on helicopter flights, a noise limit, a night curfew, and a weekend and holiday ban on touch-and-go, stop-and-go, and low approach operations conducted during fixed-wing flight training.

42.    These ordinances led to litigation against the City by the Santa Monica Airport Association ("SMAA litigation").  The FAA intervened in the case as amicus curiae on behalf of the Airport Association and argued against the City's ordinances.  Ultimately, the ordinances were upheld with the sole exception of the jet ban ordinance, which was struck down as disproportionately affecting newer aircraft when there was insufficient evidence to show that newer aircraft were more dangerous or noisier than older aircraft.  Both parties appealed, but the Ninth Circuit affirmed the conclusion of the district court.  The Ninth Circuit recognized that Federal law does not preempt the City as "airport proprietor" from adopting ordinances intended to limit its liability and protect the City's "human environment," as long as those ordinances are not unconstitutionally discriminatory.

43.    In 1979, while the appeal of the SMAA litigation was pending, the City Council adopted Ordinance No. 1137, which imposed a lower decibel limit at the Santa Monica Airport.

44.    Ordinance No. 1137 also prompted litigation against the City, this time by the National Business Aircraft Association ("NBAA litigation"), which argued

COMPLAINT

that the decibel limit in Ordinance No. 1137 was a disguised jet ban, and thus was impermissibly discriminatory for the same reasons as the jet ban ordinance at issue in the SMAA litigation. The NBAA litigation was assigned to the same district court judge who heard the SMAA litigation. Again, the FAA intervened as amicus curiae on behalf of the Airport Association and argued against the Ordinance. In November 1979, the court enjoined the City from enforcing Ordinance No. 1137, and litigation of the case continued.

45.    In June 1981, while the NBAA litigation was pending, the City Council adopted Resolution No. 6296 (CCS) declaring its intention to close the Airport when legally possible. In 1982, after Resolution No. 6296 was passed, the parties to the NBAA litigation agreed that the lawsuit would be conditionally dismissed provided the City adopted a new "Airport Master Plan" and "Noise Mitigation Project" by November of 1983.

46.    Thereafter, in 1983, the City adopted a new Master Plan for the Airport Property that created two new Fixed Base Operators ("FBOs") on the north (non-residential) side of the Property and released aviation land on the south side of the Airport Property for non-aviation purposes. The NBAA litigation was dismissed.

47.    Although the adoption of Resolution No. 6296 and the creation of the new Master Plan led to the dismissal of the NBAA litigation, these actions also prompted several Part 13 (the equivalent of today's Part 16) proceedings to be filed against the City by airport users. As a result of the multiple Part 13 complaints, the City engaged in negotiations with the FAA concerning the future of the Airport. These negotiations were intended to settle the then-pending Part 13 proceedings.

48.    Ultimately, the negotiations between the City and the FAA culminated in the signing of a "Settlement Agreement" in 1984 ("the 1984 Agreement"). The 1984 Agreement provided that the City would operate and maintain the Airport

14

1   Property as an airport until July 1, 2015.[5]  There is no mention in the1984

2   Agreement that the City must operate the Airport in perpetuity.  Nor is there an

3   assertion that the FAA had a property interest in the Airport Property.

4        49.    The 1984 Agreement also recognized the City's authority to mitigate

5   aircraft impacts through the existing noise limit, jet curfew, helicopter ban, and

6   pattern flying restrictions.  It further limited the number of aircraft tie-downs,

7   removed land from aviation use, and provided for the relocation of aviation

8   facilities to the north side of the Airport, away from residential neighborhoods.

9        50.    In June 1994, the City accepted its last federal grant for airfield

10  improvements, in exchange for contractual promises to maintain the Airport for the

11  use and benefit of the public for the useful life of improvements made with federal

12  funds, but no more than twenty years from the date of execution of the federal grant

13  agreement.  As of June 2014, therefore, the Airport will owe no further obligations

14  to the United States under any federal grant agreement contracts.

15       51.    Until recently, and as reflected in the 1984 Agreement, the FAA has

16  consistently recognized the City's ability to reevaluate the future of the Airport.

17       52.    For example, in a 1998 Part 16 administrative proceeding involving a

18  dispute over the City's refusal to offer long term leases to two airport tenants

19  beyond 2015, the FAA issued a Director's Determination discussing the 1984

20  Agreement and again demonstrating the FAA's position that the City had the ability

21  to reevaluate the future of the Airport.  The Director states: "[The 1984] Settlement

22  Agreement makes clear that the City is obligated to operate the Airport only for the

23  duration of the [1984] Agreement (through July 1, 2015) . . . To the extent that

24  Complainants and [the Airport Association] seek to prevent the future closure of the

25  Airport or require the City to operate the Airport beyond July 1, 2015, *that is a*

26

27  _____
    [5] The 1984 Agreement is attached as Exhibit D.

28

COMPLAINT

1  *local land use matter*. . . . When the City's last grant agreement expires in

2  approximately 2014, the AIP grant sponsor assurances will no longer require the

3  City to operate the Airport as an airport." (FAA Docket No. 16-99-21; Director's

4  Determination, pp. 22-23 (emphasis added).)

5      53.   An appeal of the Director's Determination resulted in the FAA issuing

6  its Final Agency Decision on the issue in 2003.  The Final Agency Decision

7  affirmed the Director's Determination regarding the City's obligations to operate

8  SMO as an airport only through July of 2015.  While discussing the 1984

9  Settlement Agreement, the FAA Administrator concluded that the Settlement

10  Agreement "provided a conceptual blueprint" by which the City was required to

11  maintain "SMO's role in the National Airport System as a general aviation reliever

12  airport until July 1, 2015."  (FAA Docket No. 16-99-21; Final Agency Decision,

13  p. 3.)  This Final Agency Decision constitutes a "final agency action" under the

14  federal regulations applicable to Part 16 proceedings.

15  **Litigation Regarding the City's Aircraft Conformance Program**

16      54.   In 2001, to address the safety and liability risks inherent in the increase

17  of Category C and D aircraft traffic at SMO[6], a study commissioned by the City

18  Council recommended the "Aircraft Conformance Program" to promote safety and

19  to conform airport usage to be consistent with the purpose of the 1984 Agreement.[7]

20      55.   Among other things, the Aircraft Conformance Program called for

21  expanding the distance from the runway ends to the airport perimeter in the

22  interests of safety, which would require shortening the runway.  The result would

23

24

25       [6] SMO is an FAA-classified B-II airport.

26       [7] Category C and D aircraft are large jets with landing approach speeds that
exceed 140 miles per hour.  Approach speed is determined at the point the aircraft

27  passes over the runway threshold.

28

16

1    be a runway that could not accommodate large Category C and D aircraft due to

2    their need for a longer runway for takeoff and landing.

3        56.    On December 10, 2002, the City Council unanimously approved the

4    Aircraft Conformance Program in principle and directed staff to continue to seek a

5    voluntary agreement with the FAA to implement it.  The FAA refused the City's

6    efforts to reach a voluntary agreement despite several years of good faith

7    negotiations by the City.

8        57.    The City Council then asserted its airport proprietor's rights in 2008

9    and promulgated an ordinance, intended to promote safety and protect adjacent

10   neighborhoods from aircraft overruns, by prohibiting the generally larger, faster

11   category C and D aircraft from using the Airport ("the Ordinance").

12       58.    On March 26, 2008, the FAA issued an Order to Show Cause to the

13   City seeking to prohibit the City from enforcing the Ordinance, and—*for the first*

14   *time*—claimed that the Surplus Property Act of 1944 and the 1948 Instrument of

15   Transfer obligated the City to operate the Airport Property in perpetuity as an

16   airport or ownership of the airport would revert to the United States.

17       59.    In April 2008, the FAA issued a Cease and Desist Order, and later

18   obtained a temporary restraining order and preliminary injunction prohibiting the

19   City from enforcing the Ordinance, claiming that the City's attempt to conform

20   Airport operations to federal runway safety standards violated federal law.

21       60.    After the preliminary injunction was issued, the City and the FAA

22   proceeded through the FAA's administrative review process regarding the C and D

23   jet ban, and on May 27, 2008, the FAA issued a Director's Determination, in which

24   the FAA found that the Ordinance unreasonably and unjustly discriminated

25   between aircraft and thereby violated the grant assurances, the 1948 Instrument of

26   Transfer, and the 1984 Agreement.

27       61.    The City then requested a hearing.  The hearing was held over four

28   days in March 2009, before the FAA Hearing Officer.  In his Initial Decision, the

1   Hearing Officer essentially affirmed the Director's Decision, holding that the

2   Ordinance was contrary to the City's obligations under grant assurance 22

3   (economic non-discrimination), the 1984 Settlement Agreement, and the 1948

4   Instrument of Transfer.  Both the City and the FAA appealed the Hearing Officer's

5   Initial Determination to the Administrator of the FAA.

6        62.    On July 8, 2009, the FAA issued its Final Agency Decision, holding

7   that the City was bound under grant assurance 22, and that the Ordinance was

8   contrary to non-discrimination requirements of grant assurance 22.  Accordingly,

9   the Final Agency Decision affirmed the Initial Decision with regards to the City's

10  obligations under grant assurance 22.  However, the Final Agency Decision also

11  held that the City's "obligations under the 1984 Settlement Agreement are not a

12  proper subject in a proceeding under [Part 16] because that Agreement was not

13  incorporated in the Grant Assurances." (FAA Docket No. 16-02-08, Final Agency

14  Decision at 4.)  Accordingly, the Final Agency Decision reversed the Initial

15  Decision with regards to whether the Ordinance was contrary to the 1984

16  Settlement Agreement.  (*Id.*)  The Final Agency Decision also reversed the Initial

17  Decision with regards to its holding concerning the Surplus Property Act and the

18  Instrument of Transfer, noting that it was "not necessary to decide whether the

19  Ordinance [was] contrary to the Surplus Property Act." (*Id.*)

20       63.    In September 2009, the City appealed the Final Agency Decision

21  regarding the Ordinance to the D.C. Circuit.  The D.C. Circuit, applying a highly

22  deferential standard of review, concluded that the FAA did not "act arbitrarily or

23  capriciously when it concluded" that the Ordinance was "contrary to grant

24  assurance 22's requirement[s.]" (Case No. 09-1233, D.C. Cir. 2011.)

25       64.    The D.C. Circuit declined to address whether the Ordinance violated

26  the 1984 Settlement Agreement or the Instrument of Transfer.  The D.C. Circuit

27  also found it unnecessary to reach the issue of whether the City's action to regulate

28  safety at the Airport was preempted by federal law.  The D.C. Circuit noted,

1    however, that the 1984 Settlement Agreement "would remain effective until July 1,

2    2015" and required the City to "operate and maintain SMO 'as a viable functioning

3    facility without derogation of its role as a general aviation reliever' <u>until that date</u>."

4    (*Id.*at 4 (emphasis added).)

5                    **The City Evaluates the Future of the Santa Monica Airport**

6           65.     In December 2010, in anticipation of the expiration of the 1984

7    Settlement Agreement, the City Council directed staff to proceed with a

8    comprehensive public process regarding the Airport's future.  The result was a

9    March 2013 report outlining a three-phased "Visioning Process."

10          66.     Though the Visioning Process report did not take a position on

11   whether the Airport should close at the expiration of the 1984 Agreement, it did

12   conclude that the status quo at the Airport is not acceptable to City residents.

13          67.     In an attempt to avoid litigation, City staff members met with FAA

14   representatives several times in the last three years to convey community concerns

15   about impacts and the City's position about its authority to determine the Airport's

16   future.  The FAA representatives willingly met and listened; however, the Agency

17   was unwilling or unable to agree to, or even to negotiate on, any compromise as to

18   the Airport's future operation.  Notably, FAA representatives steadfastly

19   maintained that the City is obligated to continue operating the Airport in perpetuity

20   under the Instrument of Transfer, that the operational status quo must be

21   maintained, and that no agreements to the contrary could be made outside of the

22   context of litigation.

23                    **FAA Guidance Concerning Reversionary Interests**

24          68.     The FAA's inflexible position concerning the reversion clause is

25   contrary to published FAA guidance on reversionary interests created by property

26   conveyances under the Surplus Property Act.

27          69.     The FAA has published an "FAA Airport Compliance Manual"

28   through FAA Order 5190.6B ("Airport Compliance Manual").  According to the

COMPLAINT

1  FAA, the Airport Compliance Manual "sets forth policies and procedures for the

2  FAA Airport Compliance Program."  The Airport Compliance manual also

3  "provides basic guidance for FAA personnel" concerning certain issues, including

4  interpretation of conditions related to the conveyance of property.

5      70.    Chapter 23 of the Airport Compliance Manual addresses "Reversion of

6  Airport Property."  Section 23.3 of that Chapter specifically sets forth how far—in

7  the FAA's view—reversionary rights extend.  Specifically, Section 23.3 provides

8  that the right of reverter "extends only to the title, right of possession, or other

9  rights vested in the United States at the time the United States transferred the

10  property described in the instrument to the grantee."  Section 23.3 is reproduced in

11  full as Figure 5, below.

**Figure 5**

09/30/2009                                                      5190.6B

### Chapter 23.  Reversions of Airport Property

**23.3.  Right of Reverter.**  The instrument of conveyance from the federal government must specify the right to have property interest revert to a federal agency and title revest in the United States.  This right extends only to the title, right of possession, or other rights vested in the United States at the time the federal government transferred the property described in the instrument to the grantee.  The right may be exercised only at the option of the United States – with or without the cooperation of a grantee – against all or part of the property in question.

22      71.    Pursuant to the Airport Compliance Manual, the reverter right

23  contained in the Instrument of Transfer—if any—extended only to the United

24  States' temporary leasehold interest in the Airport Property as that interest existed

25  at the time of the 1948 Instrument of Transfer; leasehold interests that would, by

26  their own terms, expire upon the conclusion of the War, when Presidential

27  Proclamation 2487 was terminated.

COMPLAINT

72.     Presidential Proclamation 2487 was terminated on April 28, 1952. Thus, on April 28, 1953, one year after Presidential Proclamation 2487 was terminated, the United States' reverter right in the Airport Property ceased.

73.     The FAA cannot create greater property rights than it had in 1948 and there is no basis to claim that the FAA has any ability to disturb Santa Monica's fee interest in the Airport Property under the Instrument of Transfer.

## FIRST CLAIM FOR RELIEF
### (Quiet Title Action under 28 U.S.C. § 2409a)

74.     Plaintiff incorporates by reference the allegations set forth in paragraphs 14 to 73.

75.     This is an action pursuant to 28 U.S.C. § 2409a to quiet title to certain real property located within this judicial district in Los Angeles County, California and more particularly described in the Runway Lease (Ex. C) as follows:

a.     Parcel 1:  All that portion of the Santa Monica Municipal Airport lying between a line 700.13 feet southeasterly from and parallel to the south-easterly line of Ocean Park Boulevard, measured at right angles thereto, and a line 1600 feet southeasterly from and parallel to the said south-westerly line of Ocean Park Boulevard measured at right angles thereto and extending from 25th Street, in the City of Santa Monica, to Bundy Drive in the City of Los Angeles, California.

b.     Parcel 2:  All of that certain parcel of real property adjoining the above described Parcel 1, on the southeasterly line thereof, having 100 feet of frontage on said 25th Street, in City of Santa Monica, California, being rectangular in shape and having a uniform depth of 765.87 feet.

76.     This action also seeks to quiet title to certain real property located within this judicial district in Los Angeles County, California and more particularly described in the Golf Course Lease (Ex. D) as follows:

a.     That portion of the Santa Monica Municipal Golf Course, in the City of Santa Monica, County of Los Angeles, State of California, described as follows:  Bounded on the Northwest by a line parallel to and distant 1800 feet southeasterly from the southeasterly line of Ocean Park Boulevard, measured at right angles to Ocean Park Boulevard; bounded on the northeast by the southwesterly line of Centinela Avenue, bounded on the southeast by the City Limit line of the City of Santa Monica, California, and bounded on the southwest by the northeasterly line of Twenty-seventh street in the said City, containing approximately 85 acres, together with the two-one story frame utility and repair shops containing approximately 2600 square feet and all of the one store stucco Club House, excepting the Golf Shop, restaurant and lobby, consisting of approximately 2400 square feet.  Also Lot A of the George Tract, as per map recorded in Book 16, Page 21 of Maps, Records of said County, said lot being included in the above mentioned 85 acres.

77.     The City of Santa Monica is the owner in fee simple of the property described above. (*See supra*, ¶ 15.)

78.     Under 28 U.S.C. § 2409a, the United States has consented to be sued in civil actions to adjudicate disputes regarding title to real property in which the United States claims an interest.

79.     This court has exclusive jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1346(f).

COMPLAINT

80.  The City of Santa Monica acquired fee simple title to the property described above from Herbert W. Stanton, Alice B. Stanton, Forrest Q. Stanton, Elizabeth P. Stanton, Edwin L. Stanton, and Evelyn C. Stanton, prior owners of such property, on August 30, 1926, at which time the City received a grant deed to such property.  Certain additional property comprising the Airport Property was obtained in fee simple prior to December 1941 when the Runway and Golf Course Leases were executed.

81.  The United States has never challenged the City's chain of title or Santa Monica's right, title, and interest in fee simple absolute to the Airport Property that was leased to the United States during World War II.

82.  The United States claims a reversion fee interest in the property was created by the Instrument of Transfer.  The FAA has asserted that title to the Airport Property will revert to the United States if the purported airport use condition in the 1948 Instrument of Transfer is not met (i.e., if the City decides to close any portion of the Airport to aviation use).  The FAA makes this assertion despite the fact that the only interest in the Airport Property by the United States was a World War II era lease, which expired by its own terms over sixty years ago.

83.  Santa Monica first learned of the existence of the claim of reversion interest of full title to the Airport Property on or after March 26, 2008, through the FAA's Order to Show Cause.

84.  However, the United States never had any right, title or interest in the Airport Property other than the leasehold interests that were surrendered to the City by the 1948 Instrument of Transfer and which otherwise expired by their own terms in 1953.

85.  The reverter clause in the Instrument of Transfer does not vest title upon breach of a covenant or restriction.  The reverter only applies to the rights transferred under the 1948 Instrument of Transfer, a leasehold interest.  This leasehold interest expired by its own terms in 1953.  The improvements to the

Airport Property were paid for with City funds, or were exchanged prior to execution of the Instrument of Transfer in return for the City's release of the United States from its obligation to return the property to its original condition and additional cash compensation to the City, or have exceeded their useful life.

86.    There is no basis for the United States to receive title to the Airport Property if Santa Monica determines not to operate an airport after 2015.  Under the Instrument of Transfer, the United States has no remaining interest that can revert.

87.    To the extent the United States claims any interest remains to be reverted under the reversion clause of the 1948 Instrument of Transfer, the 1984 Agreement releases the City of any obligation to operate the Airport Property as an airport after July 1, 2015.

88.    A declaration concerning the City's rights to the Airport Property is necessary at this time due to the upcoming expiration of the 1984 Settlement Agreement.

89.    The City requests a judgment by this Court declaring that the claims of defendant United States to the described real property are of no validity whatsoever, and that this Court declare that the City is the owner in fee simple of such real property and that defendant United States has no right, title, or interest in the property.

## SECOND CLAIM FOR RELIEF

**(For Violation of the Fifth Amendment to the U.S. Constitution-Taking)**

90.    Plaintiff incorporates by reference the allegations set forth in paragraphs 14 to 73.

91.    The "Takings Clause" of the Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use without just compensation."

92.    Property taken by the United States from a state or local entity is considered "private property" for purposes of the Fifth Amendment.

24

93.     The United States has constructively confiscated the Airport by requiring the City to operate the property as an airport in perpetuity.

94.     Santa Monica purchased title to the Airport Property in fee simple in 1926.

95.     To aid in the war effort, Santa Monica leased the Airport to the United States under the terms described above.

96.     The United States never owned the Airport Property; it only had a leasehold interest in the property.

97.     Despite lacking ownership of the Airport, the FAA has decided and proclaimed that Santa Monica is required to operate the Airport in perpetuity.

98.     This is constructive confiscation of the Airport because Santa Monica is prohibited from using the property for other purposes required for the benefit of its citizens.  Thus, the United States has effectively seized the Airport Property.

99.     The damage that the City would incur from this illegal and unconstitutional taking is not compensable through monetary damages.  The taking would prevent the City from using the land in its sovereign capacity and for whatever purposes it deems fit under the City's inherent governmental and proprietary power.  Further, this taking impinges upon the City's police powers to protect the public, address emerging community needs, and enforce order within the City consistent with the City's policies and the citizens' priorities.  The value that the City will lose if this illegal and unconstitutional taking is effectuated cannot be quantified in monetary terms.  The United States cannot condition the ability of the City and its citizens to use the land on the City's forfeiture of its inherent constitutional rights.

100.    The United States did not and cannot provide just compensation for the loss of the City's sovereign rights.  The United States did not justly compensate Santa Monica in any way in exchange for the requirement that it operate the Airport in perpetuity.

101.   The United States did not give Santa Monica title to the Airport Property because the United States never had title to convey.

102.   Any improvements to the land were not just compensation.  The improvements were previously passed to Santa Monica (along with additional compensation) in exchange for the release of the United States' obligation to return the land to its original condition and cash compensation paid to the City.

103.   This constructive confiscation constitutes a taking without just compensation in violation of the Fifth Amendment of the United States Constitution.

104.   In order to resolve this controversy, the City requests that, pursuant to 28 U.S.C. § 2201, this Court declare the respective rights of the parties in this matter.  In particular, this Court should declare that the City is the owner of the Airport Property in fee simple, and that the United States' act of constructive confiscation of the Airport Property is violative of the Fifth Amendment's protection against taking without just compensation.

### THIRD CLAIM FOR RELIEF

**(For Violation of the Fifth Amendment to the U.S. Constitution-**

**Regulatory Taking)**

105.   Plaintiff incorporates by reference the allegations set forth in paragraphs 14 to 73.

106.   The "Takings Clause" of the Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use without just compensation."

107.   The FAA's stance that the City is required to use the Airport Property as an airport in perpetuity deprives the City of any other use of the property.

108.   The damage that the City would incur from this illegal and unconstitutional taking is not compensable through monetary damages.  The taking would prevent the City from using the land in its sovereign capacity and for

COMPLAINT

whatever purposes it deems fit under the City's inherent governmental and proprietary power.  Further, this taking impedes on the City's police powers to protect the public, address emerging community needs, and enforce order within the City consistent with the City's policies and values.  The value that the City will lose if this illegal and unconstitutional taking is effectuated cannot be quantified.  The United States cannot condition the City's and the City's residents ability to use the land on the City's forfeiture of its inherent constitutional rights.

109.   The United States did not and cannot provide just compensation for the loss of the City's sovereign rights.  The United States did not justly compensate Santa Monica in any way in exchange for the requirement that it operate the Airport in perpetuity.

110.   The United States did not give Santa Monica title to the Airport Property because the United States never had title to convey.

111.   Any improvements to the land were not just compensation.  The improvements were previously passed to Santa Monica (along with additional compensation) in exchange for the release of the United States' obligation to return the land to its original condition.

112.   The prohibition by the United States on Santa Monica's use of the Airport Property for any purpose other than an airport constitutes a regulatory taking without just compensation in violation of the Fifth Amendment of the United States Constitution.

113.   In order to resolve this controversy, the City requests that, pursuant to 28 U.S.C. § 2201, this Court should declare the respective rights of the parties in this matter and, in particular, this Court declare that the City is the owner of the Airport Property in fee simple, and that the United States' act of requiring the City to operate an airport in perpetuity is violative of the Fifth Amendment's protection against taking without just compensation.

COMPLAINT

## FOURTH CLAIM FOR RELIEF

### (For Violation of the Tenth Amendment to the U.S. Constitution)

114.   Plaintiff incorporates by reference the allegations set forth in paragraphs 14 to 73.

115.   The Tenth Amendment to the United States Constitution provides "[t]he powers not delegated to the United States by Constitution, nor prohibited by it to the States, are reserved for the States respectively, or to the people."

116.   Pursuant to the Tenth Amendment, the United States cannot commandeer or otherwise demand and require a state or local government, or their officials, to perform federal functions.

117.   By requiring that Santa Monica operate the Airport in perpetuity, the United States has commandeered Santa Monica for its own purposes.

118.   Santa Monica purchased title to the Airport Property in fee simple in 1926.

119.   Santa Monica used the property as an airport, but had no limitations on what it could do on the property in the future.

120.   The United States never owned the Airport Property; it only had a brief leasehold interest in the property.  Further, the United States' leasehold in the Airport Property was released through the 1948 Instrument of Transfer and the leases expired by their own terms on April 28, 1953.

121.   Despite lacking ownership of the Airport Property, the United States has attempted to place, as a condition of surrendering its temporary leasehold interest in the Airport Property, a requirement that Santa Monica agrees to surrender its sovereignty and to operate the airport in perpetuity even if Santa Monica does not wish to do so.  This is coercion.

122.   This coercive condition unconstitutionally forces Santa Monica to forfeit its constitutional rights and to operate an airport as the FAA determines and regardless of any contrary wishes of the City or its citizens.

COMPLAINT

123.   The condition is also contrary to stated FAA policy.  Chapter 23 of the Airport Compliance Manual specifically addresses "Reversion of Airport Property." Section 23.3 of the Airport Compliance Manual provides that the right of reverter "extends only to the title, right of possession, or other rights vested in the United States at the time the United States transferred the property described in the instrument to the grantee."  The United States government has never had a fee simple interest in the Airport Property.  The United States government did not have a fee simple interest in the Airport Property at "the time the United States transferred the property" back to Santa Monica under the Instrument of Transfer. The only interest the United States had in the Airport Property was a leasehold interest, which has since expired by its own terms.

124.   The FAA's acts and assertions will force Santa Monica to operate the Airport against its wishes.  This is against stated FAA policy, and also violates the basic principal that the United States may not compel the states to enact or administer a federal regulatory program.

125.   The FAA's acts and assertions therefore amount to a violation of Santa Monica's Tenth Amendment rights.  Santa Monica is entitled to equitable relief enjoining the FAA and the United States from further attempts to commandeer Santa Monica to operate the Airport.

126.   The City requests that, pursuant to 28 U.S.C. § 2201, this Court declare the condition contrary to stated FAA policy, that the United States did not have a fee simple interest in the Airport Property at the time the United States transferred the property back to Santa Monica, and that the condition is violative of Santa Monica's Tenth Amendment right not to be compelled to enact or administer a federal regulatory program.

COMPLAINT

# FIFTH CLAIM FOR RELIEF

### (For Violation of the Fifth Amendment to the U.S. Constitution-Due Process)

127.   Plaintiff incorporates by reference the allegations set forth in paragraphs 14 to 73.

128.   The Fifth Amendment of the United States Constitution provides "[n]o person shall be . . . deprived of life, liberty, or property without due process of law."

129.   Santa Monica has an established and protected property interest in the Airport Property; it has at all times owned the Property in fee simple.

130.   By asserting a requirement that Santa Monica operate the Airport in perpetuity, the United States deprived Santa Monica of its right to control the Airport Property.

131.   The FAA's assertion that Santa Monica must operate the Airport in perpetuity or else the Airport Property will revert to the United States Government in fee simple is contrary to the FAA's policy as set forth in the Airport Compliance Manual.  Chapter 23 of the Airport Compliance Manual specifically addresses "Reversion of Airport Property."  Section 23.3 of the Airport Compliance Manual provides that the right of reverter "extends only to the title, right of possession, or other rights vested in the United States at the time the United States transferred the property described in the instrument to the grantee."  The United States did not have a fee simple interest in the Airport Property at "the time the United States transferred the property" back to Santa Monica under the Instrument of Transfer, or at any other time.  The only interest the United States had in the Airport Property was a leasehold interest, which has since expired by its own terms.

132.   The FAA's assertions, which are contrary to the policy set forth in the Airport Compliance Manual, are arbitrary and capricious and will result in grave unfairness to Santa Monica and its citizens.

COMPLAINT

133.   The FAA's decision to act contrary to the policy set forth in the Airport Compliance Manual was made with the intent to coerce Santa Monica and unconstitutionally deprive Santa Monica of its substantive due process and sovereign rights related to the Airport Property.  This decision was irrational, and trammels on both Santa Monica's sovereign rights and established property rights. In this sense, the FAA's assertion amounts to a deliberate flouting and abuse of power in violation of the Fifth Amendment.

134.   The FAA's assertion that, in transferring the United States' leasehold back to the City, Santa Monica must operate the Airport in perpetuity, effectively requiring a forfeiture of the City's rights as a sovereign and property owner, amounts to an unconstitutional restriction and condition.

135.   The FAA's assertions and decision therefore amount to a violation of Santa Monica's due process rights.  Santa Monica is entitled to equitable relief enjoining the United States and its agency, the FAA, from further impairing Santa Monica's rights to control the Airport Property.

136.   The City requests, pursuant to 28 U.S.C. § 2201, that this Court declare the FAA's assertion that Santa Monica must operate an airport in perpetuity is contrary to stated FAA policy, that the United States did not have a fee simple interest in the Airport Property at the time it surrendered its leasehold interest in the Airport Property to Santa Monica, and that the United States' decision to act contrary to FAA policy was in violation of Santa Monica's due process rights under the Fifth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1.   This Court render a declaratory judgment providing that the City of Santa Monica has unencumbered title to the Airport Property.

2.   This Court render a declaratory judgment providing that the City of

31

Santa Monica is the owner in fee simple of the Airport Property and title to the Airport Property is quieted as against any interest of the United States.

3.     This Court render a declaratory judgment providing that the claims of the United States to the Airport Property are invalid and the United States has no right, title, or interest in the Airport Property.

4.     This Court render a declaratory judgment providing that the United States' constructive confiscation of the Airport by prohibiting Santa Monica from using the property for whatever purpose it desires constitutes a taking in violation of the Fifth Amendment of the United States.

5.     This Court render a declaratory judgment providing that the United States' prohibition on Santa Monica from using the Airport Property for any other purpose than as an airport constitutes a taking without just compensation in violation of the Fifth Amendment of the United States Constitution.

6.     This Court render a declaratory judgment that the United States' act of placing a condition on the return of the Airport Property to Santa Monica was coercion and that such coercion is contrary to stated FAA policies; and that this coercion is violative of Santa Monica's Tenth Amendment right not to be compelled to enact or administer a federal regulatory program.

7.     This Court render a declaratory judgment that the United States' decision to act contrary to stated FAA policy and its Congressional mandate with respect to the City and the Airport Property is a deliberate flouting and abuse of power in violation of Santa Monica's due process rights under the Fifth Amendment.

8.     This Court enjoin the United States from taking any action affecting Santa Monica's right, title, or interest in the Airport Property.

9.     This Court enjoin the United States from demanding or asserting in any forum that Santa Monica must operate the Airport Property as an airport in perpetuity.

1       10.   This Court order that the United States shall cease and desist from

2   taking any action to require Santa Monica to operate the Airport Property as an

3   airport after the 1984 Agreement expires in July of 2015.

4       11.   That this Court order such further relief as the nature of the case may

5   require.

6

7   Dated: October 31, 2013        OFFICE OF THE CITY ATTORNEY

8                            SANTA MONICA, CALIFORNIA

9

10                           By: _____

                            MARSHA JONES MOUTRIE

11                              City Attorney

12  Dated: October 31, 2013        MORRISON & FOERSTER LLP

13

14                           By: _____

15                              DON G. RUSHING

16                           Attorneys for Plaintiff

                         CITY OF SANTA MONICA

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT

# EXHIBIT A

**LESSOR**

U. S. Standard Form No. 2 (Rev.
Approved by the Secretary of the Treas.
May 9, 1935

W. 193-eng-9894

# LEASE

BETWEEN

**NEGOTIATED LEASE**

CITY OF SANTA MONICA

AND

THE UNITED STATES OF AMERICA

1. THIS LEASE, made and entered into this ___8th___ day of December

in the year one thousand nine hundred and ___forty-one___ by and between

CITY OF SANTA MONICA, a municipal Corporation of the State of
California,
whose address is City Hall, Santa Monica, California.

for itself, its ~~heirs, executors, administrators,~~ successors, and assigns, hereinafter called the Lessor, and THE UNITED STATES OF AMERICA, hereinafter called the Government:

WITNESSETH: The parties hereto for the considerations hereinafter mentioned covenant and agree as follows:

2. The Lessor hereby leases to the Government the following described premises, viz:

That property commonly known as "Santa Monica Municipal Airport", situate partly within the city of Santa Monica and partly within the city of Los Angeles, County of Los Angeles, State of California, more particularly described as follows:

Parcel 1: All that portion of the Santa Monica Municipal Airport lying between a line 700.13 feet southeasterly from and parallel to the southeasterly line of Ocean Park Boulevard, measured at right angles thereto, and a line 1600 feet southeasterly from and parallel to the said southwesterly line of Ocean Park Boulevard measured at right angles thereto and extending from 25th Street, in the City of Santa Monica, to Bundy Drive in the City of Los Angeles, California.

Parcel 2: All of that certain parcel of real property adjoining the above described Parcel 1, on the southeasterly line thereof, having 100 feet of frontage on said 25th Street, in City of Santa Monica, California, being rectangular in shape and having a uniform depth of 765.87 feet.

Parcels 1 and 2 being subject to public utilities easements, if any.
Approximately containing ~~to be used exclusively for the following purposes (see Instruction No. 3):~~ 85.87 acres.

Airport, tactical positions, barracks, or any use by military forces of the United States of America.

3. TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning

December 8, 1941

and ending with ~~XXX~~ twelve months from the date of the termination of the unlimited National Emergency, as declared by the President of the United States on May 27, 1941 (Proclamation 2487).

10—1660

4. The Government shall not assign this lease in any event, and shall not sublet the demised premises except to a desirable tenant, and for a similar purpose, and will not permit the use of said premises by anyone other than the Government, such sublessee, and the agents and servants of the Government, or of such sublessee.

5. This lease may, at the option of the Government, be renewed from year to year at a rental of

and otherwise upon the terms and conditions herein specified, provided notice be given in writing to the Lessor at least _____ days before this lease or any renewal thereof would otherwise expire: Provided that no renewal thereof shall extend the period of occupancy of the premises beyond the XXXXXXXXXXXX day of X

6. The Lessor shall furnish to the Government, during the occupancy of said premises, under the terms of this lease, as part of the rental consideration, the following:

Nothing

7. The Government shall pay the Lessor for the premises rent at the following rate:

One Dollar ($1.00) for the term hereof, receipt of which is hereby acknowledged.

Payment shall be made at the end of each

8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in, or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located), which fixtures, additions, or structures so placed in, or upon, or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted: Provided, however, that if the Lessor requires such restoration, the Lessor shall give written notice thereof to the Government xxxxxxxxxxxxxxxxxxx days before the termination of the lease.x

10—1860

Exh. A
35

U. S. Standard Form No. 2
(Revised May 6, 1935)
(Sheet 2)

[LEASE]

9. The Lessor shall, unless herein specified to the contrary, maintain the said premises in good repair and tenantable condition during the continuance of this lease, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purpose of so maintaining the premises, the Lessor reserves the right at reasonable times to enter and inspect the premises and to make any necessary repairs thereto.

10. If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, either party may terminate the lease by giving written notice to the other within fifteen days thereafter, and if so terminated no rent shall accrue to the Lessor after such partial destruction or damage.

11. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this lease or to any benefit to arise therefrom. Nothing, however, herein contained shall be construed to extend to any incorporated company, if the lease be for the general benefit of such corporation or company.

Paragraphs 6, 8, 9 and 10 deleted; paragraphs 12 to 17 inclusive, added; map of premises attached; all prior to execution hereof.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

In presence of: ATTEST:

_____
D. C. FREEMAN
Commissioner of Finance, ex-officio
(Address)
City Clerk, ex-officio Clerk of the City Council of the City of Santa Monica.

CITY OF SANTA MONICA, a municipal corporation of the State of California.

_____
L. J. MURRAY          Lessor.
Commissioner of Public Safety, and ex-officio Mayor of the City of Santa Monica.

UNITED STATES OF AMERICA,

By _____
JOHN A. LOOMIS
CONTRACTING OFFICER
(Official title)

(If Lessor is a corporation, the following certificate shall be executed by the secretary or assistant secretary.)

I, W. W. Milliken _____, certify that I am the Commissioner of Public Works Secretary of the corporation named as Lessor in the attached lease; that L. J. Murray and D. C. Freeman _____, who signed said lease on behalf of the Lessor, were then Commissioner of Public Safety and Commissioner of Finance _____ of said corporation; that said lease was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

_____
W. W. Milliken

[CORPORATE SEAL]

10—1880

## INSTRUCTIONS TO BE OBSERVED IN EXECUTING LEASE

1. This standard form of lease shall be used whenever the Government is the lessee of real property; except that when the total consideration does not exceed $100 and the term of the lease does not exceed 1 year the use of this form is optional.   In all cases where the rental to be paid exceeds $2,000 per annum the annual rental shall not exceed 15 per centum of the fair market value of the rented premises at the date of lease.   Alterations, improvements, and repairs of the rented premises by the Government shall not exceed 25 per centum of the amount of the rent for the first year of the rental term or for the rental term if less than 1 year.

2. The lease shall be dated and the full name and address of the lessor clearly written in paragraph 1.

3. The premises shall be fully described, and, in case of rooms, the floor and room number of each room given.   The language inserted at the end of article 2 of the lease should specify only the general nature of the use, that is, "office quarters," "storage space," etc.

4. Whenever the lease is executed by an attorney, agent, or trustee on behalf of the lessor, two authenticated copies of his power of attorney, or other evidence to act on behalf of the lessor, shall accompany the lease.

5. When the lessor is a partnership, the names of the partners composing the firm shall be stated in the body of the lease.   The lease shall be signed with the partnership name, followed by the name of the partner signing the same.

6. Where the lessor is a corporation, the lease shall be signed with the corporate name, followed by the signature and title of the officer or other person signing the lease on its behalf, duly attested, and, if requested by the Government, evidence of his authority so to act shall be furnished.

7. Under paragraph 6 of the lease insert necessary facilities to be furnished, such as heat, light, janitor service, etc.

8. There shall be no deviation from this form without prior authorization by the Director of Procurement, except—

> (a)  Paragraph 3 may be drafted to cover a monthly tenancy or other period less than a year.
>
> (b)  In paragraph 5, if a renewal for a specified period other than a year, or for a period optional with the Government is desired, the phrase "from year to year" shall be deleted and proper substitution made.   If the right of renewal is not desired or cannot be secured paragraph 5 may be deleted.
>
> (c)  Paragraph 6 may be deleted if the owner is not to furnish additional facilities.
>
> (d)  If the premises are suitable without alterations, etc., paragraph 8 may be deleted.
>
> (e)  Paragraph 9 provides that the lessor shall, *"unless herein specified* to the contrary, maintain the said premises in good repair, etc."   A modification or elimination of this requirement would not therefore be a deviation.
>
> (f)  In case the premises consist of unimproved land, paragraph 10 may be deleted.
>
> (g)  When executing leases covering premises in foreign countries, departure from the standard form is permissible to the extent necessary to conform to local laws, customs, or practices.
>
> (h)  Additional provisions, relating to the particular subject matter mutually agreed upon, may be inserted, if not in conflict with the standard provisions, including a mutual right to terminate the lease upon a stated number of days' notice, but to permit only the lessor so to terminate would be a deviation requiring approval as above provided.

9. When deletions or other alterations are permitted specific notation thereof shall be entered in the blank space following paragraph 11 before signing.

10. If the property leased is located in a State requiring the recording of leases in order to protect the tenant's rights, care should be taken to comply with all such statutory requirements.

U. S. GOVERNMENT PRINTING OFFICE   10—1860

Exh. A
37

Attached to and a part of Lease dated December 8, 1941, by and between CITY OF SANTA MONICA AND THE UNITED STATES OF AMERICA.

12.  The Government reserves the right to cancel this lease or any renewal thereof upon giving thirty (30) days advance written notice to the Lessor.

13.  By reason of the previously existing contract by and between the Lessor and the Douglas Aircraft Co., Inc., dated November 13, 1940, and that certain License Agreement dated November 10, 1943, the Government hereby recognizes the right of said Douglas Aircraft Co., Inc., to the joint use of the Airport as provided in said contract and license.

14.  The Government, during the period that said premises are used exclusively for military purposes, shall repair and maintain in serviceable condition the landing areas and improvements, facilities and equipment thereon used by the Government; provided that during the period of this lease or any renewal, whenever said premises are not used exclusively for military purposes, the Government shall perform its proportionate share of the repairs and maintenance of said premises to the extent made necessary by their use by the Government, and the Lessor shall perform its proportionate share of additional repairs and maintenance.

15.  The Government is granted the right, during the existence of this lease, to camouflage the premises, and to construct or install in or upon the demised premises such improvements on landing and take-off facilities, runways, taxiways, fences, landing and obstruction lights, revetments, barracks, or other structures or improvements as may be deemed necessary by the Government, all of which structures or improvements shall be and remain the property of the Government and may be removed by the Government at or prior to the termination of this lease.  The Government shall not be required by Lessor to restore the premises to the condition existing at the date hereof, except for the removal of all camouflage structures and all revetments thereon, which the Government will remove at or prior to termination hereof, but the Government may leave other improvements or any portion thereof it desires, (excepting said camouflage structures and revetments) on the premises in lieu of restoration.  In no event shall the Government be held responsible for the reasonable and ordinary wear and tear, or damages by the elements, or by circumstances over which it has no control.

16.  All provisions hereof requiring any act or expenditure of funds by the Government is subject to appropriations being available for such purpose or purposes.

17.  It is understood and agreed by and between the parties hereto that, if or when, during the term of this lease, the Government should acquire fee title to any adjacent lands, at either the Easterly or Westerly ends of the airport for the purpose of extending the airport runways, the Government shall, upon completion of said extension or extensions, execute a lease to the City of Santa Monica on said parcel or parcels, on a joint use basis, for a consideration of ($1.00) one dollar per annum receipt acknowledged, and to run concurrently for the remaining term of this lease.

Misc. 3979

RECORD OF PHYSICAL SURVEY OF LAND AND/OR BUILDINGS

CITY OF SANTA MONICA, a municipal corporation, of the State of California
(XXXXXXXX OWNER XXXXXXX)

Henry Bauer                                    Chief, Leasing Section
(NAME OF OFFICER)                              (RANK and ORGANIZATION)

                                        Santa Monica, California
                                            (LOCATION)

                                          December 5th, 1941
                                              (DATE)

      This record is to be appended to and made a part of an agreement entered
into between the United States and the above named party.

1.  IDENTITY OF PROPERTY:  "SANTA MONICA MUNICIPAL AIRPORT"

2.  OWNER:      CITY OF SANTA MONICA

3.  TOTAL AREA CONTRACTED FOR:      85.87 acres, more or less

    LAND:  85.87 acres                    BUILDINGS:      none

4.  CROPS: (Including orchards)                      none

5.  BUILDINGS: (Condition)                          none

      FLOORS: _____ WALLS: _____ CEILINGS: _____ ROOF: _____

    ELEVATOR: _____ STAIRWAYS: _____ PLUMBING: _____ DRAINAGE: _____

6.  CONTENTS OF BUILDINGS (Condition) Use reverse side.  none

7.  FENCING (Condition, amount and type)             none

8.  OTHER IMPROVEMENTS (Condition of)  One NE-SW concrete runway which was construct-
    ed by WPA and CAA, paid for partly by City and partly by the Government.

9.  REMARKS:   No unusual conditions

    CITY OF SANTA MONICA, a municipal
    corporation of the State of California.
    BY:
        XXXXXXXXXXXXXXL. J. MURRAY,
    Commissioner of Public Safety,
    ex-officio Mayor of the City of
        XXXXXXXXX                              Henry (OFFICER OF USING AGENCY) Bauer
    Santa Monica, City Hall, Santa
    Monica, California.                            Chief, Leasing Section
                                                  (RANK AND ORGANIZATION)

Exh. A
39

# RUNWAY LEASE
# SUPPLEMENT NO. 1

CLOVER FIELD

SANTA MONICA MUNICIPAL AIRPORT

SANTA MONICA, CALIFORNIA

SPB-5

Basic Airport Lease No. WO4-193-eng-4894
and Supplemental Agreement #1

BLOCK 6 SCHEDULE "F"
Pages 1 to 8 & Map Exhibit

Form No. 19
WAR DEPARTMENT
ENGINEERS

Lease No.   W-193-eng-4894

## SUPPLEMENTAL AGREEMENT NO. 1

This supplemental agreement entered into this 23rd day of July 1945, by and between the United States of America, hereinafter called the Government, represented by the contracting officer executing this agreement, and the CITY OF SANTA MONICA, municipal Corporation of the State of California, whose address is City Hall, Santa Monica, California.

hereinafter called the lessor, WITNESSETH that:

WHEREAS, on the 8th day December 1941, the parties hereto entered into Lease No. W 04-193-eng-4894 covering property known as "Santa Monica Airport, situate partly within the City of Santa Monica and partly within the City of Los Angeles, County of Los Angeles, State of California, containing approximately 85.67 acres all as more particularly described in said lease for the term commencing December 8, 1941, and ending twelve months from the date of the termination of the unlimited National Emergency as declared by the President of the United States on May 27, 1941 (Proclamation 2487), and

WHEREAS, it is found advantageous and in the best interests of the United States to modify the said lease for the following reasons:

a.   to accept an offer by the lessor for a cash settlement in lieu of the Government's obligation to remove revetments "A" and "B" from the leased premises and to restore the site of said revetments to its original condition; and to waive any and all claims for damages to those portions of the leased premises on which said revetments are located.

b.   To release the Government from any and all liability arising out of the obligation of the Government to remove camouflage structures from those portions of the leased premises upon which said revetments are located.

c.   To include a covenant against contingent fees; and

WHEREAS under the terms of Paragraph 15 of said lease, the Government is obligated to restore the leased premises by removal of camouflage structures and revetments; and

WHEREAS, the camouflage structures and revetments "A" and "B" were declared surplus by the Government on 10 April 1945; and Whereas, the Lessor has given notice that restoration of the premises by the Government in accordance with Paragraph 15 of said lease will be required; and

WHEREAS those ... uflage structures installed by ... Government up n said revetments have ... n removed from the premises; a ...

WHEREAS, it has been determined to be advantageous and in the interests of the Government to negotiate a settlement in lieu of restoration of the portion of the premises occupied by said revetments "A" and "B"; and Whereas, the Lessor is willing, in lieu of performance by the Government of the restoration of that portion of the leased premises occupied by said revetments, are required by said lease, to accept the sum of THREE THOUSAND and no/100 DOLLARS ($3,000.00) in consideration of the release and discharge of the Government, its officers, agents, and employees from any and all manner of actions, liability and claims for said restoration of the premises or arising out of the construction and location of said camouflage structures and revetments on said portions of the leased premises by the Government.

NOW THEREFORE:  The said lease is hereby modified in the following particulars, but in no others:

1.   The Government shall pay to the Lessor the sum of THREE THOUSAND and no/100 DOLLARS ($3,000.00) representing the cost of restoration of those portions of the leased premises occupied by said revetments "A" and "B" and the cost of removal of said revetments "A" and "B".

2.   That the Lessor hereby remises, releases, and forever discharges the Government, its officer, agents, and employees, of and from any and all manner of actions, liability, and claims against the Government, its officers and agents, which the Lessor now has or ever will have for the restoration of those portions of said leased premises occupied by said revetments "A" and "B" or by reason of any other matter, cause or thing whatsoever particularly arising out of the construction and location of said camouflage structures and revetments "A" and "B" on the leased premises.

3.   That no member of or delegate to Congress or resident commissioner shall be admitted to any share or part of this agreement or to any benefit to arise therefrom, but this provision shall not be construed to extend to this agreement if made with a corporation for the general benefit.

4.   The Lessor warrants that he has not employed any person to solicit or secure this lease upon any agreement for a commission, percentage, brokerage, or contingent fee.  Breach of this warranty shall give the Government the right to annul the lease, or, in its discretion, to deduct from the rental the amount of such commission, percentage, brokerage, or contingent fees.  This warranty shall not apply to commissions payable by lessors upon contracts or leases secured or made through bonafide established commercial or selling agencies maintained by the Lessor for the purpose of securing business.

-2-

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

Witness:                                           THE UNITED STATES OF AMERICA

/s/ O. G. Born                                     George A. Hart, Jr.
_____                            Contracting Officer
                                                   _____

_____                            _____
                                                         (Official Title)

                                                   CITY OF SANTA MONICA
                                                   /s/ D. C. Freeman
                                                   Commissioner of Finance, ex-officio
                                                   Acting Mayor of the City of S. M.
                                                         City Hall
                                                        (Address)

Approved   /s/ W. W. Milligan                      Santa Monica
_____
       (Date)
Commissioner of Public Works,
ex-officio Street Superintendant,
of the City of Santa Monica

(If Lessor is a corporation the following certificate shall be executed by the secretary or assistant secretary).

I,    ADA H. MATTHEWS            , certify that I am a Deputy City Clerk of the corporation named as Lessor in the attached Supplemental Agreement No. 1; that      D. C. FREEMAN      , who signed said Supplemental Agreement No. 1 on behalf of the Lessor, was then Acting Mayor of said city corporation; that said Supplemental Agreement No. 1 was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

                                         /s/   Ada H. Matthews      (Corporate
                                               _____     Seal)

-3-

Exh. A
44

# RUNWAY LEASE
# SUPPLEMENT NO. 2

Form No. 19
WAR DEPARTMENT
ENGINEERS

NEGOTIATED AGREEMENT

Negotiated Lease No. W04-193-eng-4894

## SUPPLEMENTAL AGREEMENT NO. 2

This supplemental agreement, entered into this 15th day of July 1946, by and between THE UNITED STATES OF AMERICA, hereinafter called the Government, represented by the contracting officer executing this agreement, and the CITY OF SANTA MONICA, a political subdivision of the State of California, whose address is City Hall, Santa Monica, California, hereinafter called the Lessor, WITNESSETH that:

WHEREAS, on the 8th day of December, 1941, the parties hereto entered into Lease No. W04-193-eng-4894 for that certain property commonly known as the Santa Monica Municipal Airport, comprising 85.27 acres, more or less, as more particularly described in Paragraph 2 of said Lease, which said lease was formally modified by Supplementary Agreement No. 1 between the parties, dated 23 July 1945; and

WHEREAS, it is found advantageous and in the best interests of the United States to further modify the said lease for the following reasons:

1.  To relieve the Government of all maintenance and operation costs;

2.  To relieve the Government of the payment of rental under the terms of said lease;

NOW, THEREFORE: The said lease is hereby modified in the following particulars, but in no others;

Effective 15 July 1946, and during the term that certain Interim License is in effect between the Government and the City of Santa Monica covering the use, maintenance and operation by the City of Santa Monica of the landing area and certain airport facilities on the Santa Monica Municipal Airport, Santa Monica, California, and in conformance with the terms thereof, the Government is hereby relieved of all maintenance and operation costs, and the payment of rental required of the Government by said lease, covering that portion of the landing area and airport facilities embraced by said License.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

WITNESSES:

THE UNITED STATES OF AMERICA

By _____

_____

CITY OF SANTA MONICA

(SEAL)

(SIGNED) D. C. FREEMAN
Commissioner of Finance, ex-officio
City Clerk of the City of Santa Monica

(SIGNED) RAY E. SCHAFER
Commissioner of Public Safety,
Title ex-officio Mayor of the
City of Santa Monica.

(Address)

I, D. C. FREEMAN _____, certify that I am the Commissioner of Finance, ex-officio City Clerk of the political subdivision, City of Santa Monica named as Lessor in the attached Supplementary Agreement No. 2; that RAY E. SCHAFER _____, who signed said Supplementary Agreement No. 2 on behalf of the Lessor, was then Commissioner of Public Safety, ex-officio Mayor of said political subdivision, City of Santa Monica; that said Supplementary Agreement No. 2 was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

(SEAL)

(SIGNED) D. C. FREEMAN. _____ (CORPORATE
( SEAL )

-2-

# EXHIBIT B

Approved by the Secreta...ury
May 6, 193...

# LEASE

BETWEEN

**CITY OF SANTA MONICA**

AND

THE UNITED STATES OF AMERICA

The supplies and services to be obtained by this instrument are authorized by, are for the purpose set forth i..., and are chargeable to Procurement Authority.

_..y 30068 P332-05 A 1905-2 3_

the available balance of which is sufficien... to cover cost of same.

1. THIS LEASE, made and entered into this **first** day of **December** in the year one thousand nine hundred and **forty-one** by and between

**City of Santa Monica, a Municipal Corporation**

whose address is **City Hall, Santa Monica, Los Angeles County, California**

for **itself, its** heirs, executors, administrators, successors, and assigns, hereinafter called the Lessor, and THE UNITED STATES OF AMERICA, hereinafter called the Government:

WITNESSETH: The parties hereto for the considerations hereinafter mentioned covenant and agree as follows:

2. The Lessor hereby leases to the Government the following described premises, viz:

**That portion of the Santa Monica Municipal Golf Course, in the City of Santa Monica, County of Los Angeles, State of California, described as follows: Bounded on the Northwest by a line parallel to and distant 1800 feet southeasterly from the southeasterly line of Ocean Park Boulevard, measured at right angles to said Ocean Park Boulevard; bounded on the northeast by the southwesterly line of Centinela Avenue, bounded on the southeast by the City Limit line of the City of Santa Monica, California, and bounded on the southwest by the northeasterly line of Twenty-seventh street in the said City, containing approximately 83 acres, together with the two-one-story frame utility and repair shops containing approximately 2600 square feet and all of the one-story stucco Club House, excepting the Golf Shop, restaurant and lobby, consisting of approximately 2400 square feet. Also Lot A of the George Tract, as per map recorded in Book 16, Page 21 of Maps, Records of said County, said lot being included in the above mentioned 83 acres.**

/s/
NWM
DCF
LJM

to be used exclusively for the following purposes (see instruction No. 3): **Military purposes.**

3. TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning **December 1, 1941** and ending with **June 30, 1942**

**3A. The Lessor hereby consents to the extension of this lease for the fiscal year beginning July 1, 1942, and ending June 30, 1943.**

4. The Government shall not assign this lease in any event, and shall not sublet the demised premises except to a desirable tenant, and for a similar purpose, and will not permit the use of said premises by anyone other than the Government, such sublessee, and the agents and servants of the Government, or of such sublessee.

5. This lease may, at the option of the Government, be renewed from year to year at a rental of **One hundred fifty and no/100 dollars ($150.00) per month.** and otherwise upon the terms and conditions herein specified, provided notice be given in writing to the Lessor at least **fifteen (15)** days before this lease or any renewal thereof would otherwise expire: Provided that no renewal thereof shall extend the period of occupancy of the premises beyond the **30th** day of **June, 1947**.

6. The Lessor shall furnish to the Government, during the occupancy of said premises, under the terms of this lease, as part of the rental consideration, the following:

**Nothing.**

7. The Government shall pay the Lessor for the premises rent at the following rate: **One hundred and fifty and no/100 dollars ($150.00) per month**

**Finance Officer, U. S. Army, 3576 Wilshire Blvd., Los Angeles, is designated to pay this account.**

Payment shall be made at the end of each **calendar month.**

8. The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures, or signs, in or upon the premises hereby leased (provided such alterations, additions, structures, or signs shall not be detrimental to or inconsistent with the rights granted to other tenants on the property or in the building in which said premises are located); which fixtures, additions, or structures so placed in or upon or attached to the said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease, and the Government, if required by the Lessor, shall, before the expiration of this lease or renewal thereof, restore the premises to the same condition as that existing at the time of entering upon the same under this lease, reasonable and ordinary wear and tear and damages by the elements or by circumstances over which the Government has no control, excepted: Provided, however, that if the Lessor requires such restoration, the Lessor shall give written notice thereof to the Government **twenty (20)** days before the termination of the lease.

U.S. Standard Form
(Revised May 6, 1935)
(Sheet 2)

9. The Lessor shall, unless herein specified to the contrary, maintain the said premises in good repair and tenantable condition during the continuance of this lease, except in case of damage arising from the act or the negligence of the Government's agents or employees. For the purpose of so maintaining the premises, the Lessor reserves the right at reasonable times to enter and inspect the premises and to make any necessary repairs thereto.

10. If the said premises be destroyed by fire or other casualty this lease shall immediately terminate. In case of partial destruction or damage, so as to render the premises untenantable, either party may terminate the lease by giving written notice to the other within fifteen days thereafter, and if so terminated no rent shall accrue to the Lessor after such partial destruction or damage.

11. No Member of or Delegate to Congress or Resident Commissioner shall be admitted to any share or part of this lease or to any benefit to arise therefrom. Nothing, however, herein contained shall be construed to extend to any incorporated company, if the lease be for the general benefit of such corporation or company.

12.  The Government reserves the right to cancel this lease at any time during its life or renewal thereof by giving thirty days written notice to the Lessor.

Paragraphs 3a and 2 added prior to execution hereof.

IN WITNESS WHEREOF, the parties hereto have hereunto subscribed their names as of the date first above written.

CITY OF SANTA MONICA, a municipal Corporation

In presence of:

/s/ D. C. Freeman                              BY:   /s/ L. J. Murray          Lessor.
Commissioner of Finance of the        Commissioner of Public Safety
City of Santa Monica                         ex-officio Mayor of the City of
           (Address)                                  Santa Monica

                                                      UNITED STATES OF AMERICA,

/s/ R. A. Krueger
Deputy City Clerk                            By Ray T. Marsh-1st Lieut, Corps of
                                                      Engineers, Contracting Officer
                                                                  (Official title)

(If Lessor is a corporation, the following certificate shall be executed by the secretary or assistant secretary.)

I, D. C. Freeman                     , certify that I am the Commissioner of Finance
ex-officio Clerk of the City Council
Secretary of the corporation named as Lessor in the attached lease; that L. J. Murray
                                                      , who signed said lease on behalf of the Lessor, was then
Commissioner of Public Safety
ex-officio Mayor                     of said corporation; that said lease was duly signed for and in behalf of said corporation by authority of its governing body, and is within the scope of its corporate powers.

                    /s/ D. C. Freeman                     [CORPORATE SEAL]

10—1850

# GOLFCOURSE LEASE
# SUPPLEMENT NO. 1

Lease No. W-3460-dng-549
NEGOTIATED AGREEMENT

LESSOR

SUPPLEMENTAL AGREEMENT NO. 1

781-A

Received 3:30 PM
Dec. 15, 1944.
from City atty.

JRL

This supplemental agreement entered into this 20th day of December, 1944, by and between the City of Santa Monica, a municipal corporation, whose address is City Hall, Santa Monica, California, for itself, its successors, and assigns, hereinafter called the Lessor, and the UNITED STATES OF AMERICA, hereinafter called the Government, WITNESSETH THAT:

WHEREAS, on the first day of December 1941, Lease No. W-3460-eng-549 was entered into between the Lessor and the Government covering the Santa Monica Municipal Golf Course in the City of Santa Monica, County of Los Angeles, State of California, containing approximately 83 acres, together with certain buildings located thereon, all as more particularly described in the said lease for the period December 1,1941 to June 30,1943, with option of renewal annually thereafter to June 30, 1947, which lease was duly renewed by the Government to June 30, 1945, and

WHEREAS, it is found advantageous and in the best interests of the Government to modify the said lease for the following reasons:

**The supplies
and services to
be obtained by
this instrument
are authorized
by, are for the
purpose set forth
in, are chargeable
to Procurement
Authority
508-1362-P330-05
A 095-25 the
available bal-
ance of which
is sufficient
to cover cost
of same.

a. To modify said lease in connection with the proposed construction of a new runway at Clover Field, Santa Monica, Calif.

b. To accept an offer by the Lessor for a cash settlement in lieu of the Government's obligation to restore the leased premises to their original condition, and to waive any and all claims for future damages to said premises.

c. To reduce the rental for said premises.

d. To dispense with the service of Notice of Renewal for each fiscal year, as now required under said lease.

e. To change the Purpose Clause of said lease.

f. To extend the term of said lease;
**
and

WHEREAS, the Lessor has given notice that restoration of the premises by the Government, in accordance with Paragraph 8 of said lease, will be required; and

WHEREAS, it has been determined to be advantageous and in the interest of the Government to relinquish, transfer, and deliver to the Lessor the title to certain improvements which are no longer required by the Government; and

WHEREAS, the Lessor is willing, in lieu of performance by the Government of the restoration required by said lease, to accept such improvements and to accept a sum of One Hundred Fifty Thousand and no/100 ($150,000.00) dollars in consideration of the difference between the value of said improvements and the estimated cost of restoration.

NOW, THEREFORE, in consideration of the premises, the parties do hereby mutually agree as follows; and the said lease is hereby modified in the following particulars, but in no others:

1. Paragraph 2 of said lease is hereby modified, effective January 1, 1945, to eliminate that portion of the one-story stucco Clubhouse now under lease, consisting of 2400 square ft. so as to read as follows:

"2. The Lessor hereby leases to the Government the following described premises, viz:

That portion of the Santa Monica Municipal Golf Course in the City of Santa Monica, County of Los Angeles,

- 1 -

State of California, described as follows:
Bounded on the Northwest by line parallel to and distant 1800 feet southeasterly from the southeasterly line of Ocean Park Blvd., measured at right angle to said Ocean Park Blvd; bounded on the Northeast by the southwesterly line of Centinela Ave; and bounded on the southeast by the City limit line of the City of Santa Monica, California; and bounded on the Southwest by the northeasterly line of 27th Street in the said City; also Lot "A" of the George Tract, as per map recorded in Book 16, Page 21 of Maps Records of said County; said premises containing approximately 83 acres; TOGETHER WITH the two one-story frame utility and repair shops containing approximately 2600 square feet; but EXCEPTING THEREFROM the one-story stucco Clubhouse now located on the Northwest corner of the premises herein described:

to be used exclusively for the following purposes:  Construction of a runway, airport use, and other Military purposes."

2.   Paragraphs 3 and 5 of said lease are deleted, and there is inserted in lieu thereof the following Paragraph 3:

   "3.   TO HAVE AND TO HOLD the said premises with their appurtenances for the term beginning July 1, 1944 through June 30, 1945, provided that unless the Government shall give notice of termination in accordance with provisions 12 hereof, this lease shall remain in force thereafter from year to year without further notice; provided, further, that adequate appropriations are available from year to year for the payment of rentals; and provided, further, that this lease  shall in no event extend beyond the twelve months after the  official termination of the existing emergency as declared by the President of the United States on May 27, 1941 (Proclamation 2487)."

3.   Paragraph 7 of said lease is hereby modified so as to read as follows:

   "7.   The Government shall pay the Lessor for the premises rental at the following rate:

      One Hundred Fifty and no/100 ($150.00) dollars per month to and including December 31, 1944; thereafter, one and no/100 ($1.00) dollars for the remainder of the term hereof; receipt of which One Dollar is hereby acknowledged. Payment shall be made at the end of each calendar month by the Finance Officer, United States Army, 450 Mission St., San Francisco, California."

4.   Paragraph 8 of said lease is hereby modified so as to read as follows:

   "8.   The Government shall have the right, during the existence of this lease, to make alterations, attach fixtures, and erect additions, structures or signs in or upon the premises hereby leased; which fixtures, additions or structures so placed in or upon or attached to said premises shall be and remain the property of the Government and may be removed therefrom by the Government prior to the termination of this lease."

5.   The Government hereby relinquishes, transfers, and delivers to the Lessor the improvements shown on Schedule "A" attached hereto, heretofore made and constructed by the Government now in and upon the land and premises above described.

6.   The Government shall pay to the Lessor the sum of One Hundred Fifty Thousand ($150,000.00) Dollars, in consideration of the difference between the value of said improvements and the estimated cost of the restoration required by said lease.

- 2 -

7.  The Lessor will, as of January 1, 1945, assume custody and
    care of the Clubhouse which is being deleted from the pre-
    mises under lease as provided heretofore in Paragraph 1 of this
    Supplemental Agreement.

8.  The Lessor hereby remises, releases, and forever discharges the
    Government, its officers, agents, and employees, of and from
    any and all manner of actions, liability, and claims (except
    any unpaid rent for the period ending December 31, 1944) against
    the Government, its officers and agents, which the Lessor
    now has or ever will have for the restoration of said leased
    premises to their original condition or by reason of any other
    matter, cause or thing whatsoever particularly arising out of
    said lease and the occupation by the Government of the afore-
    said premises. It is mutually understood and agreed that the
    payment called for in paragraph 6 of this Supplemental Agree-
    ment, namely the sum of One Hundred Fifty Thousand Dollars
    ($150,000.00) is full compensation for all damages disclosed
    or undisclosed which may have been caused, or which may be
    caused in the future, to the Lessor or any other person claim-
    ing an interest in said leased premises by the use or occupancy
    of said premises by the Government, and Lessor agrees to accept
    said sum in lieu of any right to demand the return of the premises
    by the Government in as good condition as that existing at the
    time of entering upon the same under said lease; and in further
    consideration of said sum, Lessor hereby waives any claim
    which it has or might have in the future for any and all damage
    disclosed or undisclosed, of the nature above described
    whether the facts relating to such claim be now known to the
    Lessor or whether such claim may arise in the future out of fac
    now unknown and not now anticipated.

9.  No member of or delegate to Congress or resident commissioner
    shall be admitted to any share or part of this agreement or
    to any benefit to arise therefrom, but this provisions shall
    not be construed to extend to this agreement if made with a
    corporation for the General benefit.

10. The Lessor warrants that he has not employed any person to
    solicit or secure this lease upon any agreement for a commis-
    sion, percentage, brokerage, or contingent fee.  Breach of
    this warranty shall give the Government the right to annul
    the lease, or, in its discretion, to deduct from the rental
    the amount of such commission, percentage, brokerage, or
    contingent fees.  This warranty shall not apply to commis-
    sions payable by lessors upon contracts or leases secured or
    made through bona fide established commercial or selling
    agencies maintained by the Lessor  for the purpose of securing
    business.

    IN WITNESS WHEREOF the parties hereto have executed this instrument
as of the day and year first above written:

WITNESS:    SEAL                          CITY OF SANTA MONICA, a mun.corp;,

D. C. FREEMAN                             By L. J. MURRAY
Commissioner of Finance,ex-officio        Commissioner of Public Safety, ex-
City Clerk of the City of S.M.            officio Mayor of the City of S.M.
City Hall, Santa Monica, Calif.

                                          THE UNITED STATES OF AMERICA

(Signed)     Witness                      (Signed)By   John A. Loomis
             Carvel C. Torrence                        (Contracting Officer)

           (Mr. Freeman's certification that  J. Murray was Comm.of
             Public Safety, follows.)

                              - 3 -

SCHEDULE "A"

Government-owned Improvements Transferred to Lessor Under
Supplemental Agreement No. 1 to

Lease No. W-3400-eng-549

All revetments located on the leased premises, excepting one revetment located South of the Government hangar buildings used by Army Air Forces, Western Technical Training Command.

All Government-owned structures, alterations and additions in, about or attached to the one-story stucco Clubhouse located in the Northwest corner of the leased premises, including camouflage structures, material and netting built over or attached to said Clubhouse building.

- 4 -

(If Lessor is a corporation, the following certificate
shall be executed by the Secretary or Assistant Secretary)


I, D. C. FREEMAN   certify that I am the Commissioner of
Finance of the City of Santa Monica, a Municipal Corporation, named as
Lessor in the attached lease; that L. J. MURRAY   who signed said
lease on behalf of the Lessor, was then Comm. of Public Safety of said
Municipal corporation; that said lease was duly signed for and in behalf
of said Municipal Corporation by authority of its governing body, and
is within the scope of its corporate powers.


SEAL.            (SIGNED)  D. C. FREEMAN            (CORPORATE
                                                    SEAL)

RESOLUTION #353,                         copy.

LESSOR

TERMINAL JOINT SURVEY AND CONDITION REPORT

This Terminal Joint Survey and Condition Report is made by the undersigned lessor and the undersigned representative of the Government in connection with the amendment of Lease No. W-5460-eng-549 by Supplemental Agreement No. 1, which Supplemental Agreement provides for payment of a cash settlement to the lessor in lieu of the Government's obligation to restore the leased premises and which deletes from said lease any obligation by the Government to restore the leased premises at the termination of said lease.

The following items of restoration are considered by the lessor to be the only items which are the responsibility of the Government, taking into consideration (a) the original Joint Survey and Statement of Condition of Premises and (b) ordinary wear and tear based on the purpose of the lease, and are the only items for which the lessor demands restoration.

The following improvements and installations have been constructed: barracks, latrines, towers, sheds, hangars, reinforced concrete shelters, camouflage buildings, roadways and streets, underground shelters, concrete and dirt revetments; gravel, macadam and asphalt streets, runways, roads and parking areas; wood fences, bridges and culverts. Communication trenches, fox holes and building foundations have been excavated. Concrete foundations, piers and slabs have been constructed and a dump site established.

Contour of practically the entire area of the property has been altered. Large areas have been treated with weed killing chemicals and the top soil rendered sterile. All tame grass is dead over the entire property. At least 260 trees and 100 shrubs of assorted sizes and varieties have been destroyed. Approximately 200 tree stumps remain on the property.

Eighteen Greens, two putting Greens and sixteen Fairways and Tees have been obliterated. Two Fairways and Tees are covered with camouflage buildings.

The water and sprinkling system has been destroyed or damaged over the entire property. The top soil from large areas has been removed from the property. A woven wire fence has been removed from south boundary line and established in a different location.

The steel pipe handrail from the Clubhouse to the Starters booth has been removed.

One door and all windows and window panes have been removed from the Starters booth.

SURVEY OF CLUBHOUSE

Large quantities of roof tiles are broken. Parts of the exterior walls are painted with camouflage paint and other parts are streaked with stain. A wooden frame has been attached to the walls and constructed across the roof to support a camouflage net. Four light shades and globes

are missing from the west porch and five light shades and globes are missing from the east porch.

## Men's Toilet Room (In Clubhouse)

Part of tile trim around window has been removed. Two toilet seats, one toilet tank cover and four door knobs are missing. The original concealed hot and cold water pipes have been disconnected and exposed pipes have been installed. Paint is peeling from the ceiling and walls. Plaster has been removed from below the window and holes have been bored through the west partition wall. The tile floor is soiled and stained. One window screen is missing.

## Men's Shower Room (In Clubhouse)

Exposed water pipes have been installed and the original system disconnected. Pipe holes have been bored through the west wall. Paint is peeling from the ceiling and walls. Pipe holes bored through tile wainscot. Two panes of obscure glass are cracked in the west window. There are several nail holes in the plaster on the north wall.

## Men's Locker Room (In Clubhouse)

Three panes of obscure glass are broken in west windows. Cast iron frame on water heater is broken, partition has been removed. Two wooden panels are split in outside door. Five knobs and bolts are missing from doors. Two light shades and globes are missing. Large holes have been cut in the plaster walls and ceiling near the water heater. Numerous nail holes appear in the plaster on the four walls. The west half of the south wall and a strip of the ceiling have been damaged by water. The walls are soiled. Several holes have been broken through the concrete floor.

## Men's Lounge Room (In Clubhouse)

A mullion in the west window has been loosened and pushed inward. One pane of obscure glass is cracked. Holes have been bored through the exterior wall and window casing. Plaster has been removed from above window. There are water stains on the ceiling and the walls are soiled. Insulated wiring has been attached to the walls and ceiling. A partition and chair rail has been constructed.

## Repair Shop (In Clubhouse)

One enameled steel sink and waster trap is missing. One pane of clear glass is broken in south window. The oak floor in the south room is scarred, scratched and has several holes gouged in it. One wooden panel lock and night-latch have been removed from the outside door. The oak floor in the north room has been saturated with oil. There are several small holes in the plastered walls. The walls and ceiling are soiled. Three light globes are missing.

Sheet 3 of 5 sheets.

GOLF SHOP(In Clubhouse)

Two panes of clear glass from east door are missing.  One pane of clear glass is missing from east window and one pane of clear glass above window is cracked.  The lock is missing from the east door.  One lamp shade and globe are missing.  Two holes have been broken in the concrete floor.  The walls and ceiling are soiled and there are numerous small holes in the plaster on walls.

Main Lounge Room or Restaurant (In Clubhouse)

Nine panes of clear glass have been removed from the west wall doors and one pane from the east door.  Two window sashes and glass panes are missing from east window.  One partition with glass panels has been removed.  The wooden door to supply room has been cut into two sections. Six glass doors and all shelving from the trophy cases are missing.  Four light fixtures, 15 upholstered stools and three door locks are missing. One hardwood serving counter has been removed and left outside in the weather.  Parts of two light fixtures are missing.  One floor sink has been removed.  Four light shades and thirty-three light globes are missing. The walls are soiled and there are several small holes in the plaster.

Kitchen (In Clubhouse)

Two wood panel cupboard doors are missing.  One skylight is broken.  Shelves have been installed across the east wall.  Paint on walls, doors and cabinets is badly scarred and soiled.  Paint on ceiling is badly soiled and is peeling off.  The original water pipes have been disconnected and new surface pipes installed.  There are many pipe and nail holes in the plastered walls.  One pane of obscure glass is broken in the skylight.  One electric switch, one faucet handle and one cupboard door latch are missing.

Storage Room No. 1(In Clubhouse)

Shelving has been installed across the north and west walls. The walls are soiled and the plastered walls have numerous nail holes.

Women's Lounge Room(In Clubhouse)

One outside door is missing and the screen door has been detached. Five holes have been bored through the window sashes, two holes through the outside door casing.  Plaster has been removed from a small area below the east window.  One hole has been bored through the south wall and there are many nail holes in the walls.  Paint on the inside door is badly soiled and scarred.  The walls are streaked and soiled.  The ceiling is soiled. Paint on the floor border is peeling off.

Women's Locker Room (In Clubhouse)

Four holes have been bored through the window casing.  Paint on doors xxxxx and walls is scarred and badly soiled.  One attached wall mirror is missing and the spot where it was is painted a different color. There are many nail holes in the plastered walls.

Exh. B

59

## Women's Wash, Shower and Toilet Room (In Clubhouse)

One wall lavatory and one toilet have been removed and installed in adjoining storeroom. Surface water and drain pipes were installed. One steel shower panel has been detached from the wall. Plaster and steel lath have been removed from a large area of the partition wall of adjoining storeroom. One shower head and four sets of shower faucet handles are missing. Paint on walls, doors, ceiling, cabinet and shower cabinets is badly marred and soiled. Paint is peeling from walls and ceiling. There are numerous nail holes in plaster on east wall.

## Storeroom No. 2 (In Clubhouse)

A wood partition and platform have been constructed. A toilet and wall lavatory have been installed with surface water pipe and drains. There are several pipe and nail holes in the west wall. The walls are soiled.

## SURVEY OF SHOP BUILDING

Approximately 80 feet of partitions were installed. Eight window sashes and panes, one door and six door locks are missing. Two enamel sinks are missing. The original water and drain pipes have been disconnected and surface pipes installed. The original electrical wiring has been disconnected and surface wiring installed. Eight light fixtures are missing.

## SURVEY OF GROUNDS BUILDING

## Latrine in Southeast Corner

One low-tank toilet, one toilet seat, one toilet tank cover, one soap dispenser, one lavatory trap, two swinging doors and two window sashes and panes are missing.

## Corrugated Iron Storage Building

One window sash and glass panes is missing. There is a large hole in the west wall.

## Storage Shack

No change.

## Tool Shed

A lean-to has been constructed. Three window sashes and glass panes, and one wood paneled door are missing.

## Latrine on West Boundary

Two panel doors, one low-tank toilet, one wall lavatory, and one tank cover are missing. Two window panes are broken.

Exh. B
60

Sheet 5 of 5 Sheets

MISCELLANEOUS

Eleven wooden bridges and culverts are missing.

CITY OF SANTA MONICA, a municipal corporation,

By(SIGNED)  L. J. MURRAY
Commissioner of Public Safety, ex-officio Mayor of the City of Santa Monica.

(SEAL)

ATTEST:

(SIGNED)  D. C. FREEMAN
Commissioner of Finance, ex-officio City Clerk, ex-officio Clerk of the City Council of the City of Santa Monica.

WITNESS:

(SIGNED)  ADA H. MATTHEWS

Dated   20 December 1944.

(SIGNED) Orval N. Nail
(United States Representative)

(Signed) Negotiator Used Real Estate
(Rank, Organization, Station)

(Owner or authorized representative)

(Address)

# GOLFCOURSE LEASE SUPPLEMENT NO. 2

FHJ.

Form No. 19
WAR DEPARTMENT
   ENGINEERS

NEGOTIATED AGREEMENT

Negotiated Lease No. W3460-eng-549

## SUPPLEMENTAL AGREEMENT NO. 2

This supplemental agreement, entered into this 15th day of July, 1946, by and between THE UNITED STATES OF AMERICA, hereinafter called the Government, represented by the contracting officer executing this agreement, and the CITY OF SANTA MONICA, a political subdivision of the State of California, whose address is City Hall, Santa Monica, California, hereinafter called the Lessor, WITNESSETH that:

WHEREAS on the 1st day of December, 1941, the parties hereto entered into Lease No. W3460-eng-549 for that certain property commonly known as the Santa Monica Municipal Golf Course, comprising 83 acres, more or less, as more particularly described in Paragraph 2 of said lease, which said lease was formerly modified by Supplemental Agreement No. 1 between the parties, dated 20 December 1944, and

WHEREAS, it is found advantageous and in the best interest of the United States to further modify the said lease for the following reasons:

1.  To relieve the Government of all maintenance and operation costs;

2.  To relieve the Government of the payment of rental under the terms of said lease;

NOW, THEREFORE: The said lease is hereby modified in the following particulars, but in no others;

Effective 15 July 1946, and during the term that a certain Interim License is in effect between the Government and the City of Santa Monica covering the use, maintenance and operation by the City of Santa Monica of the landing area and certain airport facilities on the Santa Monica Municipal Airport, Santa Monica, California, and in conformance with the terms thereof, the Government is hereby relieved of all maintenance and operation costs, and the payment of rental required of the Government by said lease, covering that portion of the landing area and airport facilities embraced by said license.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first above written.

WITNESSES:

THE UNITED STATES OF AMERICA,

By (SIGNED) FRED H. JOHNSTON
Fred H. Johnston
Contracting Officer

_____

CITY OF SANTA MONICA

(SIGNED) D. C. FREEMAN
Commissioner of Finance, ex-officio
City Clerk of the City of Santa
Monica.

(SEAL)

By (SIGNED) RAY E. SCHAFER.
Commissioner of Public Safety, ex-
Title officio Mayor of the city of
Santa Monica
City Hall, Santa Monica, Calif.
(Address)

I, D. C. FREEMAN_____, certify that I am the Commissioner of
Finance, ex-officio
_____CITY CLERK._____ of the political subdivision, City of Santa Monica
named as Lessor in the attached Supplemental Agreement No. 2; that _____
RAY E. SCHAFER_____, who signed said Supplemental Agreement No. 2
Commissioner of Public Safety, ex-
on behalf of the Lessor, was then officio Mayor._____ of said
political subdivision, City of Santa Monica; that said Supplemental
Agreement No. 2 was duly signed for and in behalf of said City of Santa
Monica by authority of its governing body, and is within the scope of
its corporate powers.

(SEAL)        (SIGNED) D. C. FREEMAN_____ (CORPORAT
( SEAL )

-2-

# EXHIBIT C

Book 28055 Page 211

INSTRUMENT OF TRANSFER

KNOW ALL MEN BY THESE PRESENTS:                     Deed # 4 CCS

That, the UNITED STATES OF AMERICA, acting by and through
the WAR ASSETS ADMINISTRATION under and pursuant to Reorganization
Plan One of 1947 (12 F.R. 4534), and the powers and authority con-
tained in the provisions of the Surplus Property Act of 1944, as
amended, and applicable rules, regulations, and orders, PARTY OF
THE FIRST PART, in consideration of the assumption by the CITY OF
SANTA MONICA, a body corporate and politic under the laws of the
State of California, PARTY OF THE SECOND PART, of all the obliga-
tions and its taking subject to certain reservations, restrictions,
and conditions and its covenant to abide by and agreement to certain
other reservations, restrictions, and conditions, all as set out
hereinafter, has remised, released and forever quitclaimed, and by these
presents does remise, release, and forever quitclaim to said City of
Santa Monica, its successors and assigns, under and subject to the
reservations, restrictions, and conditions, exceptions, and reservation
of rights hereinafter set out, all its right, title, interest, and claim
in and to the following described real, personal, or mixed property
situated in the County of Los Angeles, State of California, to wit:

(1)  Tract #1 - A temporary easement granted by Raymond
E. Wright and Lula Nancy Marter Wright, husband and wife to the
United States of America, by easement deed dated 21 October 1942,
for right-of-way to locate, relocate, construct, reconstruct, main-
tain, repair, operate, renew, enlarge, remove and replace, increase
and/or change the number and/or size of conduits, pipes, pipe lines,
accessories and appurtenances for the conveyance and disposal of
sewage and/or effluent under, over, along and upon that certain land
situated in the County of Los Angeles, State of California, described
as follows:

A strip of land 10 feet in width, situate in the City of
Los Angeles, County of Los Angeles, State of California, being under
and across a portion of Lot 94, Tract No. 12450, as per map recorded
in Book 236, Pages 20 and 21 of Maps, Records of Los Angeles County,
lying 5 feet on each side of the following described center line.

Beginning at the intersection of the Southeasterly line of
said Lot 94 with the center line of Wasatch Avenue, (60 feet in width),
said point being North 32° 34' 40" West, a distance 138.81 feet from
the intersection of the center line of Wasatch Avenue and the center
line of Woodgreen Street (60 feet in width); thence North 32° 34' 40"
West along the Northwesterly prolongation of the center line of
Wasatch Avenue a distance of 44.00 feet to a point in the Northwesterly
line of said Lot 94, containing 440 square feet, more or less.

(2)  Tract #2 - A temporary easement granted by the Southern
California Water Company, a corporation organized and existing under
and by virtue of the laws of the State of California, to the United
States of America, by easement deed dated 22 October 1942, for right-
of-way to locate, relocate, construct, reconstruct, maintain, repair,
operate, renew, enlarge, remove and replace, increase and/or change
the number and/or size of conduits, pipes, pipe lines, accessories
and appurtenances for the conveyance and disposal of sewage and/or
effluent under, over, along and upon that certain land situated in
the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of
Los Angeles, County of Los Angeles, State of California being under
and across a portion of the Subdivision of the Lands of Samuel Cripe
in the Rancho La Ballona as per map recorded in Book 1, Page 64,



deed # 4

Book __28055__ Page __212__

Licensed Surveyors Maps, Records of said County lying 5 feet on each side of the following described center line: Beginning at the intersection of the Northwesterly line of Lot 94, Tract No. 12450, as per map recorded in Book 235, Pages 20 and 21 of Maps, Records of Los Angeles County, with the Northwesterly prolongation of the center line of Wasatch Avenue, (50 feet in width) said point being N 32° 34' 40" West, a distance of 182.81 feet from the intersection of the center line of Wasatch Avenue and the center line of Woodgreen Street, (60 feet in width); thence North 32° 34' 40" West along the Northwesterly prolongation of the center line of Wasatch Avenue, a distance of 16 feet to the Northwesterly line of said Subdivision of the Lands of Samuel Cripe in the Rancho La Ballona, containing 160 square feet, more or less.

(3)  Tract #3 – A temporary easement granted by the Bank of America National Trust & Savings Association, a national banking association, owners, and Gore Bros. Inc., a corporation organized and existing under and by virtue of the laws of the State of California, Vendee, under a land purchase contract, to the United States of America, by easement deed dated 21 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width situate in the City of Los Angeles, County of Los Angeles, State of California, being under and across a portion of the 10.70 Acres of Fractional Jose De La Luz Machado 61.97334 Acres in the Rancho La Ballona, (District Court Case Number 2722) as per map recorded in Book 3, Pages 204 to 209 inclusive, Miscellaneous Records of Los Angeles County, lying 5 feet on each side of the following described center line:  Beginning at the intersection of the Southeasterly line of said Fractional Jose De Luz Machado 61.97334 Acres with the Northwesterly prolongation of the center line of Wasatch Avenue (Wasatch Avenue shown on Tract No. 12450, as per map recorded in Book 235, Pages 21 and 20 of Maps, Records of said County) said point being North 32° 34' 40" West along the Northwesterly prolongation of the center line of Wasatch Avenue, a distance of 198.81 feet from the intersection of the center line of Wasatch Avenue (50 feet in width) and the center line of Woodgreen Street (60 feet in width); thence North 32° 34' 40" West 11.19 feet; thence North 65° 08' 43" West 442.15 feet to a point in the Northwesterly line of said Fractional Jose De Luz Machado 61.97334 Acres, containing 4533 square feet, more or less.

(4)  Tract #4 – A temporary easement granted by Gore Bros. Inc., a corporation organized and existing under and by virtue of the laws of the State of California, to the United States of America, by easement deed dated 20 October 1942, for right-of-way to locate, relocate, construct, reconstruct, maintain, repair, operate, renew, enlarge, remove and replace, increase and/or change the number and/or size of conduits, pipes, pipe lines, accessories and appurtenances for the conveyance and disposal of sewage and/or effluent under, over, along and upon that certain land situated in the County of Los Angeles, State of California, described as follows:

A strip of land 10 feet in width, situate in the City of Los Angeles, County of Los Angeles, State of California, being under and across a portion of Fractional Jose De La Luz Machado 61.97334 Acres in the Rancho La Ballona (District Court Case No. 2722) as per map recorded in Book 3, Pages 204 to 209 inclusive, Miscellaneous Records of Los Angeles County, lying 5 feet on each side of the following described center line:  Commencing at the intersection of

-2-

Book 28055 Page 213

the center line of Wasatch Avenue (50 feet in width) and Woodgreen
Street (60 feet in width), shown on Tract No. 12460, as per map
recorded in Book 235, Pages 20 and 21 of Maps, Records of Los
Angeles County; thence North 32° 34' 40" West along the center
line and prolongation of the center line of said Wasatch Avenue,
a distance of 210.00 feet; thence North 65° 08' 43" West 442.15
feet to the TRUE POINT OF BEGINNING.  Thence North 65° 08' 43"
West 425.10 feet; thence North 35° 33' 55" West 25.59 feet to
the point of termination in the Southeasterly line of Woodbine
Avenue (27 feet wide) shown on Tract No. 12367 as per map recor-
ded in Book 249, Page 13 of Maps, Records of Los Angeles County;
said point of termination being North 57° 11' 50" East 25.50 feet
from the most Southerly corner of said Tract No. 12367.

(5)  Tract #5 - A temporary right-of-way for construc-
tion, operation, maintenance, renewal, and removal of a sewer line
along, across, beneath and over the following described property,
to wit:

The Southwesterly ten (10) feet of Lot 62 of Tract 12367,
in the City of Los Angeles, County of Los Angeles, State of Califor-
nia, as per map recorded in Book 249, Pages 12 and 13 of Maps, re-
cords in the Office of the County Recorder of said County and State,
granted by a lease entered into by and between the Bank of America
National Trust and Savings Association, a National Banking Associa-
tion, and the United States of America, on 1 September 1942, as
modified by Supplemental Agreements:  #1, dated 10 January 1944,
#2, dated 31 July 1944, #3, dated 4 August 1946, and #4, dated 30
December 1946, which was duly transferred and assigned to the
Capital Company, a California Corporation, on 7 September, 1945.

(6)  That certain sewer pipe line constructed pursuant
to and all rights acquired by, that certain Resolution of 9 October
1942, in the Minutes of the Board of Public Works, City of Los
Angeles, Page 205, Book No. 325, granting permission to the Federal
Government to install a sanitary sewer in Stewart Avenue between
Rose Avenue and Woodbine Streets.

(7)  Those certain chattels enumerated in Schedule "A"
attached hereto and made a part hereof as though fully set forth
hereat.

EXCEPTING, HOWEVER, from this conveyance all right, title,
and interest in and to all property in the nature of equipment,
furnishing, and other personal property located on the land leased
from the City of Santa Monica as hereinafter set out, which can be
removed from the land without material injury to the land or struc-
tures located thereon, other than those chattels enumerated in
Schedule "A" attached hereto and made a part hereof as though fully
set forth hereat, and reserving to the PARTY OF THE FIRST PART for
itself and its lessees, licensees, permitees, agents, and assigns
the right to use the property excepted hereby in such a manner as
will not materially and adversely affect the development, improve-
ment, operation or maintenance of the airport and the right of re-
moval from said premises of such property, all within a reasonable
period of time after the date hereof, which shall not be construed
to mean any period more than one (1) year after the date of this in-
strument, together with a right of ingress to and egress from said
premises for such purposes.

Further, the PARTY OF THE FIRST PART, for the consideration
hereinabove expressed, does hereby surrender, subject to the terms
and conditions of this instrument, to the PARTY OF THE SECOND PART,
the former's leasehold interest in and to the premises known as
"Clover Field, Santa Monica Municipal Airport", set forth and des-
cribed in Lease No. W-04-193-Eng-4894, dated 8 December, 1941, as

-3-

Exh. C
67

Book 28055 Page 214

modified by Supplemental Agreements: #1, dated July 23, 1945, and #2,
dated July 15, 1946; and in Lease No. W-3460-Eng-549, dated December 1,
1941, as modified by Supplemental Agreements: #1, dated December 20,
1944, and #2, dated July 15, 1946, both from the City of Santa Monica
to the United States of America, and including 168.87 acres, more or
less of land situated in the County of Los Angeles, State of California.

THE PARTY OF THE SECOND PART does hereby release the PARTY
OF THE FIRST PART from any and all claims which exist or may arise
under the provisions of the aforesaid lease, except claims which may
be submitted under Section 17 of the Federal Airport Act.

Said property transferred hereby was duly declared sur-
plus and was assigned to the War Assets Administration for disposal,
acting pursuant to the provisions of the above-mentioned Act, as
amended, Reorganization Plan One of 1947 and applicable rules,
regulations and orders.

THAT THE PARTY OF THE FIRST PART has released and quit-
claimed, and by this instrument does release and quitclaim to the
PARTY OF THE SECOND PART all of the structures and improvements
on the leased land, including underground and overhead utility
systems, which were added thereto by PARTY OF THE FIRST PART.

That by the acceptance of this instrument or any rights
hereunder, the said PARTY OF THE SECOND PART, for itself, its
successors, and assigns, agrees that the aforesaid surrender of
leasehold interest, transfer of structures, improvements and
chattels, and assignment, shall be subject to the following re-
strictions, set forth in subparagraphs (1) and (2) of this para-
graph, which shall run with the land, imposed pursuant to the
authority of Article 4, Section 3, Clause 2 of the Constitution
of the United States of America, the Surplus Property Act of 1944,
as amended, Reorganization Plan One of 1947 and applicable rules,
regulations and orders:

(1)  That, except as provided in subparagraph (6) of the next
succeeding unnumbered paragraph, the land, buildings, structures,
improvements and equipment in which this instrument transfers any
interest shall be used for public airport purposes for the use and
benefit of the public, on reasonable terms and without unjust dis-
crimination and without grant or exercise of any exclusive right
for use of the airport within the meaning of the terms "exclusive
right" as used in subparagraph (4) of the next succeeding paragraph.
As used in this instrument, the term "airport" shall be deemed to
include at least all such land, buildings, structures, improvements
and equipment.

(2)  That, except as provided in subparagraph (6) of the next
succeeding paragraph, the entire landing area, as defined in WAA
Regulation 16, dated June 26, 1946, and all structures, improve-
ments, facilities and equipment in which this instrument transfers
any interest shall be maintained for the use and benefit of the
public at all times in good and serviceable condition, provided,
however, that such maintenance shall be required as to structures,
improvements, facilities and equipment only during the remainder of
their estimated life, as determined by the Civil Aeronautics Admin-
istrator or his successor.  In the event materials are required to
rehabilitate or repair certain of the aforementioned structures,
improvements, facilities or equipment, they may be procured by demolition of
other structures, improvements, facilities or equipment transferred
hereby and located on the above described premises which have outlived
their use as airport property in the opinion of the Civil Aeronautics
Administrator or his successor.

-4-

Book 28055 Page 215

That by the acceptance of this instrument, or any rights hereunder, the PARTY OF THE SECOND PART, for itself, its successors and assigns, also assumes the obligations of, covenants to abide by and agrees to, and this surrender, transfer, and assignment is made subject to, the following reservations and restrictions set forth in subparagraphs (1) to (7) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders.

(1)     That insofar as it is within its powers, the PARTY OF THE SECOND PART shall adequately clear and protect the aerial approaches to the airport by removing, lowering, relocating, marking or lighting or otherwise mitigating existing airport hazards and by preventing the establishment or creation of future airport hazards.

(2)     That the United States of America (hereinafter sometimes referred to as the "Government") through any of its employees or agents shall at all times have the right to make nonexclusive use of the landing area of the airport at which any of the property transferred by this instrument is located or used, without charge: Provided, however, that such use may be limited as may be determined at any time by the Civil Aeronautics Administrator or his successor to be necessary to prevent undue interference with use by other authorized aircraft: Provided, further, that the Government shall be obligated to pay for damages caused by such use, or if its use of the landing area is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, commensurate with the use made by it.

(3)     That during any national emergency declared by the President of the United States of America or the Congress thereof, the Government shall have the right to make exclusive or nonexclusive use and have exclusive or nonexclusive control and possession, without charge, of the airport at which any of the property transferred by this instrument is located or used, or of such portion thereof as it may desire, provided, however, that the Government shall be responsible for the entire cost of maintaining such part of the airport as it may use exclusively, or over which it may have exclusive possession or control, during the period of such use, possession, or control, and shall be obligated to contribute a reasonable share, commensurate with the use made by it, of the cost of maintenance of such property as it may use nonexclusively or over which it may have nonexclusive control and possession; Provided, further, that the Government shall pay a fair rental for its use, control, or possession, exclusively or nonexclusively of any improvements to the airport made without United States aid.

(4)     That no exclusive right for the use of the airport at which the property transferred by this instrument is located shall be vested (directly or indirectly) in any person or persons to the exclusion of others in the same class, the term "exclusive right" being defined to mean

(1)  any exclusive right to use the airport for conducting any particular aeronautical activity requiring operation of aircraft;

(2)  any exclusive right to engage in the sale or supplying of aircraft, aircraft accessories, equipment, or supplies (excluding the sale of gasoline and oil), or aircraft services necessary for the operation of aircraft (including the maintenance and repair of aircraft, aircraft engines, propellers, and appliances).

-5-

*deed # 4*

Book 28055 Page 216

(5)      That, except as provided in subparagraph (6) of this paragraph, the property transferred hereby may be successively transferred only with the proviso that any such subsequent transferee assumes all the obligations imposed upon the PARTY OF THE SECOND PART by the provisions of this instrument.

(6)      That no property transferred by this instrument shall be used, leased, sold, salvaged, or disposed of by the PARTY OF THE SECOND PART for other than airport purposes without the written consent of the Civil Aeronautics Administrator, which shall be granted only if said Administrator determines that the property can be used, leased, sold, salvaged or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation or maintenance of the airport at which such property is located; Provided, that no structures disposed of hereunder shall be used as an industrial plant, factory, or similar facility within the meaning of Section 23 of the Surplus Property Act of 1944, as amended, unless the PARTY OF THE SECOND PART shall pay to the United States such sum as the War Assets Administrator or his successor in function shall determine to be a fair consideration for the removal of the restriction imposed by this proviso.

(7)      The PARTY OF THE SECOND PART does hereby release the Government, and will take whatever action may be required by the War Assets Administrator to assure the complete release of the Government from any and all liability the Government may be under for restoration or other damages under any lease or other agreement covering the use by the Government of the airport, or part thereof, owned, controlled or operated by the PARTY OF THE SECOND PART, upon which, adjacent to which, or in connection with which, any property transferred by this instrument was located or used; Provided, that no such release shall be construed as depriving the PARTY OF THE SECOND PART of any right it may otherwise have to receive reimbursement under Section 17 of the Federal Airport Act for the necessary rehabilitation or repair of public airports heretofore or hereafter substantially damaged by any Federal agency.

By acceptance of this instrument, or any right hereunder, the PARTY OF THE SECOND PART further agrees with the PARTY OF THE FIRST PART as follows:

(1)      That in the event that any of the aforesaid terms, conditions, reservations or restrictions is not met, observed, or complied with by the PARTY OF THE SECOND PART or any subsequent transferee, whether caused by the legal inability of said PARTY OF THE SECOND PART or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument to the PARTY OF THE SECOND PART, or any portion thereof, shall at the option of the PARTY OF THE FIRST PART revert to the PARTY OF THE FIRST PART sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administrator or his successor in function, unless within said sixty (60) days such default or violation shall have been cured and all such terms, conditions, reservations and restrictions shall have been met, observed or complied with, in which event said reversion shall not occur and title, right of possession, and all other rights transferred hereby, except such, if any, as shall have previously reverted, shall remain vested in the PARTY OF THE SECOND PART, its transferees, successors and assigns.

(2)      That if the construction as covenants of any of the foregoing reservations and restrictions recited herein as covenants or the application of the same as covenants in any particular instance is held invalid, the particular reservations or restrictions in question shall be construed instead merely as conditions upon

Book 28055 Page 217

the breach of which the Government may exercise its option to cause the title, right of possession and all other rights transferred to the PARTY OF THE SECOND PART, or any portion thereof, to revert to it, and the application of such reservations or restrictions as covenants in any other instance and the construction of the remainder of such reservations and restrictions as covenants shall not be affected thereby.

TO HAVE AND TO HOLD the property transferred hereby, under and subject to the aforesaid reservations, restrictions and conditions, unto the said PARTY OF THE SECOND PART, its successors and assigns forever.

IN WITNESS WHEREOF, the UNITED STATES OF AMERICA, acting by and through the War Assets Administration, has caused these presents to be executed in its name and on its behalf by W.A. Rover, District Director, War Assets Administration, and the CITY OF SANTA MONICA, acting by and through its City Council, has caused these presents to be executed in its name and on its behalf by ___R. M. DORTON, City Manager and attested by ____K. O. GRUBB____, its City Clerk, and its seal to be hereunto affixed, all as of the ____10th____ day of ____August____, 1948.

UNITED STATES OF AMERICA
Acting by and through
WAR ASSETS ADMINISTRATION

By _____
       District Director
       Los Angeles District Office

WITNESSES:

_Evelyn St. John_
_Martha E. Livingston_

WITNESSES:

_W. B. Kimberling_
_Ada W. Matthews_

ATTEST:

_K O Grubb_
City Clerk

CITY OF SANTA MONICA
STATE OF CALIFORNIA

By _____
       CITY MANAGER

-7-

ORIGINAL

Book 28055 Page 218

### SCHEDULE "A"

| SWPA NO.P-L | ITEM | UNITS | QUANTITY |
|---|---|---|---|
| 2661568-1-1 | Ice Chest | ea. | 4 |
| " 1-2 | " " | ea. | 1 |
| " 1-3 | Ice Box | ea. | 1 |
| 2661565-1-1 | Steel Drums | ea. | 2 |
| " 1-2 | " " | ea. | 2 |
| " 1-3 | " " | ea. | 1 |
| " 1-4 | " " | ea. | 1 |
| " 1-5 | " " | ea. | 3 |
| " 1-6 | " " | ea. | 7 |
| " 1-7 | " " | ea. | 3 |
| " 1-8 | " " | ea. | 1 |
| 2661567-1-1 | Fire Extinguisher | ea. | 4 |
| " 1-2 | " " | ea. | 10 |
| " 1-3 | " " | ea. | 4 |
| " 1-4 | " " | ea. | 12 |
| 2661569-1-1 | Wire Camouflage | ea. | 10 |
| 2661570-1-1 | Hose Fibre Fire w/nozzle | ea. | 2 |
| " 1-2 | " " " " | ea. | 4 |
| " 1-3 | " " " " | ea. | 2 |
| 2661566-1-1 | Oak Barrel | ea. | 1 |
| 2661571-1-1 | Ping Pong Table | ea. | 1 |
| 8009-5711 | | | |
| WAA-21 #5 | Truck fire, pumper | | |
| 2657337-3-4 | | | |
| WAA-21 #6 | Tractor, International, Mod.TDR 18 Bulldozer | | |
| 2657337-4-4 | | | |
| WAA-21 #3 | Tractor, Fordson | | |
| 2657342-3-3 | | | |
| WAA-21 #4 | Grader, Motorized, J.D. Adams Mod. 201 | | |
| 2657342-2-1 | | | |
| WAA-21 #10 | Crane, Tractor, Hughes-Keenan, Model MC2R | | |
| 8009-11123-1-1 | | | |
| RP-1 | Truck, Fire & Rescue, International | | |

Book 28055 Page 219

STATE OF CALIFORNIA        )
                          )  SS
COUNTY OF LOS ANGELES     )

On this 19th day of August, 1948, before
me Helen P. Peralta, a Notary Public in and
for the County of Los Angeles, State of California, personally
appeared Walter A. Rover, known to me to be the District
Director, Los Angeles District Office, War Assets Administra-
tion, and known to me to be the person who executed the within
instrument on behalf of the War Assets Administration which
executed said instrument on behalf of the United States of
America and acknowledged to me that he subscribed to the said
instrument the name of the United States of America and the
name of the War Assets Administration on behalf of the United
States of America, and further that the United States of America
executed said instrument.

WITNESS my hand and official seal.

Helen P. Peralta
Notary Public in and for
County and State

My Commission expires
My Commission Expires Apr. 23, 1949

deed #4

Book 28055 Page 220

WAA Form 1241
(4-12-48)

UNITED STATES OF AMERICA
War Assets Administration

C E R T I F I C A T E

I, the undersigned ___L. S. WRIGHT, Secretary___

___The General Board___ , War Assets Administration, in my

official capacity as such ___Secretary___ ,

and duly authorized in the DELEGATION OF AUTHORITY INCIDENT TO THE CARE,

HANDLING AND CONVEYANCING dated ___Apr. 9, 1948___ , to make the following

certification, do hereby certify:

1. That ___Walter A. Rover___ is the

District Director, Los Angeles District Office

War Assets Administration, duly appointed, authorized and acting in such

capacity at the time of the execution of the attached instrument,

2. That the attached DELEGATION OF AUTHORITY INCIDENT TO THE

CARE, HANDLING AND CONVEYANCING is a true and correct copy of the original

of said DELEGATION OF AUTHORITY, dated ___Apr. 9, 1948___ ,

Given under my hand this ___10th___ day of ___August___ , 1948.

Secretary
(Title)
The General Board
(Office)
War Assets Administration

Book 28055 Page 221

(NOTICE)

DELEGATION OF AUTHORITY NO. 145

DELEGATION OF AUTHORITY INCIDENT TO THE CARE, HANDLING, AND CONVEYANCING OF
SURPLUS REAL PROPERTY AND PERSONAL PROPERTY ASSIGNED FOR DISPOSAL THEREWITH

The Deputy Administrator, Office of Real Property Disposal, and each Associate Deputy Administrator, Office of Real Property Disposal, War Assets Administration; the Regional Director, the Deputy Regional Director for Real Property Disposal, the Associate Deputy Regional Director for Real Property Disposal, and the Assistant Deputy Regional Director for Real Property Disposal, in each and every War Assets Administration Regional Office; the District Director and Deputy District Director for Real Property Disposal, in each and every War Assets Administration District Office, and any person or persons designated to act, and acting, in any of the foregoing capacities, are hereby authorized, individually (1) to execute, acknowledge and deliver any deed, lease, permit, contract, receipt, bill of sale, or other instruments in writing in connection with the care, handling and disposal of surplus real property, or personal property assigned for disposition with real property, located within the United States, its territories and possessions, (2) to accept any notes, bonds, mortgages, deeds of trust or other security instruments taken as consideration in whole or in part for the disposition of such surplus real or personal property, and to do all acts necessary or proper to release and discharge any such instrument or any lien created by such instrument or otherwise created, and (3) to do or perform any other act necessary to effect the transfer of title to any such surplus real or personal property located as above provided; all pursuant to the provisions of the Surplus Property Act of 1944, as amended, (58 Stat. 765; 50 U.S.C. App. Supp. 1611); Public Law 181, 79th Cong. (59 Stat. 533; 50 U.S.C. App. Supp. 1614a, 1614b); Reorganization Plan 1 of 1947 (12 F.R.4534); Public Law 289, 80th Cong. (61 Stat. 678); and War Assets Administration Regulation No. 1 (12 F. R. 6661), as amended.

The Regional Director in each and every War Assets Administration Regional Office is hereby authorized to redelegate to such person or persons as he may designate the authority delegated to him by this instrument.

L. S. Wright, the Secretary of The General Board and Robert Whittet, Associate Deputy Administrator, Office of Real Property Disposal, War Assets Administration, are hereby authorized, individually, to certify true copies of this Delegation and provide such further certification as may be necessary to effectuate the intent of this Delegation in form for recording in any jurisdiction, as may be required.

This Delegation shall be effective as of the opening of business on April 9 _____, 1948.

This authority is in addition to delegations of authority previously granted under dates of May 17, 1946; May 29, 1946; July 30, 1946; September 16, 1946; October 31, 1946; November 22, 1946; January 13, 1947; June 6, 1947; and December 1, 1947; but shall not in any manner supersede provisions of said delegations as do not conflict with the provisions of this Delegation.

JESS LARSON
Administrator

Dated: _____ APR 9 _____, 1948.

Exh. C
75

34-2420