Book 28055 Page 222    RESOLUTION NO. 183

(CITY COUNCIL SERIES)

A RESOLUTION OF THE CITY COUNCIL OF THE
CITY OF SANTA MONICA ACCEPTING AN INSTRU-
MENT OF TRANSFER FROM THE UNITED STATES
OF AMERICA.

THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES RESOLVE AS
FOLLOWS:

SECTION 1.   That that certain instrument of transfer from
the United States of America, acting by and through the War Assets
Administration, whereby said United States of America does surrender
to the City of Santa Monica the former's lease-hold interest in
and to the premises known as Cloverfield Santa Monica Municipal Air-
port and certain easements and temporary rights of way appurtenant
thereto, be and the same hereby is accepted.

SECTION 2.   That the City Manager hereby is authorized
to execute said instrument of transfer on behalf of the city and
the City Clerk shall attest his signature thereto.

SECTION 3.   That the City Clerk shall certify to the adop-
tion of this resolution and thenceforth and thereafter the same
shall be in full force and effect.

ADOPTED and APPROVED this 10th day of August, 1948.

ATTEST:

_____          _____
City Clerk                                         Mayor Pro Tem

I hereby certify that the foregoing resolution was duly
adopted by the City Council of the City of Santa Monica at a
regular meeting thereof held on the 10th day of August,
1948, by the following vote of the Council:

AYES:       Councilmen: Barnard, Guercio, Markworth, Neilson,
                              Talmage, Schimmer
NOES:       Councilmen: None
ABSENT:    Councilmen: Gates

_____
City Clerk

Approved as to form this
10 day of August, 1948.

ROYAL M. SORENSEN
Royal M. Sorensen, City Attorney

deed # 4

*Airport*

*No Risk*
*Deed #4*
*Do not throw away*

# ASSOCIATED TELEPHONE COMPANY LTD.

1314 SEVENTH STREET

SANTA MONICA, CALIFORNIA

April 22, 1948

RECEIVED

MAY 10 1948

CITY CLERK
SANTA MONICA, CALIF.

RECEIVED
SANTA MONICA, CALIF.

APR 23  9 04 AM '48

REFERRED TO:

City of Santa Monica
City Hall
Santa Monica, California

Gentlemen    Attention of Mr. R. M. Dorton, City Manager

There are attached for approval and execution by the City of Santa
Monica original and two copies of a right-of-way agreement conveying
to this company for underground telephone purposes an easement over
a portion of Lots 164 and 169, Tract 10529, now part of the Santa
Monica Municipal Airport, as shown on maps attached to the documents.

The easement covered hereunder is intended to enable us to increase
telephone facilities to the airport administration building and to
eliminate the need for the city owned aerial plant and its inherent
hazards.  Mr. Tyler, Airport Manager, already has expressed his
favorable view toward this proposal.

If satisfactory to the City, we shall appreciate the approval and
execution of these documents at your earliest convenience.

Very truly yours

ELTON O. WATSON
Manager

attachments

#4

Deed # 4

## GRANT OF EASEMENT

THE GRANTOR, CITY OF SANTA MONICA, a municipal corporation, in consideration of the sum of One Dollar ($1.00), and other good and valuable consideration, the receipt of which hereby is acknowledged, does by these presents grant and convey unto the ASSOCIATED TELEPHONE COMPANY, LTD., its successors and assigns, an easement and right of way for the construction, maintenance and operation of a telephone line with wires, conduits, cables and appurtenances by means of an underground system, for the transmission of electric energy for telephone and telegraph purposes together with the right of ingress and egress upon, over, in, under, across and along that certain real property situated in the County of Los Angeles, State of California, described as follows:

A strip of land 4 feet in width lying within Lots 164 and 169 of Tract No. 10529, centerline of said strip beginning at a point in the northeasterly line of said Lot 164 a distance of 6 feet northwesterly from the east corner of said Lot 164, thence southwesterly parallel with the southeasterly lines of said Lots 164 and 169 a distance of 752 feet, thence northwesterly at right angles to the southeasterly line of Lot 169 a distance of 44 feet; A strip of land 4 feet in width lying within Lot 169 in Tract No. 10529, centerline of said strip beginning at a point in the northeasterly line of Lot 164, a distance of 6 feet northwesterly from the east corner of said Lot 164, thence southwesterly parallel with the southeasterly lines of said Lots 164 and 169 a distance of 752 feet to the true point of beginning thence southwesterly parallel with the southeasterly line of Lot 169 a distance of 180 feet, thence northwesterly at right angles to the southeasterly line of Lot 169 a distance of 102.5 feet, thence southwesterly parallel with the southeasterly line of Lot 169 a distance of 4 feet; All as per map recorded in Book 160 at Page 25, of Maps, in the office of the County Recorder of Los Angeles County, California.

- 1 -

THIS grant is made subject to any and all matters of record.

IN WITNESS WHEREOF the grantor has caused its corporate seal to be hereunto affixed and these presents to be signed by its duly authorized officers this __14th__ day of __May__, 1948.

                                    CITY OF SANTA MONICA, a
                                    municipal corporation

ATTEST:

                         By _~signature~_
                            City Manager

_~signature~_
City Clerk


Approved as to form this
__14__ day of __May__, 1948.

_~signature~_
Royal M. Sorensen, City Attorney

- 2 -

#4

Exh. C
79

STATE OF CALIFORNIA   )
                      )  ss.
COUNTY OF LOS ANGELES )

On this __14th__ day of ____May____, 194_8_, before me,

__SCOTT A. McHENRY__, a Notary Public in and for said

County and State, personally appeared _R. M. DORTON_, known to me

to be the _CITY MANAGER_ of the City of Santa Monica, and

_K. O. GRUBB_, known to me to be the _CITY CLERK_

_____ of the City of Santa Monica, the municipal corporation that

executed the within instrument, and known to me to be the persons who executed

the within instrument on behalf of the corporation therein named and acknowledged

to me that such corporation executed the same.

WITNESS MY HAND and official seal, the day and year in this

certificate first above written.

_Scott A. McHenry_
Notary Public in and for said
County and State.

My Commission Expires Aug. 17, 1950

#4



# EXHIBIT D

( RACT NO. 4069(CCS)

## SANTA MONICA AIRPORT AGREEMENT

Section 1.  Purpose.

This Agreement resolves a series of disputes involving the Santa Monica Airport (hereinafter "the Airport").  These disputes have taken various forms, including extensive complex litigation.  In addition to expressing the mutual consent of the parties, including the City of Santa Monica (hereinafter "the City") and the Federal Aviation Administration hereinafter ("the FAA"), this Agreement responds to the concerns of local and national aviation interests and residents of neighborhoods affected by noise from the Airport.

The various Airport disputes have occurred over an extended period of time and have involved a number of specific issues.  In these disputes there have been two common factors:

a.  The impact on the community surrounding the Airport of noise from aircraft operating into and out of the Airport.

b.  Various restrictions and limitations imposed by the City on the users of the Airport, and the effect of these restrictions on air traffic in the Los Angeles Metropolitan Region.

By this Agreement the parties indicate their willingness to approach the many varied Airport issues systematically and cooperatively.  This Agreement describes

the specific points of agreement between the parties and provides a format within which issues arising in the future can be addressed and resolved. A fundamental purpose of this Agreement is to expand and improve the communication, cooperation, and mutual understanding of the various perspectives of the parties, while recognizing and preserving their respective legal rights.

Section 2. **Basis for Agreement.**

This Agreement was reached only after and is the result of extensive study and analysis of the many different issues involving the Airport. The parties have had numerous meetings and extensive detailed discussions concerning the points which form the terms of this Agreement. There has been extensive involvement of Airport users and neighbors, including several public hearings and the participation of an Airport Working Group composed of representatives of a broad spectrum of interests and perspectives.

a. **Recognition of Legal Principles.**

This Agreement is based on a recognition of the legal rights and duties of the parties, a balancing of interests, and an awareness of facts indicating a resolution of conflict is practicable.

Three underlying legal principles are the basis for this Agreement:

(i) The Airport is to be open and available to and for public use as an airport on fair and reasonable terms,

2

without unjust discrimination, and without granting any exclusive rights prohibited by law.

(ii) Pursuant to the Federal Aviation Act of 1958, as amended, exclusive authority is vested in the FAA for the regulation of all aspects of air safety, the management and control of the safe and efficient use of the navigable airspace, and movement of aircraft through that airspace. Under Section 611 of that Act the FAA also has substantial responsibility for the reduction of aircraft noise.

(iii) The City has the responsibility to manage the Airport, including the ability to take reasonable action designed to abate the impact of noise from aircraft operations on surrounding communities, in accordance with the principles of <u>Santa Monica Airport Association v. City of Santa Monica</u>, 479 F.Supp. 927 (C.D. Cal. 1979), <u>affirmed</u>, 659 F.2d 100 (9th Cir. 1980); and <u>British Airways Board v. Port Authority of New York</u>, 558 F.2d 75 (2d Cir. 1977).

   b. <u>Balancing of Factors</u>.

The fundamental basis for this Agreement involves the balancing of a number of diverse factors. Studies and analysis have demonstrated and it is agreed that:

(i) The Airport serves an important role in the regional and national system of air transportation and air commerce. It has a vital and critical role in its function as a general aviation reliever for the primary airports in the area. As a reliever facility the Airport attracts and provides service to general aviation thereby diverting

aircraft away from the air carrier airports and other heavily used airports located in the Greater Los Angeles Area.  Study and analysis have confirmed this congestion and that other similar general aviation reliever airports in the area are already heavily used and do not have the ability to accept or absorb the service provided by Santa Monica Airport.

(ii)  The Airport is bounded on three sides by densely populated residential areas.  Noise from aircraft departing from and landing at the Airport, including those operating within the Airport flight pattern, can have an impact on the quality of life of citizens of Santa Monica and Los Angeles. Many residents in these areas have long complained to the City over the impact of aircraft noise and demanded that the City take effective action with respect to aircraft noise.

c.  <u>Factors Leading to Agreement</u>.

Three factors were critical to the achievement of this Agreement:

(i)  The willingness of the parties to approach the Airport issues with an open mind and to consider imaginative and previously untried alternative concepts, with recognition of the legitimacy and validity of the interests and concerns of other parties.  This good faith effort to explore and consider many different alternatives was critical in achieving compromises designed to balance the many factors involved.

(ii) The recognition that the Airport is poorly designed and organized. Consequently it is agreed that the Airport can be redesigned so as to maintain the current level, quantity, and type of services provided by the Airport and to provide "residual" land which could be made available to the City for other uses compatible with Airport operations.

(iii) The recognition that any noise problem at the Airport can be addressed through a noise mitigation program focused on a cooperative effort to reduce noise levels of aircraft using the Airport, by careful design of Airport facilities and ground buffers, and by sensitive placement of flight paths to achieve noise abatement consistent with safety.

Section 3.  Scope and Duration.

This Agreement states the principles and plans for the operation of the Airport.  All prior agreements between the parties concerning the Airport, and all actions of the parties during the duration of this Agreement, shall be interpreted consistently with this Agreement.  This Agreement shall be effective from the date of its execution until July 1, 2015.

Section 4.  Settlement of Legal Disputes.

This Agreement serves to resolve all existing legal disputes among the parties.  In this context it constitutes a settlement Agreement applicable to all existing litigation

and/or administrative complaints pending between the parties. Following its acceptance and execution by the parties, a copy may be filed with any Court or administrative body where any litigation or complaint is pending as evidence of the resolution and settlement agreed to by the parties.

Section 5.   <u>Airport Layout Plan</u>.

The parties are aware that the City approved an Airport Plan and Noise Mitigation Program for the Airport at the City Council Meeting of November 15, 1983.

The Airport Layout Plan submitted to and approved by the FAA on ____JAN 31 1984____ (City Map No. SM 511 ), is incorporated by reference into this Agreement and shall guide the development and improvement of the Airport for the duration of this Agreement. This Airport Layout Plan may be referred to herein as the "Airport Layout Plan."

The Airport Layout Plan shifts a substantial portion of aeronautical services from their present location on the south side of the Airport to the north side. Some aeronautical services will be maintained on the south side of the Airport. Additionally, the Airport Layout Plan makes available a substantial portion of the area located in the southeast section of the Airport, generally along Bundy Drive and Airport Avenue, and adjacent to Clover Park, for uses compatible with Airport operations. This would provide an expanded employment and revenue base and increased parkland for the City. The parties believe the Airport

6

Layout Plan and noise abatement program described in this Agreement provide a reasonable redesign of the Airport which balances aeronautical needs and community concerns.

Section 6. Consent to Use of Land.

The FAA, as the successor to the Civil Aeronautics Administrator, approves the boundary of the Airport as shown in the Airport Layout Map, consents to the use of land designated as parkland and residual land therein for other than airport and aviation purposes, releases the City and this parkland and residual land from any and all conditions, covenants, and restrictions imposed by the Instrument of Transfer dated August 10, 1948, Deed No. 4 (CCS), and agrees that the City may develop such parkland and residual land in accordance with the terms of this Agreement, and in conformity with State and local planning law and noise compatibility standards. However, such development shall not occur prior to the execution of leases with full-service fixed base operators in accordance with Section 14 of this Agreement.

Section 7. Material Terms of Agreement.

The parties agree that certain points were specifically bargained for and constitute material terms of this Agreement. These terms shall not be altered without the mutual consent of the parties, which shall not be unreasonably withheld. The material terms of this Agreement include:

a.   The City's obligation to operate the Airport for the duration of this Agreement (Section 8).

b.   The runway/taxiway configuration as shown on the Airport Layout Plan (Sections 9 and 10).

c.   Aircraft parking and tie-down space (Section 13).

d.   Fixed base operator space (Section 14).

e.   The 95 dB Single Event Noise Exposure Level maximum noise limit (Section 16).

f.   The development of a tiered noise level system based on the performance capability of particular aircraft (Sections 17 and 18).

g.   The process for implementation of the City's Noise Mitigation Program (Section 19).

h.   The maintenance of the existing departure restriction (Section 22), the existing and possible future limitation on helicopter operations (Section 24), and the existing and possible future limitation on pattern flying (Section 25).

It is recognized and agreed to that the parties will cooperate with each other and rationally analyze issues as they arise, and that any term of this Agreement may be modified by the terms of any future agreements between the parties, provided such future agreements expressly indicate an intention to modify this Agreement.

It is agreed that any future grant agreements between the City and the FAA which are designed to implement the programs covered by this Agreement, defined as those

8

agreements for the federal funding of programs or improvements intended to further this Agreement executed prior to July 1, 1995, shall be consistent with this Agreement and shall not extend or alter the obligation of the City to operate the Airport under this Agreement, except as may be required by federal statute.

Section 8.   Commitment to Operate Airport.

The City will operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever airport as described in Section 2(b)(i) of this Agreement or its capacity in terms of runway length and width, taxiway system, and runway weight bearing strength until July 1, 2015.   The Airport will be capable of accommodating most kinds of general aviation aircraft, generally consistent with Group II Design Standards set forth in FAA Advisory Circular 150/5300.4B dated February 24, 1983.

The City agrees to improve the Airport physical layout as shown in the Airport Layout Plan and maintain the Airport and the facilities located on the Airport.

Section 9.   Runway/Taxiway Configuration.

At the present time the Santa Monica Airport has one runway designated 3/21 which is 5,000 feet long and 150 feet wide.  This runway will be continuously maintained in good operating condition by the City.   All presently installed air navigation facilities and Airport lighting systems

(i.e., Air Traffic Control Tower, VOR, VASI, runway lights, etc.) will remain in their present location. It is recognized that the VASI lights may be relocated if the landing threshold is displaced pursuant to Section 12.

Nothing in this Agreement prevents or precludes the replacement or upgrading of the present facilities and systems with new or technologically improved equipment, facilities or systems as necessary or appropriate. At some future date new technology equipment such as a microwave landing system (MLS) may be installed; the City will be given priority for the installation of MLS equipment as it is developed and becomes available.

Section 10.  Runway Exit System.

The runway/taxiway system will be redesigned so as to establish designated angled exits from the runway, also known as high speed exits, in lieu of the present system. In addition, a centrally located area adjacent to the runway will be established, designated, and maintained to permit aircraft to exit the runway without using a designated taxiway. Additional taxiway, Airport apron and aircraft parking facilities will be provided in accordance with the Airport Layout Plan.

Section 11.  Airspace Protection Criteria.

Standard FAA airspace protection criteria will be applied to maintain clear zones at the ends of the runway as shown in the Airport Layout Plan. No construction will be

10

permitted laterally from the center line of the runway for the full length and on either side of the runway for a distance of 150 feet. That constitutes the edge of the safety area. From the edge of the runway safety area extending outward from the runway, structures will be permitted provided they meet the standard FAA 7 to 1 ratio (i.e. for every 7 feet of distance laterally there can be 1 foot of height added).

Section 12.  Displaced Landing Threshold.

The City has indicated a desire to modify the existing runway by displacing the threshold by 500 feet for airplanes landing at the Airport. There is some uncertainty regarding the effect of such an action in two areas: (1) whether this action would increase or decrease noise; (2) what effect, if any, there would be on air safety and the ability of the Airport to provide the level and type of service described in Sections 2(b)(i) and 8.

In order to analyze the potential effects of displacing the landing threshold by 500 feet, the parties agree to establish a trial program for a period not to exceed one (1) year during which the effects of displacing the landing threshold by 500 feet will be investigated.

A preliminary test will be conducted to determine if threshold displacement is likely to increase or decrease community noise impact. If it is determined that noise impact is likely to increase, no further testing will be performed and the landing threshold will not be displaced.

If it is not determined that noise impact is likely to increase, the landing threshold will be displaced for a period of up to one year, and the various effects of threshold displacement will be examined.

A final determination concerning this question of runway displacement will be made by the City after consultation with the FAA at the conclusion of this study based on the results of the study. This final determination can be made at any point in time within the designated one-year period. The parties agree to cooperate in the design and conduct of the tests and to consult concerning the data obtained. The full runway length of 5,000 feet will be available at all times for takeoff and will be available for use by landing airplanes in an emergency situation.

Section 13. <u>Aircraft Parking Space and Fuel Service.</u>

The City will provide and maintain sufficient space to permit the parking or tie-down of at least 550 based aircraft and 40 transient aircraft. These aircraft tie-down or parking facilities for based aircraft will be allocated and made available by the City on reasonable terms to all Airport users including fixed base operators located on the Airport and individuals who wish to lease tie-down space from the City. Parking for transient aircraft will also be available on reasonable terms. In allocating this aircraft parking space the City will provide sufficient space to park aircraft of different types having different wing spans,

12

different lengths, and different power plants.  The mix of aircraft to be accommodated at the Airport shall be consistent with the present mix of aircraft now based at the Airport and the mix forecast for the future as shown in Chapter III of the Airport Master Plan Study dated October, 1983.  Aircraft fuel service will be available at the Airport.

Section 14.  Fixed Base Operators.

The City will provide sufficient space for the location and operation of three (3) full service fixed base operators (FBO).  The City will lease to each full service FBO sufficient space to provide a full range of aeronautical services including but not limited to: aircraft and avionics sales; aircraft and avionics maintenance, service and repair facilities; flight school and training service; and charter and air taxi service.  It is recognized that the needs of each FBO may be different in terms of total space or acreage required.  FBO leases will be consistent with the terms of this Agreement and contingent on compliance with the City's non-discriminatory policies and regulations.  The City will provide access to sufficient space at reasonable rental rates to enable each FBO to conduct a viable business, including space for an office structure, training facilities, aircraft and automobile parking and an aircraft maintenance hangar.

In addition, the City will provide sufficient space for the location and operation of limited or specialized

13

fixed base operators.  It is recognized that these FBOs do not require as much space as a full service FBO since they generally provide limited aeronautical service (e.g., avionics maintenance, repair or installation; airplane propeller repair, maintenance or installation).

In order to permit all FBOs, whether full service or engaged in specialized aeronautical activity, to conduct their business activity on a reasonable basis, the City will lease sufficient space to them consistent with the approved Airport Layout Plan on fair and reasonable terms on a financial basis comparable to those used at other similar airports in the region for a sufficient term of years to enable them to amortize their costs and have the opportunity to make a profit.

The parties recognize and agree that it is appropriate for the City to exercise its proprietary authority to adopt ordinances and regulations applicable to lessees and users of the Airport consistent with the terms of this Agreement.

Section 15.  <u>Noise Abatement Principles</u>.

The parties recognize and acknowledge that the achievement of the abatement of aircraft noise to the extent technologically practicable and consonant with air safety is consistent with the function, role, and service provided by the Airport.  To this end the parties agree to cooperate and work toward the abatement of aircraft noise by the following described methods.

The parties are aware that the City has adopted a Noise Mitigation Program as an integral part of its Airport Plan.   The City's Noise Mitigation Program is intended to abate aircraft noise to the extent technologically practicable and consonant with air safety, and to meet a noise reduction goal equivalent to an approximate 4 dB reduction in the Community Noise Equivalence Level (CNEL) from the 1982 levels attributable to aircraft noise.   Within the framework of and consistent with the material terms of this Agreement, the City expects to meet this noise goal by the application of the material terms and concepts set out in this Agreement.   The parties agree that progress toward achieving noise reduction goals through implementation of the Noise Mitigation Program will be carefully studied and analyzed.   Alternative measures to abate noise consistent with this Agreement will be evaluated for their effectiveness in reducing noise, effect on air safety and air traffic, and effect on the utility of the Airport.

Section 16.   <u>Maximum SENEL Limit</u>.

The current SENEL aircraft noise limit of 100 dB as measured at the existing noise monitoring sites established by the City will be established and maintained at 95 dB. The parties believe that substantially all of the currently based or transient aircraft which have used the Airport in recent years can be operated safely using safe noise abatement operating procedures and meet this reduced SENEL limitation.

Section 17.  <u>Performance Based Noise Limit</u>.

The parties believe that many of the aircraft using the Airport can be operated more quietly using safe noise abatement flight operating procedures.  Consequently the parties agree to cooperate in the development of a program designed to establish tiered noise levels for different types or kinds of aircraft (rather than a single specified maximum noise level limit) to encourage all aircraft operators to use safe noise abatement operating procedures in order to minimize the noise impact of their aircraft use.

The parties believe this performance-based noise reduction program is capable of resulting in reduced Community Noise Equivalence Level (CNEL) from the operation of aircraft.  The expectation of achieving such noise reduction is based on the City's analysis of actual measured aircraft flights at the Airport.  The actual results to be obtained from implementation of a performance-based noise program will depend on various factors, including the degree to which all Airport users and governmental entities cooperate in implementing and complying with procedures and practices established pursuant to this Agreement.

Section 18.  <u>Experimental Nature of Noise Program</u>.

The parties recognize and acknowledge that the concept of tiered noise level limits based on the demonstrated noise performance capabilities of different types and kinds of aircraft is unique.  Application of this concept has, to the knowledge of the parties, never been attempted prior to this

16

time anywhere; it will require the difficult task of establishing a valid and reliable data base for analysis and classification. Its application also requires creating a classification system which identifies the performance based noise levels for the wide range of diverse aircraft types operating at this Airport as well as the process of placing particular individual aircraft in a particular noise performance category for this Airport.

While the parties believe this tiered concept reasonably applied can work, they also acknowledge that it is experimental in nature. The parties agree to work cooperatively to develop this program. To this end the City agrees to provide to the FAA the data developed by and during this program. The FAA agrees to provide technical assistance to the City including but not limited to review of the data provided, review of any data analysis obtained by the City, and the FAA may conduct and make available to the City its own analysis of the data collected. The FAA will make its Integrated Noise Model Computer Program available to the City.

Section 19. <u>Implementation of Noise Abatement Program.</u>

The parties agree that the process of implementing the noise abatement program should proceed in stages, with regular measuring and analysis, full communication and cooperation, and adjustment as analysis progresses. This

17

process will generally comprise four (4) phases, to be implemented as follows:

a. Commencement of Program.

Upon execution of this Agreement, the City will commence implementation of the noise abatement program. The first implementation phase will include: the adoption of regulations instituting the noise abatement program; the establishment of a system to promote communications and voluntary compliance; the definition of the terms of scientific analyses and experiments to be performed; the gathering of data using the City's existing noise monitoring equipment; and the design, procurement, and installation of new noise equipment necessary to conduct the full program.

b. Experimental Test Period.

Commencing from the date the new noise equipment is operational, there will be a one-year test period wherein appropriate operating procedures and categorical noise limits are developed and analyzed, and the effect of other noise mitigation measures and factors is evaluated. At the conclusion of this experimental period, the regulations would be adjusted in accordance with the results of the study.

c. Evaluation Test Period.

After adjustments have been made to the program in light of the results of the Experimental Test Period, there will be a one-year period in which the noise abatement program as adjusted is evaluated in order to determine

18

progress toward achievement of the City's Noise Goal. There will also be a periodic evaluation of the program by all parties in terms of its relationship to and measurement of progress toward achievement of noise abatement generally and aviation noise as a specific contributor to community noise. Included in this review will be an analysis of the extent to which the ability of the City to achieve its noise reduction goals is affected by noise sources other than aircraft noise.

    d.  Adjustment of Program.

The results of the Evaluation Test Period will be analyzed by the parties. If the City's noise goal is not met and analysis indicates that aircraft noise exceeds noise from other sources in the community, the City will analyze alternative noise mitigation measures designed to assist in the achievement of the City's aircraft noise reduction goal, including possible regulations intended to reduce aircraft noise attributable to the volume of pattern flying. That analysis will consider the effect of these alternative measures in terms of both noise abatement results expected and the role, function, and service provided by the Airport. Before the City implements any such alternative measures, it will consult with the FAA and other interested parties, it being explicitly agreed, however, that no material terms of this Agreement can be amended or modified without the agreement of the parties to this Agreement.

Section 20.  Enforcement During Implementation.

The noise abatement program will emphasize pilot education and communication with individual pilots regarding effective and safe noise abatement operating procedures. The cooperation and advice of pilots, FBOs, and interested members of aviation and neighborhood communities will be sought.

The 95 dB maximum SENEL limit will be enforced by the City using civil sanctions varying according to the willfulness, severity, and frequency of violations.  With respect to pilots who repeatedly operate an aircraft in violation of this limit, the City may after investigation to assure that a violation was not related to extraneous factors beyond the pilot's control such as loss of power, action to avoid other aircraft, or unusual weather conditions, take actions such as formal warning, imposition of civil penalties, or, after informing the FAA, exclusion from the Airport.

The parties recognize that certain types of aircraft are estimated to be unable to meet the 95 dB maximum limit under any condition or procedure.  Operators of such aircraft, upon violation of maximum noise limits, may be requested not to return to the Airport.  If such aircraft do return and violate the noise limits after such request, they may be excluded from the Airport through formal administrative action.  It is recognized that disobedience

20

of a formal City administrative action is subject to additional sanctions.

During the initial implementation phase described in Section 19(a), the City will establish two performance-based noise limits at 95 dB and 90 dB, based on initial noise measurements and data analysis. During the second phase of the noise abatement program described in Section 19(b), aircraft will be placed into particular noise limit categories based on the demonstrated noise performance history of that aircraft and advice provided to the City by its consultants, the FAA, and users of the Airport. It is expected that noise categories will be initially established at 95 dB, 90 dB, and 87 dB, consistent with the measurements and analysis performed in conjunction with the noise abatement program.

The parties expressly recognize that there is a need to collect a substantial amount of additional data on all types of aircraft which operate at the Airport. When that data base is developed the parties recognize that additional or different categories may be created as well as the identification and placement of various specific aircraft into a particular category, or the adjustment of the noise level categories.

During the phases of this program described in Section 19, the FAA will, in cooperation with the City and any other interested person or persons, make reasonable efforts to educate, inform, and counsel pilots in terms of how to

operate their aircraft so as to eliminate unnecessary noise in the communities adjacent to the Airport. Similarly, during the implementation phases of this program described in Sections 19(a), (b), and (c), the City will not take formal administrative action against pilots who operate their aircraft to or from the Airport in a manner which exceeds either the 90 dB or 87 dB SENEL limit but does not exceed the maximum 95 db SENEL limit.

Section 21. <u>Cooperation in Enforcement</u>.

The City and the FAA acknowledge and agree that vis-a-vis third parties each of them is responsible for the enforcement of their own respective regulations and that neither of them has any responsibility for or authority to enforce any regulations established by the other. However, both the City and the FAA recognize that it is in their mutual interest to cooperate and exchange relevant information necessary to the successful implementation of this Agreement.

Section 22. <u>Night Departure Restriction</u>

The parties recognize that the City has established a prohibition on takeoffs from the Airport between 11:00 p.m. and 7:00 a.m. on Monday through Friday, and between 11:00 p.m. and 8:00 a.m. on Saturday and Sunday. This prohibition is not applicable in emergency situations. This regulation is included as a material term of this Agreement and is expected to remain in effect. It is agreed that it will not

be amended or modified without the prior agreement of the parties.

Section 23.   Golf Course Turn.

As a noise abatement measure FAA will establish a standard departure procedure for runway 21 which will route aircraft approximately 10 degrees south of the present runway alignment routing so as to route air traffic over the golf course area.   Additionally, FAA will study the possibility of establishing an offset localizer approach to runway 21.   If approved by the City and installed the offset localizer would be an interim measure until a microwave landing system can be installed at the Airport.   Before establishing such an offset localizer approach FAA will analyze and advise the City of what effect, if any, that facility would have in terms of providing some noise abatement.

The effect of the Golf Course Turn on aircraft noise impact in Santa Monica and Los Angeles neighborhoods will be analyzed during the implementation of the noise abatement program.

Section 24.   Helicopters.

The parties recognize that noise from helicopters can have an impact on residential communities around the Airport, including neighborhoods that are not significantly affected by noise from fixed-wing aircraft.   The parties agree to develop and implement a designated helicopter

23

landing area, a preferred helicopter flight path, and a helicopter flight altitude that provides maximum noise abatement consistent with safety.

The parties recognize that helicopters are an important part of the general aviation fleet, and are used for military, law enforcement and medical purposes, and will be permitted to use the Airport consistent with noise regulations.

The parties agree that the current ban on helicopter pattern flying will remain in effect.

The parties recognize that the Airport is not currently used as a base for helicopter sales, training or maintenance. The parties agree that helicopter noise will be evaluated as part of the noise abatement program study. Dependent on the results of that study the City may, after consultation with the parties, deny access to the Airport to an FBO, a substantial portion of whose activity involves helicopter operations. During the pendency of that study, the City is not required to lease space on the Airport to an FBO, a substantial portion of whose activity involves helicopter operations.

Section 25.   Pattern Flying Restrictions

The parties recognize that the City has established a prohibition on touch-and-go or stop-and-go operations at the Airport after sunset and before 7:00 a.m. on Monday through Friday as well as all day on Saturday, Sunday, and legal holidays.

This restriction is expected to remain in effect pending the results of the noise abatement study described in Section 19. The parties agree that the pattern flying restriction described above may be modified by the City, after consultation with the FAA, following the completion and based on the results of the noise abatement study.

Section 26.   Design for Noise Abatement.

The Airport Layout Plan includes several design features intended to provide mitigation of aircraft noise. These include designated engine run-up areas and noise buffers to mitigate ground noise, designated helicopter operation areas, and the establishment of a touch-and-go line. Structures constructed under the Airport Plan will be designed to assist in mitigating noise impacts.

Section 27.   Analysis of Future Alternatives.

The parties recognize and acknowledge that there may be other feasible noise abatement actions possible but not described in this Agreement. Programs to acquire homes and resell them with easements or to provide insulation of buildings may provide additional means to achieve the City's noise abatement goals. New or improved flight operating techniques or aircraft modification technology may be developed. The parties agree to keep each other informed of progress in the area of noise abatement technology and techniques which become available as means of reducing the impact of aircraft noise on the community.

25

Section 28.  Federal Funding.

The parties recognize and acknowledge that the accomplishment of the program described in this Agreement, including but not limited to the redesign of the Airport and the implementation of the noise abatement program will require the expenditure of funds. The FAA agrees that it will, consistent with this Agreement and its nationwide program, provide financial assistance to the City for those Airport projects eligible for such assistance pursuant to the Airport and Airway Improvement Act of 1982 and other funding sources, and will accord the City a high priority for such financial assistance. These funds will be made available for many different purposes including Airport planning, Airport improvement, and Airport noise abatement projects consistent with the terms of this Agreement.

Section 29.  Commitment to Future Cooperation.

The parties anticipate that from time to time in the future this Agreement may be supplemented and/or modified in order to accomplish its purposes. The parties agree to work cooperatively and consult with each other and other interested persons to resolve any differences between them which may arise in the future and in particular to work cooperatively and consult with each other with respect to implementation of the tiered noise level concept based on demonstrated aircraft noise performance classification as well as any other proposal designed to effect noise abatement at the Airport.

26

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed this 31st day of January, 1984.

CITY OF SANTA MONICA,
a municipal corporation

By _____
JOHN H. ALSCHULER, JR.
City Manager

APPROVED AS TO FORM:

_____
ROBERT M. MYERS
City Attorney

FEDERAL AVIATION ADMINISTRATION

By _____
MICHAEL J. FENELLO
Deputy Administrator

By _____
HOMER C. McCLURE
Director, Western Region

27

Exh. D
108



AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| CITY OF SANTA MONICA, | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA, FEDERAL | ) |
| AVIATION ADMINISTRATION and MICHAEL P. | ) |
| HUERTA, in his Official Capacity as Administrator of | ) |
| the Federal Aviation Administration, | ) |
| *Defendant(s)* | ) |

Civil Action No. **CV 13 - 08046** JFW (VBK)

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  UNITED STATES OF AMERICA, via Andre Birotte, United States Attorney's Office, Central District of California, 312 North Spring Street, Suite 1200, Los Angeles, California 90012;
FEDERAL AVIATION ADMINISTRATION, and MICHAEL P. HUERTA in his Official Capacity as Administrator of the Federal Aviation Administration, both located at 800 Independence Ave., SW, Suite 1010, Washington, D.C. 20591

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:  MARSHA JONES MOUTRIE, City Attorney, 1685 Main Street, Third Floor
Santa Monica, California 90401-3295

WILLIAM V. O'CONNOR, JR., MORRISON & FOERSTER LLP
707 Wilshire Boulevard Suite 6000
Los Angeles, California 90017-3543

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: OCT 3 1 2013

*Signature of Clerk or Deputy Clerk*

1227

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☑ Other *(specify):*  Pursuant to FRCP 4(i)(A)(i) and 4(i)(2), requiring service on the United States for all three
defendants, I delivered a copy of the summons and complaint to Andre Birotte Jr., the
United States Attorney for the Central District of California, at 312 North Spring St., Suite
1200, Los Angeles, California 90012 on October 31, 2013.

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                              *Server's signature*

                                         _____
                                              *Printed name and title*

                                         _____
                                              *Server's address*

Additional information regarding attempted service, etc:
Pursuant to Federal Rule of Civil Procedure 4(i)(B), governing service on the United States, in addition to serving a
copy on the United States Attorney for the Central District of California, I sent a copy of the summons and complaint to
Eric H. Holder, Jr., Attorney General of the United States, at the U.S. Department of Justice, 950 Pennsylvania Ave.,
NW, Washington, D.C. 20530-0001.  Pursuant to Federal Rule of Civil Procedure 4(i)(2), governing service on United
States agencies and United States officers sued in their official capacity, I sent a copy of the summons and complaint
by certified mail to the Federal Aviation Administration and Michael P. Huerta, Administrator of the Federal Aviation
Administration, both located at 800 Indepdenence Ave., SW, Suite 1010, Washington, D.C. 20591.

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

COPY

| I. (a) PLAINTIFFS ( Check box if you are representing yourself ☐ ) | DEFENDANTS ( Check box if you are representing yourself ☐ ) |
|---|---|
| City of Santa Monica | United States of America, Federal Aviation Administration, Michael P. Huerta, in his Official Capacity as Administrator of the Federal Aviation Administration |
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) See Attachment A | (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same information.) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 2. U.S. Government Defendant

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding   ☐ 2. Removed from State Court   ☐ 3. Remanded from Appellate Court   ☐ 4. Reinstated or Reopened   ☐ 5. Transferred from Another District (Specify)   ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☐ Yes ☒ No   (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No   ☐ MONEY DEMANDED IN COMPLAINT: $

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
This action seeks to quiet title to certain real property located within this judicial district pursuant to 28 U.S.C. § 2409a. This action also seeks declaratory relief that the FAA's actions violate the Fifth Amendment (Takings Clause, Due Process) and the Tenth Amendment (United States cannot commandeer a state or local government).

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☐ 410 Antitrust | ☐ 130 Miller Act | ☒ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL PROPERTY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**   Case Number: CV13-08046

CV-71 (09/13)          CIVIL COVER SHEET          Page 1 of 3

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A: Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| ☐ Yes   ☒ No | ☐ Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| Question B: Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | A PLAINTIFF? | A DEFENDANT? | |
| ☒ Yes   ☐ No | Then check the box below for the county in which the majority of DEFENDANTS reside. | Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | ☐ Los Angeles | ☒ Los Angeles | Western |
| | ☐ Ventura, Santa Barbara, or San Luis Obispo | ☐ Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | ☐ Riverside or San Bernardino | Eastern |
| | ☐ Other | ☐ Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? | A.<br>Los Angeles County | B.<br>Ventura, Santa Barbara, or San Luis Obispo Counties | C.<br>Orange County | D.<br>Riverside or San Bernardino Counties | E.<br>Outside the Central District of California | F.<br>Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of defendants reside: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| Indicate the location in which a majority of claims arose: | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

| C.1. Is either of the following true? If so, check the one that applies: | C.2. Is either of the following true? If so, check the one that applies: |
|---|---|
| ☐ 2 or more answers in Column C | ☐ 2 or more answers in Column D |
| ☐ only 1 answer in Column C and no answers in Column D | ☐ only 1 answer in Column D and no answers in Column C |
| Your case will initially be assigned to the<br>SOUTHERN DIVISION.<br>Enter "Southern" in response to Question D, below.<br><br>If none applies, answer question C2 to the right. ➡ | Your case will initially be assigned to the<br>EASTERN DIVISION.<br>Enter "Eastern" in response to Question D, below.<br><br>If none applies, go to the box below. ⬇ |
| Your case will initially be assigned to the<br>WESTERN DIVISION.<br>Enter "Western" in response to Question D below. | |

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | Western |

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**IX(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s):

**IX(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s):   See Notice Pursuant to Local Rule 83-1.3.1 filed concurrently.

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** *William V. Olsen*   DATE: *10-31-2013*

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Attachment A**

I(b): Attorneys for Plaintiff

Plaintiff City of Santa Monica, is representing itself through its City Attorney and it also has engaged outside counsel, Morrison & Foerster LLP, as indicated below:

Santa Monica City Attorney
Marsh Jones Moutrie
1685 Main Street, Third Floor
Santa Monica, California 90401-3295
Telephone:  310.458.8336


Morrison & Foerster LLP
William V. O'Connor, Jr.
707 Wilshire Boulevard, Suite 6000
Los Angeles, California 90017-3543
Telephone:  213.892.5200