STUART F. DELERY
Assistant Attorney General
Civil Division
ANDRE BIROTTE JR.
United States Attorney
JUDRY SUBAR
Assistant Director
Federal Programs Branch
RAPHAEL O. GOMEZ
(D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Telephone:  (202) 514-1318
Facsimile:  (202) 616-8460
raphael.gomez@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SANTA MONICA,<br><br>    Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA, et<br>al.<br><br>    Defendants. | No. CV 13-08046 JFW (VBKx)<br><br>Honorable John F. Walter<br><br>Noticed Motion Date and Time:<br>February 10, 2014<br>1:30 p.m.<br><br>DEFENDANTS' MOTION TO<br>DISMISS |

## NOTICE OF MOTION AND DEFENDANTS' MOTION TO DISMISS

PLEASE TAKE NOTICE THAT on February 10, 2014, at 1:30 p.m., before the Honorable John F. Walter, Courtroom No. 16, Spring Street Floor, Los Angeles, California, 90012, or as soon thereafter as counsel may be heard by the Court, Defendants, by and through their attorneys, will and hereby do move to

dismiss the Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

Defendants seek dismissal of this action in its entirety.  Defendants' Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, and attachments thereto, the pleadings on file in this matter, and on such oral argument as the Court may permit.

Dated:  January 10, 2014

STUART F. DELERY
Assistant Attorney General
Civil Division

ANDRE BIROTTE JR.
United States Attorney

JUDRY SUBAR
Assistant Director,
Federal Programs Branch


/s/ Raphael O. Gomez
RAPHAEL O. GOMEZ
(D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
raphael.gomez@usdoj.gov

Attorneys for Defendants

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ..................................................................................1

LEGAL BACKGROUND .......................................................................2

STATEMENT OF CASE ........................................................................3

    1.    City's Acquisition Of Initial Property Use For Airport ......................3

    2.    Federal Government's Interest In Clover Field ..................................3

    3.    City's Request That Airport Property, Including Extensive
          Improvements, Be Transferred To The City Without Cost To
          The City And Subject To The Surplus Property Act Covenants
          And Restrictions ........................................................................4

    4.    1948 Instrument of Transfer Pursuant To The SPA ...........................5

    5.    1948 Instrument of Transfer Is Recorded As A Quit Claim Deed .......6

    6.    After 1948, The City Obtained Approval From The Federal
          Government That Three Parcels Of Land Subject To The 1948
          Instrument Be Released From Aeronautical Restrictions ...................7

    7.    Legal Opinion By City Attorney That The City Was Bound
          By The 1948 Instrument of Transfer In 1962 ...................................8

    8.    Legal Opinion by the Office Of The California Attorney
          General That The City Was Bound By the 1948 Instrument
          of Transfer in 1975 ....................................................................8

ARGUMENT .......................................................................................9

    A.    This Court Lacks Subject Matter Jurisdiction Over the
          City's Quiet Title Act Claim Because It Is Time-Barred
          Under the QTA .........................................................................9

i

B.    Plaintiff's Constitutional Claims Should Be Dismissed ..................... 16

    1.    Plaintiff's 5th Amendment "Takings Claim" Should Be Dismissed ...................................................................... 16

        a    This Court lacks subject matter jurisdiction .................. 16

        b.    Plaintiff's 5th Amendment "Takings Claim" is not ripe under Article III of the Constitution ...................... 17

    2.    Plaintiff Fails to State A "Regulatory" Takings Claim…......... 18

    3.    Plaintiff Fails To State A Tenth Amendment Claim ............... 19

    4.    Plaintiff Fails To State A Fifth Amendment "Due Process" Claim ....................................................... 21

CONCLUSION .............................................................................. 22

# TABLE OF AUTHORITIES

**CASES**                                                                **PAGE(S)**

*Action Apt. Ass'n v. Santa Monica Rent Control Opinion Bd.*,
    509 F.3d 1020 (9th Cir. 2007) ........................................................................21

*Airport Cmtys. Coalition v. Graves*,
    280 F. Supp. 2d 1207 (W.D. Wash. 2003) ....................................................20

*Alaska v. Babbitt*,
    75 F.3d 449 (9th Cir. 1995) ...........................................................................11

*Allen v. Wright*,
    468 U.S. 737, 82 L.Ed2d 556, 104 S.Ct. 3315 (1984) ................................17

*Augustine v. United States*,
    704 F.2d 1074 (9th Cir. 1983) .......................................................................10

*Bank of N.Y. Mellon v. City of Richmond*,
    2013 WL 5955699 (N.D. Cal. Nov. 6, 2013) ................................................17

*Block v. North Dakota ex rel. Board of Univ. and School Lands*,
    461 U.S. 273, 103 S. Ct. 1811, 75 L.Ed.2d 840 (1983) ...........................9, 10

*Branch v. Tunnel*,
    14 F.3d 449 (9th Cir.1994) ............................................................................10

*California ex rel. State Land Com. v. Yuba Goldfields, Inc.*,
    752 F.2d 393 (9th Cir. 1985) .............................................................10, 11, 13

*California v. U.S.*,
    104 F.3d 1086 (9th Cir. 1997) .......................................................................20

*Chicago, B&Q.R. Co. v. Chicago*,
    166 U.S. 226, 41 L. Ed. 979, 17 S. Ct. 581 (1897) ......................................18

*Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*,
    508 U.S. 602, 124 L.Ed2d 539, 113 S.Ct. 2264 (1993) ...............................18

*County of Sacramento v. Lewis*,
  523 U.S. 833, 140 L.Ed.2d 1043, 118 S.Ct. 1708 (1998) ...........................21

*Crown Point Dev., Inc. v. City of Sun Valley*,
  506 F.3d 851 (9th Cir. 2007) ........................................................................21

*Deutsche Bank National Trust Co. v. FDIC*,
  784 F.Supp.2d 1142 (C.D.Cal. 2011) ..........................................................16

*Eastern Enters. v. Apfel*,
  524 U.S. 498, 141 L.Ed. 2d 451, 118 S.Ct. 2131 (1998) .............................16

*Esplanade Properties, LLC v. City of Seattle*,
  307 F.3d 978 (9th Cir. 2002) ........................................................................21

*Gardner v. Stager*,
  103 F.3d 886 (9th Cir. 1996) ..........................................................................9

*Grosz v. Andrus*,
  556 F.2d 972 (9th Cir. 1977) ........................................................................10

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
  896 F.2d 1542 (9th Cir. 1989) ......................................................................10

*Hawaii v. United States*,
  866 F.2d 313 (9th Cir. 1989) ........................................................................11

*Humboldt County v. United States*,
  684 F.2d 1276 (9th Cir. 1982) ................................................................10, 11

*Kingman Reef Atoll Inv., LLC v. United States*,
  541 F.3d 1189 (9th Cir. 2008) ......................................................................10

*Lingle v. Chevron U.S.A., Inc.*,
  544 U.S. 528, 161 L.Ed.2d 876, 125 S. Ct. 2074
  (2005)…………………………………………………..………17, 18, 21

*MHC Fin. L.P. v. City of San Rafael*,
  714 F.3d 1118 (9th Cir. 2013) ......................................................................18

iv

*McIntyre v. United States,*
    789 F.2d 1408 (9th Cir. 1986)………………………………………9, 10, 20

*McKart v. United States,*
    395 U.S. 185, 23 L.Ed.2d 194, 89 S.Ct. 1657 (1969) ...................................15

*Michel v. United States,*
    65 F.3d 130 (9th Cir. 1995) ........................................................................11

*Montara Water & Sanitary Dist. v. County of San Mateo,*
    598 F. Supp. 2d 1070 (N.D. Cal. 2009).......................................................12

*Nevada v. United States,*
    731 F.2d 633 (9th Cir. 1984) ......................................................................11

*Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,*
    313 U.S. 508, 85 L.Ed.2d 1487, 61 S.Ct. 1050 (1941) ................................20

*Park County v. United States,*
    626 F.2d 718 (9th Cir. 1980) ........................................................10, 11, 12

*Penn Central Transp. Co. v. New York City,*
    438 U.S. 104, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978) ...............................18

*Rattlesnake Coal. v. E.P.A.,*
    509 F.3d 1095 (9th Cir. 2007) ....................................................................10

*Richardson v. City & County of Honolulu,*
    124 F.3d 1150 (9th Cir. 1997) ....................................................................17

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986, 81 L.Ed.2d 815, 104 S.Ct. 2862 (1984) ...............................19

*Ry. Mail Ass'n v. Corsi,*
    326 U.S. 88, 65 S. Ct. 1483 (1945) ............................................................17

*Shultz v. Dep't of Army,*
    886 F.2d 1157 (9th Cir. 1989) ....................................................................11

*Spirit Lake Tribe v. North Dakota,*
    262 F.3d 732 (8th Cir. 2001) ........................................................................12

*Texas v. United States*,
    523 U.S. 296, 140 L.Ed. 2d 406, 118 S.Ct. 1257 (1998) ............................17

*Thomas v. Union Carbide Agric. Prods. Co.,*
    473 U.S. 568, 87 L.Ed.2d 409, 105 S.Ct. 3325 (1985)................................17

*Turntable Fishery & Moorage Corp. v. United States,*
    52 Fed. Cl. 256 (2002)................................................................................19

*United States v. Darby,*
    312 U.S. 100, 61 S. Ct. 451, 85 L. Ed. 609 (1941)……………………..19,20

*United States v. L.A. Tucker Lines, Inc.,*
    344 U.S. 33, 97 L.Ed. 54, 73 S. Ct. 67 (1952)..............................................16

*Wash. Legal Found. v. Legal Found. of Wash.,*
    271 F.3d 835 (9th Cir. 2001) ......................................................................19

*Webb's Fabulous Pharmacies v. Beckwith,*
    449 U.S. 155, 66 L. Ed. 2d 358, 101 S. Ct. 446 (1980) ..............................19

*Williamson County Reg'l Planning Comm'n v. Hamilton Bank of*
    *Johnson City,*473 U.S. 172, 105 S. Ct. 3108, 87 L. Ed. 2d 126 (1985) ........17

**STATUTES**

50 App. U.S.C.A. § 1622(g) (1949)..................................................................3
28 U.S.C. § 1491(a)(1)...............................................................................1, 16
28 U.S.C. § 2409a.......................................................................................1, 9
28 U.S.C. § 2409a(g) ...................................................................1, 9, 10, 11
49 U.S.C. § 47151 et seq.........................................................................2, 3, 20
49 U.S.C. § 47153 ........................................................................................15
50 U.S.C. App. 1622(a)-(c).............................................................................20
50 U.S.C. App. 1622(g)................................................................................20
58 Stat. 765, 770 .....................................................................................2, 3, 20

**RULES AND REGULATIONS**

49 CFR Part 155............................................................................................3

1975 Cal. AG LEXIS 64 2, 58 Ops. Cal. Atty. Gen. 345, 346
    (Cal. AG 1975) ........................................................................3, 4

Cal. Gov. Code § 27320............................................................................13

**LEGISLATIVE MATERIAL**

1947 U.S. Congressional Code Service 1519, 1520...................................2

Senate Committee on Armed Services, S. Rep. No. 359............................2

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 12(b)(1)............................................................................22

Fed. R. Civ. P. 12(b)(6)............................................................................22

**FEDERAL RULES OF EVIDENTUARY PROCEDURE**

Fed. R. Evid. 201 .....................................................................................10

## MEMORANDUM IN SUPPORT
## OF DEFENDANTS' MOTION TO DISMISS
### INTRODUCTION

This lawsuit, which involves a recorded real estate instrument signed by the plaintiff over 65 years ago, should be dismissed.  To begin, that recordation, and subsequent conduct over half a century, belies any notion that the case was timely brought under the Quiet Title Act (QTA), 28 U.S.C. § 2409a.  That statute allows suits against the United States to resolve disputes about title to real property in which the United States claims any interest (with exceptions not relevant here) only if the plaintiff sues within twelve years of learning of the federal government's interest.  In 1948, plaintiff City of Santa Monica (City) signed a recorded instrument that documented the United States' interest in the City's airport (SMO or the Airport Property).  Plaintiff's knowledge in the 1940's, and in the decades since, of the transaction giving rise to its claim here squarely triggered the QTA's statute of limitations.  Consequently, this case is jurisdictionally deficient because it was brought too late.  In addition, the case is unripe because the property continues to be used as an airport and, thus, the option that permits the United States to decide whether it takes title and right of possession of the Airport Property as well as other rights under the 1948 Instrument of Transfer has not occurred.

Plaintiff's non-QTA claims must also be dismissed.  The Tucker Act, 28 U.S.C. § 1491(a)(1), bars plaintiff's 5th Amendment "Takings" claim (Claim Two) because the Tucker Act vests exclusive subject matter jurisdiction for constitutional claims exceeding $10,000 – and presumably the City's claims exceed this amount - in the Court of Federal Claims.  This claim is also not ripe as the United States has not taken – and is not about to take – title or possession of the Airport Property.  Similarly, plaintiff's "Regulatory" takings claim (Claim Three)

is neither ripe nor otherwise actionable.  Plaintiff's Tenth Amendment claim (Claim Four), besides being unripe for the same reasons that the Fifth Amendment claims are unripe, should also be dismissed because when the United States entered into an agreement with the City with regard to the use of the Airport Property in 1948, it did so pursuant to the Surplus Property Act of 1944, as amended, 49 U.S.C. § 47151, thereby exercising a granted power in a manner which is appropriate and plainly adapted to that permitted end.  Finally, plaintiff fails to state a Fifth Amendment "Due Process" claim (Claim Five).  That claim is not ripe and fails to state a legally sufficient claim because there is no final agency action. Accordingly, defendants respectfully request that the Court dismiss the Complaint, on the grounds that this Court lacks subject matter jurisdiction, and that plaintiff has failed to state a claim upon which relief may be granted.

## LEGAL BACKGROUND

The Surplus Property Act of 1944 ("SPA"), 49 U.S.C. § 47151 et seq., authorizes conveyance of surplus federal property to meet the needs of the federal government.  Surplus Property Act of 1944, 58 Stat. 765, 770.  In 1947, Congress amended the SPA regarding the disposition of federally owned airports, airport facilities and equipment that had been used in support of the war effort in WWII to public agencies. See Senate Committee on Armed Services, S. Rep. No. 359, June 26, 1947, as reprinted in 1947 U.S. Congressional Code Service 1519, 1520.

Through the SPA, Congress sought to expedite the disposition of federal government surplus airports, airport facilities, and equipment, and to ensure the development of civilian aviation and preserve for national defense a strong, efficient, and properly maintained Nation-wide system of public airports. *Id*. Under the SPA, surplus airport property instruments of disposal are to provide that the covenants assumed by the grantee regarding the use, operation and maintenance of the airport and the property transferred shall be deemed to be covenants running with the land.  *Id*.  Any deed, bill of sale, lease, or other

instrument executed by or on behalf of a federal government agency purporting to transfer title or any other interest in property under the Act is "conclusive evidence of compliance with the provisions of the Act." 50 App. U.S.C.A. § 1622(g) (1949) (originally enacted as Surplus Property Act of 1944, ch. 479, § 13, 58 Stat. 765, 770.) See 49 U.S.C. § 47151 and 49 CFR Part 155; see SPA Regulation 16 (Regulation 16) which was adopted by the War Assets Administration (WAA) on November 16, 1945, and amended June 26, 1946, the version in effect at the time of the SMO surplus classification and disposal in 1948. (Exhibit A, Surplus Property Act, Regulation 16.)

## STATEMENT OF CASE

### 1. <u>City's Acquisition Of Initial Property Used For Airport</u>

In 1926, the City acquired the initial Airport Property, which was often referred to as Clover Field, pursuant to a $755,000 bond measure for a public park, approved on April 14, 1926.  Compl. ¶¶ 14-15; Exhibit B, 1962 City Attorney Opinion at 2-3; Exhibit C, 1975 Cal. AG LEXIS 64 *2, 58 Ops. Cal. Atty. Gen. 345, 346 (Cal. AG 1975).[1]

### 2. <u>Federal Government's Interest In Clover Field</u>

In 1941, the City and the federal government entered into two leases for use of Clover Field in the country's national defense.  *See*, Lease No. W-04-193-ENG.4894, as modified in 1945 and 1946; Lease No. W3460-ENG.549, dated December 1, 1941, and modified by supplemental agreements number 1, dated December 20, 1944, and number 2, dated July 25, 1946.  (Compl. Exhs. A and B)

---

[1] These exhibits are drawn from documents provided to the City in connection with an FAA enforcement proceeding (FAA Docket No. 16-02-08) regarding a City Ordinance banning certain types of aircraft from SMO. (See Exhibit N, Declaration of Sharon Long. A copy of the Director's Determination and exhibits (on disc) was provided to the City on May 27, 2008.

These leases covered approximately one hundred seventy acres of the property located at the Airport.  (Exh. C, 1975 Cal. AG LEXIS 64 *4, 58 Ops. Cal. Atty. Gen. at 346.)

From 1941 through 1946, the Federal government extensively improved Clover Field, including, but not limited to, construction of hangars, and construction and improvement of the runways.  (*See, e.g*., Exh. D, Form SPB-5 Declaration of Surplus Real Property; Compl. ¶30.)  With respect to the runways improvements, the Works Progress Administration (WPA) and Civil Aeronautics Authority (CAA), the federal government used eminent domain to acquire additional land in order to replaced two runways with a modern 5,000 foot runway. (See Leases, Compl. Exhs. A and B.)

3. **City's Request That Airport Property, Including Extensive Improvements, Be Transferred To The City Without Cost To The City And Subject To the Surplus Property Act Covenants And Restrictions**

On May 7, 1946, the Army granted the City of Santa Monica a revocable Interim Permit for the operation of the Airport, effectively returning some operational control of the SMO back to the City pending its disposition as surplus property.  (Exhibit E, Army letter regarding interim permit for operation of airport; Exhibit F, April 26, 1946 letter granting Interim Permit.).  On July 29, 1946, the WAA issued Form SPB-5 Declaration of Surplus Real Property concerning the SMO and declaring as surplus, all leased land and improvements at the Airport. (Exh. D; Compl. at ¶ 30.)

By letter dated September 19, 1946, the City Council of the City of Santa Monica requested that the WAA turn over Clover Field to the City "**subject to such conditions as the Administrator may desire to impose under the provisions of Surplus Property Administration Regulation 16 and**

**amendments thereto** . . . . for the purpose of encouraging and fostering the development of civil aviation." (Exhibit G) (emphasis supplied).

On January 9, 1947, the federal government made the determination that its leasehold interest at Clover Field, along with improvements and its landing facilities, including runways, taxiways, aprons, should be disposed of under SPA Regulation 16 subject to the applicable restrictions. (Exhibit H.)  As a result, in August 1947, the federal government published a public disposal notice for the Santa Monica Airport in the local newspaper. (Exhibit I.)  In April 1948, the WAA had agreed to transfer Clover Field to the City under the SPA. (Exhibit J.)

### 4.   1948 Instrument Of Transfer Pursuant To The SPA

On August 10, 1948, pursuant to the SPA, the Federal government and the City executed an "Instrument of Transfer" in which the federal government relinquished to the City several easements and its leasehold interest in the SMO Airport along with extensive buildings and airfield improvements, including the entire landing area, the Airport's concrete 5,000-foot runway and taxiway system. (1948 Instrument of Transfer, Compl., Exhibit C.)  The 1948 Instrument of Transfer remised, released and forever quitclaimed the subject premises to the City subject to reservations, restrictions and conditions specified in the Instrument, as follows:

a.  The Federal government transfers its easement, leasehold interests, property and improvements, "subject to the terms and conditions of this instrument in and to the premises known as "Clover Field, Santa Monica Municipal Airport." (*Id*. at 3- 4.)

b.  "That by the acceptance of this instrument or any rights hereunder" the City "agrees" that such transfer "shall be subject to the following restrictions, set forth in subparagraphs (1) and (2) of this paragraphs, **which shall run with the land**, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944,  as

Amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders" (*Id*. at 4) (emphasis supplied).

   c. "That no property transferred by this instrument shall be used, leased, sold, salvaged, or disposed of by [the City] for other than airport purposes without the written consent of the Civil Aeronautics Administrator . . . ." *Id*. at 6.

   d.  "By acceptance of this instrument, or any right hereunder," the City "further agrees," in pertinent part, with the federal government as follows:

> (l) That in the event that any of the aforesaid terms, conditions, reservations or restrictions is not met, observed, or complied with by [the City] or any subsequent Transferee, whether caused by the legal inability of [the City] or subsequent transferee to perform any of the obligations herein set out, or otherwise, the title, right of possession and all other rights transferred by this instrument to [the City], or any portion thereof, shall at the option of the [federal government] revert to the Government sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administrator or his successor in function . . . .

*Id*.

   On August 10, 1948, the City confirmed its acceptance of the 1948 Instrument of Transfer, including its restrictions, by passing Resolution No. 183, Resolution of the City of Santa Monica Accepting An Instrument of Transfer From the United States of America. (Compl. ¶33.)

   **5.** **<u>1948 Instrument of Transfer Is Recorded As A Quit Claim Deed</u>**

   On August 23, 1948, the executed 1948 Instrument of Transfer, was filed as a quitclaim deed, with the County Recorder for the County of Los Angeles, California.  A Title Report dated December 1, 2001, prepared by the Chicago Title Insurance Company confirms that the 1948 Instrument was filed as a quitclaim

deed on August 23, 1948 as Instrument No. 1746 in the Office of the County

Recorder, County of Los Angeles, State of California. (Exhibit K, Title Report.)

### 6. After 1948, The City Obtained Approval From The Federal Government That Three Parcels Of Land Subject To The 1948 Instrument Be Released From Aeronautical Restrictions

On April 25, 1952, the federal government granted the City's request

that a small part of the Airport Property, "Lot 'A' of the George Tract, as per map

recorded in Book 16, Page 21 of the Map, Records of Los Angeles County,

California," be released "from the conditions, reservations, and restrictions"

contained in the 1948 Instrument of Transfer.  (Exhibit L, Major Instruments on

Santa Monica Airport Land and Exhibit M, 1952 and 1956 Release.) On March 5,

1956, the City made a similar request that another portion of the land, Runway No.

1, be released from its obligation to maintain and operate said Runway for the use

and benefit of the public as required by the 1948 Instrument of Transfer. (Exh. M

at 7-8.)  The Government granted the City's request and executed a Release to

permit the City to "abandon . . . Runway No. 1 . . . [and release the City] from its

obligation to maintain and operate said Runway for the use and benefit of the

public" as required by the 1948 Instrument of Transfer; Resolution No. 3536

adopted by the City on December 27, 1944 from obligations to operate and

maintain of the SMO; and the May 11, 1948 Grant Agreement with the

Government.  *Id.* The 1956 Release also provided that:

> This Release is executed for the sole purpose of releasing Runway No.
> 1 only from the terms, covenants, conditions, reservations and
> restrictions set forth in the Instruments referred to above insofar as
> they apply to the maintenance and operation of said Runway, and this
> Release shall not be construed as a relinquishment, modification or
> waiver of any other provisions in said Instruments.

*Id.* at 8. (emphasis in original)

On January 31, 1984, the United States released a third parcel of land subject to the 1948 Instrument for non-aeronautical purposes. (1984 Settlement Agreement, Section 6, Compl. Exh. D.)

### 7. Legal Opinion By City Attorney That The City Was Bound By The 1948 Instrument Of Transfer In 1962

On January 23, 1962, the City Attorney issued a legal opinion as to whether the City was still bound by the conditions, reservations, and restrictions" contained in the 1948 Instrument of Transfer in 1962. (See Exh. B.)  The Question Presented was:  "[c]an the City, unilaterally, on motion of the City Council, abandon the use of the [SMO] as an airport." *Id*. After reviewing the 1926 purchase of the Clover Field, the City's agreement in 1941 that the Government could use the Airport property for national defense, the Government's various expenditures with respect to Clover Field after 1941, various City Council's resolutions regarding operation of Clover Field for public use, a grant assurance agreement entered into by the City and application and viability of the 1948 Instrument of Transfer, the City Attorney found that the various requirements and covenants of the 1948 Instrument of Transfer and the terms of a project with the Government "compel the conclusion that the City must continue to operate the Airport, and that the City cannot legally unilaterally, on its own motion, abandon the use of the Santa Monica Airport as an airport." *Id*.

### 8. Legal Opinion by the Office Of The California Attorney General That The City Was Bound By the 1948 Instrument Of Transfer in 1975

On May 30, 1975, the Office of the Attorney General of the State of California (California AG) revisited the question as to whether the City "at the present time, cease using the Santa Monica Municipal Airport for airport purposes. (Exh. C.)  The California AG reached the same conclusion as the City Attorney had in 1962.  The California AG found that "[t]he Instrument of Transfer provided

that the surrender to the City was subject to certain reservations, restrictions, conditions and covenants as thereafter set forth, and that the same shall run with the land." (*Id*. at *15-16.)  It concluded that "[i]n summary, it is apparent that the City has entered into numerous contracts and leases wherein it has contracted away its rights to deal freely with the Airport property and its uses as an airport.  These contractual agreements when considered as a whole and in light of the overall pattern of extensive and extending obligation, leads to the conclusion that the City may not at the present time cease using the Airport for airport purposes."[2]  *Id*. at 16.

## ARGUMENT

A. **This Court Lacks Subject Matter Jurisdiction Over the City's Quiet Title Act Claim Because It is Time-Barred under the QTA**.

Plaintiff' quiet title claim is time-barred under the twelve year statute of limitations set forth in the QTA. See 28 U.S.C. § 2409a(g).  The QTA constitutes a limited waiver of the federal government's sovereign immunity, granting federal district courts subject matter jurisdiction to "adjudicate disputed title to real property in which the United States claims an interest . . . ." 28 U.S.C. § 2409a; *see Block v. North Dakota ex rel. Board of Univ. and School Lands*, 461 U.S. 273, 275- 76, 103 S. Ct. 1811, 75 L.Ed.2d 840 (1983) (QTA precludes lawsuit because it was time barred by the QTA's twelve-year statute of limitations); *Gardner v. Stager*, 103 F.3d 886, 888 (9th Cir. 1996)) (QTA's limited waiver of sovereign immunity must be strictly construed); *see also McIntyre v. United States*, 789 F.2d 1408, 1411 (9th Cir. 1986) (QTA is exclusive means to challenge government's title to real property), *overruled on other grounds* by *Fadem v. United States*, 52

---

[2]  The California AG also noted that the City Attorney at that time suggested that the Instrument of Transfer might be voidable under contract law. However, the California AG did not find that suggestion persuasive and assumed for purposes of the opinion that the agreement was valid.  *Id*.

F.3d 202 (9th Cir. 1995), *vacated* by *U.S. v. Fadem*, 520 U.S. 1101, 137 L.Ed2 306, 117 S.Ct. 1103 (1997).

Because the QTA represents a limited waiver of the sovereign immunity, the statute of limitations is a jurisdictional prerequisite to suit and must be strictly construed in favor of the government. *Block*, 461 U.S. at 287; *Kingman Reef Atoll Inv., LLC v. United States*, 541 F.3d 1189, 1195-97 (9th Cir. 2008). Furthermore, a district court may "hear evidence regarding jurisdiction" and "resolv[e] factual disputes where necessary." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983). "[N]o presumptive truthfulness attaches to plaintiff's allegations." *Id*. In addition, a court may consider matters which may be judicially noticed pursuant to Fed. R. Evid. 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., Hal Roach Studios, Inc. v. Richard Feiner & Co*., 896 F.2d 1542, 1555 n. 19 (9th Cir. 1989); *Branch v. Tunnel*, 14 F.3d 449, 453-54 (9th Cir.1994).

Thus, timely commencement of an action to quiet title against the United States is a jurisdictional prerequisite. *Humboldt County v. United States*, 684 F.2d 1276, 1280 (9th Cir. 1982); *Park County v. United States*, 626 F.2d 718, 720 (9th Cir. 1980), cert. denied, 449 U.S. 1112, 66 L.Ed. 2d 841, 101 S. Ct. 923 (1981). Once challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *Rattlesnake Coal. v. E.P.A*., 509 F.3d 1095, 1102 n.1 (9th Cir. 2007). Additionally, the QTA statute of limitations applies retroactively. *See Block*, 461 U.S. at 284; *Grosz v. Andrus*, 556 F.2d 972, 975 (9th Cir. 1977). In determining "the date that the plaintiff or his predecessor in interest knew or should have known of the claim of the United States" under Section 2409a(g), the courts utilize a reasonableness test. All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's. *McIntyre v. United States*, 789 F.2d 1408, 1411 (9th Cir. 1986), quoting *California ex. rel., State Land Comm'n v. Yuba Goldfields, Inc*., 752 F.2d 393, 396-97 (9th Cir. 1985)

(citation omitted), cert. denied, 474 U.S. 1005, 106 S. Ct. 526, 88 L.Ed.2d 458 (1985); *Humboldt*, 684 F.2d at 1280; Park County, 626 F.2d at 721 n.6  The question is whether the United States' action would have alerted a reasonable landowner that the federal government claimed an interest in the land.  *Shultz v. Dep't of Army*, 886 F.2d 1157, 1160 (9th Cir. 1989).   Knowledge of the claim's full contours is not necessary, if there is a reasonable awareness that the United States claims "some" interest adverse to the plaintiff. *See Alaska v. Babbitt*, 75 F.3d 449, 452 (9th Cir. 1995).

Courts have recognized that claims can be time-barred by constructive or inquiry notice, even in the absence of evidence of actual notice.  *See Yuba Goldfields*, 752 F.2d at 396 ("Constructive notice of recorded deeds may commence the running of the limitations period."); *Hawaii v. United States*, 866 F.2d 313, 313 (9th Cir. 1989) ("[T]he QTA explicitly provides that constructive notice is sufficient to trigger the twelve-year statute of limitations. 28 U.S.C. § 2409a(k) (Supp. IV 1986)."); *Park County*, 626 F.2d at 721 n.6.  Accordingly, the statute of limitations under Section 2409a(g) utilizes an objective "reasonableness" standard that looks to whether a claimant "knew or should have known" of the interest asserted by the United States as opposed to a subjective, actual knowledge standard.  And "[i]f a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title" triggers the limitations period.  *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995).[3]   "The existence of one uncontroverted instance of notice suffices to trigger

_____

[3]  Plaintiff contends that its QTA claim must be resolved before July 2015 when the City's contractual and legal obligations to operate the SMO expire. Compl. ¶ 2. Plaintiff is incorrect as to when its obligations expire as its current grant obligations are in effect through August 2023, even if it were otherwise entitled to

the limitations period." *Nevada v. United States*, 731 F.2d 633, 635 (9th Cir. 1984); *see Park County*, 626 F.2d at 721 (single sign constitutes adequate notice). Even an invalid federal government claim triggers the QTA limitations period. *See Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001).

Juxtaposed against the foregoing standards, plaintiff pleads that it allegedly "first learned of the existence of the claim of reversion interest of full title to the Airport Property on or after March 26, 2008, through the FAA' s Order to Show Cause" (Compl. ¶ 83). Plaintiff's contention is erroneous and belied by plaintiff's own acknowledgements and conduct over decades. Plaintiff was or should have been aware of its claim in several previous instances.

First, the 1948 Instrument of Transfer, by its plain terms, evidences plaintiff's awareness of the United States' interest in the Airport property. By its terms, the Instrument sets forth various obligations and restrictions upon the City with respect to the Airport property, e.g., the 1948 Instrument limits the use of the property as an airport for the benefit and use of the public, requires approval by the United States before the City can use, lease, sell, salvage or dispose of the Airport property for other than airport purposes, and provides an option for the United States to take title and possession of the Airport property if it is no longer operated and maintained as an airport or if other conditions, covenants or restrictions are not met. The operative language in the Instrument of Transfer in this regard provides the federal government an interest in "the title, right of possession and all other rights transferred by this instrument" if the City does not comply with its obligations under the Instrument. (Compl. ¶ 32, Figure 4)

Second, on August 23, 1948, plaintiff had constructive notice of the United States' interest when the executed 1948 Instrument of Transfer, was filed as a

---

relief here. In any event, because this action should be dismissed on jurisdictional grounds, the timing considerations mentioned by the City should be of no moment.

quitclaim deed, with the County Recorder for the County of Los Angeles, California. (Exh. K at 10); *see Montara Water & Sanitary Dist. v. County of San Mateo*, 598 F. Supp. 2d 1070, 1075 n.3 (N.D. Cal. 2009) ("Indeed, a county recorder is required by statute promptly to record any title documents that are submitted. *See* Cal. Gov. Code § 27320."); *see also Yuba Goldfields*, 752 F.2d at 396 ("Constructive notice of recorded deeds may commence the running of the limitations period.").

Third, the City's petitions – on three separate occasions in 1952, 1956 and 1984 - for release of three parcels of land subject to the aeronautical covenants under the 1948 Instrument of Transfer further demonstrates plaintiff's awareness of the United States' interest in the Airport property. (Exh. M (1952 and 1956 Releases) and Compl. Exh. D (1984 Settlement.) While plaintiff apparently contends – now in litigation – that it did not know of a federal government interest beyond the United States' interest which expired in 1953 (Compl. at ¶¶ 1, 83-84), this proposition is squarely controverted by the City's conduct many years beyond 1953 and the QTA limitations period.  Such assertions are plainly implausible and cannot support a claim upon which relief could be granted.

Fourth, the City was on notice of the United States' interest in the Airport property pursuant to the 1948 Instrument of Transfer through the issuance of a legal opinion by its own attorney in 1962 and by the legal opinion of the California AG in 1975.  Plaintiff contends that through the 1948 Instrument, the United States is "commandeering the City to run the airport in perpetuity." Compl. at ₱ 5. Plaintiff's current contention is remarkably identical to the question addressed by the City's attorney in 1962:  "Can the City, unilaterally, on motion of the City Council, abandon the use of the [SMO] as an airport." Exh. B.  The City Attorney's answer was "No." *Id*. He concluded that the City was still bound by the conditions, reservations, and restrictions" contained in the 1948 Instrument of Transfer in 1962.  *Id*.   The City Attorney found that the various requirements and

covenants of the 1948 Instrument of Transfer "compel the conclusion that the City must continue to operate the Airport, and that the City cannot legally unilaterally, on its own motion, abandon the use of the Santa Monica Airport as an airport." *Id.* at 9-10.

Surely, plaintiff was aware of the United States' continuing interest in the Airport property when its own legal department rendered this legal opinion that dated the United States' interest from 1948 and noted no gaps in the existence of the United States' interest.

Thirteen years later, virtually that same question was presented to the California AG:  whether the City "at the present time, [could] cease using the Santa Monica Municipal Airport for airport purposes?" (Exh. C.) The California AG found that "[t]he [1948] Instrument of Transfer provided that the surrender to the City was subject to certain reservations, restrictions, conditions and covenants as thereafter set forth, and that the same shall run with the land." (*Id.* at *16.)  It concluded that "[i]n summary, it is apparent that the City has entered into numerous contracts and leases wherein it has contracted away its rights to deal freely with the Airport property and its uses as an airport.  These contractual agreements when considered as a whole and in light of the overall pattern of extensive and extending obligation, leads to the conclusion that the City may not at the present time cease using the Airport for airport purposes." (*Id.* at *18.)  Moreover, the California AG noted that the then City Attorney for plaintiff at that time (in 1975) suggested that the Instrument of Transfer might be voidable under contract law. *Id.* at *16, n. 10.)  Despite having a second legal opinion that the 1948 Instrument of Transfer contained conditions, covenants and restrictions on the City's title to the Airport property, the City did not seek to bring a quiet title action to challenge these encumbrances.

In sum, plaintiff had actual and constructive notice – on multiple occasions since 1948.  Since the QTA statute of limitations has run, the United States has not

waived its sovereign immunity, and the Court lacks jurisdiction to hear the QTA claim.

Other significant considerations counsel against the Court's exercise of jurisdiction over Plaintiff's QTA claim.  The 1948 Instrument of Transfer provides that the Airport Property "shall [not] be used, leased, sold, salvaged, or disposed of by [the City or its successor in interest] for other than airport purposes without the written consent of the Civil Aeronautics Administrator[.]" (Compl. Exh. C at 6, ¶ 6.)  The Administrator may grant a request for the property to be used for purposes other than an airport "only if said Administrator determines that the property can be used, leased, sold, salvaged or disposed of for other than airport purposes without materially and adversely affecting the development, improvement, operation or maintenance of the airport at which such property is located." *Id*. This contractual provision is consistent with the SPA, which authorizes the Secretary of Transportation to waive a term of conveyance of an interest in property if the Secretary decides that the property no longer serves the purpose for which it was conveyed or that the waiver "will not prevent carrying out the purpose for which the conveyance was made and is necessary to advance the civil aviation interests of the United States."  49 U.S.C. § 47153. Thus, both the 1948 Instrument of Transfer and the SPA provide a process by which the City can petition the FAA to be released from the conditions and restrictions in the 1948 Instrument of Transfer.   In three occasions (1952, 1956, and 1984), the City has requested and obtained approval from the FAA to be exempted from some of these conditions with respect to parts of the Airport Property.  In this instance, the City should also follow the established process if it would like to be released from the conditions and restrictions that it agreed to comply with in the 1948 Instrument of Transfer.  *See, e.g, McKart v. United States*, 395 U.S. 185, 194, 23 L.Ed.2d 194, 89 S. Ct. 1657 (1969) ("[I]t is normally desirable to let the agency develop the necessary factual background upon which decisions should be based. And since

agency decisions are frequently of a discretionary nature or frequently require expertise, the agency should be given the first chance to exercise that discretion or to apply that expertise."); *United States v. L.A. Tucker Lines, Inc*., 344 U.S. 33, 37, 97 L.Ed. 54, 73 S. Ct. 67 (1952) ("[A]s a general rule … courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

      **B**.  **Plaintiff's Constitutional Claims Should Be Dismissed**.

      **1**.  **Plaintiff's 5th Amendment "Takings Claim" Should Be Dismissed**

      **a**.  **This Court lacks subject matter jurisdiction**

      This Court lacks subject matter jurisdiction over plaintiff's 5th Amendment "Takings Claim" because plaintiff alleges a takings claim in excess of $10,000. The Tucker Act, 28 U.S.C. § 1491(a)(1), vests exclusive subject matter jurisdiction over constitutional claims exceeding $10,000 with the Court of Federal Claims. *Eastern Enters. v. Apfel*, 524 U.S. 498, 520, 141 L.Ed. 2d 451, 118 S.Ct. 2131 (1998); *Deutsche Bank National Trust Co. v. FDIC*, 784 F.Supp.2d 1142, 1169 (C.D.Cal. 2011), modified on other grounds 854 F.Supp.2d 756. Plaintiff's claim against defendants falls squarely within the Court of Federal Claims' exclusive jurisdiction. (Compl. ¶¶ 90-104.) Further, although plaintiff contends that the "taking . . . cannot be quantified in monetary terms," (Compl. ¶ 99) and allegedly precludes the City from using the land as it wishes, as well as "impinges upon the City's police powers" (Id.), plaintiff alleges that in 1926 it paid "more than $755,000, or approximately $10 million in today's dollars." (Compl. ¶ 15.) Accordingly, plaintiff's claim is well in excess of $10,000. The Tucker Act confers exclusive jurisdiction over a taking claim of such a magnitude to the Court of Federal Claim.

**b. Plaintiff's 5th Amendment "Takings Claim" is not ripe under Article III of the Constitution**

"A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300, 140 L.Ed. 2d 406, 118 S.Ct. 1257 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81, 87 L.Ed.2d 409, 105 S.Ct. 3325 (1985)).   It has long been held that in order to meet Article III requirements, there must be a "case or controversy" and the claim must be "definite and concrete, not hypothetical or abstract" for the claim to be ripe for determination. *Ry. Mail Ass'n v. Corsi*, 326 U.S. 88, 93, 65 S. Ct. 1483 (1945); *Allen v. Wright*, 468 U.S. 737, 750-51, 82 L.Ed2d 556, 104 S.Ct. 3315 (1984). Plaintiff fails to meet these requirements.

There has been no agency action to take possession of the "Airport property."   By the terms of the 1948 agreement, there is an "option" that the United States can exercise to obtain title and right of possession.   This option only arises if the "Airport Property" is not used as an airport.   Not only has that not occurred and thereby raised the availability of that "option," defendants have not taken any final agency action to exercise the option to effect the reversion.   *See Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186, 105 S. Ct. 3108, 87 L. Ed. 2d 126, (1985) (claim not ripe because respondent has not yet obtained a final decision regarding the application of the zoning ordinance); *Richardson v. City & County of Honolulu*, 124 F.3d 1150, 1160 (9th Cir. 1997) (the "central concern (of the ripeness inquiry) is whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all") (citations omitted); *see Bank of N.Y. Mellon v. City of Richmond*, 2013 WL 5955699, at *2-3 (N.D. Cal. Nov. 6, 2013).

### 2.  Plaintiff Fails To State A "Regulatory" Takings Claim.

Pursuant to the Supreme Court's decision in *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 161 L.Ed.2d 876, 125 S. Ct. 2074 (2005), "[t]he Takings Clause of the Fifth Amendment made applicable to the States through the Fourteenth, *see Chicago, B&Q.R. Co. v. Chicago*, 166 U.S. 226, 41 L. Ed. 979, 17 S. Ct. 581 (1897), provides that private property shall not 'be taken for public use, without just compensation.'" *Id*. at 536.   *Lingle* summarizes the three situations where governmental action may constitute a compensable taking, none of which exist here:  (1) Physical invasion of private property (Id. at 537); (2) regulatory taking depriving owner of all economically beneficial use; (Id. at 538); and, (3) regulatory taking based upon factors in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 57 L. Ed. 2d 631, 98 S. Ct. 2646 (1978) (including, the regulation has interfered with distinct investment-backed expectations and the character of the governmental action) (*Id*. at 538-39).   Physical invasion does not apply.  The option to take title and right of possession has not actually been exercised. Nor do the second or third theories apply.  Under either theory, the City must proffer facts that, if proven, would show the amount of economic loss the City allegedly has suffered.  *See Concrete Pipe & Prods. v. Constr. Laborers Pension Trust*, 508 U.S. 602, 645, 124 L.Ed2d 539, 113 S.Ct. 2264 (1993); *MHC Fin. L.P. v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) ("81% diminution in value (from $120 million to $23 million) would not have been sufficient economic loss or interference").

The City does not attempt to show that the 1948 Instrument and its restrictions have caused the City an economic loss.  Indeed, on September 19, 1946, the City specifically requested that the Airport property be transferred to the City "subject to such conditions as the Administrator may desire to impose under the provisions of Surplus Property Administration Regulation 16 and amendments thereto." (Exh. G, September 19, 1946 City letter regarding Clover Field.)

Furthermore, the 1948 Instrument specifically provides that the property is to be used for "for public airport purposes for the use and benefit of the public." Consequently, the City cannot reasonably allege that the federal government has taken – or will take – action contrary to its expectations. The City was not only well aware that the transfer was being made pursuant to the SPA so that it would be used as an airport, it was also fully aware that if the property ceases to be run as an airport, the possibility exists that the United States could exercise an option to take title.  Thus, the requirement that the property be run as an airport does not interfere with any reasonable investment-backed expectations of the City. S*ee Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1005-06, 81 L.Ed.2d 815, 104 S.Ct. 2862 (1984) ("A reasonable investment backed expectation must be more than a 'unilateral expectation or an abstract need.'") (quoting *Webb's Fabulous Pharmacies v. Beckwith*, 449 U.S. 155, 161, 66 L. Ed. 2d 358, 101 S. Ct. 446 (1980)); *Turntable Fishery & Moorage Corp. v. United States*, 52 Fed. Cl. 256, 261 (2002) ("A plaintiff entering a private agreement with knowledge of possible restrictions on property hardly can be said to have been denied a reasonable expectation when those restrictions materialize." (citations omitted)).  In any event, the Fifth Amendment does not provide prospective injunctive relief as a remedy for a taking.  *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 849-50 (9th Cir. 2001).  Plaintiff, therefore, fails to state a regulatory takings claim.

### 3.  Plaintiff Fails To State A Tenth Amendment Claim

The Tenth Amendment states that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  Although plaintiff seeks to couch its claims in Tenth Amendment terms, the Tenth Amendment does not independently provide a substantive limitation on the powers of the United States.  Rather, the Tenth

Amendment makes plain that the federal government possesses only the powers that have been given to it by the Constitution--and no more.  *See United States v. Darby*, 312 U.S. 100, 124, 61 S. Ct. 451, 85 L. Ed. 609 (1941).  However, the Tenth Amendment does not deprive "the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end." *Darby*, 312 U.S. at 124; *Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 534, 85 L.Ed.2d 1487, 61 S.Ct. 1050 (1941).

Congress specifically authorized the SPA to meet the needs of the federal government in order to assure the disposition of federally owned airports, airport facilities and equipment that had been used in support of the war effort in WWII to public agencies. Surplus Property Act of 1944, 58 Stat. 765, 770.  A billion dollars was expended by the federal government in the 1940's for the acquisition and construction of airport facilities. *Id*. Section 13(g) of the Surplus Property Act of 1944 (49 U.S.C. §47151) is continued in effect by section 602(a) of the Federal Property and Administrative Services Act of 1949 as amended by Public Law 311, 81st Congress (50 U.S.C. App. 1622(a)-(c)). Surplus Property instruments of disposal issued under the SPA require airport sponsors to adhere to specific obligations in return for the property or its improved condition.  Among the obligations imposed in the SPA instruments of disposal is the requirement that an airport sponsor must operate the airport for the use and benefit of the public. Thus, the Tenth Amendment does not prevent the federal government from conditioning participation in the implementation of a federal program because the government is exercising a "granted power." *See California v. U.S.*, 104 F.3d 1086, 1092 (9th Cir. 1997); *Airport Cmtys. Coalition v. Graves*, 280 F. Supp. 2d 1207, 1217 (W.D. Wash. 2003).

In any event, the City cannot sue under the Tenth Amendment to "quiet title" to the airport property, as the QTA is the exclusive means to challenge the government's title to real property. *McIntyre*, 789 F.2d at 1411.  In addition, the

United States is not "commandeering" the City to do anything.  The United States only claims that the 1948 Instrument of Transfer gives it an option to exercise some rights with regard to the Airport Property in the event that the City decides not to continue complying with the conditions and restrictions that it agreed to comply with under that Instrument.  The City has not stopped complying with these conditions and restrictions, so the City's suit is not ripe.

### 4.  Plaintiff Fails To State A Fifth Amendment "Due Process" Claim

The 1948 Instrument of Transfer contains two conditions precedent before the United States takes title and the right to possess the Airport property.  First, the property must no longer be used as an airport by the City or its successor.  Second, only in that event, does an option arise for the United States to exercise a right to take title and right of possession.  Neither the use condition nor the option condition has been met. Even if the City had a Fifth Amendment "Due Process" claim, it is not ripe as there is no agency action.

In any event, plaintiff cannot show that the conditions, covenants and restrictions to which it agreed in the 1948 Instrument of Transfer are "so arbitrary or irrational that [they] run[] afoul of the Due Process Clause." *Action Apt. Ass'n v. Santa Monica Rent Control Opinion Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007) (quoting Lingle, 544 U.S. at 542) (internal quotation omitted).  Plaintiff fails to show that the obligations under the 1948 Instrument fail "'to serve any legitimate governmental objective [that they] may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Id.*; *Lingle*, 544 U.S. at 542, *citing County of Sacramento v. Lewis*, 523 U.S. 833, 846, 140 L.Ed.2d 1043, 118 S.Ct. 1708 (1998)).  Plaintiff neither shows that the requirements fail to meet the "public use" requirement or is so arbitrary as to violate due process. S*ee Crown Point Dev., Inc. v. City of Sun Valley*, 506 F.3d 851, 855-56 (9th Cir. 2007); *Esplanade Properties, LLC v. City of Seattle*, 307 F.3d 978, 982 (9th Cir. 2002).

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

DATED January 10, 2014

Respectfully Submitted,

STUART F. DELERY
Assistant Attorney General
Civil Division

OF COUNSEL:

KATHRYN B. THOMSON
Acting General Counsel
PAUL M. GEIER
Assistant General Counsel for Litigation
PETER J. PLOCKI
Deputy Assistant General Counsel for Litigation
TIMOTHY H. GOODMAN
Senior Trial Attorney
United States Department of Transportation

MARC WARREN
Acting Chief Counsel
DAPHNE FULLER
Assistant Chief Counsel
JONATHAN CROSS
Manager, Airport Law Branch
SCOTT MITCHELL
Attorney-Advisor
Federal Aviation Administration

ANDRE BIROTTE JR.
United States Attorney

JUDRY SUBAR
Assistant Director,
Federal Programs Branch

/s/ Raphael O. Gomez
RAPHAEL O. GOMEZ
(D.C. Bar #305540)
Senior Trial Counsel
U.S. Department of Justice, Civil Division
Federal Programs Branch
P.O. Box 883
Washington, D.C. 20044
Telephone: (202) 514-1318
Facsimile: (202) 616-8460
raphael.gomez@usdoj.gov

Attorneys for Defendants