# EXHIBIT C

1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

110PN4

**Time of Request:** Wednesday, January 08, 2014   13:43:50 EST
**Client ID/Project Name:**
**Number of Lines:** 443
**Job Number:**        2825:444284662

Research Information



OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF CALIFORNIA

Opinion No. CV 74-317

*1975 Cal. AG LEXIS 64; 58 Ops. Cal. Atty. Gen. 345*

May 30, 1975

**SYLLABUS:**
 [*1]

   SANTA MONICA AIRPORT -- USES -- COMMISSION -- Considering its numerous contractual and lease obligations, Santa Monica may not cease using Municipal Airport for airport purposes. Conflict of interest arises when members of Airport Commission participate in proceedings to determine charges for tie-down spaces where they are lessees of such spaces.

**REQUESTBY:**


ASSEMBLYMAN, 44th DISTRICT

**QUESTION:**

   The Honorable Alan Sieroty, Assemblyman from the Forty-Fourth District, has requested an opinion on the questions which may be stated as follows:

   1. May the City of Santa Monica, at the present time, cease using the Santa Monica Municipal Airport for airport purposes?

   2. Would a conflict of interest arise where members of the Santa Monica Airport Commission participate in Commission proceedings for the purpose of making recommendations to the Santa Monica City Council concerning charges to be levied for aircraft tie-down spaces at the Santa Monica Municipal Airport where such members are lessees of such tie-down spaces at such airport?

   The conclusions are:

   1. The City of Santa Monica, at the present time, may not cease using the Santa Monica Municipal Airport for airport purposes.

   2. A conflict of interest does [*2]   arise where members of the Santa Monica Airport Commission participate in Commission proceedings for the purpose of making recommendations to the Santa Monica City Council concerning charges to be levied for aircraft tie-down spaces at the Santa Monica Municipal Airport where such members are lessees of such tie-down spaces at such airport.

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 3 of 11   Page ID #:284

Page 2
1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

The conflict of interest may be avoided by the affected member by immediately disclosing the interest, withdrawing from participation in the matter, refraining from voting, refraining from attempting to influence other members, and having all of these matters reflected in the minutes.

**OPINIONBY:**

EVELLE J. YOUNGER, Attorney General; Daniel Weston, Deputy

**OPINION:**

**ANALYSIS**

1. May the City of Santa Monica, at the present time, cease using the Santa Monica Municipal Airport for airport purposes?

[**346]   The Santa Monica Municipal Airport, n1 is owned by the City of Santa Monica. n2 The initial property was acquired pursuant to a bond measure approved on April 14, 1926, with the bond monies to be used for public park purposes. n3

> n1 Hereinafter referred to as the Airport.
>
> n2 Hereinafter sometimes referred to as City.

[*3]

> n3 The people of Santa Monica, on April 14, 1926, adopted the following proposition:
>
>> "Shall the City of Santa Monica incur a bonded indebtedness of $ 860,000 for the acquisition, construction and completion of a certain municipal improvement, to wit: the acquisition of lands in the City of Santa Monica, California, being a part of that certain tract of land commonly known as Cloverfield for public park purposes, and the improvement thereof by the acquisition or construction therein of all such buildings, structures and improvements as may be necessary or convenient for purpose of a public park?"

In 1927, the State Legislature enacted the following provision into law: n4

> "Any lands previously acquired by . . . any municipal corporation . . . for park purposes, may be used for any of the purposes in this section specified [airport operation]; it being hereby specifically declared that the purpose specified in this section shall constitute park purposes." n5

> n4 Stats. 1927, Chap. 267, effective July 29, 1927.

[*4]

> n5 Cases in other jurisdictions have held that airport use is a type of park use, irrespective of statutory definitions. One such case was *Schmoldt v. Oklahoma City, 144 Okla. 208 (1930).* In the *Schmoldt* case, the court considered "whether or not an aviation airport, with all necessary and proper equipment . . . may be paid for out of funds derived from the sale of bonds issued and sold for the purpose of public park improvement." The court decided: "If a city may use a portion of such funds (derived from the sale of bonds voted to purchase or maintain a park) for building sidewalks around, walks and driveways through a park for the amusement of the public, we see no good reason for holding the city cannot expend a part of its funds in maintaining an airport. . . ."

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 4 of 11   Page ID #:285

Page 3
1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

The property initially acquired consisted of approximately 128 acres and included Clover Field, a then operating air field. The City, since the original acquisision, has purchased outright, additional lands and the Airport presently consists of approximately 215 acres.

Almost from the inception, [*5] and continuing to the present time, the City has entered into numerous contracts, leases and licenses affecting the use of the Airport. It is abundantly clear that the City had such authority to obligate itself. *Section 50474 of the Government Code* n6 subdivisions (c) and (h) provide that in connection with the erection or maintenance of an airport, a local agency may "Lease or assign for operation any space and any necessary or useful appurtenances, appliances, or other conveniences," and may "Enter into contracts or otherwise cooperate with the Federal Government or other public or private agencies."

> n6 All references are to the Government Code unless otherwise stated.

Section 50475 provides:

> "A local agency operating or maintaining an airport may grant leases, licenses, concessions, and other privileges, regarding aviation facilities to the state or the United States, for the use or occupation of hangars, structures, works, or other aviation facilities by the Department of [*6] Defense, National Guard, or other state or federal departments or agencies in connection with aviation or air commerce."

[**347] Section 50478 provides:

> "A local agency may lease or sublease property owned, leased, or otherwise controlled by it for not to exceed 50 years for airport purposes or purposes incidental to aircraft, including:
>
> "(a) Manufacture of aircraft, airplane engines, and aircraft equipment, parts, and accessories.
>
> "(b) Construction and maintenance of hangars, mooring masts, flying fields, signal lights, radio equipment, service shops, conveniences, appliances, works, structures, and other air navigation, aircraft, and airplane engine manufacturing plants and facilities."

It is clear that a municipality may enforce its airport contracts, *City and County of San Francisco v. Western Air Lines, Inc., 204 Cal. App. 2d 105 (1962);* and that contracts are enforceable against the municipality. *Trans World Airlines v. City and County of San Francisco, 228 F.2d 473 (1955), cert. den. 351 U.S. 919 (1956).* In this case, the City and County of San Francisco, in 1942, entered [*7] into a long term contract for 20 years with TWA with the payment charges fixed by the agreement. In 1950, the Board of Supervisors attempted by resolution to raise the fees to be paid by TWA. The Court held that the City and County of San Francisco had bound itself as to its rates and charges by entering into a valid contract expressly authorized by state law, and that during the term of such contract, it could not unilaterally change the terms thereof. (See *Berkeley Lawn Bowling Club v. City of Berkeley, 42 Cal. App. 3d 280 (1974).*)

Note is further made of the legislative intent that these municipal airport contracts are to be observed. Sections 37440 through 37444 provide generally that a municipally owned airport, which is restricted to use for airport purposes, may, under certain conditions, be sold. Section 37443 expressly provides that such sale "shall be made subject to any duty or obligation imposed by law or contract upon the city with respect to such property." n7

> n7 In the event of a sale of an airport pursuant to these sections, the airport must continue to be used for airport purposes for not less than 10 years from the date of sale. § 37443.

[*8]

We now turn to a consideration of the numerous contracts which have been entered into by the City respecting the use of the Airport and its property. No useful purpose would be served by considering in detail each of these agreements since a consideration of some of them will amply demonstrate the degree to which the City has contracted away its rights to deal freely with the Airport property and its uses as an airport. These agreements may be subsumed under 5 general classifications; Federal Grant Agreements, Federal Lease Agreements, Federal Transfer Agreement, State Grant Agreements, and Private Lease Agreements. n8

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 5 of 11   Page ID #:286

Page 4
1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

n8 The Office of the City Attorney of Santa Monica has provided us with copies of many of the outstanding private leases as well as a comprehensive chronological history of events affecting the Airport. The Federal Aviation Administration has provided us with copies of 27 documents involving agreements with the Federal Government. The State Department of Aeronautics has provided us with copies of 12 grant agreements made pursuant to the California Airport Assistance Funds. (*§§ 21680-21688, Public Utilities Code*.)

[*9]

[**348] In 1941, the City of Santa Monica and the Federal Government entered into Lease No. W-04-193-ENG.4894, modified by supplemental agreements number 1, dated July 23, 1945, and number 2, dated July 15, 1946. The City and the Federal Government also entered into Lease No. W3460-ENG.549, dated December 1, 1941, and modified by supplemental agreements number 1, dated December 20, 1944, and number 2, dated July 25, 1946. These leases cover approximately one hundred seventy acres of the property located at the Airport. The Federal Government expended approximately $ 800,000.00 in improving the land leased to it, and the City, in return, agreed pursuant to the above mentioned leases, to maintain the airport for the benefit of the public during the life of these improvements.

The nature of such improvements were the construction of two hangars, the construction of a control tower, fencing, construction of a service road and utilities and improvement of a concrete runway and taxiway. n9

n9 Most of the agreements with the Federal Government provide that the term of the obligation shall continue during the useful life of the improvements. No information has been provided us, nor suggestion made to us, that the useful life of all such improvements have now expired.

[*10]

In addition, six grant agreements were entered into between the City and the Federal Government. In essence, these grant agreements provided the City with Federal funds for the improvement of the Airport property. In return for such funds, the City has agreed to maintain the Airport for the use and benefit of the public during the life of the improvement made with the Federal funds. In no event is the life of the particular improvement deemed to be more than twenty years, under any grant agreement. Therefore, the maximum duration of the obligations of the City under these grant agreements is twenty years from the date of execution of the grant agreement.

The first such grant agreement is number 9-04-044-801, Contract No. CA6A2985. It was entered into on May 11, 1944. Two amendments dated 6-24-48 and 10-18-48 were also executed. This agreement, by its terms, expired in twenty years from the date of the last amendment to it, or in 1968 and thus is not material to our inquiry.

The second grant agreement, number 9-04-044-5702, Contract No. C4A-4161A, was entered into on June 25, 1957. Under this grant agreement, the United States agreed to incur maximum obligations of $ 20,056.00 for [*11] the construction of an entry road, fence relocation, installation of obstruction lights, and installment of taxiway entrance signs. As with the previous grant agreement, Section 8 of the June 25, 1957 agreement required that the agreement remain in full force and effect throughout the useful life of the facilities developed under the project, not to exceed twenty years from the date of acceptance of the agreement. Therefore, the City of Santa Monica ceases to be bound by the provisions thereof on June 25, 1977. The actual cost incurred by the Federal Government under this grant agreement was $ 20,266.26.

The third grant agreement, number 9-04-044-083, Contract No. C4CA4906-A, was entered into on April 23, 1958, and provided for Federal funding for construction [**349] of a taxiway crossing, construction of an aircraft apron, and construction of extensions to existing aircraft aprons, including storm drains. The Federal Government expended $ 19,574.00. Again, this agreement was limited in duration to the useful life of the improvements provided for thereunder, but in no event to exceed twenty years, or 1978.

The fourth grant agreement, number 9-04-044-5904, Contract No. FA-4-188, [*12] was executed on April 29, 1959. The improvements to be made by the Federal Government under this grant agreement were the construction of an additional apron including a drainage and a retaining wall. The amount expended was $ 13,952.00. As with the other agreements, this one was limited to the useful life of the improvements constructed thereunder, not to exceed twenty years, or 1979.

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 6 of 11   Page ID #:287

Page 5
1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

The fifth grant agreement, number 9-04-044-D205, Contract No. FA-WE-2313, was entered into on June 22, 1962. The improvements made under this 1962 grant agreement were the construction of an extension of the aircraft apron, including a retaining wall, hazard lights, and the relocation of utilities. The obligation of the Federal Government under this agreement was $ 72,804.00. The duration of this agreement was the useful life of the improvements made but in any event the agreement term was not to exceed twenty years, or 1982. As a part of this agreement, a sponsor's assurance agreement was executed by the City. A similar sponsor's agreement had previously been incorporated in the amendment to the first grant agreement, executed in 1948, and reincorporated in the grant agreement of June 25, 1957. Paragraph [*13] 6 of the project application dated April 30, 1962, states as follows:

> "The sponsor will operate and maintain in a safe and serviceable condition the airport and all facilities thereon and connected therewith which are necessary to serve the aeronautical users of the airport . . . and will not permit any activity thereon which would interfere with its use for airport purposes."

The following language is contained in Part 3 of the same sponsor's assurance agreement:

> "2. The sponsor will operate the airport as such for the use and benefit of the public. In furtherance of this covenant (but without limiting its general applicability and effect), the sponsor specifically agrees that it will keep the airport open to all types, kinds, and classes of aeronautical uses . . .
>
> * * *
>
> "4. The sponsor agrees that it will operate the airport for the use and benefit of the public on fair and reasonable terms . . ."

These provisions were incorporated in the later grant agreement.

The sixth grant agreement, number 9-04-044-906, Contract No. DOT-FA69WE-1535, was executed on July 24, 1968. The improvements to be constructed thereunder included the removal of an abandoned control tower, the [**350]   [*14]   modernization of field lighting, the relocating of field lighting controls and circuits, and a new control tower. Also, a new control tower panel was to be built. The actual amount spent by the Federal Government under this grant agreement was $ 12,406.00.

In addition the City has entered into numerous lease agreements with the Federal Government. Some of these are noted below.

Lease No. FA4-1718, was executed on July 26, 1961, and expires June 30, 1981. The Federal Government installed a navigational aid facility on the property which is the subject of this lease, which is known as a Vassy Visual Slope Indicator. The cost for this visual slope indicator was $ 26,560.00, and this cost was borne by the Federal Government.

Lease No. WE-17024, was executed on April 12, 1963, and expires June 30,

1983. The land was acquired by the Federal Government for installation of a very high frequency omni range facility. The cost for the construction of this facility was $ 226,000.00 which was borne by the Federal Government.

Lease No. FA64-WE1054, was executed on July 2, 1964, and expires June 30, 1984. The land leased to the Federal Government is used for runway and identifier lights. The amount [*15]   of money expended by the Federal Government for this facility was $ 5,420.00.

Lease No. FA65-WE1153, was executed on April 6, 1965 and expires June 30, 2015. This lease is for property upon which a control tower was constructed. The cost for the construction of the control tower facility by the Federal Government was $ 386,931.00.

Lease No. FA65-WE1194, was executed on August 25, 1965, and expires June 30, 2015. The land leased is used for a remote transmitter receiver. The cost to the Federal Government for this facility was $ 46,600.00.

Lease No. DOT-FA72-WE-1830 was executed June 30, 1972, and expires June 30, 1982. The cost to the Federal Government for this lease is $ 11,000.00 per year. The land is used for general aviation district offices and the amount spent by the Federal Government to date for improvements is $ 22,540.00.

In addition to the above, various other leases with the Federal Government have, from time to time, been entered into.

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 7 of 11   Page ID #:288

Page 6
1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

These leases include the lease signed on January 15, 1953, two signed on May 29, 1968, and three on March 29, 1971. The expiration dates of these leases are, respectively, 1978, 1981, 1983, 1984, 2015 and 2015.

On August 10, 1948, the [*16] City and the Federal Government executed a document entitled *Instrument of Transfer*. By this document the Federal Government acting pursuant to the War Assets Administration Act, returned control of the Airport property to the City. The Instrument of Transfer provided that the surrender to the City was subject to certain reservations, restrictions, conditions and covenants as thereafter set forth, and that the same shall run with the land. Only a few of the conditions, etc., will be alluded to.

[**351] The City agreed that the propery transferred "shall be used for public airport purposes for the use and benefit of the public," that "the United States of America . . . through any of its employees or agents shall at all times have the right to make non-exclusive use of the landing area," and finally that "no property transferred by this instrument shall be used, leased, sold, salvaged, or disposed of by . . . [the City of Santa Monica] for other than airport purposes without the written consent of the Civil Aeronautics Administrator, which shall be granted only if said Administrator determines that the property can be used, leased, sold, salvaged or disposed of for other than [*17] airport purposes without materially and adversely affecting the development, improvement, operation or maintenance of the airport at which such property is located." n10

> n10 The former City Attorney of Santa Monica, Robert G. Cackins, on January 23, 1962, issued an opinion which concluded, "Deed No. 4 (CCS) ("Instrument of Transfer") and the terms of the project application above alluded to compel the conclusion that the City must operate the airport as an airport, and that the City cannot legally unilaterally, on its own motion, abandon the use of the Santa Monica Municipal Airport as an airport."
>
> The present City Attorney, Richard L. Knickerbocker, has suggested that several of the agreements entered into with the Federal Government (including said Instrument of Transfer) may be voidable under general contract law. For the purposes of this opinion we assume without deciding that all the agreements considered herein are valid, since the avoidance of several of the agreements would not significantly affect the remaining overall pattern of obligation.

[*18]

From 1962 through and including 1973, the City has received 11 payments in excess of $ 37,000 from the Airport Assistance Revolving Fund administered by the State Department of Aeronautics. In each case the City obligated itself to expend such funds for airport and aviation purposes as the same is set forth in *section 21681 Public Utilities Code*. Unlike the receipt of Federal grants, the receipts of these State grants, did not expressly obligate the City for specific time periods. However *section 21687 Public Utilities Code* does provide that in the event a beneficiary airport ceases to be used as an airport within 20 years of a grant, that repayment of the monies must be made to the Airport Assistance Revolving Fund as therein more specifically set forth.

We consider finally the contract obligations which the City has incurred with private parties relative to the use of the Airport. There are numerous master lease agreements and subsidiary sub-leases executed by the master lessees. Extensive consideration of these leases regarding the use of the Airport is not necessary. Some of the master leases [*19] include leases with Clover Leaf Aviation, Lear Siegler, Bel Air Service, Douglas Aircraft Corporation, Pacific Aeromotive, Inc., Gunnell Aviation, Kettler Aviation, Jon Daudy, Earl Beacon Lease a Plane, and Briles Helicopter. These leases expire respectively in 1996, 1979, 1979, 1986, 1979, 1979, 1979, 1982, 1981, and 1979.

In summary, it is apparent that the City has entered into numerous contracts and leases wherein it has contracted away its rights to deal freely with the Airport property and its uses as an airport. These contractual agreements when considered as a whole and in light of the overall pattern of extensive and extending obligation, [**352] leads to the conclusion that the City may not at the present time cease using the Airport for airport purposes. n11

> n11 In concluding that contractual commitments prevent the present cessation of airport usage, we do not reach the question as to what extent the partial acquisition of airport property pursuant to the 1926 bond election was tantamount to public dedication of such property thereby exercising further restraints on the City as to its options in dealing with the property.

[*20]

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 8 of 11   Page ID #:289

Page 7
1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

2. Would a conflict of interest arise where members of the Santa Monica Airport Commission participate in Commission proceedings for the purpose of making recommendations to the Santa Monica City Council concerning charges to be levied for aircraft tie-down spaces at the Santa Monica Municipal Airport where such members are lessees of such tie-down spaces at such airport?

The Santa Monica Airport Commission n12 is created by the City charter. Section 1015 of the Santa Monica Municipal Code provides:

> "There shall be an Airport Commission, consisting of five members, which shall be appointed by the City Council. They shall be qualified electors of the City, none of whom shall hold any paid office or employment in the City government."

> n12 Hereafter referred to as Commission.

The duties of the Commission are set forth in section 1016 of the Santa Monica Municipal Code as follows:

> "The Airport Commission shall have power and be required to:
>
> "(a) Act in an advisory capacity to the City Council in all matters pertaining [*21] to the Municipal Airport and to aviation matters generally to the extent that they affect the City;
>
> "(b) Approve or disapprove the appointment of a Municipal Airport Director by the City Manager, as and when the City Council provides for the filling of such position; and
>
> "(c) Consider and recommend to the City Council rules and regulations for the management and operation of the Municipal Airport."

We are informed by the City Attorney that the Commission acting under subdivision (a) above, advises the City Council as to what rates should be charged for tie-down spaces; and acting under subdivision (b) above, the Commission exercises an absolute veto power over the appointment of the Airport Director. The Airport Director's duties and powers are extensive. n13 It is thus apparent that   [**353]   the Commission functions not only in an advisory capacity, but also exercises some of the governmental powers of the city. The members, therefore, appear to be "officers." Consequently, we need not meet any potential issue as to whether the members are "officers" or "officials" within the meaning of the various conflict of interest statutes. *See*, generally, *42 Ops. Cal. Atty. Gen. 93, 95 (1963).*   [*22]

> n13 Section 2217 of the Santa Monica Municipal Code provides:
>
> > "The duties and functions of the Airport Director shall be as follows:
> >
> > "(a) Be responsible for all activities of the Santa Monica Airport;
> >
> > "(b) Act as department head for the Santa Monica Airport Department;
> >
> > "(c) Supervise all personnel, protect facilities and property of the City at such Airport;
> >
> > "(d) Maintain all records of flight operations as required;
> >
> > "(e) Supervise the operation of the Control Tower;
> >
> > "(f) Attend all meetings of the Airport Commission; and
> >
> > "(g) Perform such other duties in connection with the maintenance and operation of such Airport as may be prescribed by the City Manager."

Conflict of interest laws fall under two broad classifications, statutory law and the common law of conflicts of interest. We shall examine them both.

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 9 of 11   Page ID #:290

Page 8

1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

The Political Reform Act of 1974 (known as Proposition 9 in the June 4, 1974 primary election), is codified in sections 81000 through 91014. Section 82048 provides that, "'Public official' means every member, [*23] officer, employee or consultant of a state or local government agency." Section 87100 provides that, "No public official at any level of state or local government shall make, participate in making or in any way attempt to use his official position to influence a governmental decision in which he knows or has reason to know he has a financial interest." However it appears that Commission members do not fall within section 87100 in that they do not have a financial interest as such as defined in section 87103 which provides in relevant part:

> "An official has a financial interest in a decision within the meaning of Section 87100 if it is reasonably foreseeable that the decision will have a material financial effect, distinguishable from its effect on the public generally, on:
>
> * * *
>
> "(b) Any real property in which the public official has a direct or indirect interest worth more than one thousand dollars ($ 1,000);"

We have been informed that the cost of tie-down spaces range from $ 40 per month to $ 130 per month and that the rentals are from month to month. From the facts as we understand them, it would appear that a one month license interest costing $ 130 would not be an interest [*24] in property having a fair market value in excess of $ 1,000. n14

> n14 There are approximately 600 tie-down spaces available, not all of which are filled. An applicant fills out a document entitled "Rental of Space License." This agreement provides that the "license may be renewed monthly by payment of the monthly charge on or before the first of each month. Failure to pay monthly in advance shall automatically revoke this license. . . ."

Similarly, it would appear that the conflict of interests provision of the "Moscone Act," (§§ 3600-3760), would not apply since section 3625(b) (2) excludes therefrom property interests of less than $ 1,000 value. n15 Furthermore, sections 1090-1097 do not apply since these sections prohibit certain financial interests "in any contract" made by a member in his official capacity. § 1090. n16 [**354] Also, sections 8920-8926 do not apply since by its terms it does not extend to city officials.

> n15 This Act has been substantially amended by 1974 Stats. Chapts. 48 and 1249.

[*25]

> n16 We are advised that the Commission members do not participate directly in the making and letting of the tie-down license contracts. Thus, literally, sections 1090, *et seq.* have no application to the questions presented herein. However, this proscription of the Code has been held to be applicable not only to the actual governmental contracting body, but also to *advisors* thereof as to the contract, or others who may participate in the making of the contract. See *Schaefer v. Berinstein, 140 Cal. App. 2d 278, 291-292 (1956); 46 Ops. Cal. Atty. Gen. 74 (1965)* re advisors. See *Stigall v. City of Taft, 58 Cal. 2d 565 (1962); Millbrae Assn. For Residential Survival v. City of Millbrae, 262 Cal. App. 2d 222, 236-237 (1968),* re other participants.
>
> However, we believe that under the *unique* circumstances of this case a court would probably not so apply section 1090 if the Commission members complied with the subsequently discussed common law rules regarding full disclosure and nonparticipation. The unique circumstances herein are (1) that there is a *multiple* member Commission instead of a single "advisor" or other participant, as was the case in the authorities above cited, and (2) the advisory or participation status is one step removed from the actual contract itself. The public should be sufficiently protected by disclosure and abstention as hereafter set forth. Under similar circumstances we have similarly concluded. Letter to Hon. Sig Hansen, Director, Department of Human Resources Development, August 16, 1972, I.L. 72-143.

[*26]

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 10 of 11   Page ID #:291

Page 9

1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

We turn to a consideration of the common law of conflict of interest which we find applicable. It was stated in *42 Ops. Cal. Atty. Gen. 151 at 155 (1963):*

> "The courts have made clear that even though a specific conflict of interest situation does not come within the statutory proscription -- such a conflict may still be condemned by the courts as violative of public policy which is always susceptible to broader interpretation than the express statutory provisions.' Kaufmann & Widiss, *The California Conflict of Interest Laws*, 36 So. Calif. L. Rev. 186, 187 (1963). The fundamental policy is that A public office is a public trust created in the interest and for the benefit of the people. Public officers are obligated . . . to discharge their responsibilities with integrity and fidelity. . . . They may not exploit or prostitute their official position for their private benefits. When public officials are influenced in the performance of their public duties by base and improper considerations of personal advantage, they violate their oath of office and vitiate the trust reposed in them, and the public is injured by being deprived [*27] of their loyal and honest services. . . .' *Terry v. Bender, 143 Cal. App. 2d 198, 206 (1956).*"

And further in *40 Ops. Cal. Atty. Gen. 210, 212 (1962):*

> "It is also important to note that the California courts have traditionally predicated conflict of interest decisions on the dual basis of: (a) the statutory restriction; and (b) the prohibition of sound public policy evolved from common law principles. See *City of Oakland v. California Const. Co., 15 Cal. 2d 573, 576 (1940); Schaefer v. Berinstein, 140 Cal. App. 2d 278, 290 (1956).* Thus, in *Noble v. City of Palo Alto, 89 Cal. App. 47, 51 (1928),* the court concluded that, A public officer is impliedly bound to exercise the powers conferred on him with *disinterested* skill, zeal, and diligence. . . .' (Emphasis added.) Fidelity in the public officer must be maintained, and the law does not permit a public officer to place himself in a position in which he might be tempted by his own private interest to disregard the interests of the public. See *Stigall* v. [*28] *City of Taft*, Cal. Sup. Ct. Dkt. No. S.F. 20906 (Oct. 23, 1962); *People v. Darby, 114 Cal. App. 2d 412, 425 (1952).*"

[**355] This office has further pointed out that, "The general common law-conflict of interest rule is not restricted to contractual relationships. . . . It strictly requires public officers to avoid placing themselves in a position in which personal interest may come into conflict with their duty to the public." *46 Ops. Cal. Atty. Gen. 74, 86 (1965).*

The gist of the common law of conflict of interest is to prevent the doing of an official act where the official may have a direct or indirect interest in the outcome. The courts of this state have held that an interest may be so remote and speculative as not to create any conflict of interest. *Hotchkiss v. Moran, 109 Cal. App. 321, 323 (1930).* What constitutes a remote and speculative interest is not clearly defined. For example, in *People v. Darby, 114 Cal. App. 2d 412 (1952),* the court used language that might suggest that any interest that might affect an official's conduct creates [*29] a conflict. In *Darby*, the Court, approving the instructions of the trial court, stated (at page 435):

> ". . . Whether the interest was *direct or indirect, remote or contingent*, the sum and substance of the three instructions read as a whole is that if the interest of the member is sufficient to cause him *to be swayed in the slightest degree* from his duty to the public, it is a violation of section 1097 as well as 1011." (Emphasis added.)

In light of the language in *Darby*, extreme caution should be exercised in concluding that an interest is too remote. It would appear not to be too remote an interest where the interest of the member of the Commission was that the member's spouse leased tie-down space from the City (*e.g.*, see the last paragraph of section 87103 where the interest of the spouse is deemed that of the official). Further it would appear that an interest would not be too remote where a member of the Commission leases tie-down from a private party at the Airport. This is so because a member could hypothetically keep the City rates low and thereby through the forces of competition keep the private rates low. We have been informed that two of the Commission [*30] members fall within these two examples.

We turn finally to the question of the remedy that is to be applied when it is determined that a conflict exists. Several opinions of this office have dealt with situations wherein matters have come before boards or commissions wherein a member of the board had an interest in the matter. In *26 Ops. Cal. Atty. Gen. 5 (1955)* we were required to rule upon the question whether a supervisor could participate in the deliberations and decision regarding the relocation of a county road where the supervisor owned property traversed by one of the two routes under consideration. We held that he could not, stating at pages 6-7:

Case 2:13-cv-08046-JFW-VBK   Document 18-3   Filed 01/10/14   Page 11 of 11   Page ID #:292

Page 10

1975 Cal. AG LEXIS 64, *; 58 Ops. Cal. Atty. Gen. 345, **

> "The question which arises at this point is whether the supervisor who owns the affected land may participate in the prior deliberations and decision concerning the route the relocated road is to take. It is obvious that this decision will directly affect a private interest of the supervisor; that is, whether or not his land will be condemned by the county. While *Government Code section 1090* does not forbid his participation, since [**356] the section is restricted [*31] to activities of a contractual nature, the common law rule on which it is based is not so limited."

Likewise, in *39 Ops. Cal. Atty. Gen. 165, 168 (1962)* we held that a municipal ordinance was invalid which granted an exception to a zoning ordinance in which a city councilman, having a direct financial interest, cast the deciding vote. In so holding, we noted:

> ". . . this opinion should not be construed as holding that a member of a city council cannot have an interest, regardless of his lack of participation in the vote, in property subject to a zoning regulation of the city. As regards non-contractual matters coming before a governing body, if the interested officer refrains from voting, it would appear that the demands of public policy have been met; . . . otherwise, only citizens who live and work in a complete vacuum could be qualified to sit on public bodies'. . . ."

Thus, it is seen that the common law doctrine prohibits *participation* by a Commission member in matters in which the member has an interest. This includes not only participation in the vote, but also prior deliberations. The latter is of course to prevent the member from *influencing* [*32] unduly the outcome of the vote.

In numerous opinions this office has, in articulating this common law remedy in conflict of interest situations, specified the approach of abstention:

> "(1) he should immediately disclose the interest, (2) he should withdraw from any participation in the matter, (3) he should refrain from attempting to influence another member of the board and should refrain from voting, and (4) all of this should be reflected in the minutes." n17

---

n17 Letter to Hon. Sig Hansen, Director, Department of Human Resources Development, August 16, 1972, I.L. 72-143. *Accord:* Letter to Mr. T. P. Stivers, District Securities Officer, District Securities Division of Office of State Treasurer, October 6, 1970, I.L. 70-177; Letter to Special Assistant Attorney General, February 17, 1972, I.L. 72-53; Letter to Dr. Malcolm H. Merrill, M.D., Director of Public Health, October 16, 1964, I.L. 64-163.

---

It is concluded that a conflict of interest does arise where members of the Santa Monica Airport Commission participate [*33] in Commission proceedings for the purpose of making recommendations to the Santa Monica City Council concerning charges to be levied for aircraft tie-down spaces at the Santa. Monica Municipal Airport where such members are lessees of such tie-down spaces at such airport.

The conflict of interest may be avoided by the affected member by immediately disclosing the interest, withdrawing from participation in the matter, refraining from voting, refraining from attempting to influence other members, and having all of these matters reflected in the minutes.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Contracts LawTypes of ContractsLease AgreementsGeneral OverviewTransportation LawAir TransportationAirportsEstablishment, Maintenance & OperationTransportation LawAir TransportationAirportsFunding