1    MARSHA JONES MOUTRIE (SBN 69711)
     City Attorney
2    Marsha.Moutrie@smgov.net
     JOSEPH LAWRENCE (SBN 99039)
3    Assistant City Attorney
     LANCE S. GAMS (SBN 125487)
4    Deputy City Attorney
     IVAN O. CAMPBELL (SBN 216049)
5    Deputy City Attorney
     1685 Main Street, Third Floor
6    Santa Monica, California 90401-3295
     Telephone:  310.458.8336
7    Facsimile:   310.393.6727

8    DON G. RUSHING (SBN 87565)
     DRushing@mofo.com
9    JAMES W. HUSTON (SBN 115596)
     WILLIAM V. O'CONNOR, JR. (SBN 216650)
10   MORRISON & FOERSTER LLP
     707 Wilshire Boulevard, Suite 6000
11   Los Angeles, California 90017-3543
     Telephone:  213.892.5200
12   Facsimile:   213.892.5454

13   Attorneys for Plaintiff
     CITY OF SANTA MONICA
14

15              UNITED STATES DISTRICT COURT

16             CENTRAL DISTRICT OF CALIFORNIA

17   CITY OF SANTA MONICA,              Case No. CV13-08046-JFW (VBKx)

18                  Plaintiff,          **PLAINTIFF THE CITY OF SANTA
                                        MONICA'S OPPOSITION TO
19          v.                          DEFENDANTS' MOTION TO
                                        DISMISS**
20   UNITED STATES OF AMERICA,
     FEDERAL AVIATION
21   ADMINISTRATION and MICHAEL P.
     HUERTA, in his Official Capacity as
22   Administrator of the Federal Aviation
     Administration,                    Date:      February 10, 2014
23                                      Time:      1:30 p.m.
                    Defendants.         Ctrm:      16
24

25                                      Complaint filed:  October 31, 2013

26

27

28

                                        OPPO TO MOTION TO DISMISS COMPLAINT
                                        Case No. CV13-08046-JFW (VBKx)
     sd-633857

1

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................ 1

II.     FACTUAL BACKGROUND ....................................................... 2

    A.   Santa Monica Acquires the Airport Property ......................... 2

    B.   The City Leases the Airport Property to the United States ................ 2

    C.   The United States Surrenders Its Leasehold Interest ........................ 4

    D.   The 1984 Settlement Agreement ........................................... 4

    E.   The City Accepts Its Last Federal Grant in 1994 ...................... 5

    F.   The FAA Confirms the City's Obligations Run until 2015 ............ 5

    G.   The FAA Drastically Changes Its Position in 2008 ................... 6

    H.   The City Evaluates the Future of SMO ................................. 6

III.    LEGAL STANDARD ............................................................... 7

IV.    DEFENDANTS' MOTION MUST BE DENIED ............................. 8

    A.   This Court Has Jurisdiction to Hear the City's QTA Claim................ 8

        1.   The City First Received Notice of Defendants' Asserted Interest in the Airport Property in 2008 ...................... 8

        2.   The City Did Not Have Notice of the Purported Reversionary Interest in SMO's Title before 2008 .................. 9

            a.   The 1948 Instrument of Transfer ....................... 9

            b.   The 1962 City Attorney Opinion ................... 11

            c.   The 1975 California Attorney General Opinion ........... 12

            d.   Purported Requests for Release From Conditions in 1952, 1956 and 1984 ...................... 12

        3.   The 1971 Letter, 1984 Agreement, and Subsequent FAA Assertions  Constitute Abandonment of Defendants' Claim................................................ 14

        4.   The Changed Scope of the United States' Interest Restarts the Statute of Limitations ...................... 17

        5.   Issues Concerning the QTA's Statute of Limitations Are Intermeshed with the Case's Substantive Issues ...................... 18

        6.   A Request for Release Would Be Futile.................... 19

        7.   The City Cannot Impliedly Relinquish Its Rights .................. 20

    B.   This Court Has Jurisdiction over the City's Takings Claim.............. 21

    C.   The City's Constitutional Claims Are Ripe....................... 22

        1.   The Issues Are Fit for Judicial Decision .................. 23

        2.   The City Will Suffer Severe Hardship ..................... 23

# TABLE OF CONTENTS
## (continued)

Page

D.  The City's Complaint Properly Pleads Its Takings, Tenth Amendment, and Substantive Due Process Claims .......................... 24

    1.  The Regulatory Takings Claim Is Properly Pleaded ............... 24

    2.  The Tenth Amendment Claim Is Properly Pleaded................. 25

    3.  The Due Process Claim Is Properly Pleaded .......................... 25

V.    CONCLUSION .................................................................................. 25

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

# TABLE OF AUTHORITIES

**Page**

CASES

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ........................................................................... 24

*Avco Comm. Developers, Inc. v. S. Coast Regional Com.,*
    17 Cal.3d 785 (Cal. 1976) ........................................................... 20, 21

*Aydin Corp. v. Union of India,*
    940 F.2d 527 (9th Cir.1991) ......................................................... 2, 22

*Babbit v. United Farm Workers Nat'l Union,*
    442 U.S. 289 (1979) ........................................................................... 23

*Block v. North Dakota,*
    461 U.S. 273 (1983) ............................................................................. 8

*Cal ex. rel. State Land Comm'n v. Yuba Goldfields, Inc.,*
    752 F.2d 393 (9th Cir. 1984) ............................................................... 8

*City of Glendale v. Trondsen,*
    *48 Cal.2d 93* (Cal. 1957) ................................................................... 21

*City of Paducah v. Paducah Ry. Co.,*
    261 U.S. 267 (1923) ........................................................................... 21

*Cnty of Inyo v. Dept. of Interior,*
    No. CV F 06-1502 AWI DLB, 2008 WL 4468747 (E.D. Cal. 2008) ................... 8

*Dreier v. United States,*
    106 F.3d 844 (9th Cir.1996) .................................................... 7, 11, 13

*Duke Power Co. v. Carolina Env. Study Group. Inc.,*
    438 U.S. 59 (1978) ....................................................................... 22, 24

*E. Enterprises v. Apfel,*
    524 U.S. 498 (1998) .................................................................... 21, 22

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.,*
    130 S. Ct. 3138 (2010) ...................................................................... 22

1

2

**TABLE OF AUTHORITIES**
**(continued)**

Page

3

4

*Harris v. Rand*,
    682 F.3d 846 (9th Cir. 2012) ......................................................................... 7

5

6

*Khodara Environmental, Inc. v. Blakey*,
    376 F.3d 187 (3d Cir. 2004) ........................................................................ 20

7

8

*Kingman Reef Atoll Investments, L.L.C. v. United States*,
    541 F.3d 1189 (9th Cir. 2008) .................................................................... 19

9

*McFarland v. Norton*,
    425 F.3d 724 (9th Cir. 2005) ...................................................................... 18

10

11

*Michel v. United States*,
    65 F.3d 130 (9th Cir. 1995) ......................................................... 14, 15, 18

12

13

*Nat'l Park Hosp. Ass'n v. Dept. of Interior*,
    538 U.S. 803 (2003) .................................................................................... 23

14

15

*New York v. United States*,
    505 U.S. 144 (1992) .................................................................................... 25

16

17

*Ohio Forestry Ass'n Inc. v. Sierra Club*,
    523 U.S. 726, 733 (1998) ........................................................................... 23

18

19

*Osswald v. Anderson*,
    49 Cal. App. 4th 812 (Cal. App. 1996) ...................................................... 11

20

*San Luis & Delta-Mendota Water Auth. v. Salazar*,
    638 F.3d 1163 (9th Cir 2011) ..................................................................... 23

21

22

*Santa Monica Airport Ass'n v. City of Santa Monica*,
    Dkt. No. 16-99-21, 2000 WL 1824463 (F.A.A. Nov. 22, 2000) ................ 6, 16, 17

23

24

*Santa Monica Airport Ass'n v. City of Santa Monica*,
    Dkt. No. 16-99-21, 2003 WL 1963858 (F.A.A. Feb. 4, 2003) ...................... 6, 7, 17

25

26

*Shultz v. Department of Army*,
    10 F.3d 649 (9th Cir.1993) ("*Shultz II*") ................................................... 14

27

28

*Skranak v. Castenada*,
    425 F.3d 1213 (9th Cir. 2005) .................................................................... 18

iv

# TABLE OF AUTHORITIES
## (continued)

**Page**

*St. Clair v. City of Chico,*
   880 F.2d 199 (9th Cir.1989) ............................................... 7

*Thornhill Pub. Co. v. Gen. Telephone Elec.,*
   594 F.2d 730 (9th Cir.1979) .............................................. 7

*United States v. 1.377 Acres of Land,*
   352 F.3d 1259 (9th Cir. 2003)........................................... 16

*Villarino v. Comm'n Social Sec. Admin.,*
   No. CV F 12-1225 LJO BAM, 2012 WL 3205171 (E.D. Cal. 2012).................... 7

*Vincent Murphy Chevrolet Co., Inc. v. United States,*
   766 F.2d 449 (10th Cir. 1985) ........................................... 8

*Wash. Legal Found. v. Legal Found. of Wash.,*
   271 F.3d 835 (9th Cir. 2001) ........................................... 24

*Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,*
   473 U.S. 172 (1985) ................................................... 23

**STATUTES**

28 U.S.C.
   § 2409a(g) ........................................................... 8

**OTHER AUTHORITIES**

14 C.F.R. § 13.1 *et seq.*................................................ 5

Black's Law Dictionary (9th Ed. 2009) ................................... 11

Cal. Const. Article XI, § 7 ............................................. 21

Federal Rule Civil Procedure
   12(b)................................................................. 7
   12(b)(1) ........................................................... 7, 19
   12(b)(6)............................................................. 24

1

## I.   INTRODUCTION

2      Since the 1920's Santa Monica has owned – in fee simple – the property in

3  Santa Monica, California that is the subject of this dispute (commonly referred to as

4  "Clover Field" or "SMO").  Yet, in 2008, the FAA asserted for the first time that

5  Santa Monica was obligated to operate SMO as an airport forever or *title* to the land

6  on which SMO sits would, inexplicably, revert to the United States even though the

7  United States *never* owned the property.  Through this lawsuit, Santa Monica seeks

8  to remove the cloud that the United States placed on the City's title in 2008.

9      Defendants' misguided Motion to Dismiss is premised on the fact that the

10  United States released its temporary leasehold interest in the Airport Property in

11  1948 through an Instrument of Transfer ("IOT") that contained certain restrictions

12  on the Airport Property's use.  Defendants argue that because the IOT was recorded

13  in 1948 (*i.e.*, more than twelve years ago), the City's claims are time-barred under

14  the Quiet Title Act's ("QTA") statute of limitations, thus precluding this Court

15  from having jurisdiction to hear Santa Monica's claims.  Defendants' Motion

16  misses the mark; Santa Monica does not dispute that the IOT contains certain

17  restrictions (although Santa Monica does challenge the constitutionality of those

18  restrictions).  Rather, Santa Monica's Complaint demonstrates that the restrictions

19  contained in the IOT could not have unilaterally converted the United States'

20  temporary leasehold interest into a fee interest, let alone put Santa Monica on notice

21  of the United States' claim that fee title to the Airport Property would revert to the

22  United States if the City ever ceased using the property for airport purposes.

23      The first time Santa Monica received notice of the United States' claim to its

24  title was in 2008, when the FAA took that position in litigation over the City's

25  Aircraft Conformance Program.  The City's Complaint, filed just five years later (as

26  the City's other federal obligations related to SMO are set to expire), was initiated

27  well-within the QTA's 12-year statute of limitations.  This Court should not permit

28  Defendants to hold hostage 168 acres of property in Santa Monica that they have

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1  never owned based on the unfounded assertion that the City acted too late.

2        Additionally, despite the concrete dispute that has arisen between the parties,

3  Defendants now suggest that the City's constitutional claims are not ripe (an

4  interesting position given the FAA's assertions between 2010 and 2013 that the

5  City must bring a lawsuit in order to effect any change in the status of SMO).

6  Defendants' ripeness arguments have no basis in law or logic.  "The Supreme Court

7  has rejected [a] strict conception" of ripeness in cases where, like here, a party

8  seeks equitable and declaratory relief "to clarify [its] rights or obligations *before* an

9  affirmative remedy is needed."  *Aydin Corp. v. Union of India*, 940 F.2d 527, 528

10 (9th Cir.1991).  Moreover, the hardship to the City and its residents (and

11 Defendants, for that matter) of requiring the City to cease airport operations, letting

12 the SMO's land sit effectively unused, and then wait (perhaps indefinitely) for

13 Defendants to institute ejectment proceedings weighs heavily in favor of deciding

14 the City's constitutional claims now.  This case of first impression is ripe for

15 decision.  Defendants' Motion should be denied.

16 **II.    FACTUAL BACKGROUND**

17     **A.    Santa Monica Acquires the Airport Property**

18     In 1926, Santa Monica acquired title to certain parcels of unimproved land

19 that now constitute most of the property subject to this dispute.  (Compl. ¶ 15.)

20 Between 1926 and December 1941, the City acquired additional smaller parcels

21 that make up the rest of the property (together, the "Airport Property").  (*Id.*)

22     On May 27, 1941, President Franklin D. Roosevelt issued Presidential

23 Proclamation 2487, which declared that the United States was faced with an

24 "unlimited national emergency" that required "military, naval, air and civilian

25 defenses be put on the basis of readiness to repel any and all acts or threats of

26 aggression directed toward any part of the Western Hemisphere."  (*Id.* ¶ 18.)

27     **B.    The City Leases the Airport Property to the United States**

28     In December 1941, the City leased the Airport Property to the United States

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1    to aid in the war effort.  (*Id.* ¶ 19.)  The United States' leasehold was accomplished

2    through two separate leases covering two adjoining parcels of land.  (*Id.*)

3         The "Runway Lease" (No. W-04-193-ENG.4894) leased to the United States

4    approximately 86 acres on the northern portion of the Airport Property.  (*Id.* ¶ 20.)

5    The Runway Lease term began on December 8, 1941, and was to end twelve

6    months from the date of the termination of Presidential Proclamation 2487.  (*Id.*)

7    The City charged the United States only $1 for the entire term of the lease.  (*Id.*;

8    Compl. Ex. A, Runway Lease and Supplements.)

9         The "Golf Course Lease" (No. W3460-ENG.549) went into effect December

10   1, 1941, and leased to the United States approximately 83 acres on the southern

11   portion of the Airport Property.  (Compl. ¶ 21.) The Golf Course Lease terminated

12   on June 30, 1943, with an option of renewal annually thereafter until June 30, 1947.

13   (*Id.*)  Under the Golf Course Lease, the United States paid only $150 per month to

14   the City.  (*Id.*; Compl. Ex. B, Golf Course Lease and Supplements.)

15        In 1944 and 1945, respectively, Supplement Number 1 to the Runway Lease

16   and the Golf Course Lease modified the leases to allow for construction of a new

17   runway to accommodate larger aircraft.  (Compl. ¶ 23, Figure 2.)  Supplement

18   Number 1 to the leases also released the United States from its obligation to restore

19   the leased parcels to their original condition in exchange for the United States'

20   conveyance of any improvements to the property and cash payments to the City,

21   which were then reinvested in the Airport Property.  (*Id.*)  Supplement Number 1 to

22   the Golf Course Lease also extended the lease term until twelve months after the

23   termination of Proclamation 2487 (to align the lease term with that of the Runway

24   Lease) and reduced the rent to $1 for the remainder of the lease.  (*Id.*)

25        At the end of World War II, the United States determined that it was no

26   longer necessary to have a presence at SMO.  (*Id.* ¶ 28.)  Thus, the United States

27   and the City modified the leases through a Supplement Number 2 to each lease, by

28   which United States stopped operating the airport and stopped paying rent.  (*Id.*)

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

### C.   The United States Surrenders Its Leasehold Interest

On July 29, 1946, the War Assets Administration issued Form SPB-5 Declaration of Surplus Real Property, declaring as surplus the United States' leasehold interest in the Runway Lease and Golf Course Lease. (*Id.* ¶ 30.) On January 9, 1947, the United States made the determination that its 168 acre leasehold interest at the Airport Property, along with any improvements, should be disposed of under the Surplus Property Act of 1944 ("SPA"). (*Id.*; MTD Ex. H.)

On August 10, 1948, the United States surrendered its leasehold interest in the Airport Property per the IOT. (Compl. ¶ 31.) The IOT included restrictions on the property, including non-discrimination and public use requirements. (*Id.*; Compl. Ex. C.) The IOT also included a "reversion clause," which provides that, in the event the IOT's restrictions are not met, "the title, right of possession and all other rights transferred by" the IOT shall "revert" to the United States. (*Id.*) A City Council resolution confirmed that the intent of the IOT was to surrender the United States' leasehold interest in the Airport Property. (*Id.*¶ 33; Ex. A30, Res. No. 183.) On August 23, 1948, the IOT was filed with the Los Angeles County Recorder.

### D.   The 1984 Settlement Agreement

In the 1960s, SMO operations reached an all-time high and City residents began expressing concerns about the increase in air travel's impact. (*Id.* ¶ 39.) In response to the rising tide of resident apprehensions, various aviation associations also began expressing their concerns should airport operations cease. (*Id.* ¶ 40.)

The FAA recognized and responded to these aviation-related concerns in an April 1971 letter to the then Senior Vice President of the Aircraft Owners and Pilots Association. (*Id.*) The FAA stated that once the City's grant assurance obligations ended, "Santa Monica Airport is vulnerable to being discontinued and used for non-aviation purposes." (*Id.*; Ex. B31, 1971 FAA Letter.) The FAA did not take the position that the City was obligated to operate SMO in perpetuity. (*Id.*)

In June 1981, the City Council adopted Resolution No. 6296, declaring its

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

1   intention to close SMO when legally possible.  (*Id.* ¶ 45.)  Thereafter, in 1983, the

2   City adopted a new Master Plan for the Airport Property.  (*Id.* ¶ 46.)  Resolution

3   No. 6296 and adoption of the new Master Plan prompted several Part 13 actions

4   against the City.[1]  (*Id.* ¶ 47.)  As a result of the complaints and City's position

5   concerning SMO's future, the FAA negotiated with the City concerning SMO's

6   operations.  (*Id.*)  These negotiations culminated in the signing of a "Settlement

7   Agreement" in 1984 ("the 1984 Agreement").  (*Id.* ¶ 48.)  The 1984 Agreement

8   expressly provides that the City will operate SMO as an airport until "July 1, 2015."

9   (*Id.*; *see also* Compl. Ex. D.)

10              **E.      The City Accepts Its Last Federal Grant in 1994**

11          In June 1994, the City accepted its last federal Airport Improvement Grant in

12   exchange for contractual promises to maintain the Airport for the use and benefit of

13   the public for the useful life of improvements made with the funds, but for no more

14   than twenty years from the date of execution of the grant agreement.  (*Id.* ¶ 50.)

15         **F.      The FAA Confirms the City's Obligations Run until 2015**

16          Until 2008, and as reflected in the 1971 Letter and the 1984 Agreement, the

17   FAA has consistently recognized the City's ability to reevaluate the future of SMO.

18   (*Id.* ¶ 51.)  In a 1998 Part 16 proceeding involving a dispute over the City's refusal

19   to offer two long term leases, the FAA issued a Director's Determination discussing

20   the 1984 Agreement and confirming this position: "[The 1984] Settlement

21   Agreement makes clear that the City is obligated to operate the Airport only for the

22   duration of the [1984] Agreement (through July 1, 2015) ... To the extent that

23   Complainants and [the Airport Association] seek to prevent the future closure of the

24   Airport or require the City to operate the Airport beyond July 1, 2015, that is a local

25

26   [1] A Part 13 proceeding is an administrative proceeding before the Department of
     Transportation for the purpose of adjudicating alleged violations of aviation

27   regulations.  *See* 14 C.F.R. § 13.1 *et seq.*

28

OPPO TO MOTION TO DISMISS COMPLAINT
                                              Case No. CV13-08046-JFW (VBKx)
sd-633857

1    land use matter." (*Id.* ¶ 52; *see also Santa Monica Airport Ass'n v. City of Santa*
2    *Monica*, Dkt. No. 16-99-21, 2000 WL 1824463, at *19 (F.A.A. Nov. 22, 2000).

3    In 2003, the FAA issued its Final Agency Decision on the issue.  The Final
4    Agency Decision affirmed the Director's Determination, concluding that the 1984
5    Agreement "provided a conceptual blueprint" by which the City was required to
6    maintain "SMO's role in the National Airport System as a general aviation reliever
7    airport until July 1, 2015." (*Id.* ¶ 53; *see also Santa Monica Airport Ass'n v. City of*
8    *Santa Monica*, Dkt. No. 16-99-21, 2003 WL 1963858, at *3 (F.A.A. Feb. 4, 2003).

9                    **G.       The FAA Drastically Changes Its Position in 2008**
10   In 2001, to address the safety risks inherent in the increase of jet traffic at
11   SMO, a commissioned study recommended adoption of an "Aircraft Conformance
12   Program" to promote safety and to conform airport usage to SMO's B-II airport
13   designation. (*Id.* ¶ 54.)  In December 2002, the City Council approved the Aircraft
14   Conformance Program and directed staff to seek a voluntary agreement with the
15   FAA to implement it. (*Id.* ¶ 56.)  The FAA refused the City's efforts to reach a
16   voluntary agreement. (*Id.*)  The City Council then asserted its airport proprietor's
17   rights and, in 2008, passed an Ordinance intended to promote safety and protect
18   adjacent neighborhoods by prohibiting jet traffic at SMO. (*Id* ¶ 57.)

19   On March 26, 2008, the FAA issued an Order to Show Cause to the City
20   seeking to prohibit the City from enforcing the Ordinance, and – *for the first time* –
21   claimed that the IOT obligated the City to operate SMO as an airport "in
22   perpetuity" or ownership of the airport would "revert[] under the right to revert
23   clause" in the IOT. (*Id.* ¶ 58; Ex. C38, 2008 OSC at 6.)  Notably, Defendants point
24   to no analogous prior assertion in their moving papers.

25                   **H.       The City Evaluates the Future of SMO**
26   In December 2010, in anticipation of the expiration of the 1984 Settlement
27   Agreement, the City Council directed staff to conduct a comprehensive public
28   process regarding SMO's future. (*Id.* ¶ 65.)  The result was a March 2013 report on

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1   the "Visioning Process." (*Id.*) The Visioning Process concluded that the status quo

2   at the Airport is not acceptable to City residents. (*Id.* ¶ 66.)

3       Thereafter, City staff members met with FAA representatives several times

4   to convey community concerns and the City's position about SMO's future. (*Id.* ¶

5   67.) The FAA was unwilling or unable to agree to, or even to negotiate on, any

6   compromise as to SMO's future operation. (*Id.*) FAA representatives maintained

7   that the City is obligated to continue operating SMO in perpetuity under the IOT,

8   that the operational status quo must be maintained, and that no agreements to the

9   contrary could be made outside of the context of litigation. (*Id.*)

## III.   LEGAL STANDARD

11      Rule 12(b)(1) permits a Defendant to move to dismiss for lack of subject

12  matter jurisdiction. *See* Fed. R. Civ. P. 12(b). The burden is then placed on a

13  plaintiff to establish that subject matter jurisdiction is proper. *Harris v. Rand*, 682

14  F.3d 846, 851-51 (9th Cir. 2012). This burden must be met by pleading sufficient

15  allegations to show a basis for the court to assert subject matter jurisdiction. *Id.*

16  When a defendant challenges jurisdiction "facially," all material allegations in the

17  complaint are assumed true; the question for the court is whether the lack of federal

18  jurisdiction appears from the face of the pleading itself. *Thornhill Pub. Co. v. Gen.*

19  *Telephone Elec.*, 594 F.2d 730, 733 (9th Cir.1979).

20      A defendant may also attack the existence of subject matter jurisdiction apart

21  from the pleadings. In such a case, the court may rely on evidence extrinsic to the

22  pleadings to resolve factual disputes relating to jurisdiction. *St. Clair v. City of*

23  *Chico*, 880 F.2d 199, 201 (9th Cir.1989). It is axiomatic that "[w]hen a court

24  considers items outside of the pleadings on a [Rule] 12(b)(1) motion, the court

25  resolves all disputes in favor of the non-movant." *Villarino v. Comm'n Social Sec.*

26  *Admin.*, No. CV F 12-1225 LJO BAM, 2012 WL 3205171, at *6 (E.D. Cal. 2012);

27  *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996).

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

## IV.   DEFENDANTS' MOTION MUST BE DENIED

### A.   This Court Has Jurisdiction to Hear the City's QTA Claim

This Court has exclusive jurisdiction under the QTA to decide the present dispute between the City and the United States related to the Airport Property. *Block v. North Dakota*, 461 U.S. 273, 275-76 (1983).  Claims under the QTA must be brought within 12 years of "the date the plaintiff . . . knew or should have known of the claim of the United States."  28 U.S.C. § 2409a(g).  The words "should have known" impart a test of "reasonableness."  *Cal ex. rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396 (9th Cir. 1984).  Because the QTA waives sovereign immunity, timeliness under § 2409a(g) is a jurisdictional prerequisite.  *Id.*

Where, like here, a plaintiff seeks to quiet title with regards to a purported contingent future interest, the statute of limitations is triggered only when there is a "present, non-contingent, claim of the United States that either immediately or foreseeably comes into conflict with the plaintiff's claim."  *Cnty of Inyo v. Dept. of Interior*, No. CV F 06-1502 AWI DLB, 2008 WL 4468747, at *10 (E.D. Cal. 2008).  Federal courts may properly look to state law as an aid in determining application of the QTA's language to specific facts.  *Vincent Murphy Chevrolet Co., Inc. v. United States*, 766 F.2d 449, 451 (10th Cir. 1985).

### 1.   The City First Received Notice of Defendants' Asserted Interest in the Airport Property in 2008

On March 26, 2008, the FAA issued an Order to Show Cause to the City seeking to prohibit the City from enforcing an Ordinance banning category C and D aircraft from using SMO.  (Compl. ¶ 58.)  In the Order to Show Cause, the FAA asserted that the IOT obligates the City to operate SMO as an airport forever, or ownership – *i.e,* title – to SMO would revert to the United States under the "right to revert" clause.  (*Id.*; Ex. C, 2008 OSC at 6.)  This was the first time Defendants claimed a reversionary interest in SMO that included title to the Airport Property.

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

This assertion triggered the statute of limitation for the City's QTA claim. [2]

### 2.   The City Did Not Have Notice of the Purported Reversionary Interest in SMO's Title before 2008

Defendants' Motion ignores the evidence demonstrating that the City was first put on notice of the cloud on its title in 2008, and also ignores Defendants' own repeated assertions that the City need only operate the Airport until July 1, 2015.  Instead, Defendants put forth four reasons they contend the City had notice of Defendants' claimed a reversionary interest to the City's fee title: (1) the language of the IOT; (2) language in a 1962 Opinion by the City Attorney; (3) language in a 1975 Opinion by the California Attorney General; and (4) purported evidence that the City "petitioned" for release from the conditions of the IOT on three occasions.  For the reasons set forth below, none of Defendants' evidence demonstrates that the City was on notice of the United States' 2008 position.

### a.   The 1948 Instrument of Transfer

First, Defendants argue that the IOT itself put the City on notice that title to SMO would revert if the City ceased using the Airport Property as an airport. (MTD at 12:11-23.)  This argument disregards both the express language of the IOT and the FAA's guidance on reversionary interests.  In fact, contrary to Defendants' argument, the IOT's language confirms the City's position.

The IOT sets forth a list of proprietary interests that may revert to the United States should a restriction contained in the IOT not be met.  These interests include "the title, right of possession, and all other rights *transferred by the instrument*" to the City.  (Compl. Ex. C38 (emphasis added).)  Because the United States never had title to the airport property, title simply could not be an interest transferred back to the City per the IOT; accordingly, title cannot be an interest subject to the IOT's

---

[2] Defendants have maintained this position from 2008 up-and-through the present Motion.

sd-633857

1   reversionary clause.  The IOT was merely a surrender of the United States' "lease-

2   hold interest in and to the premises" back to the City through boilerplate language

3   in a form document used for numerous post-war transfers.  (Compl. ¶ 33, Ex. C.)

4       Notably, Defendants' Motion ignores on-point FAA Guidance that confirms

5   the City's position.  Chapter 23 of the Airport Compliance Manual published by the

6   FAA is titled "Reversion of Airport Property."  (*Id.* ¶ 70; *see generally,* Ex. D,

7   Airport Compl. Man.)  Section 23.3 provides that the right of reversion contained in

8   an SPA instrument of transfer "extends only to the title, right of possession, or other

9   rights vested in the United States at the time the federal government transferred the

10  property described in the instrument to the grantee."  (Ex. D45.)  Because the

11  United States had nothing more than a temporary leasehold interest in the property,

12  the reversionary interest retained under the IOT can only extend that far; it cannot

13  extend to the City's fee simple title.  Accordingly, the IOT itself could not have put

14  Santa Monica on notice that Defendants would, decades later, contend that title

15  would revert to the United States should airport operations cease.

16      Defendants also argue that the City had "constructive notice" of the United

17  States' interest when the IOT was recorded as a "quitclaim deed" with the County

18  Recorder in Los Angeles.[3]  (MTD at 12:24-13:7.)  For the same reasons set forth

19  above, the recording of the IOT could not possibly put the City on notice of the

20  Government's claim to Santa Monica's title in the event that the City chose not to

21  operate SMO as an airport.  That the IOT was recorded as a "quitclaim deed" does

22  not change this conclusion.  Despite Defendants' implication that "quitclaiming"

23  the property back to Santa Monica somehow connotes that Defendants' had a claim

24  to title (MTD at 5:16-19), a "quitclaim deed" merely conveys the grantors "interest"

25  in certain real property, without any warranty as to what that interest is.  *See*

26  _____

27  [3] Nor can the City impliedly waive its police powers related to the property.  *See*
    Section IV(A)(7), *infra*.

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1  Black's Law Dictionary (9th Ed. 2009), "DEED" (18c); *Osswald v. Anderson*, 49

2  Cal. App. 4th 812, 820 (Cal. App. 1996) ("quitclaim deed transfers only whatever

3  interest the grantors possess at the time of the conveyance.").  Under the IOT, the

4  only interest conveyed back to the City was the United States' temporary leasehold

5  interest.  Thus, recording of the IOT could not possibly put the City on notice –

6  constructive or otherwise – that the Government would claim that *title* to the airport

7  property would revert if the City ceased airport operations at SMO.

8                    **b.      The 1962 City Attorney Opinion**

9          Second, Defendants argue that a 1962 Opinion of the City Attorney

10  demonstrates that the City had notice that title to the airport property would revert if

11  airport operations ceased.  (MTD at 13:18-14:8.)  This argument also fails.

12  Although the 1962 Opinion concludes that, under the IOT and other contractual

13  obligations, Santa Monica could not abandon use of SMO as an airport at the time

14  the Opinion was written, nowhere does the Opinion conclude – or even consider –

15  that *title* to the airport property would revert to the United States if Santa Monica

16  ceased airport operations more than fifty years later.

17          Nor does the Opinion's conclusion rest solely on the language of the IOT,

18  stating that "Deed No. 4 ("Instrument of Transfer") *and the terms of the project*

19  *application above alluded to* compel the conclusion that the City must operate the

20  airport as an airport" at the present time.  (MTD Ex. B35-36 (emphasis added).)

21  Thus, whether the basis for the Opinion's conclusion is the IOT, the "project

22  application," or the two documents together is unclear and this dispute must be

23  resolved in favor of Santa Monica.  *Dreier*, 106 F.3d at 847 (on a Rule 12(b)(1)

24  motion, disputes should be resolved in favor of non-movant).

25                  **c.      The 1975 California Attorney General Opinion**

26          Third, Defendants argue that a 1975 Opinion of the California Attorney

27  General ("AG") demonstrates that the City had notice that title to the airport

28  property would revert to the United States if Santa Monica ceased airport

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1    operations.  (MTD at 14:9-26.)  This argument fails from the outset because it rests

2    on the mistaken assumption that the California Attorney General opinion somehow

3    imputes notice to the City, an illogical leap without support in the record.

4          Furthermore, this argument also suffers the same flaws as Defendants'

5    argument regarding the 1962 Opinion.  The only conclusion reached by the opinion

6    was that "*at the present time*" (1975), the City could not cease airport operations.

7    (MTD Ex. C37.)  In reaching that conclusion, the AG stated that, at the time, the

8    City was bound under "Federal Grant Agreements, Federal Lease Agreements,

9    Federal Transfer Agreement, State Grant Agreements, and Private Lease

10   Agreements," which individually the 1975 Opinion did not "consider in detail."[4]

11   (*Id.* at C39.)  Although the 1975 Opinion quoted a small portion of the IOT,

12   noticeably absent from the 1975 Opinion is any reference whatsoever that the IOT

13   by itself imposed an obligation that SMO must be operated in perpetuity or title to

14   the airport property would revert to the United States.  Indeed, the *only* conclusion

15   of the 1975 opinion was that the City – in 1975 – was obligated to operate the

16   airport per the myriad contractual obligations it was under at that time.  (*See* n.4.)

17                        d.      **Purported Requests for Release From
                                  Conditions in 1952, 1956 and 1984**
18

19         Fourth, Defendants argue that the City's purported "petitioning" of the

20   United States for release from restrictions on "three separate occasions in 1952,

21   1956 and 1984" demonstrates that the City had notice of the Government's claim to

22   the City's title should airport operations cease.  (MTD at 13:8-17.)  This argument

23   fails too.  None of the releases make any mention whatsoever of the United States'

24   purported reversionary interest to the City's title.  Thus, this evidence does not

25   _____

26   [4] These included at least six Federal Grant Agreements (MTD Ex. C40), at least six
     Federal Lease Agreements (MTD Ex. C41), eleven payments from Airport
27   Assistance (MTD Ex. C42), and at least ten master leases with private parties.  (*Id.*)

28

                                              12              OPPO TO MOTION TO DISMISS COMPLAINT
                                                              Case No. CV13-08046-JFW (VBKx)

1    demonstrate that the City was on notice of Defendants' now-asserted interest.

2        *1952 Release*:  First and foremost, the property released by the 1952 Release

3    was not part of the Airport Property covered by the IOT.  (Ex. F56, Campbell Decl.

4    ¶ 8, Ex. E53, Survey.)  Secondly, even if it were, at the time of the 1952 Release,

5    the United States still retained some reversionary leasehold interest in the Airport

6    Property under the IOT because the request for release was made before the United

7    States' leasehold interest expired (i.e., within one year from the termination of

8    Presidential Proclamation 2487).  (Compl. ¶ 72, noting that the leasehold interest

9    expired on April 28, 1953.)  Additionally, the City was obligated under a 1948

10   Grant Agreement.  (MTD Ex. M114.)  There is no indication that this release was

11   sought because of restrictions in the IOT – which were inapplicable to the George

12   Tract – as opposed to restrictions contained in the 1948 Grant Agreement.  *See*

13   *Dreier*, 106 F.3d at 847 (disputes should be resolved in favor of non-movant).

14       *1956 Release*:  The 1956 Release ended Santa Monica's obligation to

15   maintain Runway No. 1 "for the life of said facilities" under multiple agreements

16   with the Government, including a 1948 Grant Agreement.  As with the 1952

17   Release, there is no indication that this release was sought because of restrictions in

18   the IOT as opposed to restrictions contained in the 1948 Grant Agreement.

19       *1984 Release*:  Also misplaced is Defendants' reliance on the 1984

20   Agreement as a "release" from the terms of the IOT and notice that the United

21   States allegedly retained a reversionary interest to SMO's title should airport

22   operations cease.  First, the City was bound by additional Grant Agreements from

23   1968 and 1969 at the time the 1984 Agreement was signed, precluding Defendants'

24   position that the 1984 Release was sought to circumvent restrictions in the IOT

25   (Project No. 9-04-044-D906).  Second, the 1984 Agreement confirms the City's

26   position that the FAA – until 2008 – took the position that Santa Monica must

27

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

1  operate SMO as an airport only "until July 1, 2015." (Compl. Ex. D.) [5] The 1984

2  Agreement provides no indication that either the City (or the FAA) was or should

3  have been aware that the FAA would, decades later, claim that title to SMO would

4  revert if airport operations ceased.  Indeed, the opposite holds true.  There would be

5  no need for the FAA or the City to state in the 1984 Agreement that the City's

6  obligations to operate SMO as an airport expired on July 1, 2015, if either believed

7  that actually the obligation ran in perpetuity.

8
9
### 3.    The 1971 Letter, 1984 Agreement, and Subsequent FAA Assertions Constitute Abandonment of Defendants' Claim

10      Assuming, *arguendo*, the City was somehow on notice from the IOT that

11  Defendants' claimed reversionary interest included title to SMO, Defendants

12  abandoned that position when the FAA: (1) stated in 1971 that "Santa Monica

13  Airport is vulnerable to being discontinued and used for non-aviation purposes"

14  (Compl. ¶ 40; Ex. B31, 1971 Letter); (2) entered into the 1984 Agreement; and (3)

15  subsequently interpreted the 1984 Agreement as requiring operation of SMO only

16  "until July 1, 2015."  *See Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995)

17  ("if the government has apparently abandoned any claim it once asserted, and then

18  reasserts a claim, the later assertion is a new claim and the statute of limitations for

19  an action based on that claim accrues when it is asserted."). [6]

20      In *Michel*, the Ninth Circuit reversed the district court's order dismissing the

21  plaintiff's complaint on QTA statute of limitations grounds.  There, the United

22
23  [5] Moreover, the mere fact that the City at one time or another requested a release from a restriction in a federal document does not mean that (1) the City was required to request such release or (2) the City is forever bound to request releases.

24
25  [6] "This language was subsequently reaffirmed by a different panel in *Shultz v. Department of Army*, 10 F.3d 649, 661 (9th Cir.1993) ("*Shultz II*"). Although the panel granted rehearing in *Shultz II*, the issues presented on rehearing do not concern abandonment. In any event, *Shultz I* remains the law of the circuit." *Michel*, 65 F.3d at 132 n.2.

26
27
28

OPPO TO MOTION TO DISMISS COMPLAINT
                                                    Case No. CV13-08046-JFW (VBKx)
sd-633857

1   States argued the "history of disputes between the parties since 1960 indicated the

2   Michels had notice of the government's claim." *Id.*  The Ninth Circuit disagreed,

3   citing the Michels' allegation that in 1970 the government wrote them a letter

4   which recognized their claim. *Id.*at 133.  The Ninth Circuit reasoned that the

5   "government's acknowledgment of the Michels' [position] . . . appears to abandon

6   any previously asserted claim" by the United States. *Id.*  Although disputes

7   between the Michels and the United States renewed shortly thereafter, the parties

8   apparently came to another agreement in 1984 that "could be construed as an

9   abandonment of the government's claim[.]" *Id.*  Accordingly, the Ninth Circuit

10  held that, assuming the 1984 agreement affirmed the Michels' position, the action

11  filed by the Michels in 1992 was timely. *Id.*

12          Here, like in *Michel*, Defendants have abandoned any claim they may have

13  previously made concerning the IOT's reversionary clause (for the reasons

14  discussed above, the City maintains that it had no notice whatsoever until 2008).

15  Defendants first abandoned any such claim when the FAA stated – in 1971 – its

16  position that "Santa Monica Airport is vulnerable to being discontinued and used

17  for non-aviation purposes." (Compl. ¶ 40; Ex. B31, 1971 Letter.)  Defendants

18  further confirmed this position when the FAA entered into the 1984 Agreement

19  with the City.  The 1984 Agreement provides that the City will operate and

20  maintain the Airport Property as an airport only until "July 1, 2015." (Compl. Ex.

21  D90.)  There is no mention in the 1984 Agreement that the City must operate the

22  Airport in perpetuity.  Nor is there an assertion that the FAA had *any* property

23  interest in the Airport Property, much less an assertion that the United States

24  retained a reversionary interest to SMO's title.[7]  Accordingly, Defendants' prior

25  _____

26  [7] Query why the FAA would enter into an Agreement to keep SMO in operation as
    an airport through 2015 in the first place if the FAA believed the IOT required
27  SMO to be operated as airport "in perpetuity."  Also query why the City would
    have passed Council Resolution No. 6296 in 1981 declaring its intention to close
28

(Footnote continues on next page.)

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1   assertions concerning SMO constitute abandonment of the position that the IOT

2   reversionary clause extends to SMO's title.   (Complaint ¶ 48.)

3        Additionally, from the time the 1984 Agreement was signed until the March

4   2008 OSC was issued, Defendants maintained that SMO must only be operated as

5   an airport until July 2015.   This makes sense; it is black letter law that contracts,

6   like the 1984 Agreement, "are to be interpreted as a unified whole, with effect

7   given to each provision to the greatest extent possible." *United States v. 1.377*

8   *Acres of Land*, 352 F.3d 1259, 1265 (9th Cir. 2003) (California law).  Indeed, a

9   court "interpreting the language of [a] contract should give effect to every

10  provision, and an interpretation which renders part of the instrument to be

11  surplusage should be avoided." *Id.* (internal quotations omitted).

12       The July 1, 2015 date and the joint FAA and City understanding in 1984 that

13  the City must operate SMO as an airport only until July 1, 2015 cannot be read out

14  of the 1984 Agreement.  This term must be given effect and its logical meaning –

15  that both the FAA and the City understood the City need only operate SMO as an

16  airport until July 1, 2015.  In fact, until 2008, the FAA acted consistently with this

17  joint understanding of the1984 Agreement.  For example, in a 1998 Part 16

18  proceeding involving a dispute over the City's refusal to offer long term leases to

19  two airport tenants beyond 2015, the FAA issued a Director's Determination

20  confirming the parties joint belief that the City had the ability to reevaluate the

21  future of the SMO.  (Compl. ¶ 52; *Santa Monica Airport Ass'n*, 2000 WL 1824463,

22  at *19).  The Director stated:  "[The 1984 Agreement] makes clear that the City is

23  obligated to operate the Airport *only for the duration of the [1984] Agreement*

24  *(through July 1, 2015)* ... To the extent that Complainants . . . seek to prevent the

25  _____

26  (Footnote continued from previous page.)

27  SMO when possible if the City believed it was obligated under the IOT to operate
    SMO in perpetuity.  (Compl. ¶ 45.)

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1   future closure of the Airport or require the City to operate the Airport beyond July

2   1, 2015, that is a local land use matter." (*Id.* (emphasis added).)

3          The Final Agency Decision on the issue, promulgated by the FAA in 2003,

4   again affirmed the parties' joint view that the City's obligations to operate SMO as

5   an airport continued only through July 2015. (*Id.* ¶ 53; *Santa Monica Airport*

6   *Ass'n*, 2003 WL 1963858, at *3.) While discussing the 1984 Agreement, the FAA

7   Administrator concluded that it "provided a conceptual blueprint" by which the

8   City was required to maintain "SMO's role in the National Airport System as a

9   general aviation reliever airport until July 1, 2015." (*Id.*)[8]

10         In 1971, 1984, 1998, and 2003 the FAA itself took the position that the City

11  was required to operate SMO as an airport only through July 1, 2015 under the

12  1984 Agreement. This plainly evidences abandonment of any prior position that

13  Santa Monica was required to operate SMO in perpetuity or fee title would revert to

14  the United States.[9] Only when Defendants (re)asserted that position in 2008 did the

15  clock (re)start for purposes of the QTA's 12-year statute of limitations.

### 4.    The Changed Scope of the United States' Interest Restarts the Statute of Limitations

18         Additionally, the drastic change in 2008 to the scope of Defendants' claimed

19  interest in SMO triggers the statute of limitations with regards to the City's QTA

20  claim. Any prior interest Defendants may have had under the IOT was not

21  sufficient to trigger the statute of limitations with regards to Defendants' claim in

---

23  [8] The City's leasing practices at SMO further confirm the City's long-standing

24  belief that its obligations to operate SMO as an airport run only until 2015. Leases

    for all airport tenants are set to expire on or before 2015. (Ex. F, Campbell Decl. ¶¶

25  5-7.)

26  [9] It may also evidence that, except for its 2008 position, Defendants never assumed

    the IOT gave a property interest in SMO, especially one that potentially restricted

27  the City's fee interest in SMO *forever*.

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1   2008 that the IOT's reversionary clause extends to the City's title. *See Skranak v.*
2   *Castenada*, 425 F.3d 1213 (9th Cir. 2005) (limitations period began when
3   government converted vehicular road into trail usable only for hiking and riding,
4   not when plaintiff was aware of government ownership); *McFarland v. Norton*, 425
5   F.3d 724 (9th Cir. 2005) (QTA claim for easement over federally-owned road
6   accrued when government denied landowner access to road, not when government
7   claimed ownership of road); *Michel v. United States*, 65 F.3d 130 (9th Cir. 1995)
8   (landowners' QTA claim accrued when landowners knew or should have known
9   that government claimed exclusive right to deny their historic access to roads rather
10  than at the time landowners knew of government's claim of title to refuge).

11      As discussed above, before 2008 Defendants never asserted that the IOT's
12  reversionary clause extended to title to SMO, should the City cease airport
13  operations. (*See also,* Compl. ¶ 58.) Rather, the IOT has always been interpreted
14  as extending "only to the title, right of possession, or other rights vested in the
15  United States at the time the federal government transferred the property described
16  in the instrument to the grantee." (Compl. ¶ 70; Ex. D45, Airport Compl. Manual
17  Chapter 23, § 23.3.) The FAA's unanticipated and dramatic assertion in 2008 that
18  rather than then retaining a legally expired reversionary interest under the IOT, it
19  held a reversionary interest in the City's title to modern-day SMO, commences the
20  statute of limitations for the City's QTA claim.

21          **5.      Issues Concerning the QTA's Statute of Limitations
22                    Are Intermeshed with the Case's Substantive Issues**

23      Defendants' Motion must also be denied because Defendants' arguments
24  concerning the statute of limitations are inextricably intertwined with the
25  substantive issues raised by the City's QTA claim, including substantive disputes
26  concerning the scope of the reverter clause in the IOT, expiration of the
27  Government's interest under the IOT, the scope of the 1984 Agreement, and
28  whether the 1984 Agreement constitutes abandonment of any still-existing

18

1   Government interest in SMO, among others.  Courts are not permitted to dismiss a

2   Complaint pursuant to Rule 12(b)(1) where the "jurisdictional issues and the

3   substantive issues are so intermeshed that the question of jurisdiction is dependent

4   on decision of the merits."  *Kingman Reef Atoll Investments, L.L.C. v. United*

5   *States*, 541 F.3d 1189, 1196-97 (9th Cir. 2008).  Here, a decision on the merits

6   concerning the scope of the reverter clause in the IOT may be determinative of the

7   statute of limitations argument.  Because the merits of this case are entirely

8   intertwined with the jurisdictional issues, Defendants' Motion must be denied.

9               **6.    A Request for Release Would Be Futile**

10      In a last-ditch effort, Defendants assert that "other significant considerations

11   counsel against the exercise of jurisdiction over Plaintiff's QTA claim."  (MTD

12   15:3-4).  Defendants argue that the City should be required to "petition the FAA to

13   be released from the conditions and restrictions in the 1948 Instrument of Transfer."

14   (*Id.*at 15:18-21.)  Defendants' argument ignores that City officials met with

15   representatives from the FAA numerous times between 2010 and 2013 in order to

16   convey community concerns about SMO and the City's position about its authority

17   to determine the airport's future.  (Compl. ¶ 67.)  For three years, the FAA "was

18   unwilling or unable to agree to, or even to negotiate on, any compromise as to the

19   Airport's future operation."  (*Id.*)  "Notably, FAA representatives steadfastly

20   maintained that the City is obligated to continue operating the Airport in perpetuity

21   under the Instrument of Transfer, that the operational status quo must be

22   maintained, and that *no agreements to the contrary could be made outside of the*

23   *context of litigation*."  (*Id.* (emphasis added).)

24      Given (1) disputes between the parties relating to the City's authority have

25   been on-going for years despite attempts at negotiation; (2) the FAA's position in

26   the present motion is that the United States has the "option" to "take title" to SMO;

27   and (3) the FAA may only release the City from a restriction if such release would

28   not "materially and adversely affect[] the development, improvement, operation or

19

1    maintenance of the airport," any requirement that the City petition the FAA for

2    release from the reversionary clause and other restrictions would be futile.

3         *Khodara Environmental, Inc. v. Blakey*, 376 F.3d 187, 198 (3d Cir. 2004)

4    presents an analogous case.  There, Justice Alito, writing for the Third Circuit, held

5    that there was no reason to require a plaintiff to seek administrative review by the

6    FAA where "the FAA's position on [an] issue is perfectly clear."  *Id.*  The Third

7    Circuit rejected the defendants' argument that the plaintiff should be required to

8    "petition the FAA for an exemption" because "the futility of such a request [was]

9    evident."  *Id.*  The court found that FAA review would "not lead to further

10   development of the relevant facts," and would not put the court in "any better

11   position to answer the question" presented.  *Id.*  Accordingly, the plaintiff's claim

12   was ripe for judicial review even though FAA review had not been exhausted.  *Id.*

13        Here, like in *Khodara*, the FAA's position is clear:  the FAA believes that the

14   IOT contains a reversionary right, including the right to title to SMO, should the

15   City cease airport operations.  The facts necessary to decide this claim are well-

16   developed or can be discovered in this litigation; administrative review would not

17   add to the factual record; and requiring such a request would delay the inevitable,

18   prolonging the uncertainty surrounding the SMO's future.  Defendants' arguments

19   here, like the FAA's arguments in *Khodara*, are not grounds for dismissal.

20                    **7.     The City Cannot Impliedly Relinquish Its Rights**

21        As a matter of law and policy, Santa Monica cannot contract away its police

22   power to promote the public health, safety and welfare of its residents.  *Avco*

23   *Comm. Developers, Inc. v. S. Coast Regional Com.*, 17 Cal.3d 785, 800 (Cal. 1976)

24   (in California "the government may not contract away its right to exercise the

25   police power in the future.").  Nonetheless, Defendants ask this Court to make the

26   determination (on a motion to dismiss, no less) that Santa Monica, through the IOT,

27   contracted away its sovereign rights and police power.

28        Defendants' position is misguided.  As a California charter City, the City's

                                  20                 OPPO TO MOTION TO DISMISS COMPLAINT
                                                     Case No. CV13-08046-JFW (VBKx)

police power is extensive and an inherent virtue of its sovereignty.  Cal. Const. Art. XI, Section 7; *City of Glendale v. Trondsen, 48 Cal.2d 93, 98* (Cal. 1957).   It follows that the police power is inalienable.  *Avco,* 17 Cal.3d at 800.  The authority, unless restrained by its charter or preempted by appropriate state or federal law, exists in the City unrestricted.  *City of Glendale*, 48 Cal.2d at 98.  Federal law similarly requires that surrender of the City's power must be "plain, and the intention so to do must clearly and unmistakably appear."  *City of Paducah v. Paducah Ry. Co.*, 261 U.S. 267, 272 (1923).  Here, both law and the facts make plain that there could not have been any surrender of the City's inherent police power via restriction over its property rights.  Even if that were legally possible, the IOT hardly evinces the clear and unmistakable surrender required by law.

### B. This Court Has Jurisdiction over the City's Takings Claim

Contrary to Defendants' position, this Court is vested with jurisdiction over the City's Fifth Amendment Takings Clause claims because the City is not seeking monetary compensation related to the Takings violation.  The City cannot be justly compensated in monetary terms for the taking and, as such, the City seeks only equitable relief.   Where, like here, a plaintiff seeks declaratory and equitable relief and not compensation related to a taking, its claims are properly heard in district court. *E. Enterprises v. Apfel*, 524 U.S. 498, 521-22 (1998) (plurality opinion).

In *Apfel*, the Supreme Court held that declaratory and injunctive relief may be proper remedies for a Takings Clause violation, and that a district court, not the Court of Federal Claims, has the power to grant such relief. *Id.* at 522.  The Supreme Court reasoned that there, the plaintiff  "[did] not seek compensation . . . Instead,[it] requests a declaratory judgment . . . and a corresponding injunction[.]"  *Id.* at 520.  Because "[s]uch equitable relief is arguably not within the jurisdiction of the Court of Federal Claims under the Tucker Act," the Court held that the district court was vested with jurisdiction to hear the claims. *Id.*; *Duke Power Co. v. Carolina Env. Study Group. Inc.*, 438 U.S. 59, 71 n.15 (1978) (district court may

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1  declare a taking unconstitutional before "uncompensable damages are sustained").

2      Like the plaintiffs in *Apfel*, the City seeks only equitable and declaratory

3  relief; not monetary compensation.  (Compl. ¶ 104.)  The Court of Federal Claims

4  is not empowered to grant such relief.  Accordingly, jurisdiction properly lies with

5  this Court.[10]

6  ### C.    The City's Constitutional Claims Are Ripe

7      Contrary to Defendants' arguments, the City's constitutional claims are ripe

8  for judicial review.  Despite the plain language of the 1984 Agreement, Defendants

9  have – since 2008 – denied that the City's obligations concerning SMO end in

10  2015.  Accordingly, a concrete dispute has manifested between the parties.

11  Defendants' Motion, which ignores this dispute and applicable standards governing

12  ripeness in the context of equitable and declaratory relief actions, must be denied.

13      In order for an action to be ripe, the Constitution only "requires that there be

14  a substantial controversy of sufficient immediacy and reality to warrant the issuance

15  of a declaratory judgment."  *Aydin*, 940 F.2d at 528.  Where, like here, a party seeks

16  equitable and declaratory relief, "[t]he Supreme Court has rejected [a] strict[]

17  interpretation" of the ripeness doctrine, because such an interpretation would make

18  "all declaratory judgment claims . . . suspect."  *Id.* (citations omitted).  Courts

19  recognize the tension between ripeness and declaratory relief, but "do not require

20  plaintiffs to 'bet the farm . . . by taking the violative action' before 'testing the

21  validity of the law.'"  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130

22  S. Ct. 3138, 3151 (2010).  Thus, the Supreme Court has explained ripeness

23  determinations entail evaluating only (1) "the fitness of the issues for judicial

24  _____

25  [10] Defendants' reference to the original purchase price of the land on which SMO
   sits ignores basic economic principles, and certainly does not establish the

26  availability of monetary damages.  No amount of money can compensate the City
   for its inability to use the airport property however it sees fit in its discretion or for

27  the imposition of restrictions on the City's proprietary and police powers.

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1   decision" and (2) "the hardship to the parties of withholding court consideration."

2   *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 808 (2003).

3   ### 1.   The Issues Are Fit for Judicial Decision

4   The City's claims are fit for judicial decision. Where, like here, further

5   factual development would not "significantly advance [the court's] ability to deal

6   with the legal issues presented," courts have found issues ripe for judicial review.

7   *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir

8   2011).[11] The facts underlying the City's constitutional claims are well developed

9   and based on historical documents and events that are not in substantial dispute.

10  Further factual development will not aid the court in deciding the City's claims.

11  ### 2.   The City Will Suffer Severe Hardship

12  If the Court withholds consideration of the City's constitutional claims, the

13  City will suffer significant hardship.  For declaratory relief claims, a plaintiff need

14  not show that the harm has already occurred, but rather "must demonstrate a

15  realistic danger of sustaining a direct and immediate injury." *Babbit v. United*

16  *Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).  Postponing review of the

17  City's constitutional claims will impose significant and direct hardship on the City.

18  Without speedy resolution, the City will have no choice but to either continue

19  operating SMO (in which case the claims will never ripen), or face costly ejectment

20  proceedings.  Either option will substantially harm the City by withholding the

21  City's proprietary rights.  *See Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S.

22  726, 733 (1998).  Withholding review will also allow Defendants to enforce their

23  view of the IOT forever by holding the City hostage; a plainly unjust result.  The

24  _____

    [11] Defendants also appear to argue that because the FAA has not taken any "final

25  agency action," the Fifth Amendment takings claim is not ripe for review.  (MTD
    17:13-18.)  The ripeness determination does not require final agency action, instead

26  requiring a final agency decision.  *Williamson County Regional Planning Comm'n*
    *v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985).  The FAA has made a

27  final decision regarding the application of the IOT to the Airport Property.

28

City's constitutional claims are ripe.

### D. The City's Complaint Properly Pleads Its Takings, Tenth Amendment, and Substantive Due Process Claims

Defendants argue that the City's Complaint does not properly state claims for regulatory taking under the Fifth Amendment, violations of the Tenth Amendment, or violations of Substantive Due Process.  Defendants' Motion reveals a disregard for the Federal Rules' pleading standard.  "To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

### 1. The Regulatory Takings Claim Is Properly Pleaded

Defendants argue that the City has not stated a claim for a regulatory taking because the City has not shown "the amount of economic loss the City allegedly has suffered."  (MTD at 18:16-18.)  This argument ignores the proactive approach of the City's Complaint, which seeks only equitable relief related to the Airport Property once the City's other federal obligations expire in July 2015.  *See Duke*, 438 U.S. 59, 71 n.15 (1978) ("individuals threatened with a taking [may] seek a declaration of the constitutionality of the disputed governmental action before potentially[12] uncompensable damages are sustained.").  Defendants' argument also ignores the City's allegations that damages will not be "compensable through monetary damages" and that "[t]he value that the City will lose if this illegal and unconstitutional taking is effectuated cannot be quantified."  (Compl. ¶¶ 108-111.)

---

[12] Defendants' cite to *Wash. Legal Found. v. Legal Found. of Wash.*, 271 F.3d 835, 849  (9th Cir. 2001) is inapposite. Although that case noted that injunctive relief is not available "when a suit for compensation can be brought," it also recognized that "equitable relief may be available under other circumstances in a takings case[.]"

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

### 2.   The Tenth Amendment Claim Is Properly Pleaded

Defendants' argue that the City has not stated a claim for violations of the Tenth Amendment because Congress acted pursuant to the SPA when the United States surrendered its leasehold interest in the Airport Property through the IOT. (MTD at 19:22-21:6.)  Defendants' mistakenly argue that this means the United States was exercising a "granted power."  (MTD at 20:23.)  A "granted power" is one provided to congress under the Constitution.  *See New York v. United States*, 505 U.S. 144, 175 (1992) (finding that a "take title" provision "crossed the line distinguishing encouragement from coercion" and was not within Congress' granted powers).  Here, the City challenges the SPA (and its operation via the IOT) on Tenth Amendment grounds because the Constitution does not permit Congress to pass a law requiring Santa Monica to surrender its sovereignty or allowing the Government, as one-time tenant, to dictate the rights of the fee owner.  Conditions unconstitutionally imposed are exactly the type of issues this Court can adjudicate.

### 3.   The Due Process Claim Is Properly Pleaded

Defendants argue that the City "cannot show that the conditions, covenants and restrictions" in the IOT are "so arbitrary or irrational that they run afoul of the Due Process Clause."  (MTD at 21:15-17.)  First, Defendants' argument is inappropriately made on a motion to dismiss.  Second, the City has sufficiently pled that Defendants' position is irrational, including allegations that the FAA's position, which is contrary to the policy set forth in the Airport Compliance Manual, was made "with the intent to coerce Santa Monica and deprive [it] of its substantive due process and sovereign rights related to the Airport Property;" (2) is "irrational, and trammels on both [the City's] sovereign rights and established property rights;" and (3) "amounts to a deliberate flouting and abuse of power." (Compl. ¶133.)

### V.   CONCLUSION

Based on the foregoing, the City requests Defendants' Motion be denied.

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857

1

2

Dated:   January 17, 2014          OFFICE OF THE CITY ATTORNEY
                                   SANTA MONICA, CALIFORNIA

3

4                                  By:  /s/ Marsha Jones Moutrie
                                        MARSHA JONES MOUTRIE
5                                       City Attorney

6

7   Dated:  January 17, 2014         MORRISON & FOERSTER LLP

8                                  By:  /s/ Don G. Rushing
9                                       DON G. RUSHING

10                                      Attorneys for Plaintiff
                                        CITY OF SANTA MONICA
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPO TO MOTION TO DISMISS COMPLAINT
Case No. CV13-08046-JFW (VBKx)

sd-633857