# EXHIBIT C

# UNITED STATES DEPARTMENT OF TRANSPORTATION
## FEDERAL AVIATION ADMINISTRATION
### WASHINGTON, DC

|  |  |
|---|---|
| )<br>IN THE MATTER OF COMPLIANCE )<br>WITH FEDERAL OBLIGATIONS )<br>BY THE CITY OF SANTA MONICA, )<br> CALIFORNIA )<br>)<br>————————————————————— ) | FAA Docket No. 16-02-08 |

## ORDER TO SHOW CAUSE

This matter is before the Federal Aviation Administration (FAA) based on a Notice of Investigation initiated by the Director of the Office of Airport Safety and Standards on October 8, 2002, into the legality of the City of Santa Monica, California's ("the City") proposed Ordinance, an Aircraft Conformance Program (ACP), banning certain jet aircraft from the Santa Monica Municipal Airport (SMO). The Notice of Investigation (NOI) was issued in accordance with the FAA Rules of Practice for Federally Assisted Airport Enforcement Proceedings, 14 C.F.R. Part 16, Subpart D. This investigation has remained pending because the City had not adopted the proposed ordinance and had engaged in discussions with the FAA to resolve the matter until its recent action adopting the Ordinance.

On March 25, 2008, the City adopted a new Ordinance banning Category C and D jet aircraft from SMO effective within 30 days, on or about April 24, 2008. These circumstances require expedited handling of this matter. The City is hereby provided the opportunity to show cause why the FAA should not supplement the existing Part 16 investigation with the facts pertaining to the adopted Ordinance and expedite said investigation and issuance of the initial determination , pursuant to 14 C.F.R. § 16.11.

## SUMMARY OF FACTS UNDER REVIEW

The Santa Monica Municipal Airport is a public-use airport owned and operated by the City of Santa Monica, California.[1]  The facility, classified as a reliever airport,[2] is the base of operations for over 400 aircraft and accounts for approximately 130,000 operations each year.[3]  FAA records indicate that the planning and development of the airport has been financed, in part, with funds

---

[1] FAA Form 5010 *"Airport Master Record"* for APF. Date: 10/11/2001.
[2] National Plan of Integrated Airport Systems (NPIAS), 1998-2002.  SMO serves as an important reliever airport to Los Angeles International Airport (LAX).
[3] FAA From 5010 *"Airport Master Record"* for 2005 reported 165,000 annual operations but the number of operations today is believed to be about 135,000.  The executive summary to the 2008 Ordinance estimates 130,000 operations.

EXHIBIT C<br>033

provided by the FAA under the Airport Improvement Program (AIP), authorized by the Airport and Airway Improvement Act of 1982,(AAIA), as amended, 49 USC § 47101, *et seq*.  Between 1985 and 1994, the Airport has received a total of $9.7 million in Federal airport development assistance.[4]  In addition, the Airport was transferred to the City from the Federal government under the provisions of the Surplus Property Act (SPA) of 1944.

On July 22, 2002, the Santa Monica Airport Commission voted to recommend that the Santa Monica City Council implement, by ordinance, an Aircraft Conformance Program (ACP) at SMO. The ACP would restrict aircraft operations at SMO to aircraft that meet the standards for an airport with an Airport Reference Code (ARC)[5] designation of B-II. Essentially, the ACP would prohibit Category C and D aircraft from operating at the Airport.

On October 1, 2002, FAA representatives from the Air Traffic, Flight Standards, Airports Divisions and the Regional Counsel met with Santa Monica to address the proposed ACP.  FAA cautioned the Santa Monica representatives that the proposal was not consistent with the City's Federal obligations and Federal law.  FAA commented that safety determinations involving flight of aircraft are the responsibility of the FAA and the agency does not consider it inherently unsafe for an aircraft of a larger design category to use an airport designed to accommodate a lesser category aircraft.

Additionally, Air Traffic and Flight Standards representatives reiterated that design standards limitations do not translate into operational limitations and that FAA develops instrument approaches to permit safe aircraft operations.  Finally, the FAA told Santa Monica that the agency holds the expectation that the City must comply with Section 9 of the 1984 Agreement to maintain the existing runway length and width,[6] and that any action taken by the City that conflicts with its federal obligations would be of concern to the FAA.

---

[4] Airport Sponsor AIP Grant History dated July 22, 2002.

[5] The ARC is an FAA coding system used to relate airport design criteria to the operational and physical characteristics of the aircraft types for which the airport was designed. FAA Advisory Circular No. 150/5300-13, "Airport Design" (September 29, 1989), chapter 1, p.4.  The ARC code has two components, both relating to the "critical design aircraft" for the airport. The critical design aircraft is defined as the category of aircraft which conducts 500 itinerant or more operations per year at the airport. National Plan of Integrated Airport Systems (NPIAS), 1998-2002, p. 38. The first component, depicted by the letters A-E, is the aircraft approach category and relates to aircraft approach speed. For example, a Category A aircraft has an approach speed of less than 91 knots while a Category B aircraft has an approach speed of 121 knots or more, but less than 141 knots.  The second component, depicted by Roman numerals I-VI, is the airplane design group and relates to airplane wingspan.  For example, a Group I aircraft have a wingspan of up to but not including 49 feet, while a Group II aircraft has a wingspan of 49 feet up to but not including 79 feet. Id., p. 1.

[6] In l981, the Santa Monica City Council enacted a resolution to close SMO.  That action resulted in extensive litigation against the City by airport associations, the FAA, and the Department of Justice (DOJ). The litigation resulted in a negotiated settlement memorialized on January 31, 1984, referred to as the l984 Santa Monica Airport Agreement ("1984 Agreement"), which resolved a series of disputes involving SMO. The 1984 Agreement recognized that SMO serves a "vital and critical role in its functions as a general aviation reliever for the primary airports in the area … by diverting aircraft away from the air carrier airports and other heavily used airports located in the Greater Los Angeles Area." The 1984 Agreement, p. 3-4.  In addition, the 1984 Agreement outlined conditions by which the City would operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever airport.  As the basis for the 1984 Agreement, the parties recognized several legal principals including…the "Airport is to be open and available to and for public use as an airport on fair and reasonable terms, without unjust discrimination, and without granting any exclusive rights prohibited by law.." and "pursuant to the

2

EXHIBIT C
034

On October 8, 2002, the FAA issued the NOI under Part 16 initiating the investigation concerning the legality of the ACP. The City responded to the NOI on November 2, 2002.

On December 10, 2002, the City Council received the Airport Commission's recommendation to approve the ACP and a report on the pending administrative proceeding.   Following a public hearing, the City Council approved the ACP concept of implementing 300 foot runway safety areas at either end of the runway, a 300 foot relocated threshold from the departure end of the runway, and a ban on C and D aircraft. The City Council did not adopt the ACP as an ordinance but directed City staff to continue to meet with the FAA in an attempt to promptly resolve the matter. Attempts at resolution between the FAA and the City continued until the adoption of the Ordinance in March 2008

Between 2002 and 2008, there were several meetings and discussions between SMO officials and the FAA that included new proposals and counterproposals as alternatives to the ACP. The City's proposals included displaced thresholds[7] of several hundred feet, declared distances[8] and large engineered material arresting system (EMAS) installations[9] which would have a significant impact on the utility of the Airport.

On July 31, 2007, the FAA proposed the installation of one EMAS installation at each end of the runway. On August 28, 2007, the FAA participated at a public hearing on SMO in Santa Monica. At the meeting the FAA reiterated that its proposal provides an actual, physical stopping effect on overrunning aircraft that directly benefits both persons on the aircraft and the areas off the ends of the runway.

The FAA believes that the proposal would significantly enhance safety at SMO while maintaining the utility of the Airport. The City rejected the FAA's proposal. On November 27, 2007, the new Ordinance was read (first reading) at the City Council meeting. By letter dated March 7, 2008, the FAA proposed modifications to its EMAS proposal, as well as to holdline and departure procedures, and to the information pilots receive on SMO upon filing a flight plan.

On March 25, 2008, the City adopted the new Ordinance banning Category C and D jet aircraft from SMO effective within 30 days, on or about April 24, 2008. The effect of the new Ordinance is the same as the Aircraft Conformance Program (ACP) proposed by the City in 2002. Both would prohibit Category C and D aircraft from operating at the Airport.

---

Federal Aviation Act of 1958, as amended, exclusive authority is vested in the FAA for the regulation of all aspects of air safety, the management and control of the safe and efficient use of the navigable airspace, and movement of aircraft through that airspace." 1984 Agreement pgs 3 & 9.

[7] A displaced threshold is a threshold located at a point on the runway other than the designated beginning of the runway. Displacement of a threshold reduces the length of runway available for landings. The portion of runway behind a displaced threshold is available for takeoffs in either direction and landings from the opposite direction.

[8] Declared Distances are the distances the airport owner (with FAA concurrence) declares available for the airplane's takeoff run, takeoff distance, accelerate-stop distance, and landing distance requirements.

[9] EMAS is a bed of highly crushable concrete blocks that are installed at the ends of the runway. When an aircraft leaves the runway traveling at speed, the landing gear will crush the EMAS bed and the aircraft will come to a quick and safe stop.

3

EXHIBIT C
035

The Ordinance adds section 10.04.06.220 to the Municipal Code prohibiting Category C or D aircraft from landing or departing SMO except in a "bonafide" emergency. Violations of the Ordinance are punished as misdemeanors by a $1,000 fine or six months imprisonment, or both.

The stated purpose of the new Ordinance is to protect the safety of persons living adjacent to the airport and flying in aircraft using the airport. The City claims that the Ordinance comports with agreements between the City and the FAA "recognizing the City's obligation to serve category A and B aircraft at the Airport." It further claims to be consistent with the 1984 Settlement Agreement and 1991 Airport Layout Plan (ALP) assigning an Airport Reference Code (ARC) designation of B-II to the Airport and, obligating the City to operate it accordingly.

The Ordinance prohibits all aircraft of a category higher than B ARC from operating at the Airport. As explained in the original 2002 NOI, the ARC design category of an airport is not intended, and cannot be used, to limit operations of an airport. The same is true of the related runway safety areas (RSA) design standard. While the design category and geometry of an airport are useful in airport planning, the FAA does not consider it inherently unsafe for an aircraft of a larger design category to utilize an airport that has been designed to accommodate a lesser design category of aircraft. It is incorrect to assume that Category C and D aircraft operating at SMO are not compatible with the airport's Airport Reference Code and lack of standard RSAs.

Instrument approach charts published by the FAA for SMO provide instrument approach procedures for the airport up to Category D aircraft. Under 14 C.F.R. § 91.3, the pilot in command of an aircraft is directly responsible for, and is the final authority as to, the safe operation of the aircraft he or she commands.

The applicable FAA operational limitations, such as the FAA approved Airplane Flight Manual performance data and the regulatory frame work, such as 14 CFR Part 91 and Part 135, permit safe operations of Category C and D aircraft on 5,000-foot runways. The safety of an aircraft's operation is a function of the requirements for that operation in the aircraft certification manual. SMO's runway is 4987 feet. If SMO's runway meets the FAA's requirements, there is no safety basis for prohibition of that operation.

On several occasions since 2002, the City was advised that RSAs, [which are clear areas at the end of runway varying in size depending upon the ARC code] are designed for the protection of aircrews and passengers, not to guarantee that an aircraft will never get beyond the safety area. RSAs are problematic at SMO because they need to be level, and the land drops off at the end of the runways at SMO. However, the RSA standard is part of FAA's airport design standards, and is not an operating requirement of condition. No FAA aircraft operating rule requires a standard RSA, and there is no basis in FAA regulations for prohibition of any operation based on the status of the RSA.

For protection of persons and property near the end of the runway, FAA design standards provide for a runway protection zone (RPZ) that limits land uses in that area, and when necessary, promotes the acquisition and clearing of RPZs by the airport. The RPZ is recommended but not

4

EXHIBIT C
036

required at general aviation airports like SMO. It appears that the City has not acted to acquire land to create RPZs at SMO.

The practical effect of the new Ordinance (like that of the ACP) would be to ban several thousand jet operations per year from SMO. Based on the City's own data, the new Ordinance would ban approximately 9,000 operations at the Airport.

## APPLICABLE LAW AND POLICY

Title 49 of the United States Code assigns the FAA Administrator broad responsibilities for the regulation of air commerce in the interests of safety and, among other things, the promotion, encouragement, and development of civil aeronautics. 49 U.S.C. §§ 40101(c), (d), 40104[10]. Under these broad powers, the FAA seeks to achieve safety and efficiency of the total airspace system through direct regulation of airman, aircraft, and airspace. 49 U.S.C. §§ 40103, 44702-44705.

The Federal role in promoting civil aviation has been augmented by various legislative actions which authorize programs for providing funds and other assistance to local communities for the development of airport facilities. In each such program, the airport sponsor assumes certain obligations, either by contract or by restrictive covenants in property deeds and conveyance instruments, to maintain and operate its airport facilities safely and efficiently and in accordance with specified conditions. Commitments assumed by airport sponsors in property conveyance or grant agreements are important factors in maintaining a high degree of safety and efficiency in airport design, construction, operation and maintenance as well as ensuring the public fair and reasonable access to the airport.

SMO has been financed, in part, with funds provided by the FAA and the U.S. Department of Transportation under the Airport Improvement Program (AIP). The program provides financial assistance to an airport sponsor for airport development in exchange for binding commitments designed to assure that the public interest will be served. These commitments are set forth in the sponsor's applications for Federal assistance and in the grant agreement as sponsor assurances, i.e. a list of applicable Federal laws, regulations, executive orders, statute-based assurances, and other requirements, binding the sponsor upon acceptance of the Federal assistance.

The FAA has a statutory mandate to ensure that airport owners comply with these sponsor assurances. See 49 U.S.C. §§ 40103(e), 40113, 40114, 46104, 47122, 46101, 46105, 47107(a), (b), (g), 47106(e), 47111(d), and 47122.

---

[10] In addition and with limited exceptions for military concerns, the FAA shall make long-range plans and policy for the orderly development and use of the navigable airspace and air navigation facilities that will best meet the needs and serve the interests of civil aeronautics and national defense. 49 U.S.C. § 44501(a).

The U.S. Government has exclusive sovereignty of air space of the United States. 49 U.S. C. § 40103. Moreover, the FAA Administrator prescribes air traffic regulations on the flight of aircraft for navigating, protecting, and identifying aircraft; protecting individuals and property on the ground; using the navigable airspace efficiently; and preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects. 49 U.S. C. § 40103(b) (2)

5

EXHIBIT C
037

Because the City of Santa Monica assumed Federal obligations in the form of grant assurances, surplus property obligations and those incorporated into the 1984 Settlement Agreement, the City is required to operate its airport facilities in accordance with specified conditions, including making SMO available for public use on reasonable terms, and without unjust discrimination, and without granting an exclusive right, to all types, kinds, and classes of aeronautical activities, including commercial aeronautical activities offering services to the public at the airport. Thus, any actions taken by the airport sponsor that conflict with these obligations could be found to be in violation of its Federal obligations.

GRANT ASSURANCES

As a condition of providing airport development assistance under the AAIA, the Secretary of Transportation must receive certain assurances from the airport sponsor.  Title 49 U.S.C. § 47101 et seq. sets forth assurances to which an airport sponsor receiving Federal financial assistance must agree as a condition precedent to receipt of such assistance.

49 U.S.C. § 47107(g)) authorizes the Secretary to prescribe project sponsorship requirements to insure compliance.

Grant Assurance No 22, Economic Nondiscrimination, and Grant Assurance No. 23, Exclusive Rights are applicable to the specific circumstances of this proceeding. [11]

Surplus Property Obligations

Under the Surplus Property Act of 1944 (SPA), surplus property instruments of transfer are one of the means by which the Federal government provides airport development assistance to public airport sponsors. The conveyance of surplus Federal land to public agencies for airport purposes is administered by the FAA, in conjunction with the U.S. Department of Defense (DOD) and the General Services Administration (GSA) pursuant to 49 USC §§ 47151, 47152, and, 47153. Upon acceptance of surplus property conveyance by the City, the obligations in the instrument of disposal became a binding obligation of the City.

The SPA deed contains Federal obligations similar to AIP grant obligations to offer access on fair and reasonable terms, that run in perpetuity until the FAA releases the SPA obligations or reverts the airport under the right to revert clause for violations of the SPA deed covenants. One of the surplus property conveyance covenants contained in the 1948 Surplus Property Instrument of Transfer stipulates that the Airport "shall be used for public airport purposes for the use and benefit of the public, *on reasonable terms and without unjust discrimination and without grant or exercise of any exclusive right* for use of the airport…"

The FAA has the sole responsibility for determining and enforcing compliance with the terms and conditions of all instruments of transfer by which surplus airport property is or has been conveyed to non-federal public agencies pursuant to the Surplus Property Act of 1944 (SPA).  Accordingly,

---

[11] 14 Code of Federal Regulations Part 16 implements regulatory guidance for enforcement proceedings related to the grant assurances.

6

EXHIBIT C
038

such covenants continue in full force and effect until released under 50 App. U.S.C.A. § 1622(g)
(1949) (originally enacted as Surplus Property Act of 1944, ch. 479, § 13, 58 Stat. 765, 770, or
other applicable Federal law.

Other Applicable Law – Airport Noise and Capacity Act of 1990

As stated in the 2002 NOI, the City of Santa Monica should also be aware of the FAA's concerns
regarding compliance with other applicable Federal law.  Under the Airport Noise and Capacity
Act of 1990 (ANCA), 49 U.S.C. § 47524 (c) an airport noise *or* access restriction that affects Stage
3 aircraft, like the C and D category aircraft affected by the City's proposed ordinance, may
become effective only if agreed to by the airport proprietor and all aircraft operators or has been
submitted and approved by the Secretary.  Restrictions covered by this paragraph include any
restriction on Stage 3 aircraft. The ANCA statute also provides in part that unless the Secretary is
satisfied that an airport is not imposing an airport or access restriction not in compliance with this
subchapter, the airport may not receive grants or impose Passenger Facility Charges (PFCs). 49
U.S.C. §47526.

**ISSUES UNDER INVESTIGATION**

In addition to the issues presented in the October 8, 2002 NOI, the issues under investigation
include, but are not limited to, the following issues:

• 	Whether Santa Monica's implementation of the adopted Ordinance prohibiting Category C
and D aircraft is consistent with the federal obligation to make its airport available as an airport for
public use on reasonable terms and without unjust discrimination to all types, kinds, and classes of
aeronautical activities.

• 	Whether Santa Monica's implementation of the adopted Ordinance prohibiting Category C
and D aircraft is consistent with the federal obligation prohibiting the granting of an exclusive right
at the airport to conduct any aeronautical activities.

• 	Whether Santa Monica's implementation of the adopted Ordinance prohibiting Category C
and D aircraft is preempted under Federal Law.

• 	Whether Santa Monica's implementation of the adopted Ordinance prohibiting Category C
and D aircraft is consistent with the terms of the 1984 Agreement.

• 	Whether Santa Monica's implementation of the adopted Ordinance prohibiting Category C
and D aircraft is consistent with the Surplus Property Act deed covenants.

**ORDER TO SHOW CAUSE**

Given the public interest for fair review and decision of this matter; the right of the City to be
heard,  and finding that the adoption of the ordinance requires expedited handling of this matter,
the Director concludes that the City should be provided with the opportunity to show cause as
described below  pursuant to 14 C.F.R.§ 16.11.(a);(b).

7

EXHIBIT C
039

Accordingly:

1.      The FAA hereby directs the City of Santa Monica to show cause why the FAA should not supplement the existing Part 16 investigation with the facts pertaining to the adopted Ordinance and expedite said investigation and issuance of the initial determination pursuant to 14 C.F.R. § 16.11.

2.      Because of the April 24th effective date of the Ordinance this matter needs to be expedited pursuant to 14 C.F.R. §16.11(b).  The City may file a response to this Order to Show Cause within 10 days from the date of this Order  pursuant to 14 C.F.R. 16.11(b). Service of documents is limited as follows pursuant to 14 C.F.R. §16.11(b).  The City's response directed to the Director of the Office of Airport Safety and Standards must be served by personal delivery, or by electronic-mail to kelvin.l.solco@faa.gov.

3.      Failure of the City to respond to this Order within the 10 day period provided will result in the FAA supplementing and expediting the investigation, and expediting issuance of the initial determination.

_____
Kelvin L. Solco
Acting Director
Office of Airport Safety
 and Standards

_3/26/08_
Date

8

EXHIBIT C
040

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 26, 2008, I caused to be served by electronic mail (e-mail) and by overnight express delivery service (Federal Express), a true copy of the foregoing document addressed to:

Marsha Jones Moutrie
City Attorney
City of Santa Monica
1685 Main Street
Santa Monica, CA 90401
marsha.moutrie@smgov.net

P. Lamont Ewell
City Manager
City of Santa Monica
1685 Main Street, Room 209
Santa Monica, CA 90401
lamont.ewell@smgov.net

Mr. Robert Trimborn
Airport Manager
Santa Monica Municipal Airport
3223 Donald Douglas Loop S.
Santa Monica, CA 90405
**bob.trimborn@smgov.net**

Sharon Long
Airports and Environmental Law Division
Office of the Chief Counsel

9

EXHIBIT C
041