# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SANTA MONICA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, FEDERAL AVIATION ADMINISTRATION and MICHAEL P. HUERTA, in his Official Capacity as Administrator of the Federal Aviation Administration,<br><br>Defendants. | Case No. CV 13-08046 JFW (VBKx)<br><br>**[PROPOSED] ORDER DENYING DEFENDANTS' MOTION TO DISMISS**<br><br><br>Date:    February 10, 2014<br>Time:    1:30 p.m.<br>Ctrm:    16<br><br>The Honorable John F. Walter |

**[PROPOSED] ORDER**

On January 10, 2014, Defendants filed a Motion to Dismiss Plaintiff's complaint pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) ("Motion").  On January 17, 2014, Plaintiff City of Santa Monica (the "City" or "Santa Monica") filed its Opposition.  On January 27, 2014, Defendants filed a Reply.  Defendants' Motion came on regularly for hearing on February 10, 2014, at 1:30 p.m., in Department 16 before the Honorable John F. Walter, presiding.

The Court, having read and considered the briefs with exhibits, as well as the arguments from counsel, and good cause appearing, hereby DENIES Defendants' Motion to Dismiss.

### I. FACTUAL BACKGROUND

In 1926, Santa Monica acquired title to certain parcels of unimproved land that now constitute most of the property subject to this dispute. Between 1926 and December 1941, the City acquired additional smaller parcels that make up the rest of the property (together, the "Airport Property").

On May 27, 1941, President Franklin D. Roosevelt issued Presidential Proclamation 2487, which declared that the United States was faced with an "unlimited national emergency" that required "military, naval, air and civilian defenses be put on the basis of readiness to repel any and all acts or threats of aggression directed toward any part of the Western Hemisphere."

#### A. The City Leases the Airport Property to the United States

In December 1941, the City leased the Airport Property to the United States to aid in the war effort.  The United States' leasehold was accomplished through two separate leases covering two adjoining parcels of land.

The "Runway Lease" (No. W-04-193-ENG.4894) leased to the United States approximately 86 acres on the northern portion of the Airport Property.  The Runway Lease term began on December 8, 1941 and was to end twelve months from the date of the termination of Presidential Proclamation 2487.  The City

charged the United States only $1 for the entire term of the lease.

The "Golf Course Lease" (No. W3460-ENG.549) went into effect December 1, 1941, and leased to the United States approximately 83 acres on the southern portion of the Airport Property. The Golf Course Lease terminated on June 30, 1943 with an option of renewal annually thereafter until June 30, 1947. Under the Golf Course Lease, the United States paid only $150 per month to the City.

In 1944 and 1945, respectively, Supplement Number 1 to the Runway Lease and the Golf Course Lease modified the leases to allow for construction of a new runway to accommodate larger aircraft. Supplement Number 1 to the leases also released the United States from its obligation to restore the leased parcels to their original condition in exchange for the United States' conveyance of any improvements to the property and cash payments to the City. The payments to the City were then reinvested in the Airport Property in order to obtain additional land and fund the improvements. Supplement Number 1 to the Golf Course Lease also extended the lease term until twelve months after the termination of Proclamation 2487 (to align the lease term with that of the Runway Lease) and reduced the rent to $1 for the remainder of the lease.

At the end of World War II, the United States determined that it was no longer necessary to maintain a presence at SMO. Accordingly, the United States and the City modified both the Runway and Golf Course Leases through a Supplement Number 2 to each lease, by which United States stopped maintaining and operating the airport and paying rent.

**B. The United States Surrenders Its Leasehold Interest**

On July 29, 1946, the War Assets Administration issued Form SPB-5 Declaration of Surplus Real Property concerning the Airport Property, declaring as surplus the United States' leasehold interest in the Runway Lease and Golf Course Lease. On January 9, 1947, the United States made the determination that its 168 acre leasehold interest at the Airport Property, along with any improvements,

1  should be disposed of under the Surplus Property Act of 1944 ("SPA").

2  On August 10, 1948, the United States officially surrendered its leasehold
3  interest in the Airport Property to the City pursuant to the 1948 IOT.  The IOT
4  included certain restrictions on the property, including non-discrimination
5  restrictions and public use requirements.  The IOT also included a "reversion
6  clause," which provides that, in the event any of the restrictions or conditions set
7  forth in the IOT are not met, "the title, right of possession, and all other rights
8  transferred by the instrument" shall, at the option of the Government, "revert" to the
9  United States.  A City Council resolution confirmed the intent of the Instrument of
10 Transfer was to surrender the United States' leasehold interest in the Airport
11 Property. On August 23, 1948, the IOT was filed with the Los Angeles County
12 Recorder.

### C.  The 1984 Settlement Agreement

14 In the late 1960s, SMO operations (takeoffs and landings) reached an all-time
15 high.  Santa Monica residents began expressing concerns about the impact of the
16 increased air travel.  In response to the rising tide of resident apprehensions, various
17 aviation associations also began expressing their concerns should airport operations
18 cease.

19 The FAA recognized and responded to these aviation-related concerns in an
20 April 1971 letter to the then Senior Vice President of the Aircraft Owners and Pilots
21 Association.  The FAA stated that once the City's grant assurance obligations
22 ended, "Santa Monica Airport is vulnerable to being discontinued and used for non-
23 aviation purposes."  The FAA did not take the position that the City was obligated
24 to operate the Airport in perpetuity.

25 In 1983, the City adopted a new Master Plan for the Airport Property that
26 created two new Fixed Base Operators on the north side of the Property and
27 released aviation land on the south side of the Airport Property for non-aviation
28 purposes.  Adoption of the new Master Plan prompted several Part 13 proceedings

against the City.[1]  As a result of the complaints, the City engaged in negotiations with the FAA concerning the future of SMO.  These negotiations culminated in the signing of a "Settlement Agreement" in 1984 ("the 1984 Agreement").  The 1984 Agreement provides the City will operate SMO as an airport until "July 1, 2015."

### D.    The City Accepts Its Last Federal Grant in 1994

In June 1994, the City accepted its last federal Airport Improvement Grant in exchange for contractual promises to maintain the Airport for the use and benefit of the public for the useful life of improvements made with the funds, but for no more than twenty years from the date of execution of the grant agreement.

### E.    The FAA Confirms that the City's Obligations Run Only Until 2015

Until 2008, and as reflected in the 1971 Letter and the 1984 Agreement, the FAA has consistently recognized the City's ability to reevaluate the future of SMO.  In a 1998 Part 16 proceeding involving a dispute over the City's refusal to offer long term leases to two airport tenants, the FAA issued a Director's Determination discussing the 1984 Agreement, again demonstrating the FAA's position that the City could reevaluate the future of SMO: "[The 1984] Settlement Agreement makes clear that the City is obligated to operate the Airport only for the duration of the [1984] Agreement (through July 1, 2015) ... To the extent that Complainants and [the Airport Association] seek to prevent the future closure of the Airport or require the City to operate the Airport beyond July 1, 2015, that is a local land use matter." (*Id.*; *see also Santa Monica Airport Ass'n v. City of Santa Monica*, Dkt. No. 16-99-21, 2000 WL 1824463, at *19 (F.A.A. Nov. 22, 2000).

In 2003 the FAA issued its Final Agency Decision on the issue.  The Final Agency Decision affirmed the Director's Determination, concluding that the 1984

---

[1] A Part 13 proceeding is an administrative proceeding before the Department of Transportation.

Agreement "provided a conceptual blueprint" by which the City was required to maintain "SMO's role in the National Airport System as a general aviation reliever airport until July 1, 2015."

### F. The FAA Drastically Changes Its Position in 2008

In 2001, to address the safety risks inherent in the increase of Category C and D aircraft traffic at SMO, a study commissioned by the City Council recommended an "Aircraft Conformance Program" to promote safety and to conform airport usage to be consistent with the purpose of the 1984 Agreement.

In December 2002, the City Council unanimously approved the Aircraft Conformance Program and directed staff to continue to seek a voluntary agreement with the FAA to implement it. The FAA refused the City's efforts to reach a voluntary agreement. The City Council then asserted its airport proprietor's rights and, in 2008, promulgated an Ordinance intended to promote safety and protect adjacent neighborhoods from aircraft overruns by prohibiting the generally larger, faster category C and D aircraft from using SMO.

On March 26, 2008, the FAA issued an Order to Show Cause to the City seeking to prohibit the City from enforcing the Ordinance, and – *for the first time* – claimed that the IOT obligated the City to operate SMO as an airport in perpetuity or ownership of the airport would revert to the United States.

### G. The City Evaluates The Future of SMO

In December 2010, in anticipation of the expiration of the 1984 Settlement Agreement, the City Council directed staff to proceed with a comprehensive public process regarding SMO's future. The result was a March 2013 report outlining a "Visioning Process." The Visioning Process concluded that the status quo at the Airport is not acceptable to City residents.

Thereafter, City staff members met with FAA representatives several times to convey community concerns and the City's position about SMO's future. The FAA was unwilling or unable to agree to, or even to negotiate on, any compromise

1  as to SMO's future operation.  Notably, FAA representatives maintained that the
2  City is obligated to continue operating SMO in perpetuity under the IOT, that the
3  operational status quo must be maintained, and that no agreements to the contrary
4  could be made outside of the context of litigation.

## II.  LEGAL STANDARD

### A.  Legal Standard Governing Motion to Dismiss Under Rule 12(b)(1)

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a district court must dismiss an action if it lacks jurisdiction of the subject matter of the suit.  Fed. R. Civ. Proc. 12(b)(1).  A party mounting a Rule 12(b)(1) challenge to the court's jurisdiction may do so either on the face of the pleadings or by presenting extrinsic evidence for the court's consideration.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) ("Rule 12(b)(1)) jurisdictional attacks can be either facial or factual").  There is an important difference between Rule 12(b)(1) motions that attack a complaint on its face and those that rely on extrinsic evidence.  In ruling on the former, courts must accept the allegations of the complaint as true.  *See Cranford v. United States*, 359 F. Supp. 2d 981, 984 (E.D. Cal. 2005); *Valez v. United States*, 837 F. Supp. 1065, 1067 (E.D. Cal. 1993), *aff'd*, 56 F.3d 1177 (9th Cir. 1995).  In deciding the latter, courts may weigh the evidence presented, and determine the facts in order to evaluate whether they have power to hear the case.  *See Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987); *see also Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1141 n.5 (9th Cir. 2003) ("[I]n ruling on a 12(b)(1) jurisdictional challenge, a court may look beyond the complaint and consider extrinsic evidence").

It is axiomatic, however, that "[w]hen a court considers items outside of the pleadings on a [Rule] 12(b)(1) motion, the court resolves all disputes in favor of the non-movant." *Villarino v. Comm'n Social Sec. Admin.*, No. CV F 12-1225 LJO BAM, 2012 WL 3205171 (E.D. Cal. 2012); *Dreier v. United States*, 106 F.3d 844,

847 (9th Cir. 1996).

### B. Legal Standard Governing Motion to Dismiss Under Rule 12(b)(6)

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Summit Tech., Inc. v. High-Line Med. Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)).

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party. *See, e.g., Wyler Summit Parnership v. Turner Broadcasting Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998). "However, a court need not accept as true unreasonable interferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Summit Tech.*, 922 F. Supp. at 304 (citing *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citations omitted). However, a court may consider material which is properly submitted as part of the complaint ad matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment. *See, e.g., id.; Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994). Where a motion to dismiss is granted, a district court should provide leave to amend unless it is clear that the complaint could not be saved by any amendment. *See Chang v. Chen*, 80 F.3d 1293, 1296 (9th Cir. 1996).

## III. DISCUSSION

### A. This Court Has Jurisdiction to Hear Plaintiff's Quiet Title Act Claim

The Quiet Title Act ("QTA") operates as a limited waiver of sovereign immunity in cases in which a party seeks to adjudicate a title dispute to real property in which the United States claims an interest. *See* 28 U.S.C. § 2409a. Claims under the QTA are required to be brought within 12 years of "the date the plaintiff . . . knew or should have known of the claim of the United States. 28 U.S.C. § 2409a(g). When determining whether a plaintiff "should have known," the court must impart a test of "reasonableness." *Cal ex rel. State Land Comm'n v. Yuba Goldfields, Inc.*, 752 F.2d 393, 396 (9th Cir. 1984). Because the QTA waives sovereign immunity, timeliness under section 2409a(g) is a jurisdictional prerequisite. *Id.*

When a plaintiff seeks to quiet title with regards to a purported contingent future interest, the statute of limitations is triggered only when there is a "present, non-contingent, claim of the United States that either immediately or foreseeably comes into conflict with the plaintiff's claim." *Cnty of Inyo v. Dept. of Interior*, No. CV F 06-1502 A WI DLB, 2008 WL 4468747, at *10 (E.D. Cal. 2008). This is such a situation. In this case, the first time the United States took the position that it maintained a reversionary interest in the airport property was in an Order to Show Cause issued by the FAA to the City on March 26, 2008. In that Order to Show Cause, the FAA asserted that the Surplus Property Act and the Instrument of Transfer obligated the City to operate SMO as an airport forever, or title to SMO would revert to the United States.

The Court concludes that neither the Complaint, nor Defendants' motion presents a factual scenario in which the City was put on notice of the cloud on Santa Monica's title before 2008. The language of the Instrument of Transfer could not have put the City on notice of a cloud of title because the United States never

had title to the Airport Property. Accordingly, title could not be an interest transferred back to Santa Monica under the IOT. Nor did recordation of the IOT as a quitclaim deed put the City on notice of the United States' interest. A quitclaim deed merely conveys the grantors "interest" in certain real property, without any warranty as to what that interest is. *See* Black's Law Dictionary (9th Ed. 2009), "DEED" (18c). Because Defendants only ever had a temporary leasehold interest, the IOT could only convey a temporary leasehold interest, and not more.

The 1962 Opinion of the Santa Monica City Attorney did not demonstrate that the City had notice that title to the airport property would revert if airport operations ceased either. The Opinion does not conclude that *title* to the airport property would revert to the United States. Further, it is unclear whether the basis for City Attorney's conclusion was the IOT or the "project application." Such a dispute must be resolved in favor of Santa Monica. *Dreier*, 106 F.3d at 847.

The 1975 Opinion of the California Attorney General ("AG") could not have put the City on notice that title to the airport property would revert to the United States if Santa Monica ceased airport operations. Not only does the California Attorney General's opinion not impute notice to the City, but the opinion only concluded that at the time of the opinion (i.e. 1975), the City could not cease airport operations.

The "petitioning" by the City for release from restrictions in 1952, 1956, and 1984 does not equate to notice either. The releases, relied on by Defendants, do not mention a reversionary interest by the United States in the airport property. Additionally, the 1952 Release did not concern land subject to any alleged interest covered by the IOT because the "George Tract" was outside the land that the City leased to the United States in 1941. Accordingly, the IOT could not restrict the George Tract. Finally, the City was separately bound by various other federal obligations at the time it sought the releases, including Federal Grant Agreements. It has not been established that the City was not seeking release from these other

obligations.

Even if the City was on notice that the Government's claimed reversionary interest included title to SMO, Defendants abandoned that position on multiple occasions. *See Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995) ("if the government has apparently abandoned any claim it once asserted, and then reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is a asserted.") citing *Shultz v. Dept. of Army*, 886 F.2d 1157, 1161 (9th Cir.1989).

Defendants abandoned any claim they may have had when the FAA, in 1971, stated that "Santa Monica Airport is vulnerable to being discontinued and used for non-aviation purposes." Another example of abandonment occurred when the FAA entered into the 1984 Agreement with the City, which provided that the City will operate and maintain the Airport Property as an airport until "July 1, 2015." Finally, during the disputes that culminated in the Director's Determination and Final Agency Decision, the FAA maintained that SMO must only be operated as an airport until only July 2015.

Moreover, the Ninth Circuit considers any drastic change in the interest claimed by a defendant triggers the statute of limitations with regards to that claim. *See Skranak v. Castenada*, 425 F.3d 1213 (9th Cir. 2005) (limitations period began to run when government converted vehicular road into trail usable only for hiking and riding, and prohibited vehicular access, not when plaintiff was aware of government ownership); *McFarland v. Norton*, 425 F.3d 724 (9th Cir. 2005) (cause of action under QTA for easement over federally-owned road accrued, and twelve-year limitations period began to run, when government denied landowner access to road, not when government originally claimed ownership of road); *Michel v. United States*, 65 F.3d 130 (9th Cir. 1995) (landowners' claim did not accrue under QTA, until landowners knew or should have known that government claimed exclusive right to deny their historic access to roads and trails rather than at time landowners

knew of government's claim of title to refuge). Defendants' drastic change in scope in 2008 from an expired reversionary interest, to a reversionary interest in the City's title to modern-day SMO commenced the statute of limitations for the City's instant claim.

Finally, courts are not permitted to dismiss a complaint pursuant to Rule 12(b)(1) where "the jurisdiction issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits." *Kingman Reef Atoll Investments, L.L.C. v. United States*, 541 F.3d 1189, 1196-97 (9th Cir. 2008). The inextricably intertwined substantive and jurisdictional issues require denial of Defendants' motion.

### B. This Court Has Jurisdiction to Hear the City's Takings Clause Claim

The Tucker Act requires claims for "just compensation" over $10,000 to be filed in the Court of Federal Claims. 28 U.S.C. § 1491(a)(1). Here, however, Plaintiff does not request just compensation and instead seeks only equitable relief, which the Court of Federal Claims does not have jurisdiction over. *See U.S. v. Testan*, 424 U.S. 392, 297-98 (1976) (Court of Federal Claims does not have the power to grant equitable relief). Because the City seeks declaratory and equitable relief and not compensation related to a taking, the claims are properly heard in district court. *E. Enterprises v. Apfel*, 524 U.S. 498, 521-22 (1998) (plurality opinion).

### C. Plaintiff's Constitutional Claims Are Ripe for Judicial Review

In order for claims to be ripe for judicial review, there must "be a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Aydin*, 940 F.2d at 528. Where a party seeks equitable, as opposed to monetary relief, "the Supreme Court has rejected a strict[] interpretation of the ripeness doctrine," because such an interpretation would make "all declaratory judgment claims . . . suspect." *Id.* citing *Aetna Life Ins. Co. v. Haworth*,

300 U.S. 227, 228 (1937). There is a tension between ripeness and declaratory relief because such relief necessarily "involves plaintiffs seeking to clarify their rights or obligations before an affirmative remedy is needed." *Id.* Accordingly, the Supreme Court has explained that to determine whether a claim is ripe for review entails evaluating only (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dept. of Interior*, 538 U.S. 803, 807 (2003).

In evaluating whether the City's claims are fit for judicial decision, courts look to whether further factual development would "significantly advance our ability to deal with the legal issues presented." *San Luis & Delta-Mendota Water Auth. v. Salazar*, 638 F.3d 1163, 1173 (9th Cir 2011). Here, the facts underlying the City's constitutional claims are well-developed and based on historical documents and events that are not in substantial dispute. Accordingly, further factual development will not aid the court in deciding the City's constitutional claims and the claims are fit for judicial decision.

For a plaintiff to demonstrate that it will suffer significant hardship if a ruling is withheld, plaintiff "must demonstrate a realistic danger of sustaining a direct and immediate injury." *Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). Here, the City has demonstrated such a danger. Whether the City continues operating the airport forever (giving up its choices in regards to its own property) or discontinues operation and faces costly ejectment proceedings, the injury is direct and immediate. Accordingly, the City's constitutional claims are ripe.

### D. Plaintiff's Constitutional Claims are Properly Pleaded

"To survive a motion to dismiss" under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the pleaded factual content

[PROPOSED] ORDER DENYING DEFENDANTS'
MOTION TO DISMISS
Case No. CV 13-08046 JFW (VBKx)

allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Plaintiff's claims for regulatory taking under the Fifth Amendment, violations of the Tenth Amendment, and violations of Substantive Due Process meet this standard. Because the City's complaint seeks only equitable relief related to the Airport Property and alleges that the damages are not compensable through monetary damages, the City has properly stated the loss it will suffer for purposes of the Takings Clause. *See Duke Power Co. v. Carolina Environmental Study Group. Inc.*, 438 U.S. 59, 71 n.15 (1978) ("individuals threatened with a taking [may] seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.").

Similarly, the City's Tenth Amendment Claim is properly pled because the City has made allegations sufficient that Defendants' conduct, if proved, is unconstitutional commandeering.

Finally, the City has alleged facts to show that Defendants' actions are irrational and an abuse of power. Thus, the City's substantive due process is properly pled.

## IV.   CONCLUSION

For all the foregoing reasons, Defendants' Motion is DENIED.

IT IS SO ORDERED.

Dated: February___, 2014

By:_____
Hon. John F. Walter
UNITED STATES DISTRICT JUDGE