Donald P. Brigham (California State Bar no. 68708)
dbrigham@brighamlawfirm.us
Brigham Law Firm
831 State Street, Suite 240
Santa Barbara, CA 93101
Telephone: 805.845.0490

*Of Counsel:*

Kathleen A. Yodice
kathy.yodice@aopa.org
Elizabeth M. Candelario
elizabeth.candelario@aopa.org
Law Offices of Yodice Associates
411 Aviation Way, Suite 245
Frederick, MD 21701
Telephone: 301.695.2300
Facsimile: 301.695.2151

Kenneth Mead
ken.mead@aopa.org
Aircraft Owners and Pilots Association
421 Aviation Way
Frederick, MD 21701
Telephone: 301.695.2018
Facsimile: 301.695.2202

Attorneys for *Amicus Curiae*
AIRCRAFT OWNERS AND PILOTS
ASSOCIATION

Edward M. Bolen
ebolen@nbaa.org
National Business Aviation Association
1200 G Street NW, Suite 1100
Washington, DC 20005
Telephone: 202.783.9450
Facsimile: 202.463.6287

Attorney for *Amicus Curiae*
NATIONAL BUSINESS AVIATION
ASSOCIATION

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY OF SANTA MONICA, | Case Number: **CV13-08046** |
| Plaintiff | **NOTICE OF MOTION AND MOTION TO APPEAR AS** *AMICUS CURIAE*; **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| v. | |
| UNITED STATES OF AMERICA, FEDERAL AVIATION ADMINISTRATION and MICHAEL P. HUERTA, in his Official Capacity as Administrator of the Federal Aviation Administration, | Hon. John F. Walter |
| | Date: March 10, 2014 |
| | Time: 1:30pm |
| Defendants | Place: Courtroom 16 |

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD: PLEASE TAKE NOTICE that as soon as it may be heard, in Courtroom 16, 312 N. Spring Street, Los Angeles, CA 90012, before the Honorable John F. Walter, the National Business Aviation Association ("NBAA") and the Aircraft Owners and Pilots Association ("AOPA") (collectively, "Amici" or "Associations") will, and hereby do, move this court for an order granting this motion to appear as *amicus curiae* (the "Motion"), and request that the Court consider the following Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss (the "Brief").

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on February 6 for the Defendants and on February 7 for the Plaintiffs. Defendants informed counsel for Amici that they do not object to this Motion, but Plaintiffs informed counsel for Amici that they do object to this Motion on the basis that it could delay the Court's review of the pending Motion to Dismiss. In order to mitigate the Plaintiffs' concern, Amici respectfully request that this Court waive the requirement of L.R. 7-3 that the conference occur at least 7 days before the filing of a motion, and accept this Motion for filing today, the same day upon which a hearing on the Motion to Dismiss until recently was scheduled. Amici note that this Court can and does waive the requirements of L.R. 7-3 when doing so will not cause any prejudice and respectfully submit that this is such a case. *See, e.g., Brodie v. Bd. of Trustees of Calif. State Univ.*, no. 12-CV-7690, 2013 WL 4536242, *1 (C.D.Cal. Aug. 27, 2013); *Reed v. Sandstone Properties, L.P.*, no. 12-CV-5021, 2013 WL 1344912, *6 (C.D.Cal. Apr. 2, 2013). Amici do not intend for their participation to broaden or alter the scope of the legal issues presented in the parties' pleadings in this case and, as such, do not expect their participation to interfere with the Court's timing for the resolution of pending matters, such as the motion presently before this Court.

Neither NBAA nor AOPA has any parent corporation. As non-profit associations, neither NBAA nor AOPA has any stock and therefore no corporation owns any NBAA or AOPA stock. Counsel for NBAA and AOPA have authored this brief and no other person, including the parties or their counsel, have contributed money that was intended to fund preparing or submitting this brief.

Dated: February 10, 2014

Respectfully submitted,

Donald P. Brigham
dbrigham@brighamlawfirm.us
Brigham Law Firm
831 State Street, Suite 240
Santa Barbara, CA 93101
Telephone: 805.845-0490

*Of Counsel:*

NATIONAL BUSINESS AVIATION ASSOCIATION
Edward M. Bolen
Attorney for *Amicus Curiae*
NATIONAL BUSINESS AVIATION ASSOCIATION

LAW OFFICES OF YODICE ASSOCIATES
Kathleen A. Yodice
Elizabeth M. Candelario
Attorney for *Amicus Curiae*
AIRCRAFT OWNERS AND PILOTS ASSOCIATION

AIRCRAFT OWNERS AND PILOTS ASSOCIATION
Kenneth Mead
Attorney for *Amicus Curiae*
AIRCRAFT OWNERS AND PILOTS ASSOCIATION

# TABLE OF CONTENTS

Page

MOTION TO APPEAR AS *AMICUS CURIAE* .................................................. 1

I.     INTERESTED PARTIES ......................................................................... 1

II.    STATEMENT OF INTEREST ................................................................. 1

    (1)   Summary Of Associations' Interests ........................................... 1

    (2)   Aircraft Owners and Pilots Association, In Particular ................ 3

    (3)   National Business Aviation Association, In Particular ................ 5

    (4)   Request To Participate ................................................................. 6

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF

DEFENDANTS' MOTION TO DISMISS ............................................................ 8

III.   FACTS ...................................................................................................... 8

IV.    THE BACKGROUND AND IMPLICATIONS OF THE ISSUES

    BEFORE THE COURT ARE SIGNIFICANT ..................................... 9

    (1)   The Surplus Property Act ............................................................ 9

    (2)   Unintended Consequences .......................................................... 11

V.     THE QUIET TITLE ACT CLAIM SHOULD BE DISMISSED ........... 17

VI.    THE FIFTH AMENDMENT TAKINGS CLAIMS SHOULD BE

    DISMISSED ............................................................................................. 18

    (1)   The Takings Counts Are Duplicative Of The QTA Claim ......... 19

    (2)   Declaratory Relief Is Not Available To The City ...................... 19

    (3)   Purported Loss Of Sovereignty Is Not a Basis For A Takings

        Claim ........................................................................................... 20

    (4)   A Takings Claim Is Not A Means By Which To Modify A Contract 20

VII.   THE TENTH AMENDMENT CLAIM SHOULD BE DISMISSED ..... 21

VIII.  THE FIFTH AMENDMENT DUE PROCESS CLAIM SHOULD BE

    DISMISSED ............................................................................................. 22

IX.    CONCLUSION ........................................................................................ 22

# TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Adams v. City of Chicago*
    no. 97-CV-5727, 1995 WL 491496 (N.D.Ill. Aug. 11, 1995) ................. 8

*Animal Legal Defense Fund v. U.S.D.A.*,
    no. 12-CV-4028, 2013 WL 1191736 (C.D.Cal. Mar. 22, 2013) ................. 7

*Barnes v. Babbitt*,
    329 F. Supp. 2d 1141 (D.Ariz. 2004) ................. 20

*Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*,
    461 U.S. 273 (1983) ................. 19

*Brodie v. Bd. of Trustees of Calif. State Univ.*,
    no. 12-CV-7690, 2013 WL 4536242 (C.D.Cal. Aug. 27, 2013) ................. ii

*Buckles v. King Cnty.*,
    191 F.3d 1127 (9th Cir. 1999) ................. 22

*Carson Harbor Vill., Ltd. v. City of Carson*,
    86 F. App'x 274 (9th Cir. 2004) ................. 22

*City & Cnty. of Denver v. Bergland*,
    517 F. Supp. 155 (D.Colo. 1981), *aff'd in part and rev'd in part on*
    *other grounds*, 695 F.2d 465 (10th Cir. 1982) ................. 19

*City of Santa Monica v. FAA*,
    631 F.3d 550 (9th Cir. 2011) ................. 4, 5

*Clouser v. Espy*,
    42 F.3d 1522 (9th Cir. 1994) ................. 19

*Cnty. of Inyo v. Dep't of the Interior*,
    no. 06-CV-1502, 2008 WL 4468747 (E.D.Cal. Sept. 29, 2008) ................. 18

*E. Enters. v. Apfel*,
    524 U.S. 498 (1998) ................. 19, 20

*Fishback v. J.C. Forkner Fig Gardens*,

30 P.2d 586, 137 Cal. App. 211 (1934) .................................................... 17

*Friends of Panamint Valley v. Kempthorne,*

    499 F. Supp. 2d 1165 (E.D.Cal. 2007) ............................................ 19

*Hoptowit v. Ray,*

    682 F.2d 1237 (9th Cir. 1982) ...................................................... 7

*In re Roxford Foods Litig.,*

    790 F. Supp. 987 (E.D.Cal. 1991) ................................................ 7

*Integrated Logistics Support Sys. Int'l, Inc. v. U.S.,*

    42 Fed. Cl. 30 (1998) ............................................................ 21

*League of Women Voters of California v. F.C.C.,*

    568 F. Supp. 295 (C.D.Cal. 1983) ................................................ 7

*Lowry v. Parole & Prob. Comm'n,*

    473 So. 2d 1248 (Fla. 1985) ...................................................... 17

*Macri v. King County,*

    126 F.3d 1125 (9th Cir. 1997) .................................................... 22

*Montara Water & Sanitary District v. County of San Mateo,*

    598 F. Supp.2d 1070 (N.D.Cal. 2009) ............................................ 10

*Reed v. Sandstone Properties, L.P.,*

    no. 12-CV-5021, 2013 WL 1344912 (C.D.Cal. Apr. 2, 2013) ...................... ii

*Robinson v. U.S.,*

    586 F.3d 683 (9th Cir. 2009) ...................................................... 19

*Ryan v. C.F.T.C.,*

    125 F.3d 1062 (7th Cir. 1997) .................................................... 7

*Sanders v. Freeman,*

    221 F.3d 846 (6th Cir. 2000) ...................................................... 18

*Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.,*

    272 F. Supp.2d 919 (N.D.Cal. 2003) ............................................ 7

*State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.,*

313 U.S. 508 (1941) ................................................. 21

*Syriani v. Freddie Mac Multiclass Certificates, Series 3365,*

    no. 12-CV-3035, 2012 WL 6200251 (C.D.Cal. July 10, 2012) ............. 21

*U.S. v. 50 Acres of Land,*

    469 U.S. 24 (1984) ............................................. 20

*U.S. v. Darby,*

    312 U.S. 100 (1941) ........................................... 21

*U.S. v. Louisiana,*

    751 F. Supp. 608 (E.D.La. 1990) .............................. 7

*Wallace v. Chafee,*

    451 F.2d 1374 (9th Cir. 1971) ................................ 17

*Washington Legal Found. v. Legal Found. of Washington,*

    271 F.3d 835 (9th Cir. 2001) ................................. 20

*Watson v. Sutro,*

    24 P. 172, 86 Cal. 500 (1890) ............................... 17

Congressional Materials                Page(s)

*National Airport Plan,*

    House Doc. No. 807, 78th Cong., 2d Sess. (Nov. 28, 1944) ............ 10

FAA Administrative Materials         Page(s)

FAA Order 5190.6A, *Airport Compliance Requirements* (Oct. 2, 1989) ......... 10

FAA Order 5190.6B, *Airport Compliance Manual* (Sept. 30, 2009) ........... 11

*In the Matter of Compliance by the City of Santa Monica, California,*

    FAA Docket no.16-02-08, Director's Determination, 2008 WL

    6895776 (May 27, 2008) ....................................... 12

*Letter from the FAA Acting Associate Administrator for Airports to Burbank-*

    *Glendale-Pasadena Airport Authority* (Oct. 30, 2009) ................. 12

*Report to Congress on NPIAS, 2013-2017* ............................... 2

| Federal Register | Page(s) |
|---|---|
| 10 Fed. Reg. 14204 (Nov. 17, 1945) | 9, 10 |
| 12 Fed. Reg. 2028 (March 27, 1947) | 9 |
| 76 Fed. Reg. 74843 (Dec, 1, 2011) | 16 |

| Regulations | Page(s) |
|---|---|
| 14 C.F.R. Part 155 | 11, 16 |
| 32 C.F.R. § 8305.3 | 9, 10 |
| 32 C.F.R. § 8316.3 | 9 |
| 32 C.F.R. § 8316.10 | 10 |
| 32 C.F.R. § 8316.18 | 10 |
| War Assets Administration Regulation 16 | 9, 10 |

| Statutes | Page(s) |
|---|---|
| 26 U.S.C. § 9502 | 2 |
| 49 U.S.C. § 40103 | 2 |
| 49 U.S.C. § 47101 | 2 |
| 49 U.S.C. § 47102 | 2 |
| 49 U.S.C. § 47103 | 2 |
| 49 U.S.C. § 47104 | 2 |
| 49 U.S.C. § 47151 – 47153 | 2, 11 |
| Surplus Property Act of 1944, 58 Stat. 765 (Oct. 3, 1944) | 2, 3, 9, 16, 20 |

## MOTION TO APPEAR AS *AMICUS CURIAE*

### I. INTERESTED PARTIES

AOPA is an independent, not-for-profit education and advocacy association incorporated under the laws of New Jersey and headquartered in Frederick, Maryland. AOPA is the world's largest aviation member association, representing pilots and aviation enthusiasts alike. A primary purpose of AOPA is to promote, protect, and represent the interests of its members.

NBAA is an independent, not-for-profit education and advocacy association incorporated under the laws of and headquartered in Washington, DC. NBAA is the leading voice for companies that operate general aviation aircraft in support of their business or are otherwise involved in business aviation. A primary purpose of NBAA is to promote, protect, and represent the interests of its members.

### II. STATEMENT OF INTEREST

(1)   Summary of Associations' Interests

AOPA and NBAA are nationally known trade associations that represent the interests of their members, who are individuals and companies that operate aircraft throughout the United States. AOPA represents around 370,000 pilots who fly for personal and business reasons. NBAA represents more than 10,000 companies that operate aircraft in connection with their business or are otherwise involved in business aviation. The members of both associations operate general aviation aircraft – *i.e.*, aircraft other than those operated by the airlines or by the military. General aviation accounts for approximately two-thirds of the aircraft hours flown in the national airspace system.

AOPA has over 6,000 members within a 25-mile radius of Santa Monica and many of those members base their aircraft at the Santa Monica Municipal Airport ("SMO"). Additionally, fifteen NBAA members are based at SMO and NBAA members operate thousands of flights at the airport annually. Generally speaking, access to Santa Monica Municipal Airport is important to almost any NBAA

member with business in Southern California, a congested airspace for which SMO is one of the primary general aviation gateways, and similarly any AOPA member potentially could fly in the Southern California area and make use of SMO.

Moreover, SMO – like many other airports similarly situated – is a critical component of the safe and efficient aviation transportation system. As airport users, AOPA's and NBAA's members share an interest in preserving access to the nation's public-use airports – particularly those, like SMO, that have been transferred according to Federal law, such as the Surplus Property Act of 1944 ("Surplus Property Act" or "SPA"), and/or that have received Federal financial support through the Airport and Airway Trust Fund.[1] *See* 58 Stat. 765 (Oct. 3, 1944) (codified as amended at 49 U.S.C. § 47151 – 47153, 49 U.S.C. § 47104, and 26 U.S.C. § 9502). AOPA and NBAA are also interested in preserving the Federal government's role, policies, and law in maintaining and developing the safe, efficient and integrated national transportation infrastructure. *See* 49 U.S.C. §§ 40103, 47101, and 47103. Such infrastructure is, in large part, dependent on the availability of public-use reliever airports, which are high-capacity general aviation airports in metropolitan areas. SMO is one such airport, serving the Los Angeles basin.[2] AOPA and NBAA can offer a practical perspective as to the importance of the Federal government's role and responsibility to manage the accessibility of individual airports in planning for national transportation needs.

---

[1] One of the purposes of the Fund is to support grants made to airports through the Airport Improvement Program ("AIP"), which are accompanied by contractual obligations, including that a recipient continue to be operated as an airport. *See* 49 U.S.C. § 47104, *et seq*. SMO previously has accepted AIP grants, but the FAA and the City are in conflict as to the date upon which the obligations expire.

[2] *See* the FAA's *Report to Congress on NPIAS, 2013-2017*, available online at http://www.faa.gov/airports/planning_capacity/npias/reports/. *See also* 49 U.S.C. § 47102(23).

AOPA and NBAA are also concerned with the broader implications of this case. Many other general aviation airports were transferred pursuant to the Surplus Property Act and/or have received AIP grants. Any decision in this case may set a precedent for other airports in regard to their obligations to adhere to restrictions and covenants agreed upon with the Federal Aviation Administration ("FAA"), including to continue to be an integral part of the national aviation transportation system. AOPA and NBAA accordingly seek to assist the Court by addressing the underlying issues and broader ramifications of any disposition the Court may make in this case, so that the Court may be fully informed and that any decision in this case would not have unintended adverse consequences on future matters.

(2)   Aircraft Owners and Pilots Association, In Particular

On behalf of its individual members, AOPA has a substantial interest in the disposition of the issues presented to the Court for decision in this case. AOPA, a national not-for-profit membership organization, is the largest civil aviation organization in the world. Founded in 1939, AOPA has long represented the interests of its members in the field of general aviation, including their interests as they relate to general aviation airports. AOPA, its membership, its history, its mission, and its activities are described in detail on the Internet at www.aopa.org.

General aviation is the largest segment of the aviation industry, accounting for approximately two-thirds of the flying in the National Airspace System (in terms of hours flown). AOPA serves the interests of approximately 370,000 individual pilots and aircraft owners, including private, commercial, and airline-transport pilots, private student pilots, and proprietors of airports and aviation-related businesses, and other aviation enthusiasts.

AOPA has been very active on the national, state, and local levels in examining issues related to general aviation, in general, and to pilots' access to airports, in particular. AOPA has made an effort to preserve much-needed and important access to existing airports in communities throughout the United States.

This access is becoming more and more limited, to the detriment of the public interest, and in many cases, the loss of the airport or limitations on its use are unnecessary in light of a full and fair understanding of the matter. In addition to other advocacy, AOPA has frequently participated in litigation in its continuing efforts to preserve rules and processes that are in place to protect against the loss or limitation of the use of public airports.[3]

By means of its nationwide membership, AOPA is aware of the multitude of concerns and challenges facing both large and small airports and the pilots who fly into them in locations across the country. AOPA would like to bring its unique and valuable perspective to the assistance of the Court in understanding the history and the local and national importance in deciding the disputes presented by the City of Santa Monica. The implications of this case have been and are currently being felt by the tenants and users of the airport, impacting operations at and around the airport. The ramifications of any decision in this case extend beyond the instant dispute between the City and the FAA, such that it could potentially affect how similar circumstances are treated elsewhere. If the City of Santa Monica is permitted to avoid obligations it accepted knowingly, plainly, and legally, such precedent could provide airport owners and sponsors nationwide with a basis to challenge similar surplus property transfers as well as other agreements in place at airports. AOPA seeks to assist the Court in understanding the broader implications at issue, including the value of surplus property airports not only to the pilots who use them, but to the flying public in general, so that the Court may be fully informed in drafting any and that any decision which is rendered in this case would not have unintended adverse consequences to future matters.

---

[3] *See, e.g., City of Santa Monica v. FAA*, 631 F.3d 550 (9th Cir. 2011), in which AOPA and NBAA filed an *amicus* brief in support of the Federal government, and specifically argued that Santa Monica neither could nor should be allowed to restrict operations by certain classes of aircraft at SMO.

(3)     National Business Aviation Association, In Particular

On behalf of its individual members, NBAA has a substantial interest in the disposition of the issues presented to the Court for decision in this case. NBAA, a national not-for-profit membership organization, is the leading voice for business aviation in the United States. Founded in 1947, NBAA long has represented the interests of its members in the field of business aviation, including their interests as they relate to general aviation airports. NBAA, its membership, its history, its mission, and its activities are described in detail on the Internet at www.nbaa.org.

General aviation is the largest segment of the aviation industry, accounting for approximately two-thirds of the flying in the National Airspace System (in terms of hours flown). NBAA serves the interest of more than 10,000 companies that operate general aviation aircraft as an aid to the conduct of their business or that are otherwise involved in business aviation, such as "fixed base operators" and other companies that provide aviation support services at airports.

NBAA has been very active on the national, state, and local levels in engaging issues related to business aviation, in general, and access to airports, in particular. NBAA has made an effort to preserve much-needed and important access to existing airports in communities throughout the United States. This access is increasingly under challenge, to the detriment of the public interest; in many cases, the loss of an airport or limitations on its use can be shown to be unnecessary, based upon a full and fair understanding of the underlying issues. In addition to other advocacy, NBAA frequently has participated in litigation in its ongoing efforts to preserve rules and processes that have been put in place to protect against the loss or limitation of the use of public airports.[4]

---

[4] *See, e.g., City of Santa Monica v. FAA*, 631 F.3d 550 (9th Cir. 2011), in which AOPA and NBAA filed an *amicus* brief in support of the Federal government, and specifically argued that Santa Monica neither could nor should be allowed to restrict operations by certain classes of aircraft at SMO.

1    By means of its nationwide membership, NBAA is aware of the multitude of
2    concerns and challenges facing both large and small airports and the operators who
3    utilize them in locations across the country. NBAA would like to bring its unique
4    and valuable perspective to the assistance of the Court in understanding the history
5    and the local and national importance in deciding the disputes presented by the
6    City of Santa Monica. The implications of this case have been and are currently
7    being felt by the tenants and users of the airport, impacting operations at and
8    around the airport, as well as at other local airports. Moreover, the ramifications of
9    any decision in this case extend beyond the instant dispute between the City and
10   the FAA; it could potentially affect how similar circumstances are treated
11   elsewhere – *i.e.*, if the City of Santa Monica is permitted to avoid obligations it
12   accepted knowingly, plainly, and legally, such precedent could provide airport
13   owners and sponsors nationwide with a basis to challenge similar surplus property
14   transfers as well as other agreements in place between the Federal government and
15   airports. NBAA seeks to assist the Court in understanding the broader implications
16   at issue -- including the value of surplus property airports not only to the operators
17   who utilize them, but to the flying public in general – so that the Court may be
18   fully informed and that any decision which is rendered in this case would not have
19   unintended adverse consequences to future matters.

20       (4)    Request to Participate

21       Although neither the Federal Rules of Civil Procedure nor the local rules of
22   the United States District Court for the Central District of California set standards
23   for *amicus* status in Federal District Court, granting *amicus* status is well within
24   this Court's discretion and is warranted here. As a sister court has observed:

25           Generally, courts have exercised great liberality in
26           permitting an amicus curiae to file a brief in a pending
27           case, and, with further permission of the court, to argue
28           the case and introduce evidence . . . . There are no strict

1    prerequisites that must be established prior to qualifying

2    for amicus status; an individual seeking to appear as

3    amicus must merely make a showing that his

4    participation is useful to or otherwise desirable to the

5    court.

6    *In re Roxford Foods Litig.*, 790 F. Supp. 987, 997 (E.D.Cal. 1991) (quoting *U.S. v.*

7    *Louisiana*, 751 F. Supp. 608, 620 (E.D.La. 1990)). Another sister court has said:

8    District courts frequently welcome amicus briefs from

9    non-parties . . . if the amicus "has unique information or

10   perspective that can help the court beyond the help that

11   the lawyers from the parties are able to provide."

12   *Sonoma Falls Developers, L.L.C. v. Nev. Gold & Casinos, Inc.*, 272 F. Supp.2d

13   919, 925 (N.D.Cal. 2003) (quoting *Ryan v. C.F.T.C.*, 125 F.3d 1062, 1063 (7th Cir.

14   1997)); *see also Hoptowit v. Ray*, 682 F.2d 1237, 1260 (9th Cir. 1982) ("The

15   district court has broad discretion to appoint amici curiae").

16   While this Court does not appear to have examined the issue to the same

17   extent as some of its sister courts in California, it has previously accepted *amicus*

18   briefs in other cases. *See, e.g., League of Women Voters of California v. F.C.C.*,

19   568 F. Supp. 295, 298 (C.D.Cal. 1983) ("The Court granted leave for the Senate to

20   appear as *amicus curiae* and permitted the filing of the Senate's motion to

21   dismiss"). Notably, in one recent case, *Animal Legal Defense Fund v. U.S.D.A.*, no.

22   12-CV-4028, 2013 WL 1191736 (C.D.Cal. Mar. 22, 2013), in an unpublished

23   order dated December 3, 2012, this Court allowed Hudson Valley Foie Gras – a

24   private party with an interest that would be significantly affected by the outcome of

25   the case – to file an *amicus* brief in support of the Federal government's dispositive

26   motion.

27   AOPA and NBAA respectfully submit that their participation as *amicus*

28   *curiae* in this case would assist the Court by virtue of their experience and

1   perspective. Because of their special interest and expertise in the statutory and
2   regulatory processes that support the Federal government's interests in airports and
3   the maintenance of the National Plan of Integrated Airport Systems ("NPIAS"),
4   and their impact on the operation of local airports and the typical users of airports
5   such as the Santa Monica Municipal Airport, the Associations can make a unique
6   and valuable contribution to the resolution of this matter that would be separate
7   from that of the present parties to the litigation and might otherwise escape the
8   Court's consideration. While the FAA, through its counsel, is well-suited to
9   provide arguments necessary to address the instrument of transfer, contract, and
10  Constitutional-based claims in this case, AOPA and NBAA are uniquely situated
11  to provide additional information that the FAA may be necessarily limited in
12  presenting to this Court and to provide a perspective on the civil aviation needs and
13  protections in place on behalf of the public that can assist the Court in making an
14  informed and appropriate decision in this case, as it relates to the Santa Monica
15  Municipal Airport and its potential impact on other airports nationwide.[5]

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
### III. FACTS

19       For the purposes of this Motion, Amici adopt the "Statement of the Case"
20  section of the Federal government's motion to dismiss.

---

[5] To the extent that the Court may deem the Associations' participation in this case
on an *amicus* basis to be premature, they respectfully request that any order of the
Court be limited to the pending motion to dismiss and that the Associations be
permitted to renew their Motion and Brief at a later time. *See Adams v. City of
Chicago*, no. 97-CV-5727, 1995 WL 491496, *2 (N.D.Ill. Aug. 11, 1995).

## IV. THE BACKGROUND AND IMPLICATIONS OF THE
## ISSUES BEFORE THE COURT ARE SIGNIFICANT

(1)  The Surplus Property Act

This case presents issues related to the execution of an instrument pursuant to a Federal statute that came into effect almost 70 years ago. Although the individuals then involved have come and gone, the intent of both the underlying law and the transaction now before the Court have been consistent – the public requires a national transportation system that is safe, efficient, and effective, and for that reason and upon assurance that they would remain devoted to that purpose, SMO along with numerous other airports were transferred to local control. The City of Santa Monica now is attempting to undermine the public's interest in this regard.

At the conclusion of World War II, Congress enacted the Surplus Property Act to provide a comprehensive system for the disposal of facilities no longer needed by the U.S. Government to serve the public interest. In accordance with that purpose, the SPA set forth specific objectives, including "to prevent insofar as possible unusual and excessive profits being made out of surplus property." 58 Stat. at 766, § 2(q). Additionally, the SPA stated an intent "to dispose of surplus Government-owned transportation facilities and equipment in such manner as to promote an adequate and economical national transportation system." *Id.*, § 2(s).

The importance of planning for a *national* transportation system in the surplus property disposal process was reiterated in regulations issued under the SPA. The disposal of surplus airport property, in particular, was to be performed in such a manner as to "encourage and foster the development of civil aviation and provide and preserve for civil aviation . . . a strong, efficient, and properly maintained nationwide system of public airports." War Assets Administration ("WAA") Regulation 16, 32 C.F.R. § 8316.3, 10 Fed. Reg. 14204 (Nov. 17, 1945), recodified at 32 C.F.R. § 8305.3(e), 12 Fed. Reg. 2028 (March 27, 1947). Benefits

to the public and the nation were the principal considerations in disposing of surplus airport property. *Id.* Furthermore, these objectives were consistent with the recommendations of the then-Civil Aeronautics Administration's ("CAA") 1944 *National Airport Plan* (an ancestor of the current NPIAS), which emphasized that the "growth of both private and commercial flying depends on the development of airports, and that our present airport system is not adequate to serve the needs of aviation." *See* House Doc. No. 807, 78th Cong., 2d Sess., at 1 (Nov. 28, 1944), *available in* CIS U.S. Serial Set no. 10879, Fiche 15-16. Thus, airports that were considered valuable to the maintenance of "an adequate and economical national transportation system" could be transferred to local governments in consideration of the acceptance of reservations, restrictions, and conditions of the Federal government instead of a cash payment. WAA Regulation 16, 32 C.F.R. §§ 8316.3 and 8316.18, 10 Fed. Reg. 14204.

To implement these goals, Congress intended that there be firm limits on the subsequent use of airport property, and "sought to provide the FAA with prospective oversight powers in furtherance of specific statutory purposes." *Montara Water & Sanitary District v. County of San Mateo*, 598 F. Supp.2d 1070, 1089 (N.D.Cal. 2009). Transfers of airport property – specifically airports transferred without cash payment for the value of the land and/or improvements made by the Government – typically contained restrictive covenants requiring the transferee to use the airport for public airport purposes; maintain the landing area, facilities, and equipment of the airport "at all times in good and serviceable condition to assure its efficient operation"; and to prevent the land in and around the airport from being used in a way that could interfere with the lands use as an airport. WAA Regulation 16, § 8316.10(a)(2), 10 Fed. Reg. 14204. The purpose of such restrictions was to "ensure that 'every acre of a surplus airport is held in trust for a specific purpose and usage.'" *Montara*, 598 F. Supp.2d at 1087 (quoting FAA Order 5190.6A, ¶ 4-18(b) (Oct. 2, 1989)). In other words, Congress intended that

surplus airport property be disposed of in such a manner as to ensure that the property remained airports as needed for an efficient *national* transportation system, under the oversight of the CAA (and now the FAA as its successor), and that airport property was not misallocated by transferees for other purposes. *See* FAA Order 5190.6B, ¶ 23.17(a) (Sept. 30, 2009) (case study of airport in which "mismanagement by the sponsor – including illegal disposal of the airport's assets – and restricted access resulted in [reversion] action by the federal government").

Thus, as a threshold matter, AOPA and NBAA respectfully suggest that the City's efforts to quiet its title to the SMO property (and its claims of Constitutional intrusions) have the ulterior purpose of closing SMO once its commitments to the Federal government pursuant to AIP grants and the 1984 settlement agreement have ended – and entirely contradict both the overt purposes of the underlying law and the agreement made pursuant to that law. Congress specifically intended that recipients of surplus airport property post-World War II do so under express and relatively simple terms that allow for the preservation, maintenance, and improvement of the national air transportation system – *i.e.*, predicated on an explicit Federal right of reversion. Moreover, those terms cannot be avoided at a later date unless the recipient requests an exception from the FAA and a conscious determination is made to allow such an exception, based upon the public interest. *See* 49 U.S.C. § 47151 – 47153; 14 C.F.R. Part 155. In this case, not only has Santa Monica failed to submit such a request to the FAA prior to filing suit, but given the importance of SMO to the national air transportation system, such an exception manifestly would not be in the public interest in any case.

(2)     Unintended Consequences

AOPA and NBAA further emphasize the detrimental effect that the closure of the Santa Monica Municipal Airport – the all-but-certain outcome of a ruling for the City in this litigation – would have on air traffic in the southern California

region and the national airspace system, which in turn would detrimentally impact the members of the Associations and the public as a whole.

There already is limited airport capacity in the Los Angeles basin, which would be further reduced if the transfer conditions at issue were held to be invalid and the City thus was empowered to close SMO once other commitments to the Federal government have ended. As noted by the FAA Acting Associate Administrator for Airports in a 2009 decision rejecting the nearby Burbank-Glendale-Pasadena Airport Authority's application to impose a nighttime curfew on operations at Bob Hope Airport ("BUR") "[t]he southern California airspace is currently highly congested and complex." *Id.* at 31 (Oct. 30, 2009), *available online at* http://www.faa.gov/airports/environmental/airport_noise/part_161/media/burbank_10_30_09.pdf; *see also In the Matter of Compliance by the City of Santa Monica, California*, FAA Docket No. 16-02-08, Director's Determination, 2008 WL 6895776, at 51 (May 27, 2008) ("the Los Angeles region is one of the most congested air traffic control areas in the country"). With this in mind, in regard to BUR the Acting Associate Administrator for Airports observed that "[a] curfew at BUR would worsen congestion elsewhere" and thus would be inconsistent with the "safe and efficient use of the navigable airspace." *Id.* at 31, 35.

Effectively awarding City unfettered discretion to *close* the Santa Monica Municipal Airport at a future date would indubitably have a similar – and more dramatic – effect on air traffic in Southern California. The operations currently being handled at SMO would necessarily move to other airports in the Los Angeles basin, affecting established routes and procedures at (as well as shifting environmental impacts to) other airports – many of which already operate at or near capacity. The reverberations would be felt across the United States, could interfere with the FAA's mission in ensuring a safe and efficient transportation system, and would not be in the public interest. According to judicially-noticeable records of airport traffic posted by Santa Monica, in recent years on average there

1  have been more than 100,000 annual aircraft operations (*i.e.*, arrivals and
2  departures) at SMO – more than 270 per day, serving as a significant reliever for
3  general aviation traffic that might otherwise seek to utilize Los Angeles
4  International Airport (LAX) and other commercial airports.[6] *See also* Table 1, *infra*,
5  which provides a summary of the overall air traffic in the Los Angeles basin, based
6  on FAA data.



7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27  _____
28  [6] *See* http://www.smgov.net/Departments/Airport/Operational_Data.aspx.

# 2013 LOS ANGELES BASIN
# AIRPORT OPERATIONS

| BY THE NUMBERS: | AIRPORT OPERATIONS | | +/- |
|---|---|---|---|
| YEAR | 2012 | 2013 | |
| WHITEMAN AIRPORT | 71,520 | 71,855 | 135 |
| VAN NUYS AIRPORT | 259,132 | 268,531 | 9,399 |
| BOB HOPE AIRPORT/BURBANK | 135,635 | 131,122 | (4,513) |
| EL MONTE AIRPORT | 84,137 | 86,575 | 2,438 |
| SANTA MONICA MUNICIPAL AIRPORT | 103,278 | 95,607 | (7,671) |
| LOS ANGELES INTERNATIONAL AIRPORT | 605,480 | 614,917 | 9,437 |
| HAWTHORNE MUNICIPAL AIRPORT | 73,044 | 80,322 | 7,278 |
| COMPTON/WOODLEY AIRPORT* | N/A | 66,000 | N/A |
| LONG BEACH AIRPORT | 258,776 | 275,496 | 16,720 |
| TORRANCE AIRPORT | 139,874 | 123,952 | (15,922) |
| TOTAL AIRPORT OPERATIONS IN LOS ANGELES BASIN | 1,730,875 | 1,814,187 | 83,311 |

**SOURCES:**

FAA AIR TRAFFIC DATA
*FAA AIRPORT MASTER RECORDS

Table 1

Moreover, the outcome of the closure of SMO could not have been contemplated when the Federal government agreed to relinquish its interest in the airport property in 1948; when the Federal government and the City agreed on at least three separate occasions, pursuant to the underlying law and agreement, to release portions of the airport property; and when the airport repeatedly was identified to be a part of the national transportation system, and on that basis the Federal government agreed to grant Federal monies to the City to invest in SMO. Rather, knowledge of and reliance upon the obligations that governed the airport – including the obligation that the City continue to operate SMO upon condition of reversion which has been in effect since 1948 – have for decades informed the Federal government's deliberations – and indeed, City and California deliberations also – when considering matters related to SMO, as the Federal government has documented.

The closure of SMO would also result in the loss of the significant economic contributions made by the airport. According to a judicially-noticeable economic study presented to the Santa Monica City Council on October 4, 2011, there are more than 175 business entities on the airport property – mostly small businesses – accounting for almost 1,500 jobs, with an estimated $275 million total annual economic output, thereby contributing substantially to the economy and quality of life of Santa Monica.[7] Indeed, as acknowledged by the City's own history of the airport as recounted in its complaint, SMO has played an important role not just in aviation but also in the City's economy as a whole since the 1920s.

Further, out of the approximately 5,000 public-use airports in the United States – and the approximately 2,800 of those that are considered to be general aviation and reliever airports for NPIAS purposes – there may be more than 200

---

[7]   *See*   http://www.smgov.net/departments/Council/agendas/2011/20111004/
s2011100404-A.htm   and   http://www.smgov.net/departments/Council/agendas/
2011/20111004/s2011100404-A-2_PPP.pdf.

1    airports that have executed surplus property transfer agreements that are similar to
2    the agreement that is at issue in this case, which appear to include significant
3    gateways for general aviation as well as commercial traffic in Southern California
4    such as LAX and Van Nuys Airport (VNY). Other examples from around the
5    nation include Chicago O'Hare International Airport (ORD); Boston's General
6    Edward Lawrence Logan International Airport (BOS); San Francisco International
7    Airport (SFO); Milwaukee's General Mitchell International Airport (MKE);
8    Columbus, Ohio's Port Columbus International Airport (CMH); Laurence G.
9    Hanscom Field (BED) in Bedford, Massachusetts; St. Lucie County International
10   Airport (FPR) in Fort Pierce, Florida; and Witham Field (SUA) in Martin County,
11   Florida.

12       Witham Field (SUA), a major general aviation field in Martin County,
13   Florida (which FAA data indicates has more annual operations than SMO) is a
14   useful case study. In judicially-noticeable correspondence with the FAA, posted by
15   Martin County, the airport has taken the position that its property is not now
16   subject to obligations pursuant to the Surplus Property Act – a similar argument to
17   that made in Santa Monica's complaint.[8] Unlike SMO, SUA subsequently availed
18   itself of FAA administrative procedures (14 C.F.R. Part 155) in order to obtain an
19   agency release of the parcels in dispute, which the FAA and SUA agreed were not
20   needed for aeronautical purposes. *See* 76 Fed. Reg. 74843 (Dec. 1, 2011). But the
21   SUA example serves as a caution that a decision in this case could set a precedent
22   with wide-ranging implications for the future of other airports across the nation.

23       Indeed, if the City's novel argument regarding the timeliness of its
24   complaint challenging the effectiveness of a contract executed in the 1940s is
25   found to be valid, the consequence could be to open up an opportunity for the
26   owners of hundreds of other public-use airports to consider the diminution or

27
28   [8]    *See*    http://www.martin.fl.us/documents2010/correspondence/mca/2009/
     mca2009L15.pdf.

elimination of their operations – potentially leading to the substantial crippling of the nation's air transportation infrastructure. The United States is not building new airports at any significant pace, so any loss of access to any existing airport is a matter of serious concern to the Associations, and can have an impact far beyond the airfield and community at issue through ripple effects. In this case, the facial conditions of the 1948 Instrument of Transfer are clear, and repeatedly were acknowledged by Santa Monica at later dates. Thus the City's claim of ignorance at this late date about the effect of the plain language at issue amounts to a naked and parochial effort to undermine the national air transportation system that has been planned, established, and nurtured to serve the nation's public.

## V. THE QUIET TITLE ACT CLAIM SHOULD BE DISMISSED

Amici support the Federal government's motion to dismiss the Quiet Title Act (the "QTA") count because it is time-barred, and accordingly there is a lack of subject matter jurisdiction. The City's twelve-year window to bring the QTA count closed long ago. Although the complaint alleges that the City only became aware in 2008 of the reversion condition and related restrictions (the "Restrictions") in the 1948 Instrument of Transfer (the "Agreement"), the Restrictions appear *on the face of the Agreement*, and this language was sufficient to put the City on notice of them. *See, e.g., Wallace v. Chafee*, 451 F.2d 1374, 1377 (9th Cir. 1971) ("One who enters a contract is on notice of the provisions of the contract"); *Fishback v. J.C. Forkner Fig Gardens*, 30 P.2d 586, 589, 137 Cal. App. 211, 219 (1934) ("a purchaser must be held to have notice of everything which appears on the face of the deeds under which he buys") (quoting *Watson v. Sutro*, 24 P. 172, 178, 86 Cal. 500, 522 (1890)).

Likewise, Amici concur that the 1962 and 1975 opinions of local and state counsel cited by the Federal government, among other data sources, further alerted the City to the Restrictions. *See, e.g., Lowry v. Parole & Prob. Comm'n*, 473 So. 2d 1248, 1249 (Fla. 1985) (Attorney General opinion "put the [Parole and

1   Probation Commission] on notice that" a parole procedure violated state law);

2   *Sanders v. Freeman*, 221 F.3d 846, 854-55 (6th Cir. 2000) (Attorney General

3   opinion placed individual "on notice that his sales were taxable in Tennessee").

4   Even under the logic of *Cnty. of Inyo v. Dep't of the Interior*, no. 06-CV-

5   1502, 2008 WL 4468747 (E.D.Cal. Sept. 29, 2008) – incorrectly relied upon by the

6   City to support its assertion that the statute of limitations only recently began to

7   run in this case – the deadline to file a QTA action passed decades ago. As the *Inyo*

8   court noted, consistent with Ninth Circuit precedent, "actual adversity is not

9   required to commence the running of the statute of limitations . . . [a]ll that is

10  required is that some right the plaintiff could exercise be impaired" and "a

11  plaintiff's claim for relief accrues when the plaintiff knows or should have known

12  of a claim." *See Id.* at *10. Further, a dispute exists sufficient to commence

13  running of the statute of limitations when "a deed, a conveyance, leasing activity,

14  or some other communication" sets forth a "claim of the United States that either

15  immediately or foreseeably comes into conflict with the plaintiff's claim." *Id.* In

16  this case, the Agreement signed and accepted by the City specifically states that the

17  SMO property may not be used "for other than airport purposes" without approval

18  from the Federal government, or else the United States may opt to exercise a right

19  of reversion. *See* p. 6 of the Agreement, as set forth in Exhibit C to Plaintiff's

20  Complaint. The Agreement in this case set forth the United States' SMO-related

21  claim even more clearly than did the agency designations at issue in *Inyo*, and thus

22  in this case the City's claim under the QTA is time-barred.

23        **VI. THE FIFTH AMENDMENT TAKINGS CLAIMS**

24            **SHOULD BE DISMISSED**

25  With respect to the second and third counts, Amici again endorse the

26  arguments made by the Federal government. But in supplement thereto, Amici

27  observe that the City's takings claims are defective for additional reasons.

28

### (1)   The Takings Counts Are Duplicative Of The QTA Claim

What the City frames as Fifth Amendment takings challenges are, in reality, mere re-stylizations of its QTA count. Counts two and three on their face request title determinations, rather than compensation. Here, as in *City & Cnty. of Denver v. Bergland*, 517 F. Supp. 155 (D.Colo. 1981), *aff'd in part and rev'd in part on other grounds*, 695 F.2d 465 (10th Cir. 1982), the counts are "more like one[s] seeking possession of the right to use property than one[s] for just compensation for its taking." *Id.* at 176 (footnote omitted). "Congress intended the QTA to provide the exclusive means by which adverse claimants could challenge the United States' title to real property." *Block v. N. Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 286 (1983); *see also Robinson v. U.S.*, 586 F.3d 683, 688 (9th Cir. 2009) ("a suit that actually challenges the Federal government's title, however denominated, falls within the scope of the QTA regardless of remedy sought"). Because it is well-established that "[a] claim that seeks a title determination against the United States can *only* be brought under the Quiet Title Act, *not the Declaratory Judgment Act or any other law*," *Friends of Panamint Valley v. Kempthorne*, 499 F. Supp.2d 1165, 1178 (E.D.Cal. 2007) (emphasis added), counts two and three of the complaint must be dismissed.

### (2)   Declaratory Relief Is Not Available To The City

The only potential remedy for the City's takings claim is money damages and thus the claim can only be pursued in the Court of Federal Claims -- presuming that the value of SMO is more than $10,000. It is well-established that declaratory or injunctive relief for takings is not available in the Ninth Circuit (with exceptions not here applicable). *See, e.g., Clouser v. Espy*, 42 F.3d 1522, 1539 (9th Cir. 1994) ("Because plaintiffs seek only injunctive and declaratory relief on their takings claim[s], . . . dismissal [i]s therefore appropriate"). To the extent that the City cites the plurality opinion in *E. Enters. v. Apfel*, 524 U.S. 498, 520-22 (1998), it is unavailing and irrelevant. The Court's decision in *Apfel* was specifically "[b]ased

on the nature of the taking alleged in [that] case," *id.* at 522 – *i.e.*, a challenge to the constitutionality of a statute, which the petitioner alleged to effect a taking. There is no such claim here; the City does not and could not argue that the Surplus Property Act – or the agreement that the City voluntary entered into under its auspices – is unconstitutional. Thus, the logic and holding of *Apfel* is inapposite. Amici further note that decisions in the Ninth Circuit post-*Apfel* have continued to recognize that declaratory and injunctive relief is unavailable for a takings claim. *See Washington Legal Found. v. Legal Found. of Washington*, 271 F.3d 835, 849-50 (9th Cir. 2001); *Barnes v. Babbitt*, 329 F. Supp. 2d 1141, 1151 (D.Ariz. 2004).

     (3)   <u>Purported Loss Of Sovereignty Is Not A Basis For A Takings Claim</u>

     Counts two and three of the complaint both seek to invalidate the Restrictions because "[t]he taking would prevent the City from using the land in its sovereign capacity and for whatever purposes it deems fit under the City's inherent governmental and proprietary power." But the Supreme Court has clearly rejected the argument that state or local entities are immune from takings:

> [I]t is most reasonable to construe the reference to "private property" in the Takings Clause of the Fifth Amendment as encompassing the property of state and local governments when it is condemned by the United States. Under this construction, the same principles of just compensation presumptively apply to both private and public condemnees.

*U.S. v. 50 Acres of Land*, 469 U.S. 24, 31 (1984) (footnote omitted). The City's reasoning would effectively prevent the taking of *any* state or city property. That is not the law; sovereignty is not an independent basis for a takings claim.

     (4)   <u>A Takings Claim Is Not A Means By Which To Modify A Contract</u>

     As Judge Walter has recognized, "there is no 'taking' for Fifth Amendment purposes if the government is merely acting as a private party enforcing a

1   contract." *Syriani v. Freddie Mac Multiclass Certificates, Series 3365*, no. 12-CV-
2   3035, 2012 WL 6200251, *4 (C.D.Cal. July 10, 2012). In this case, the City is
3   essentially seeking to prevent enforcement of the terms of a contract into which it
4   voluntarily entered in 1948, and with which it has since grown dissatisfied. But "a
5   plaintiff cannot exploit the Fifth Amendment to amend unilaterally a contract in an
6   effort to rectify what hindsight reveals as an unappealing bargain." *Integrated*
7   *Logistics Support Sys. Int'l, Inc. v. U.S.*, 42 Fed. Cl. 30, 34 (1998). This is yet
8   another reason that the City's takings claims should not be allowed to continue.

9   ## VII. THE TENTH AMENDMENT CLAIM SHOULD BE DISMISSED
10          The fourth count of the complaint states: "the United States has attempted to
11   place, as a condition of surrendering its temporary leasehold interest in the Airport
12   Property, a requirement that [the City] agrees to surrender its sovereignty and to
13   operate the airport in perpetuity . . . ." To the extent that the City again invokes a
14   purported loss of sovereignty as a defense, the Supreme Court has said:

15          The Tenth Amendment does not deprive "the national
16          government of authority to resort to all means for the
17          exercise of a granted power which are appropriate and
18          plainly adapted to the permitted end." . . . The fact that
19          land is owned by a state is no barrier to its condemnation
20          by the United States.

21   *State of Oklahoma ex rel. Phillips v. Guy F. Atkinson Co.*, 313 U.S. 508, 534
22   (1941) (quoting *U.S. v. Darby*, 312 U.S. 100, 124 (1941)). In other words, the
23   Tenth Amendment does not bar a taking by the Federal government of state or city
24   property nor a contract with the same effect. For this reason, as well as those stated
25   by the Federal government, this claim also must be dismissed.

26
27
28

## VIII. THE FIFTH AMENDMENT DUE PROCESS CLAIM
## SHOULD BE DISMISSED

In addition to the well-reasoned arguments made by the Federal government, Amici observe that the Ninth Circuit has recognized that the Fifth Amendment precludes a due process challenge if the allegations fall within the scope of the Takings Clause – irrespective of whether the allegations actually are successful:

> In what is an "exception to the general rule [that a plaintiff can seek relief under multiple constitutional theories], recognized out of a well-placed reluctance to expand the concept of substantive due process," a plaintiff is precluded from asserting a substantive due process claim instead of, or in addition to, a takings claim.

*Buckles v. King Cnty.*, 191 F.3d 1127, 1137 (9th Cir. 1999) (quoting *Macri v. King County*, 126 F.3d 1125, 1128 (9th Cir. 1997)). What the Ninth Circuit recognized in *Carson Harbor Vill., Ltd. v. City of Carson*, 86 F. App'x 274 (9th Cir. 2004) is just as true here as it was there: "[b]ecause [plaintiff's] allegations, if proven, would constitute a taking of property, its claim is covered by the explicit protections of the Fifth Amendment's Takings Clause and cannot be brought under the more generalized rubric of substantive due process." *Id.* at 276.

## IX. CONCLUSION

For the reasons stated, Amici respectfully request that this Court grant the motion to dismiss filed by the Federal government and all other appropriate relief.

Dated: February 10, 2014

Respectfully submitted,

Donald P. Brigham (California State Bar no. 68708)
dbrigham@brighamlawfirm.us
Brigham Law Firm
831 State Street, Suite 240
Santa Barbara, CA 93101
Telephone: 805.845-0490

*Of Counsel:*

NATIONAL BUSINESS AVIATION ASSOCIATION
Edward M. Bolen
Attorney for *Amicus Curiae*
NATIONAL BUSINESS AVIATION ASSOCIATION

LAW OFFICES OF YODICE ASSOCIATES
Kathleen A. Yodice
Elizabeth M. Candelario
Attorneys for *Amicus Curiae*
AIRCRAFT OWNERS AND PILOTS ASSOCIATION

AIRCRAFT OWNERS AND PILOTS ASSOCIATION
Kenneth Mead
Attorney for *Amicus Curiae*
AIRCRAFT OWNERS AND PILOTS ASSOCIATION