**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES -- GENERAL**

Case No.    **CV 13-8046-JFW (VBKx)**                                  Date:  February 13, 2014

Title:      City of Santa Monica  -v- United States of America, et al.

**PRESENT:**

**HONORABLE JOHN F. WALTER, UNITED STATES DISTRICT JUDGE**

| Shannon Reilly | None Present |
|---|---|
| Courtroom Deputy | Court Reporter |

**ATTORNEYS PRESENT FOR PLAINTIFFS:**        **ATTORNEYS PRESENT FOR DEFENDANTS:**
                None                                                          None

**PROCEEDINGS (IN CHAMBERS):**     ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [filed 1/10/2014; Docket No. 18]

On January 10, 2014, Defendants United States of America, Federal Aviation Administration ("FAA"), and Michael P. Huerta, in his Official Capacity as Administrator of the Federal Aviation Administration (collectively "Defendants") filed a Motion to Dismiss.  On January 17, 2014, Plaintiff City of Santa Monica ("Plaintiff" or "City") filed its Opposition.  On January 27, 2014, Defendants filed a Reply.  Pursuant to Rule 78 of the Federal Rules of Civil Procedure and Local Rule 7-15, the Court found the matter appropriate for submission on the papers without oral argument.  The matter was, therefore, removed from the Court's February 10, 2014 hearing calendar and the parties were given advance notice.  After considering the moving, opposing, and reply papers, and the arguments therein, the Court rules as follows:

**I.    FACTUAL AND PROCEDURAL BACKGROUND[1]**

The City brings this action in large part to clear its title to the property underlying the Santa Monica Airport ("the Airport Property"), and prevent Defendants "from interfering with the City's fee interest, right to title, and unfettered use of the Airport Property as it sees fit."  Complaint at ¶ 4.  Specifically, the City disputes Defendants' claim that, pursuant to a 1948 Instrument of Transfer, the City is required to operate the Santa Monica Airport ("SMO") as an airport in perpetuity, or the title and right of possession to the Airport Property may, at the United States' option, revert to the United States.

---

[1] These facts are based on the City's Complaint and the exhibits submitted by parties.  All relevant facts are undisputed.

### A. The City Acquires the Airport Property.

The Airport Property was used as an informal landing strip beginning in 1917. According to the City, it purchased most of the Airport Property in 1926 and it has retained its fee simple interest in the land ever since. Between 1926 and December 1941, the City acquired additional parcels of land that make up the balance of the Airport Property.

### B. The City Leases the Airport Property to the United States.

On May 27, 1941, President Franklin D. Roosevelt issued Presidential Proclamation 2487, which declared that the United States was faced with an "unlimited national emergency" that required "military, naval, air and civilian defense be put on the basis of readiness to repel any and all acts or threats of aggression directed toward any part of the Western Hemisphere."

Accordingly, in December 1941, the City leased the Airport Property to the United States to aid in the war effort. The City and United States entered into two separate leases covering two adjoining parcels of land - the "Runway Lease" (No. W-04-193-ENG.4894) and the "Golf Course Lease" (No. W3460-ENG.549).

The Runway Lease covered approximately 86 acres on the northern portion of the Airport Property. The term of the Runway Lease commenced on December 8, 1941, and was scheduled to end twelve months after the date of the termination of Presidential Proclamation 2487. The City charged the United States only $1 for the entire term of the Runway Lease.

The Golf Course Lease commenced on December 1, 1941 and covered approximately 83 acres on the southern portion of the Airport Property. The Golf Course Lease terminated on June 30, 1943, with an option to renew annually until June 30, 1947. The United States paid $150 per month to the City under the Golf Course Lease.

In 1944 and 1945, respectively, the City and the United States entered into Supplement Number 1 to the Runway Lease and the Golf Course Lease, which modified the leases to allow for construction of a new runway to accommodate larger aircraft. Supplement Number 1 also released the United States from its obligation to restore the leased parcels to their original condition, in exchange for the United States' conveyance of any improvements to the property and cash payments to the City (which were reinvested in the Airport Property). Supplement Number 1 to the Golf Course Lease also extended the lease term until twelve months after the termination of Proclamation 2487 and reduced the rent to $1 for the remainder of the lease.

From 1941 through 1946, the United States improved the Airport Property, including, but not limited to, construction of hangars, and construction and improvement of the runway.

At the end of World War II, the United States determined that it was no longer necessary to maintain a presence at the Airport Property. Accordingly, on July 15, 1946, the United States and the City entered into Supplement Number 2, which modified both the Runway Lease and Golf Course Lease. In accordance with Supplement Number 2, the United States stopped maintaining and operating the airport and paying rent. Because the United States had not yet surrendered its leasehold interest (and Proclamation 2487 had not been terminated), the City operated the airport

under a right of entry from the United States.

**C.     The United States Transfers its Interest in the Airport Property to the City.**

       1.     <u>The Surplus Property Act</u>

The Surplus Property Act of 1944 ("SPA"), 49 U.S.C. § 47151, et seq., authorizes the conveyance of surplus federal property to State or local governments without monetary consideration to the United States. *See* SPA, 58 Stat. 765, 770. In 1947, Congress amended the SPA to expedite the disposition of surplus airport property owned or leased by the United States, that had been used in support of the war effort during World War II. The SPA provides specific terms, conditions, reservations, and restrictions upon which conveyances of surplus property may be made.

Pursuant to the SPA, on July 29, 1946, the War Assets Administration ("WAA") issued Form SPB-5 *Declaration of Surplus Real Property* concerning the Airport Property, declaring as surplus all leased land and improvements at SMO. Defendants' Motion, Exhibit D. Thereafter, by letter dated September 19, 1946, the City requested, "pursuant to the provisions of Surplus Property Administration Regulation 16 and amendments thereto and subject to the conditions that may be imposed thereunder" that "it be given an opportunity to acquire, without reimbursement, all government owned airport facilities located upon land owned by the City of Santa Monica for the purpose of encouraging and fostering the development of civil aviation." Defendants' Motion, Exhibit G. It also requested the termination of the Runway Lease and Golf Course Lease. On January 9, 1947, the United States made the determination that its leasehold interest in the Airport Property and any improvements, should be disposed of under the SPA. Defendants' Motion, Exhibit H.

       2.     <u>Instrument of Transfer</u>

As a result, on August 10, 1948, the United States and the City executed an Instrument of Transfer, in which the United States surrendered its leasehold interest in the Airport Property, as well as several easements, buildings, and airfield improvements, including the entire landing area, the concrete 5,000-foot runway, and taxiway system. Pursuant to the Instrument of Transfer, the United States "remised, released and forever quitclaimed" all of its "right, title, interest and claim" to the described "real, personal, or mixed property" to the City subject to certain reservations, restrictions and conditions agreed to in the Instrument of Transfer. Specifically, the Instrument of Transfer provided, in relevant part:

- "That by the acceptance of this instrument or any rights hereunder" the City "agrees that the aforesaid surrender of leasehold interest, transfer of structures, improvements and chattels and assignment, shall be subject to the following restrictions, set forth in subparagraphs (1) and (2) of this paragraph, which shall run with the land, imposed pursuant to the authority of Article 4, Section 3, Clause 2 of the Constitution of the United States of America, the Surplus Property Act of 1944, as amended, Reorganization Plan One of 1947 and applicable rules, regulations and orders . . . ."

- "(1)  That, except as provided in subparagraph (6) of the next succeeding unnumbered paragraph, the land, buildings, structures, improvements and equipment in which this instrument transfers any interest shall be used for public airport purposes for the use and benefit of the public, on reasonable terms and without unjust discrimination . . . ."

- "(6) That no property transferred by this instrument shall be used, leased, sold, salvaged, or disposed of by" the City "for other than airport purposes without the written consent of the Civil Aeronautics Administrator . . . ."

*See* Complaint, Exhibit C.  The Instrument of Transfer also contains the following "reversion" clause:

- "By acceptance of this instrument, or any right hereunder" the City "further agrees . . . [t]hat in the event that any of the aforesaid terms, conditions, reservations or restrictions is not met, observed, or complied with by [the City] or any subsequent transferee . . . the title, right of possession and all other rights transferred by this instrument to the [City], or any portion thereof, shall at the option of [the United States] revert to the [United States] sixty (60) days following the date upon which demand to this effect is made in writing by the Civil Aeronautics Administrator or his successor in function . . . ."

*Id.*

On August 10, 1948, the City confirmed its acceptance of the Instrument of Transfer, by passing Resolution No. 183.  On August 23, 1948, the Instrument of Transfer was recorded as a quitclaim deed with the County Recorder for the County of Los Angeles, California.

On April 28, 1952, President Truman proclaimed that the national emergency declared in 1941 no longer existed and terminated Proclamation 2487.

### D. Grant Agreements

In addition to the Instrument of Transfer, the City and the United States have entered into numerous grant agreements since 1944, which provide that the City must operate SMO as an airport for the use and benefit of the public.  More specifically, in these grant agreements, the City has agreed to maintain SMO for the use and benefit of the public during the life of the improvements, but no more than twenty years from the date of execution of the grant agreement, in exchange for federal funds for the improvement of the Airport Property.  According to the City, the last grant agreement was executed in June 1994, and thus the City contends that it will have no further obligations to the United States under the grant agreements as of June 2014.[2]

---

[2]According to the United States, the City's grant agreement obligations to operate the SMO for the use and benefit of the public do not expire until August 2023.  Defendants' Motion at p. 11 n.3. The Court finds it unnecessary to resolve this factual dispute in ruling on this motion, and will assume that the City's grant agreement obligations expire in June 2014.

### E.     The City's Recognition of its Obligations under the Instrument of Transfer

Since executing the Instrument of Transfer, the City has on several occasions recognized its continuing obligation to operate SMO as an airport. Indeed, in accordance with the terms of the Instrument of Transfer, the City requested in 1952, 1956, and 1984 that the United States agree to release three parcels of land from the restrictions in the Instrument of Transfer. On each of those occasions, the United States agreed to release the City from its obligations under the Instrument of Transfer with respect to those specific parcels of Airport Property.

In addition, on January 23, 1962, the City Attorney issued a legal opinion in response to the question posed by the City Council: "Can the City, unilaterally, on motion of the City Council, abandon the use of [SMO] as an airport?" The City Attorney concluded and advised the City that the Instrument of Transfer and other agreements with the United States "compel the conclusion that the City must operate the airport as an airport, and that the City cannot legally, unilaterally, on its own motion, abandon the use of the Santa Monica Municipal Airport as an airport."[3] Defendants' Motion, Exhibit B.

### F.     The 1984 Settlement Agreement

Beginning in 1975, to alleviate the impact of SMO's operations on its residents, the City Council adopted several ordinances to reduce aircraft noise. In June 1981, the City Council also adopted Resolution No. 6296 declaring its intention to close SMO when legally possible. Thereafter, in 1983, the City adopted a new Master Plan for the Airport Property (which was also designed to address the noise impact of SMO's operations on the surrounding community). The City's actions prompted litigation and several Part 13 complaints against the City.

In an effort to resolve the Part 13 complaints, the City engaged in settlement negotiations with the FAA. Ultimately, the FAA and the City signed a "Settlement Agreement" in 1984, which resolved all existing legal disputes between the parties. The Settlement Agreement was intended to address the noise impact on the community surrounding the Airport Property and the restrictions and limitations imposed by the City on the users of the airport. The Settlement Agreement provides that "[a]ll prior agreements between the parties concerning the Airport, and all actions of the parties during the duration of this Agreement, shall be interpreted consistently with this Agreement." It also provides, in relevant part:

> The City will operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever airport as described in Section 2(b)(i) of this Agreement or its capacity in terms of runway length and width, taxiway system, and runway weight bearing strength until July 1, 2015.

---

[3] Over a decade later, on May 30, 1975, the Office of the Attorney General of the State of California ("California AG") revisited the issue of whether the City may "at the present time, cease using the Santa Monica Municipal Airport for airport purposes." After reviewing the Instrument of Transfer, as well as the federal grant agreements, federal lease agreements, state grant agreements, and private lease agreements, the California AG concluded that "the City may not at the present time cease using the Airport for airport purposes." Defendants' Motion, Exhibit C.

Complaint, Exhibit D at 90. Pursuant to the Settlement Agreement, the FAA agreed to release a parcel of land from the restrictions in the Instrument of Transfer and allowed the City to use that parcel for non-airport purposes.

### G. The FAA's Statements Regarding the City's Obligations to Operate SMO as an Airport

The City contends that the FAA has, at various times, made statements or taken positions that indicate that the City could decide to cease using SMO as an airport, without losing title or ownership of the Airport Property. For example, in a letter dated April 23, 1971 to the Senior Vice President of the Aircraft Owners and Pilots Association, the FAA stated that once the City's grant agreement obligations expire, "Santa Monica Airport is vulnerable to being discontinued and its land used for non-airport purposes." Plaintiff's Opposition, Exhibit B. The letter did not make any mention of the Instrument of Transfer.

In addition, in a 1998 Part 16 proceeding involving a dispute over the City's refusal to offer two long term leases to the Santa Monica Air Center and Krueger Aviation, Inc., the FAA issued a Director's Determination discussing the 1984 Settlement Agreement, stating: "[The 1984] Settlement Agreement makes clear that the City is obligated to operate the Airport only for the duration of the [1984] Agreement (through July 1, 2015) . . . To the extent that Complainants and [the Airport Association] seek to prevent the future closure of the Airport or require the City to operate the Airport beyond July 1, 2015, that is a local land use matter." *See Santa Monica Airport Ass'n v. City of Santa Monica*, Dkt. No. 16-99-21, 2000 WL 1824463, at *19 (F.A.A. Nov. 22, 2000). In 2003, the FAA issued its Final Decision and Order, affirming the Director's Determination, stating in relevant part: "The 1984 Airport Agreement provided the conceptual blueprint according to which SMO is to be reconfigured and administered by the City without derogation of SMO's role in the National Airport System as a general aviation reliever airport until July 1, 2015." *Santa Monica Airport Ass'n v. City of Santa Monica*, Dkt. No. 16-99-21, 2003 WL 1963858, at *3 (F.A.A. Feb. 4, 2003). However, the FAA did not consider the 1948 Instrument of Transfer in the Director's Determination or the Final Decision and Order. *See Santa Monica Airport Ass'n*, Dkt. No. 16-99-21, 2000 WL 1824463, at *2 ("Our consideration of this matter is based solely on a review of the arguments and supporting documentation listed in the administrative record [FAA Exhibit 1] and the applicable Federal law and FAA policy prohibiting a sponsor from practicing unjust economic discrimination."); *id* at *25 (index of administrative record).

Finally, the City contends that the "FAA Airport Compliance Manual," effective September 30, 2009, confirms that the Instrument of Transfer does not permit the United States to take title or ownership of the Airport Property in the event the City ceases to operate SMO as an airport. Section 23.3 of the FAA Airport Compliance Manual provides, in relevant part:

> **23.3. Right of Reverter.** The instrument of conveyance from the federal government must specify the right to have property interest revert to a federal agency and title revest in the United States. This right extends only to the title, right of possession, or other rights vested in the United States at the time the federal government transferred the property described in the instrument to the grantee. The right may be exercised only at the option of the United States -- with or without the cooperation of the grantee -- against all or part of the property in question.

Plaintiff's Opposition, Exhibit D at 45.

### H. The FAA Issues an Order to Show Cause.

The City alleges that the FAA "drastically" changed its position in 2008, when it issued an Order to Show Cause to the City, and "asserted for the first time that Santa Monica was obligated to operate SMO as an airport forever or *title* to the land on which SMO sits would, inexplicably, revert to the United States even though the United States *never* owned the property." Plaintiff's Opposition at pp. 1, 6.

The Order to Show Cause was issued on March 26, 2008 in response to an Ordinance passed by the City Council on March 25, 2008, which banned Category C and D aircraft[4] from SMO. The Order to Show Cause sought to prohibit the City from enforcing the Ordinance. The Order to Show Cause stated in relevant part:

> [The Instrument of Transfer] contains Federal obligations . . . to offer access on fair and reasonable terms, that run in perpetuity until the FAA releases the SPA obligations or reverts the airport under the right to revert clause for violations of the [Instrument of Transfer] deed covenants.

Plaintiff's Opposition, Exhibit C at 38.

After an administrative review and appeal to the appropriate courts, the City was prohibited from enforcing the Ordinance.

### I. The City Evaluates the Future of SMO

In December 2010, in anticipation of the expiration of the 1984 Settlement Agreement, the City Council directed staff to proceed with a comprehensive public process regarding the future of SMO. The result of their efforts was a March 2013 report outlining a three-phased "Visioning Process." Although the report did not take a position on whether SMO should be closed at the expiration of the 1984 Settlement Agreement, the report concluded that maintaining the status quo at SMO was not acceptable to City residents.

Thereafter, City staff members met on several occasions with FAA representatives to convey community concerns and discuss the City's position regarding its authority to determine SMO's future operations. During those meetings and discussions, FAA representatives expressed their view that, under the Instrument of Transfer, the City is obligated to continue operating SMO in perpetuity.

### J. This Action

On October 31, 2013, the City filed a Complaint against Defendants seeking to determine

---

[4] Category C and D aircraft are large jets with landing approach speeds that exceed 140 miles per hour.

the City's rights with respect to the Airport Property and clear the City's title to the Airport Property. Specifically, the City claims that the Instrument of Transfer could not possibly allow the United States to take title to, or assert ownership of, the Airport Property in the event that the City ceases to operate SMO as an airport because United States never owned the land. The City contends that its obligation to operate SMO as an airport will end on July 1, 2015, when the term of the 1984 Settlement Agreement expires.

In its Complaint, the City alleges the following claims for relief: (1) Quiet Title Action under 28 U.S.C. § 2409a; (2) taking in violation of the Fifth Amendment to the United States Constitution; (3) regulatory taking in violation of the Fifth Amendment to the United States Constitution; (4) violation of the Tenth Amendment to the United States Constitution; and (5) violation of the Fifth Amendment to the United States Constitution (Due Process).

Defendants move to dismiss the City's Complaint on the grounds, in relevant part, that: (1) the Quiet Title Act claim is time-barred; (2) the takings claims are premature and must be brought before the United States Court of Federal Claims pursuant to the Tucker Act; and (3) the Tenth Amendment and Fifth Amendment claims are not ripe for review.

## II.     LEGAL STANDARD

### A.     Federal Rule of Civil Procedure 12(b)(1)

Pursuant to Federal Rule of Civil Procedure 12(b)(1), a party may move to dismiss an action for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "[W]hen considering a motion to dismiss pursuant to Rule 12(b)(1) the district court is not restricted to the face of the pleadings, but may review any evidence, such as affidavits and testimony, to resolve factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d 558, 560 (9th Cir. 1988). "In such circumstances, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quotations and citations omitted). "However, where the jurisdictional issue and substantive issues are so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits, the jurisdictional determination should await a determination of the relevant facts on either a motion going to the merits or at trial." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

### B.     Federal Rule of Civil Procedure 12(b)(6)

A motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. "A Rule 12(b)(6) dismissal is proper only where there is either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Summit Technology, Inc. v. High-Line Medical Instruments Co., Inc.*, 922 F. Supp. 299, 304 (C.D. Cal. 1996) (quoting *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988)). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)

(internal citations and alterations omitted).  "[F]actual allegations must be enough to raise a right to relief above the speculative level."  *Id.*

In deciding a motion to dismiss, a court must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party.  *See, e.g., Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  "However, a court need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations."  *Summit Technology*, 922 F. Supp. at 304 (citing *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981) *cert. denied*, 454 U.S. 1031 (1981)).

"Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion."  *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n. 19 (9th Cir. 1990) (citations omitted).  However, a court may consider material which is properly submitted as part of the complaint and matters which may be judicially noticed pursuant to Federal Rule of Evidence 201 without converting the motion to dismiss into a motion for summary judgment.  *See, e.g., id.*; *Branch v. Tunnel*, 14 F.3d 449, 454 (9th Cir. 1994).

Where a motion to dismiss is granted, a district court must decide whether to grant leave to amend.  Generally, the Ninth Circuit has a liberal policy favoring amendments and, thus, leave to amend should be freely granted.  *See, e.g., DeSoto v. Yellow Freight System, Inc.*, 957 F.2d 655, 658 (9th Cir. 1992).  However, a Court does not need to grant leave to amend in cases where the Court determines that permitting a plaintiff to amend would be an exercise in futility.  *See, e.g., Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987) ("Denial of leave to amend is not an abuse of discretion where the pleadings before the court demonstrate that further amendment would be futile.").

### III.  DISCUSSION

#### A.  The Quiet Title Act Claim is Barred by the Statute of Limitations.

In its First Claim for Relief, the City seeks to quiet title to the Airport Property pursuant to the Quiet Title Act, 28 U.S.C. § 2409a.  Defendants move to dismiss the City's Quiet Title Act claim on the grounds that it is barred by the statute of limitations.

##### 1.  <u>The City knew or should have known that the United States claimed an interest in the Airport Property in 1948.</u>

The Quiet Title Act "waives the federal government's sovereign immunity to certain civil actions by plaintiffs seeking to quiet title to property in which the United States claims an interest." *Kingman Reef Atoll Investments, LLC v. United States*, 541 F.3d 1189, 1195 (9th Cir. 2008).  The Quiet Title Act provides in relevant part:

> The United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest, other than a security interest or water rights.

28 U.S.C. § 2409a(a).  The statute of limitations under the Quiet Title Act is set forth in 28 U.S.C. § 2409a(g):

> Any civil action under this section, except for an action brought by a State, shall be barred unless it is commenced within twelve years of the date upon which it accrued.  Such action shall be deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States.

28 U.S.C. § 2409a(g).  If the statute of limitations under the Quiet Title Act has expired, the Court lacks jurisdiction over this action.  *See Fidelity Exploration and Production Co. v. United States*, 506 F.3d 1182, 1186 (9th Cir. 2007) ("Accordingly, as our court has continued to do, we treat the statute of limitations in the QTA as jurisdictional."); *Kingman Reef Atoll Investments, LLC*, 541 F.3d 1189, 1195-96 (9th Cir. 2008) (quoting *Block v. North Dakota*, 461 U.S. 273, 292 (1983)) ("The running of the twelve-year limitations period deprives federal courts of 'jurisdiction to inquire into the merits' of an action brought under the QTA.").

"The court must strictly construe the Quiet Title Act's statute of limitations in favor of the government."  *Shultz v. Dep't of Army*, 886 F.2d 1157, 1159 (9th Cir. 1989).  An action under the Quiet Title Act "accrues when the landowner or his predecessors-in-interest knew or should have known of the United States' claim."  *Id.* at 1158.  "The statutory term 'should have known' imparts a test of reasonableness.  The question is whether the United States' actions would have alerted a reasonable landowner that the government claimed an interest in the land."  *Id.* at 1160 (internal citations omitted).  "This standard does not require the government to provide explicit notice of its claim." *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738  (8th Cir. 2001).  Indeed, "[t]he government's claim need not be 'clear and unambiguous. . . . All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's."  *Id.* (internal citations omitted) (cited favorably by *Kingman Reef Atoll Investments, LLC*, 541 F.3d at 1198).  "If a claimant asserts fee title to disputed property, notice of a government claim that creates even a cloud on that title may be sufficient to trigger the limitations period."  *Michel v. United States*, 65 F.3d 130, 132 (9th Cir. 1995).

The Court concludes that the record unquestionably demonstrates that the City knew, or should have known, that the United States claimed an interest in the Airport Property as early as 1948.  The Instrument of Transfer expressly provides that, in the event the Airport Property is used "for other than airport purposes without the written consent of the Civil Aeronautics Administrator," "the title, right of possession and all other rights transferred by this instrument to the [City], or any portion thereof, shall at the option of [the United States] revert to the [United States] . . . ."   The Instrument of Transfer was executed and accepted by the City on August 10, 1948.  Accordingly, by executing and accepting the terms of the Instrument of Transfer, the City had actual notice of the reversion clause in 1948, and thus had actual notice that the United States claimed an interest in the title to the Airport Property in 1948.  Moreover, even assuming the City could credibly argue that it lacked actual notice, the City had constructive notice of the United States' reversionary interest in the title to the land because the Instrument of Transfer was recorded as a quitclaim deed with the County Recorder for the County of Los Angeles in 1948. *See Yuba Goldfields*, 752 F.2d at 396 ("Constructive notice of recorded deeds may commence the running of the limitations period.").

Notwithstanding the Instrument of Transfer's clear language, the City contends that the 1948 Instrument of Transfer did not put the City on notice that the United States claimed an interest in the title to the Airport Property. Specifically, the City argues: "Because the United States never had title to the airport property, title could not be an interest transferred back to the City per the [Instrument of Transfer]; accordingly, title cannot be an interest subject to the [Instrument of Transfer]'s reversionary clause." Plaintiff's Opposition at pp. 9-10. However, the City's argument, which relates to the merits, ignores that "the crucial issue in our statute of limitations inquiry is whether [the City] had notice of the federal claim, not whether the claim itself is valid." *State of Nevada v. United States*, 731 F.2d 633, 635 (9th Cir. 1984). "Even invalid government claims trigger the QTA limitations period." *Spirit Lake Tribe v. North Dakota*, 262 F.3d 732, 738 (8th Cir. 2001). The Court concludes that the use of the term "title" in the Instrument of Transfer would have, or at least should have, alerted a reasonable landowner that the government claimed an interest in the title to the land.[5]

Moreover, even if the Instrument of Transfer did not provide notice that the United States claimed an interest in the *title* to the land, it certainly put the City on notice that the United States claimed a substantial property interest in the land sufficient to create a cloud on title. "[T]he starting of the limitations clock is not dependent on the plaintiff knowing the precise nature of the property interest upon which the United States predicates its claim of title." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010). "In that regard, the United States need not assert a full legal title in the disputed property for the limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create a cloud on title." *Id.* "In other words, the United States need not assert that it holds title in fee simple to the property." *Id.* The Court concludes that the reversion clause in the Instrument of Transfer created a sufficient cloud on the City's title to the Airport Property for the limitations period to accrue.

In addition, the City's statements and conduct since agreeing to the terms of the Instrument of Transfer demonstrate the City's awareness that the United States had a continuing and substantial  interest in the Airport Property, and support the Court's conclusion that the statute of limitations accrued more than twelve years ago. Indeed, the City requested on three occasions -- in 1952, 1956 and 1984 -- that the United States release parcels of land from the restrictions in the 1948 Instrument of Transfer.[6] Moreover, in 1962, in response to a question posed by the City Council about SMO's future operations, the City Attorney issued a legal opinion which concluded,

---

[5] The City also relies on the FAA's guidance on reversionary interests in the Airport Compliance Manual for its position that the Instrument of Transfer did not provide it with notice that the United States claimed an interest in the title to the Airport Property. However, the Airport Compliance Manual was not effective until September 30, 2009, and thus it is irrelevant to whether the City had notice that the United States claimed an interest in the title to the Airport Property in 1948.

[6] The City argues that there is no indication that the 1952, 1956, and 1984 releases were sought to circumvent the restrictions in the Instrument of Transfer, as opposed to restrictions in the grant agreements. However, contrary to the City's argument, all of the releases explicitly refer to the 1948 Instrument of Transfer. *See* Defendants' Motion, Exhibit M at 108, 111, 114; Complaint, Exhibit D at 88.

based in part on the Instrument of Transfer, that "the City cannot legally, unilaterally, on its own motion, abandon the use of the Santa Monica Municipal Airport as an airport."[7]

Accordingly, the Court concludes that the City knew, or should have known, that the United States claimed an interest in the Airport Property in 1948, sufficient to trigger the statute of limitations under 28 U.S.C. § 2409a(g).

### 2. The United States did not abandon its interest in the Airport Property.

The City argues, that even if the City knew or should have known that the United States claimed a reversionary interest in the title to the Airport Property, the United States subsequently abandoned that interest, and therefore the statute of limitations has not yet run.

The Court agrees that, "if the Government has abandoned any claim it once asserted, and then it reasserts a claim, the later assertion is a new claim and the statute of limitations for an action based on that claim accrues when it is asserted." *Shultz v. Dep't of Army*, 886 F.2d 1157, 1161 (9th Cir. 1989). The "key inquiry" is whether the United States' actions would give the City "reason to believe the government did not continue to claim an interest" in the property. *Kingman Reef Atoll Investments, LLC v. United States*, 541 F.3d 1189, 1200 (9th Cir. 2008) (quotations and citations omitted). However, the United States "cannot be deemed to have abandoned a claim of ownership for purposes of § 2409a(g) unless it 'clearly and unequivocally abandons its interest,' as evidenced by documentation from a government official with authority to make such decisions on behalf of the United States." *Kingman Reef Atoll Investments, LLC v. United States*, 541 F.3d 1189, 1201 (9th Cir. 2008) (internal citations omitted).

The City claims that Defendants abandoned their reversionary interest in the title to Airport Property when the FAA: (1) stated in its 1971 letter to the Senior Vice President of the Aircraft Owners and Pilots Association that "Santa Monica Airport is vulnerable to being discontinued and its land used for non-airport purposes"; (2) entered into the 1984 Settlement Agreement, which required the City to operate SMO as an airport "only" until July 1, 2015; and (3) subsequently interpreted the 1984 Settlement Agreement as requiring operation of SMO as an airport only until July 1, 2015. However, none of the FAA's statements or conduct relied on by the City constitute the required "clear and unequivocal" abandonment of the United States' interest in the title to the Airport Property. Indeed, the 1971 letter makes no mention of the Instrument of Transfer, and merely makes an informal, non-binding statement to a third party that SMO is "vulnerable" to being discontinued and its land used for non-airport purposes. *Cf. Kingman Reef Atoll Investments, LLC*, 541 F.3d at 1200 ("In a real estate transaction, a reasonable prospective purchaser intending to buy property free of any clouds on the title would require clear evidence that all adverse claims of ownership had been relinquished, as documented by a person with appropriate authority, and

---

[7]To the extent the City contends that it did not believe that the United States continued to claim an interest in the Airport Property under the Instrument of Transfer after the United States' temporary leasehold interest under the Runway and Golf Course Lease expired (i.e., one year after the termination of Presidential Proclamation 2487), the City's statements and conduct since 1953 are totally inconsistent with and belie this contention.

would not rely on informal letters and memos from low-level employees.").

Likewise, the 1984 Settlement Agreement does not constitute the necessary "clear and unequivocal abandonment" of the United States' interest in the title to the Airport Property. Indeed, as discussed *supra*, the 1984 Settlement Agreement provides in relevant part:

> The City will operate and maintain the Airport as a viable functioning facility without derogation of its role as a general aviation reliever airport as described in Section 2(b)(i) of this Agreement or its capacity in terms of runway length and width, taxiway system, and runway weight bearing strength until July 1, 2015.

Contrary to the City's argument, this provision does not provide that the City is *only* required to operate SMO as an airport until July 1, 2015, and it does not have any provision governing the City's obligations to operate SMO as an airport after July 1, 2015. In other words, the parties failed to arrive at any agreement as to, or even mention, whether the City is obligated to operate SMO as an airport after July 1, 2015 or whether title would revert to the United States if the City ceases to operate SMO as an airport after July 1, 2015. Accordingly, the terms of the Settlement Agreement are entirely consistent with the City's obligations under the Instrument of Transfer, and certainly do not constitute a clear and unequivocal abandonment of the United States interest in the title to the Airport Property.

Finally, the interpretation by the FAA of the 1984 Settlement Agreement in the context of the Part 16 proceedings do not constitute a clear and unequivocal abandonment of the United States' interest in the title to the Airport Property. As mentioned, the FAA did not consider the 1948 Instrument of Transfer in the Director's Determination or the Final Decision and Order, as the Instrument of Transfer was not part of the administrative record.

Accordingly, the Court concludes that the United States has not abandoned its claimed interest in the Airport Property. Thus, because the City knew or should have known that the United States claimed a reversionary interest in the title to the Airport Property as early as 1948 and certainly more than twelve years ago, the statute of limitations has expired, and the City's claim under the Quiet Title Act is time-barred.

> 3. <u>The statute of limitations issue is not so intertwined with the substantive issues as to preclude dismissal.</u>

Finally, the City contends that the Court should not dismiss its Quiet Title Act claim on statute of limitations grounds because the statute of limitations issue is inextricably intertwined with the substantive issues raised by the Quiet Title Act claim. The Court disagrees.

"In general, a district court is permitted to resolve disputed factual issues bearing upon subject matter jurisdiction in the context of a Rule 12(b)(1) motion unless 'the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits.'" *Kingman Reef Atoll Investments, LLC v. United States*, 541 F.3d 1189, 1196-97 (9th Cir. 2008) (quoting *Thornhill Publ'g Co. v. Gen. Tel. & Elecs. Corp.*, 594 F.2d 730, 735 (9th Cir. 1979)). In this case, the Court concludes that the statute of limitations issue is not inextricably intertwined with the ultimate merits of the Quiet Title Act claim because "[t]he crucial

issue in the statute of limitations inquiry is whether the plaintiff had notice of the federal claim, not whether the claim itself is valid." *Id.* (quotations and citations omitted).

For the foregoing reasons, Defendants' Motion to Dismiss the City's Quiet Title Act claim under Federal Rule of Civil Procedure 12(b)(1) is **GRANTED**.

### B. The Takings Claims are Premature.

In its Second and Third Claims for Relief (the "Takings Claims"), the City alleges that the FAA's position that the City must operate SMO as an airport in perpetuity amounts to a taking or regulatory taking by the United States without just compensation in violation of the Fifth Amendment to the United States Constitution. Defendants move to dismiss the Takings Claims on the grounds, in relevant part, that the City has failed to first seek compensation in the United States Court of Federal Claims under the Tucker Act, 28 U.S.C. § 1491.

The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "As its text makes plain, the Takings Clause does not prohibit the taking of private property, but instead places a condition on the exercise of that power. In other words, it is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation*, in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A Inc.*, 544 U.S. 528, 536-37 (2005) (quotations and citations omitted). "And the government need not provide immediate compensation at the time of the taking; it must simply 'provide[ ] an adequate process for obtaining compensation.'" *Bay View, Inc. v. Ahtna, Inc.*, 105 F.3d 1281, 1285 (9th Cir. 1997) (quoting *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 194 (1985)). "[I]f resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." *Williamson County Regional Planning Comm'n*, 473 U.S. at 194-95 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1013, 1018 n.21 (1984)).

"The federal government has provided such a compensation process by consenting to suit in the United States Court of Federal Claims under the Tucker Act." *Bay View, Inc.*, 105 F.3d at 1285; *see also* 28 U.S.C. § 1491(a)(1). The Tucker Act, 28 U.S.C. § 1491, provides the United States Court of Federal Claims with exclusive jurisdiction over any claim against the United States seeking damages in excess of $10,000[8] that is "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). "If there is a taking, the claim is founded upon the Constitution; and within the jurisdiction of the [United States Court of Federal Claims] to hear and determine." *Preseault v. ICC*, 494 U.S. 1, 12 (1990) (quotations and citations omitted).

Accordingly, "takings claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." *Williamson County*

---

[8]Given the size and location of the Airport Property in the City of Santa Monica, there can be no serious dispute that the monetary compensation to which the City would be entitled, if it were to succeed on its Takings Claims, would greatly exceed $10,000.

*Regional Planning Comm'n*, 473 U.S. at 195.  Because the City has not yet availed itself of the more than adequate process provided by the Tucker Act, its Takings Claims are premature.

The City argues that its Takings Claims are not premature and that it need not seek relief in the United States Court of Federal Claims under the Tucker Act, because it is seeking declaratory and equitable relief, and not compensation.  However, the Ninth Circuit has squarely rejected that argument:

> [M]any courts have viewed the Tucker Act as a jurisdictional hurdle against the payment of damages but not as an impediment to equitable relief.  This, of course, is totally wrong.  Because a compensation remedy is available, any taking that may have occurred simply cannot violate the takings clause.  We have no authority to decide the hypothetical question whether the [statute] would amount to an unconstitutional taking were it uncompensated.

*Bay View*, 105 F.3d at 1286 (internal citations omitted).

The City relies on the Supreme Court's plurality opinion in *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998) for its position that it need not first seek relief in the United States Court of Federal Claims under the Tucker Act.  However, *Apfel*, as a plurality opinion, is not binding on this Court, and since *Apfel*, the Ninth Circuit has re-affirmed its precedent that the Tucker Act is a jurisdictional hurdle to actions seeking injunctive and declaratory relief in district court.  *See In re National Security Agency Telecommunications Records Litigation*, 669 F.3d 928, 932 (9th Cir. 2011).  Regardless, the City's reliance on *Apfel* is misplaced. The plurality stated in relevant part:

> [I]n a case such as this one, it cannot be said that monetary relief against the Government is an available remedy. . . . Accordingly, the presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds mandated by the Government. In that situation, a claim for compensation would entail an utterly pointless set of activities.  Instead, . . . the Declaratory Judgment Act allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained.

*Apfel*, 524 U.S. at 521 (internal citations and quotations omitted).  As expressly suggested by the Supreme Court, monetary relief is available when the challenged government action burdens real property.  Accordingly, in this case, because the City's Takings Claims concern real property, the City can be justly compensated by monetary relief and it must first seek "just compensation" in the United States Court of Federal Claims under the Tucker Act.

For the foregoing reasons, Defendants' Motion to Dismiss the City's Takings Claims under Federal Rule of Civil Procedure 12(b)(1) is **GRANTED**.

### C.     The Remaining Constitutional Claims are Not Ripe for Review.

In its Fourth and Fifth Claims for Relief, the City alleges that Defendants violated the Tenth Amendment and the Due Process Clause of the Fifth Amendment by requiring the City to operate

SMO as an airport in perpetuity. Defendants move to dismiss these claims, in relevant part, on the grounds that they are not ripe for review. The Court agrees.

"In order for a case to be justiciable under Article III of the Constitution, it must be ripe for review." *Aydin Corp. v. Union of India*, 940 F.2d 527, 528 (9th Cir. 1991). "[R]ipeness is peculiarly a question of timing, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1138 (2000) (quotations and citations omitted). "For a suit to be ripe within the meaning of Article III, it must present concrete legal issues, presented in actual cases, not abstractions." *Colwell v. Dep't of Health & Human Services*, 558 F.3d 1112, 1123 (9th Cir. 2009) (quotations and citations omitted).

"[T]he ripeness inquiry contains both a constitutional and prudential component." *Thomas*, 220 F.3d at 1138 (quotations and citations omitted). "[T]he constitutional component of the ripeness inquiry . . ., in many cases, . . . coincides squarely with standing's injury in fact prong." *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 773 (9th Cir. 2006) (quotations and citations omitted). Prudential ripeness requires the evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149 (1967).

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). "That is so because, if the contingent events do not occur, the plaintiff likely will not have suffered an injury that is concrete and particularized enough to establish the first element of standing. In this way, ripeness and standing are intertwined." *Bova v. City of Medford*, 564 F.3d 1093, 1096 (9th Cir. 2009).

The City admits in its Complaint that it has not yet decided, or declared its intention, to cease operating SMO as an airport in 2015. Complaint at ¶¶ 65-67. Indeed, the City has not passed any additional resolutions, since its resolution in June 1981, declaring its intention to close the airport. Moreover, although the City has recently undertaken a "comprehensive public process" evaluating SMO's future, it has not made any recommendation or taken a position as to whether it should cease operating SMO as an airport in 2015. Accordingly, the City's claims rest upon contingent future events that may not occur as anticipated, or indeed may not occur at all. *See Lyon v. Gila River Indian Community*, 626 F.3d 1059, 1079 (9th Cir. 2010) (concluding that claim seeking a declaration that the plaintiff had zoning authority to prevent future residential development of certain property was not ripe because the possibility that the property would be developed as a housing subdivision was speculative).

Although the Court recognizes that a decision would be helpful to the City in evaluating the future of SMO, and as much as the Court would like to address the merits of the City's claims, the Court reluctantly concludes that it would be constitutionally impermissible to do so. As the Ninth Circuit stated: "Practical usefulness to litigants or not, the Constitution confines the power of federal courts to issue declaratory judgments to disputes that are sufficiently immediate and real. This dispute has not yet reached that stage." *Aydin Corp.*, 940 F.2d at 529. Accordingly, the Court concludes that the City's Tenth Amendment and Fifth Amendment claims are not ripe for review.

Defendants' Motion to Dismiss the City's Tenth Amendment and Fifth Amendment claims is **GRANTED**.

## IV.     CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is **GRANTED.**  The City's Quiet Title Act claim (First Claim for Relief) is **DISMISSED with prejudice.**  The Takings Claims (Second and Third Claims for Relief), Tenth Amendment claim (Fourth Claim for Relief), and Fifth Amendment Claim (Fifth Claim for Relief) are **DISMISSED without prejudice.**

IT IS SO ORDERED.